# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL CONSUMER TRENDS, individually and on behalf of all others similarly situated, | 21-CV-09582 (ALC) (OTW) |
| | The Honorable Andrew L. Carter |
| Plaintiff, | The Honorable Ona T. Wang |
| -v- | <u>CLASS ACTION</u> |
| PELOTON INTERACTIVE, INC., JOHN FOLEY, WILLIAM LYNCH, JILL WOODWORTH, THOMAS CORTESE, MARIANA GARAVAGLIA, and HISAO KUSHI, | |
| Defendants. | |

# AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW</u>

### TABLE OF CONTENTS

Page

I.  NATURE OF THE CASE ................................................................................................. 1

II.  JURISDICTION AND VENUE ...................................................................................... 9

III.  THE PARTIES ................................................................................................................ 10

    A.  LEAD PLAINTIFF .................................................................................................. 10

    B.  MANAGEMENT DEFENDANTS ......................................................................... 10

    C.  INSIDER TRADING DEFENDANTS ................................................................... 12

IV.  CONFIDENTIAL WITNESSES .................................................................................... 13

    A.  CW1 .......................................................................................................................... 13

    B.  CW2 .......................................................................................................................... 14

    C.  CW3 .......................................................................................................................... 14

    D.  CW4 .......................................................................................................................... 15

    E.  CW5 .......................................................................................................................... 16

    F.  CW6 .......................................................................................................................... 16

    G.  CW7 .......................................................................................................................... 17

V.  FACTS .............................................................................................................................. 18

    A.  BACKGROUND OF PELOTON ............................................................................ 18

        1.  Peloton's Highly Connected Management Team and Board of Directors ................................................................................................... 21

        2.  Peloton's Sales Organization ........................................................... 23

        3.  Peloton's Sales Reporting Databases ............................................. 25

        4.  Peloton's Insides Sales Operations ................................................. 28

        5.  Peloton's inventory reporting and tracking processes ................... 30

    B.  BEFORE THE CLASS PERIOD, AS DEMAND SPIKED, PELOTON FACED SUPPLY CHAIN AND INVENTORY MANAGEMENT WOES ...................................... 32

i

C.      As COVID-19 Restrictions Eased in 2021, Peloton Touted Investments into its Supply Chain Capacity and Supply Chain To Mask Evidence of Declining demand For Its Products ............................. 36

D.      Peloton Also Concealed an Alarming Surge in Inventory Levels When Demand Declined ................................................................... 41

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 42

A.      Analyst Concerns About COVID Fueled Success Story Prior To Peloton's February 4, 2021 Earnings Call ..................................... 42

B.      FEBRUARY 4, 2021 EARNINGS CALL: ........................................... 44

C.      Analyst Reactions to the Peloton's Fiscal Year 2021 Second Quarter Earnings Call ...................................................................... 48

D.      FEBRUARY 11 AND MARCH 1, 2021 ............................................... 49

E.      MAY 6 AND 7, 2021 ........................................................................... 50

F.      MAY 25, 2021 J.P. Morgan Global Technology, Media and Communications Conference ........................................................... 52

G.      The August 26, 2021 8-K, August 26, 2021 Earnings Call, and August 27, 2021 10-K .......................................................................... 53

H.      ANALYST REACTION TO PELOTON'S FISCAL YEAR 2022 REVENUE GUIDANCE ...................................................................... 59

I.      September 22, 2021 Goldman Sachs Communicopia Conference ............... 60

VII.    DEFENDANT FOLEY TERMINATED HIS 10B5-1 TRADING PLAN WHILE IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION .......................... 61

VIII.   THE MANAGEMENT DEFENDANTS AND INSIDER TRADING DEFENDANTS ENGAGED IN ILLEGAL INSIDER TRADING IN VIOLATION OF SECTION 20A ...................................................................... 62

IX.     THE TRUTH EMERGES ................................................................................. 67

X.      POST CLASS PERIOD DISCLOSURES ......................................................... 69

XI.     ALLEGATIONS OF SCIENTER ..................................................................... 72

D.      Imputed Knowledge of Facts Critical to the Company's Inventory and Trends in Demand for Connected Fitness Products ............................ 77

E.	THE MANAGEMENT DEFENDANTS PLEDGED A SUBSTANTIAL PERCENTAGE OF THEIR SHARES DURING THE CLASS PERIOD AND THUS WERE MOTIVATED TO KEEP PELOTON'S STOCK PRICE HIGH TO PROTECT THEIR COLLATERAL ........................................................................................ 77

F.	THE MANAGEMENT DEFENDANTS AND THE INSIDER TRADING DEFENDANTS PROFITED FROM CLASS PERIOD STOCK SALES ................................ 79

1.	The Management Defendants and the Insider Trading Defendants Suspiciously Adopted, Modified, Amended, or Prematurely Terminated 10b5-1 Trading Plans During the Class Period and Thus the Plans do Not Absolve Them of Insider Trading Liability ......... 79

2.	Defendant Foley.................................................................................. 82

3.	Defendant Woodworth......................................................................... 85

4.	Defendant Lynch................................................................................. 87

5.	Defendant Kushi ................................................................................. 90

6.	Defendant Garavaglia ......................................................................... 93

7.	Defendant Cortese............................................................................... 97

XII.	PELOTON INSIDERS SOLD MORE THAN 5.2 MILLION SHARES OF PELOTON COMMON STOCK DURING THE CLASS PERIOD, REALIZING COMBINED PROFITS OF $383 MILLION ................................................................. 100

A.	PELOTON INSIDERS SUSPICIOUSLY EXERCISED THEIR STOCK OPTIONS YEARS BEFORE THEY WERE SET TO EXPIRE, THEN IMMEDIATELY SOLD THE SHARES ACQUIRED BEFORE THE PRICE OF PELOTON'S COMMON STOCK TANKED .......... 102

B.	THE MANAGEMENT DEFENDANTS AND INSIDER TRADING DEFENDANTS SOLD A SUBSTANTIAL PORTION OF THEIR STOCKHOLDINGS DURING THE CLASS PERIOD .................................................................................... 106

XIII.	LOSS CAUSATION.................................................................................................. 106

XIV.	CLASS ACTION ALLEGATIONS ........................................................................... 107

XV.	INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................... 108

XVI.	PRESUMPTION OF RELIANCE ............................................................................. 109

XVII.	CLAIMS FOR RELIEF ............................................................................................. 110

COUNT I  For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Peloton and The Management Defendants................................................ 110

iii

COUNT II  For Violations of Section 20(a) of the Exchange Act  Against the
Management Defendants ...................................................................... 112
COUNT III For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Against the Insider Trading Defendants ................................................. 113
COUNT IV For Violations of Section 20A of the Exchange Act Against the
Management Defendants and The Insider Trading Defendants ............................ 116
PRAYER FOR RELIEF ............................................................................................................ 118
JURY DEMAND ...................................................................................................................... 119

Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends ("Robeco")("Lead Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Peloton Interactive, Inc. ("Peloton" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Peloton; (d) other public information regarding the Company; and (e) investigative interviews with former Peloton employees having first-hand knowledge of the Company's business operations, sales, inventory, and supply chain operations.

## I.   NATURE OF THE CASE

1.      Lead Plaintiff Robeco brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired Peloton's common stock between February 5, 2021 and November 4, 2021, inclusive (the "Class Period") and a subclass of all persons who purchased Peloton's common stock contemporaneously with the Management Defendants' sales of Peloton common stock, and who were harmed by virtue of the misconduct alleged herein.

2.      This securities fraud and insider trading class action concerns a fraudulent scheme orchestrated by Peloton and its senior executives who sought to deceive the public about the true nature of Peloton's business while simultaneously unloading millions of shares before the truth became known to the public. Lead Plaintiff's claims arise under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

1

3.      Based in New York City, Peloton is a fitness-equipment and media company. During the Class Period, Peloton sold internet-connected stationary bicycles and treadmills that were designed and marketed for use in customers' homes. These "Connected Fitness Products" included: the Peloton Bike; the Bike+; the Tread and the Tread+. The bicycles and treadmills include connected touchscreen devices through which customers can access exercise classes and other content. Peloton also sells monthly subscription services that allow customers to access fitness classes using their Peloton equipment, or alternatively, on their own devices without using Peloton equipment.

4.      For most of the 2020 calendar year, as the COVID-19 pandemic and related stay-at-home orders and business closures kept individuals out of the gym, the demand for in-home exercise options increased dramatically. In the months leading up to the Class Period, Peloton experienced unprecedented demand for its products and services.  Peloton's revenue increased from $426.4 million for the three months ended March 31, 2020 to $601.40 million for the following three months, ended September 2020, as a result of this uptick in demand.

5.      Peloton was largely viewed as a pandemic success story by analysts and  was often referred to as a "pandemic stock" by the investment community. However, Peloton's leadership bristled at the media's characterization of Peloton as a pandemic darling, and insisted that the demand for its products caused by the pandemic restrictions would continue after such restrictions were lifted. For example, the *Financial Times* reported that during a Goldman Sachs conference in October 2020, Defendant Foley, Peloton's CEO, "seemed irked when the pandemic's impact on Peloton's fortunes came up."  During the conference, a frustrated Foley made air quotes around the "COVID story," and stated that COVID was not "a one-time booster of demand" for Peloton's products, and that "it annoys the crap out of me because what we are building is here to stay."

2

6.     Throughout the Class Period, in response to investor concerns about whether Peloton's growth would decline once vaccines were approved, businesses reopened, and individuals could return to exercising at the gym, Defendants assured investors that Peloton's recent success was not primarily due to COVID-related demand, but rather that the Company's growth was "organic;" financial results were sustainable; and demand was strong and would remain strong well after COVID subsided. These statements were false.

7.     As news of vaccines emerged and individuals were able to return to the gym, Peloton sought to allay concerns of lessening demand by pumping money into its supply chain to create the illusion that its business was unaffected. The investments in its manufacturing capacity were not merely a miscalculation of supply and demand, but rather, a means of deceiving the public into believing that demand remained strong and the Company's success was going to continue long after the impact of COVID receded.

8.     Defendants represented to investors during the Class Period that the Company's investments in its supply chain in late 2020 – including increasing the number of bikes and treadmills produced, reducing the average time it took to deliver products to customers, and permanently expanding its domestic manufacturing capabilities – were aligned with customer demand and would enable Peloton to better synchronize supply and demand for its products. For example, on February 4, 2021, in a letter to Peloton shareholders, the Company stated that "our supply chain investments over the last several months are helping us better match our supply and demand going forward." Accordingly, Defendants represented that the rising inventory levels reported in the Company's periodic financial reports filed with the SEC during the Class Period reflected outstanding demand, including orders that had not yet been filled, rather than excess supply that far outpaced waning demand.

3

9.     Contrary to these assurances, Peloton's inventory levels were starkly misaligned with customer demand. Defendants knew, but did not disclose, that demand for its Bikes and Treads had started declining as vaccines became increasingly accessible in early 2021 and pandemic-related restrictions eased.  By February 2021, Defendants learned  at meetings with John Adee, Peloton's Chief Supply Chain Officer, that **demand for Peloton Connected Fitness Products was likely to decline by 7%–20%** by March 2021.  Despite evidence of declining sales and excessive inventory build-up, Defendants continued to tout demand and increase capacity for production of bikes and treadmills.

10.     Defendants' Class Period representations that increased demand was not related to COVID and that Peloton would continue to see the same levels of sales post-COVID were false. In truth, Defendants knew or disregarded that Peloton's Class Period financial results, contrary to Defendant's public statements, were driven primarily by short-term, COVID-related increases in demand for at-home exercise options. Defendants had no reasonable basis for representing otherwise during the Class Period in light of internal information documenting slowing sales, decreasing demand, and inventory overflow.

11.     During the Class Period, Defendants were regularly updated on both forecasted demand for Peloton's products and inventory levels. According to CW 1, Defendants Lynch and Woodworth attended monthly Wednesday meetings to discuss demand and capacity.  CW1 also stated that Defendants Lynch and Woodworth received updates on the data considered in separate Tuesday weekly meetings at which attendees – including Defendant Thomas Cortese – "looked at demand and what we could deliver based on manufacturing and material constraints."

12.     During one of these internal meetings, Defendants Woodworth and Lynch were shown data revealing that demand was declining by late February 2021 and were informed of the build-up of excess inventory as sales continued to decline throughout 2021.

13.     Defendants were also made aware of and discussed the build-up of inventory during a senior level meeting which took place in May 2021, according to CW2. According to CW1, action items from these meetings were emailed regularly to Defendant Foley and other executives. CW1 also expressed concerns directly to Defendant Lynch that increasing capacity for production would exacerbate the problem of unsold inventory. Defendant Foley was therefore aware of declining demand, but nevertheless assured investors that investments in its supply chain were indicative of continuing strong demand for its products.

14.     Throughout the Class Period, Peloton's senior management, including Defendants, were kept apprised of sales figures and inventory levels for Company products. According to CW3, who worked as a regional operations manager in Peloton's southern region until April 2021, it was apparent very early in calendar year 2021 that Peloton's sales were depressed and warehouses were making fewer deliveries.

15.     Further, in the Company's 10-K for fiscal year ("FY") 2021, the Company admitted that it suffered from a material weakness in its internal controls over financial reporting during the Class Period, specifically concerning inventory levels. In light of that material weakness, Peloton could not accurately report its inventory levels, and had no sound basis to represent to investors that the Company would need the same supply chain capacity "for years and years" and that supply and demand were aligned.

16.     Specifically, on August 26, 2021, just one day before Peloton was set to announce the Company's financial results for its 2021 fiscal year, Peloton disclosed that "in the course of

our fiscal 2021 audit process, a material weakness was identified in our internal controls over financial reporting with respect to identification and valuation of inventory." In its Annual Report on Form 10-K for its 2021 fiscal year, filed with the SEC on August 27, 2021, Peloton further disclosed that the "material weakness arose because our controls were not effectively designed, documented and maintained to verify that our physical inventory counts were correctly counted and communicated for reporting in our financial statements."

17.    Determined to maintain the façade of organic growth and to keep Peloton's stock price inflated, as 2021 progressed, Peloton and its executives continued to falsely reassure investors that there was continued demand for its Connected Fitness Products. On August 26, 2021, Peloton issued guidance of $5.4 billion in total revenue for fiscal year 2022 (beginning July 1, 2021), representing 34% year-over-year growth. Discussing that guidance on the August 2021 earnings call, Peloton's Chief Financial Officer, Defendant Jill Woodworth, claimed that Peloton was "entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of continued strong demand."

18.    Just over two months later, after the market closed on November 4, 2021, Peloton disclosed during its earnings call for the first quarter of fiscal year 2022, that it had revised its full year revenue guidance down from $5.4 billion to a range of $4.4 to $4.8 billion (or 18%) due to declining demand for its Connected Fitness products. Peloton also disclosed that inventory as of September 30, 2021 totaled $1.27 billion, an astounding 35% increase over ending inventory levels for the prior quarter, 91% of which was "finished products" that remained unsold.

19.    As a result of these disclosures, the price of Peloton common stock declined by $30.42 per share, or 35%, from a closing price of $86.06 per share on November 4, 2021 to $55.64 per share on November 5, 2021, erasing $8.1 billion in shareholder value.

*20.*     Also during the November 4, 2021 earnings call, Defendant Woodworth told investors that management did not "see the need for any additional capital raised based on our current outlook."  However, just twelve days later, on November 16, 2021, Peloton announced a $1.1 billion secondary offering of approximately 24 million shares of Class A common stock, sending Peloton's share price down another 5.2%.  ***In November alone, Peloton's share price dropped by 53%.***

21.     Following the disclosures of November 4, 2021, the truth about Peloton continued to emerge. On January 24, 2022, Business Insider reported that a January 10, 2022 presentation leaked by a Peloton employee indicated that Peloton would be putting a pause on the production of its Bike, Bike+, and treadmills due to declining demand for its products and a "glut of excess inventory" in its warehouses, as described by former Peloton employees.

22.     The Business Insider report also revealed that contrary to the Company's repeated assurances to the public that demand for its products was not declining, Peloton had already halted production of its Bike+ beginning in December 2021, planned a six-week production pause of its regular Bikes and Treads beginning in February 2022, and had stopped all production of its Tread+ for fiscal year 2022.

23.     On February 8, 2022, Peloton announced that Foley would resign as CEO and move into the role of executive chair.  The Company further announced that Defendant Lynch would relinquish his role as president but would maintain his board position.

24.     On the same day, Peloton announced a number of drastic cost cutting measures including: laying off 20% of its workforce, or approximately 2,800 employees globally as part of its layoff strategy dubbed "Project Fuel"; abandoning plans for the construction of a $400 million

manufacturing facility in Ohio, causing the Company to incur $60 million in restructuring capital expenses; and scaling back on its number of warehouses and delivery centers.

25.     Just one week later, on February 14, 2022, Yahoo Finance reported that Chief of Business Operations Mariana Garavaglia, Chief Business Officer Brad Olson, and Chief Supply Chain Officer Jon Adee were also leaving the Company.

26.     In the weeks following these reports, Peloton's share price continued its downward spiral as the truth about supply and demand became more transparent, hitting $9.45 on June 16, 2022, significantly lower than the prices at which Defendants were selling shares during the Class Period.

27.     Throughout the Class Period, as Defendants repeatedly denied that COVID was temporarily creating artificial demand for its exercise equipment, despite internal reports that demand already was waning, and at a time that Peloton's internal controls were admittedly lacking, the Management Defendants and the Insider Trading Defendants were dumping millions of shares of Peloton stock in unprecedented amounts and in suspicious patterns. As they disposed of their shares throughout the Class Period, all Defendants were motivated to maintain the illusion that all was well at Peloton in order to keep its share price high.  Defendants sold their stock at an average share price of $118.23, a price significantly distorted by their material misstatements regarding demand and inventory levels.

28.     These Defendants fared much better than Lead Plaintiff Robeco and other members of the proposed Class.  The Management Defendants and the Insider Trading Defendants sold a combined **3.26 million** shares, ***cashing out $383 million dollars*** during the Class Period. Most of them converted their stock options on a cashless basis or exercised options nearly a decade prior

to their expiration dates and then immediately dumped their shares into the public market under the guises of their 10b5-1 trading plans.

29.     Although the Management Defendants and Insider Trading Defendants sold many of their shares pursuant to 10b5-1 trading plans, they deviated from their plans by, among other things: failing to properly adhere to such plans when executing their trades; trading outside the prescribed terms of such plans; or terminating the plans early while in possession of material non-public information, thereby contravening the very purpose of a trading plan.  These Defendants may not seek protection under Rule 10b5-1(c)'s safe harbor.

30.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares alleged herein, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

31.     The claims arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

32.     Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Peloton maintains its headquarters in New York City, New York, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

33.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   THE PARTIES

#### A.   LEAD PLAINTIFF

34.     Lead Plaintiff Robeco, established in 1929, is an open-ended investment company based in Rotterdam, Netherlands. Robeco Global Consumer Trends is an actively managed fund that invests in stocks in developed and emerging countries across the world. The fund invests in a number of structural growth trends in consumer spending. The first is the "digital transformation of consumption." The second trend is growth in the "emerging middle class." The third trend focuses on the increasing importance of "health & wellbeing."

35.     Lead Plaintiff Robeco purchased Peloton common stock at artificially inflated prices during the Class Period and was damaged thereby. Lead Plaintiff's purchases of Peloton common stock are detailed in ECF No. 16-2.

#### B.   MANAGEMENT DEFENDANTS

36.     Defendant Peloton is a fitness-equipment and media company, the main products of which are internet-connected stationary bicycles and treadmills (referred to herein as "Connected Fitness" products) that enable monthly subscribers to remotely participate in classes via streaming media. Incorporated in Delaware, the Company maintains its corporate headquarters at 441 Ninth Avenue, 6th Floor, New York, New York. Peloton common stock trades on NASDAQ under the ticker symbol "PTON." Peloton's fiscal year begins on July 1 and ends on June 30.

37.     Defendant John Foley ("Foley") is the Executive Chair and one of Peloton's co-founders. At all relevant times, Foley was Peloton's Chief Executive Officer ("CEO") and a member of the Peloton Board of Directors (the "Board"). Foley made materially false and misleading statements, and failed to disclose material facts to investors, during the Class Period, as alleged herein. Foley also engaged in insider trading throughout the Class Period, and realized $78.82 million in profits, by trading on the basis of confidential and material information about

the Company's declining demand and overflow of supply and selling his shares contemporaneously with Lead Plaintiff's purchases of Peloton common stock.

38.     Defendant William Lynch ("Lynch") is one of Peloton's co-founders and was, at all relevant times, Peloton's President and member of the Board. Lynch made materially false and misleading statements and failed to disclose material facts, to investors during the Class Period, as alleged herein.  Defendant Lynch engaged in insider trading during the entire Class Period, realizing profits of $103.57 million from his stock sales by trading on the basis of material and non-public information about Peloton's declining demand and excessive inventory buildup and selling his shares contemporaneously with Lead Plaintiff's purchases of Peloton common stock.

39.     Defendant Jill Woodworth ("Woodworth") was at all relevant times, Peloton's Chief Financial Officer ("CFO"). Woodworth made materially false and misleading statements, and failed to disclose material facts, to investors during the Class Period, as alleged herein.  During the Class Period, Defendant Woodworth realized profits of $16.82 million by trading on the basis of material and nonpublic information about Peloton's supply and demand problems and selling her shares contemporaneously with Lead Plaintiff's purchases of Peloton common stock.  On June 6, 2022, CNBC reported that Defendant Woodworth was stepping down from her role as Peloton's CFO.

40.     Defendants Foley, Lynch, and Woodworth, are collectively referred to herein as the "Management Defendants." The Management Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Peloton's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Management Defendants were provided with copies of the Company's reports and press releases alleged in this Amended Complaint to be misleading before, or shortly

11

after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Management Defendants knew that the adverse facts and omissions specified in this Amended Complaint had not been disclosed to, and were being concealed from, the public, and that positive representations and omissions which were being made were then materially false and misleading. The Management Defendants are liable for the false statements and omissions pleaded herein.

### C.   INSIDER TRADING DEFENDANTS

41.     Defendant Hisao Kushi ("Kushi") is, and was at all relevant times, Peloton's Chief Legal Officer ("CLO") and Co-Founder.   Defendant Kushi is Defendant Foley's "trusted best friend" and the two have worked together and formed a friendship over the course of more than two decades.  Kushi sold approximately 800,000 shares of Peloton common stock during the class period, realizing profits of $91.71 million, by misappropriating material, nonpublic information for his own benefit, and selling his shares contemporaneously with Lead Plaintiff's purchases of artificially inflated Peloton common stock.

42.     Defendant Mariana Garavaglia ("Garavaglia") was at all relevant times, Peloton's Chief People Officer ("CPO") and Chief Business Operations Officer ("CBO").   Garavaglia unloaded approximately 260,000 shares of Peloton common stock during the Class Period, resulting in profits of nearly $25.29 million, by misappropriating material, nonpublic information for her own benefit, and disposing of her shares contemporaneously with Lead Plaintiff's purchases of artificially inflated Peloton common stock.

43.     Defendant Thomas Cortese ("Cortese") is one of Peloton's co-founders and was Peloton's Chief Operations Officer ("COO") until August 2021, at which time he became Peloton's Chief Product Officer ("CPO"), a role he remained in for the remainder of the Class

Period.  Cortese unloaded 570,000 shares of Peloton common stock during the Class Period, resulting in profits of approximately $67.09 million, by misappropriating material, nonpublic information for his own benefit, as further alleged herein.

44.     Defendants Kushi, Garavaglia, and Cortese are collectively referred to herein as the "Insider Trading Defendants." Because of their positions with the Company, their access to material non-public information available to them, but not to the public, and their close relationship with Defendants Foley, the Insider Trading Defendants knew that the adverse facts about Peloton's overbuild of supply and dwindling demand were not disclosed to the public, and that the representations and statements being made to the public were, at the time, materially false and misleading. The Insider Trading Defendants misappropriated this adverse information by dumping millions of dollars' worth of their shares in breach of their fiduciary duty owed to Lead Plaintiff and other members of the Class, causing them to incur substantial financial harm.

## IV.     CONFIDENTIAL WITNESSES

### A.     CW1

45.     CW1  is a former employee of Peloton who served as a Senior Director of Operations and Supply Chain Program Management. CW1 worked with Peloton from July 2020 to November 2021, at which point they[1] departed on their own accord because they were dismayed by the fact that senior management pushed them and their team to continue to drive capacity, despite the clear decline in demand. CW1 reported to Commercial Manager Patty Johnson ("Johnson"), who in turn reported to Chief Supply Chain Officer Jon Adee ("Adee") until July 2021, when Randy Chu ("Chu") replaced Johnson. CW1 reported to Chu until their voluntary departure from Peloton in November 2021. In their role as Senior Director of Operations and

---

[1] The Confidential Witnesses are all referred to herein with gender neutral pronouns: "they," "them," "their" and "theirs."

Supply Chain Management, CW1 attended monthly meetings with Defendants Woodworth and Lynch, as well as with Adee, to discuss capacity for production and trends in customer demand. During the Class Period, Woodworth and Lynch were kept apprised of the fact that demand for Peloton's bikes was expected to decline substantially as early as February 2021.

**B.    CW2**

46.    CW2  is a former employee of Peloton who worked as an Account Executive ("AE") within Peloton's inside sales organization ("Inside Sales Team") from May 2020 to September 2021, when they were terminated due to a failure to meet their sales goals. CW2 reported to Senior Sales Manager, Jeff Wanek ("Wanek"), who in turn reported to Peloton's Senior Director of Inside Sales, Israel Varela ("Varela"). CW2's job duties included working with prospective customers on calls and chats to complete sales.  CW2, along with the other AEs, was paid a percentage of their salary based on the percentage to goal attained. CW2 observed through data generated via Salesforce and the Looker Report (as further described in Section V(A)(3), below) that Peloton's sales organization had begun missing sales goals starting as early as December 2020.  In particular, at the beginning of every work day, CW2, along with the other AEs, received a "Looker report" in PDF format which included data about how many units each AE had sold; each AE's percentage to goal; how many phone calls each AE had handled; and how many warranties and accessories each AE had sold. Whereas before 2020, CW2 had no problem meeting sales goals, by late 2020 and into early 2021, CW2 reported that Peloton's sales began to decline and that "sales were not what they wanted." However, despite clear evidence that demand for the Peloton's Connected Fitness products was declining, the sales goals remained the same.

**C.    CW3**

47.    CW3  is a former employee of Peloton who worked as a Regional Operations Manager for the Southern Region from April 2018 until April 2021.  In this role, CW3 was

responsible for eleven distribution facilities and oversaw approximately 1,000 employees. CW3 reported to Vice President of Operations Jamie Beck who in turn reported to Chief Supply Chain Officer Jon Adee. CW3 believed that Adee reported to either Defendant Foley or Defendant Lynch. CW3 emphasized that Adee did not operate in a vacuum and likely made decisions in conjunction with Defendants Foley and Lynch. CW3 stated that Adee was close to Defendants Lynch and Foley "personally and work-wise."

48.     CW3 reviewed widely distributed Salesforce delivery reports on a nightly basis. These reports tracked deliveries and inventory movement. CW3 was therefore intimately familiar with the decline in sales of Peloton's exercise equipment in early 2021 when pandemic restrictions began to ease, and frequently discussed the decline in sales on calls with other regional operations managers.

49.     CW3 stated that Defendants Foley, Lynch, and Woodworth misrepresented the outlook for Peloton and misled investors that the 2020 growth trajectory was repeatable, stating: "there were false projections."

50.     After leaving Peloton in April 2021, CW3 "consulted" for the Company for approximately one month, providing management and logistics consultation for the Southern Region. Peloton was slow to cut off access to his emails and thus, CW3 continued to have access to email and auto-generated reports that CW3 had customized through at least the third quarter of the 2021 calendar year. Further, even after their departure, CW3 remained close with the warehouse staff they had previously supervised who were still employed at the Company. The warehouse staff kept CW3 apprised of the declining number of deliveries.

**D.     CW4**

51.     CW4 worked for Peloton from August 2021 to February 2022, at which point CW8 was laid off along with thousands of other colleagues. CW4 was the Senior Analyst, Warehousing

and Distribution for Peloton's supply chain logistics team. In this capacity, CW4 specifically worked on "downstream" distribution systems, from the time that bikes entered the distribution centers to the point at which they were shipped to customers.  CW4 worked with the warehouse information systems and was also on the product team to assist with new software assessment. As further alleged herein, CW4 was intimately familiar with Peloton's various supply chain and logistics software platforms sch as NetSuite and Scale and stated: ***they were unaware of any system deficiencies at Peloton that would have made it difficult for Peloton to accurately track or account for inventory.***

       **E.**       **CW5**

52.    CW5  was a seasonal AE within Peloton's Inside Sales Team ("Inside Sales Team") from September 2021 to January 2022. CW5 was laid off in January 2022 despite being one of the top two performers on the Inside Sales Team every month during their employment and having been offered a non-seasonal, more permanent role at Peloton just one week before being laid off. CW5 reported to Inside Sales Manager Brenda Funke ("Funke") as did approximately 12 other AEs.

       **F.**       **CW6**

53.    CW6  worked at Peloton from June 2015 until February 2022, at which point CW6 was laid off.   For the first few years of employment with Peloton, CW6 was a member of the Outside Sales Team.  In particular, from around June 2015 until March 2016, CW6  was a general manager of a showroom and from March 2016 until October 2018, CW6 was a regional manager. CW6 wanted to limit the amount of work travel, so CW6 moved to the Inside Sales Team in October 2018 and became an Inside Sales Supervisor, a role that continued until March 2020. Thereafter, CW6 was an inside Sales Manager from March 2020 until January 2021.  Then, in January 2021, CW6 became the Senior Sales Manager of Training and Enablement, and remained

in that role until February 2022, when CW6 was laid off along with thousands of his colleagues. According to Peloton's landing page called "The Org," CW6 reported to Shari Eaton, Peloton's Chief People Officer.   CW6 reported that sales goals were conveyed by Tim Shannehan ("Shannehan"), Peloton's Chief Global Sales Officer, to Varela, Peloton's Senior Director of Inside Sales, every month.   According to Linkedin and other public sources, Shannehan has been with Peloton since 2014, initially served as Peloton's Chief Revenue Officer, and at one point was even a member of Peloton's Board of Directors. CW6 reported that Shannehan reported to Defendant Lynch and believes that sales goals were set with input from Defendant Lynch.

**G.    CW7**

54.    CW7  worked at Peloton's Minneapolis, Minnesota final mile warehouse from December 2020 until February 2022, at which point he was laid off along with thousands of other employees.  CW7  was an Inventory Specialist from December 2020 until April 2021.  In this role, C7 was responsible for physical inventory counts and managing inventory "flow." In April 2021, CW7 became a Warehouse Management System Specialist ("Warehouse Specialist") after Peloton implemented the Scale information system to manage inventory, and continued in this role until February 2022.  According to CW7, the Warehouse Specialist role was a "spin off" of his previous role as an Inventory Specialist that came about via a "whole restructuring of mid-level management" that came with the implementation of Scale.  As a Warehouse Specialist, CW7 provided IT support for the new Scale system at the Minneapolis site.  CW7  provided IT support for Peloton's Scale system, in particular, he assisted with the rollout of the Scale system as the Minneapolis site and at a final mile warehouse in Hazelwood, Minnesota. CW7  maintained involvement in – and was thus aware of – the inventory processes at the Hazelwood facility.

## V.    FACTS

### A.    BACKGROUND OF PELOTON

55.    Peloton is a fitness-equipment and media company that is incorporated in Delaware and has its principal place of business in New York, New York.  During the Class Period, Peloton's products included two internet-connected stationary bicycles (the "Bike" and "Bike+"), as well as two internet-connected treadmills (the "Tread" and "Tread+"), designed and marketed for at-home use. The bicycles and treadmills include connected touchscreen devices through which customers can access exercise classes and other fitness content. To that end, along with the exercise equipment, Peloton sells two subscription services: the "All-Access Membership" that Peloton advertises as providing "full access to Peloton's available classes, content, and features" on Peloton products, "plus access to the Peloton Apps;" and the "Peloton App Membership," which Peloton advertises as providing "access to Peloton's available classes, content, and features" but "does not provide you with access to any classes, content, and features on any Peloton Product."

56.    Peloton manufactured 80% of its bike frames in Taiwan which were then shipped to and assembled in the United States.

57.    According to CW3, Peloton has five geographic distribution centers in the United States: West, East, North, South, and Midwest and a warehouse in Toronto, Canada. The West region spans from California to Washington; the East region includes New York and Pennsylvania; and the South region ranges from Texas to the Carolinas, including Florida, Alabama, and Georgia. According to CW3, each region had a regional manager, and the Midwest region had a "floater regional manager."

58.    According to an analyst report issued by Cowen, as of September 16, 2020, Peloton had 105 last-mile hubs, which the Company refers to as its "last mile facilities." The Company

18

also has seven "super distribution centers" which feed the last-mile facilities in the U.S., totaling approximately 1.2 MM square feet of warehouse space.

59.     Peloton's revenue was generated primarily from the sales of its Connected Fitness equipment. In its Form 10-K for Peloton's Fiscal Year 2020 (ended June 30, 2020), the Company reported that fitness equipment sales accounted for $1.46 billion, or approximately 80% of its revenue, while fitness subscriptions accounted for $363.7 million, or 20% of its revenue. In its Form 10-K for Fiscal Year 2021 (ended June 30, 2021), the Company reported that fitness equipment sales accounted for $3.15 billion, or 72% of its revenue, while fitness subscription sales increased to $872.2 million, accounting for 28% of its revenue.

60.     For most of calendar year 2020 and the beginning of 2021, the COVID-19 pandemic was a boon for Peloton. Because stay-at-home orders and business closures kept many people out of the gym, the demand for in-home exercise options increased dramatically. Throughout the pandemic, including in the months leading up to the Class Period, Peloton experienced unprecedented demand for its products and services. As Defendant Foley confirmed in statements to investors on December 9, 2020, demand for Peloton products and services was "through the roof" during the pandemic due to "crazy demand for our products because gyms have been closed or you didn't want to go to the gym because you might get COVID there."

61.     When gyms began to reopen in the latter half of 2020, analysts and investors questioned whether Peloton's success could be maintained in a post-pandemic world. Defendant Foley often balked at analysts who referred to Peloton as a pandemic stock, despite the clear connection between the pandemic and the rise in consumer demand for at-home fitness equipment. For example, on September 11, 2020, during Peloton's earnings call for the fourth quarter of its FY 2020, Defendant Foley assured the public that "fitness is moving into the home because home

is a better location," and that "these are not COVID dynamics. These are fundamental, sustainable dynamics that meet people where they are with content and programs that exceed their fitness and wellness goals and make it fun and engaging to work out at home."

62.    At this time, analysts and shareholders were regularly questioning how a post-pandemic market would impact sales of Peloton's fitness products.  For instance, on October 14, 2020, Truist Securities reported that 55% of gym-goers reported that they visited a gym or attended community exercise classes *as frequently as they did before* COVID, and 12% reported that they visited a gym *more frequently than they did before COVID*.  Further, in response to a question about how individuals anticipate COVID changing how and where people plan to exercise after 2020 (i.e., once there is a widely-available vaccine), ***only 20% of respondents reported that they planned to work out exclusively from home***.

63.    Barclays held its Global Tech, Media & Telecom Conference on December 10, 2020 during which one of its research analysts, Deepak Mathivanan, asked Defendant Woodworth: "Obviously demand was really strong in 2020. There's still plenty of uncertainties about 2021. But how are you thinking about some of the demand trends for 2021 as you plan your business . . .?"

64.    Despite the skepticism from analysts, CEO John Foley was determined to lead investors and shareholders to believe that Peloton's future success was not dependent on gym closures and COVID-related factors. For example, during Goldman Sachs' Builders and Innovators Summit on October 30, 2020, Defendant Foley stated:

> I hate the COVID dynamic. We want to win fitness in regular times. Anytime I hear about Peloton as a COVID story, I get annoyed. What we're building is here to stay. COVID is helping at-home fitness, but it's not a pull-forward of demand. It's an acceleration of demand. It's better to work out at home. There are 35 million homes with treadmills in them. They're crap treadmills. They want to work out at home, but it's not engaging.

65.     On December 9, 2020, Peloton held its annual shareholders meeting during which shareholders were invited to ask questions regarding the Company's business affairs.   One shareholder asked: "How should we think about how a post-COVID world impacts our view of our business opportunity?" In response, Defendant Foley stated (emphasis supplied):

> Now that Peloton is here and now that the experiences at home are incredible, **that has nothing to do with COVID**. That is a human need of I want to get fit. I want fitness in my life in a consistent way. Every week, I want to get 3 or 4 workouts in, and I want it to be convenient, I want it to be fun, I want it to be motivating and I want it to be a great value. And all of those things are foundational to what Peloton delivers, always delivered it. **We delivered it pre-COVID, during COVID, and we will deliver it post-COVID.**

66.     Not only were investors focused on whether Peloton's unprecedented growth was sustainable in the long-term, but they also regularly inquired about Peloton's inventory levels and what such levels indicated about present and future demand for its products.

### 1.     Peloton's Highly Connected Management Team and Board of Directors

67.     Peloton's executive team is comprised of a highly interconnected group of long-term friends and colleagues who, at all relevant times, controlled 70% of Peloton' voting power.

68.     In particular, as disclosed in Peloton's FY 2021 Proxy Statement, at all relevant times, Defendant Foley controlled 39.6% of the total voting power; Defendant Lynch: 12.3%; Defendant Cortese: 9.9%; and Defendant Kushi: 8.1%.   Defendant Foley and his friends, Defendants Cortese, Lynch, Kushi, combined **controlled 70% of Peloton's voting power during the Class Period.**

69.     According to a January 2021 Fortune Magazine interview published on February 4, 2021, Defendants Foley, Kushi, Cortese, and Lynch met at IAC/InterActiveCorp in the late 1990s – early 2000s.

70.   CW3  stated that Defendants Foley, Lynch, and Kushi, as well as Peloton's former Chief Supply Chain Officer, Jonathan Adee, have had a long and storied history of working together.  According to CW3, and as confirmed by public sources such as CNBC, prior to working at Peloton, Defendants Foley and Lynch and Adee worked together at Barnes & Nobles ("B&N") for more than 20 years.  There, they were responsible for launching Barnes & Noble's Nook product, which is an e-reader akin to Amazon's Kindle. CW3 stated that while Defendants Foley and Lynch and Jonathan Adee worked at B&N, they had a sales goal of 2.8 million Nooks and "forced" the contract manufacturer in China to add capacity and be prepared to deliver on the goal. However, according to CW3, only about 1.2 million Nooks were sold. As a result, Defendants Foley and Lynch, as well as Adee, "walked away" from the contract manufacturer without accepting any responsibility or liability for the overproduction of inventory and the costs incurred. CW3 stated that the issues at Peloton were a "significant repeat offense" for Defendants Foley and Lynch, and Adee.

71.   CW3 stated that Foley, Lynch and Adee were a tight knit team at Peloton. According to CW3, the three supported one another's decisions, regardless of the merit or cogency of such decisions.

72.   In January 2021, Fortune Magazine interviewed Defendants Foley, Cortese, and Kushi regarding the evolution of Peloton.  The interview, published on February 4, 2021, confirms that Defendants Foley is good friends with Defendants Kushi and Cortese. During the interview, Defendant Foley referred to Defendant Kushi as his "trusted, best friend" and reminisced about the time that he invited Defendant Cortese to join the Peloton team over "several bottles of wine to loosen him up a bit so he would be weakened when I made my pitch."

## 2.      Peloton's Sales Organization

73.      During the Class Period, Peloton established sales quotas for their sales force. Defendants received regular Salesforce reports about actual sales data which were, in turn, used to forecast demand and formed the basis of the revenue guidance that they provide to the market. As early as February 2021, Defendants received Salesforce reports which revealed that the sales teams were missing quotas. In the subsequent summer months of 2021, Defendants continued receiving Salesforce reports demonstrating that members if the sales teams were behind on their quotas. Defendants thus knew that these quotas were unachievable.

74.      Peloton has three main sales channels for its Connected Fitness products: (1) web/ecommerce wherein the prospect visits Peloton's website or third party channel that sells Peloton's products and purchases a Bike or Tread; (2) Inside Sales which consists of inbound leads whereby interested customers directly reach out to Peloton to inquire about purchasing fitness products; and an outbound strategy wherein prospective customers are directly contacted by the Company's sales representatives; and (3) Retail, wherein sales are made in a brick-and-mortar location called a "showroom."

75.      Peloton's sales organization consists of an inside sales organization ("Inside Sales Team"), an outside sales organization ("Outside Sales Team") also referred to as its "Retail Organization," and a corporate sales team which the Company refers to as "Peloton Corporate Wellness Team."  CW6 stated that Peloton's inbound sales team handles communications sent by interested customers inquiring about purchasing  fitness equipment through an external online chat platform called "Drift." CW6 also stated that Peloton's outbound sales team consists of sales representatives calling prospects to discuss purchasing Peloton's exercise equipment. Peloton's Inside Sales Team and Outside Sales Team both sell Peloton's Bikes and Treads, accessories for the workout equipment, as well as warranties for the equipment. According to CW5 , the Peloton

Corporate Wellness Team consisted of two employees and was responsible for overseeing bulk orders and gifts.

76.     According to its website, Peloton has 83 retail showrooms in the United States; five retail show rooms in Australia; nine in Canada; 18 in Germany; and 26 in the United Kingdom. Members of the Outside Sales Team or Retail Organization works at these retail showrooms. CW6 was a member of Peloton's Outside Sales Team from approximately June 2015 until October 2018.

77.     According to a presentation called "Peloton Gets Peak Performance from Their Inside Sales Team," given by Matt Heiss, Peloton's former Global Head of Sales Operations and Enablement, in or around 2017, Peloton's C-suite members received admin login access so that they could listen to and moderate calls in real-time and send chats to employees via Slack.

*78.*     As demand increased in 2020, management began increasing sales quotas.  As a result, the Inside Sales Team was only achieving 70-75% of its sales goals in certain months throughout 2021.  As a result, Varela began lowering the Inside Sales Teams' sales quotas in 2021 and eventually, the Inside Sales Team began hitting closer to 80–100% to goal.  Using an average number of 85 AEs and monthly sales goals of 200–350 units in 2021, CW6  calculated that the Inside Sales Group was selling between 17,000 and at least 30,000 bikes per month throughout 2021.  According to CW6 , however, this volume of sales was still insufficient to satisfy the Inside Sales Team's goal, as the volume was still only 80-90%, or even less, than the goal Shannehan had communicated to Varela.

79.     According to CW2, the Inside Sales Team had four managers including: Brenda Funke; Meleah Willis; and Jeff Wanek.  Above the Insider Sales Team's managers are Senior Sales Manager, Continuous Improvement and Operations Jeff Wanek ("Wanek"), among others.  Wanek worked primarily in sales operations, although he also developed the front-line sales managers.

Wanek obtained information from Peloton's logistics team, for instance, regarding shipping lead times and in turn, would share that data with CW6 . The Insider Sales Team is led by Senior Director of Insider Sales, Israel "Izzy" Varela ("Varela") who reports to Shannehan, Peloton's Global Chief Sales Officer.

### 3.   Peloton's Sales Reporting Databases

80.     Peloton's Sales Teams use a variety of software tools to track sales and communicate internally including: Looker, Salesforce, Slack, Talkdesk, and Callidus.

81.     Looker is a business intelligence tool that allows businesses to view dashboards, insights, workflows, and analytics in real-time. Looker can, and often is, seamlessly integrated with CRMs such as Salesforce, by use of an application programming interface ("API"). Peloton used Looker to compile sales reports. According to CW5 and CW2 , Ian Clark, Peloton's Senior Product Manager, was responsible for producing and circulating the Looker reports. In particular, CW2 reported that the Looker report was in PDF format and contained a comprehensive set of sales data including: how many units each AE sold; each AE's percentage to goal; how many phone calls each AE handled; and how many warranties and accessories each AE sold. The Looker report included sales data for approximately 80 plus members of the Inside Sales Team and the "corporate sales" group. According to CW6 Peloton's Looker reports clearly conveyed Peloton's inability to attain sales goals and even stated that "the Looker reports showed the goals were not being met," describing Looker as the "source of truth" on actual sales and actual sales to goal. CW2 reported that the Looker report allowed sales employees to see all of their peers' performance.

82.     CW6 stated that the Looker database was updated every 24 hours based on data from the SalesForce information system. Thereafter, Looker reports were automatically generated and then sent out to the Inside Sales Teams and their managers "every single morning." According

to CW2, every member of the Inside Sales Team and the managers received the Looker report at the same time each day. This was based on the conversations CW2 had with their peers and managers.

83.    Additionally, according to CW6, the Looker reports displayed the actual sales and sales goals and were used, among other things, to discern whether the Inside Sales Team was on pace to hit its goal for the month.  As an example, CW6 stated that if the Inside Sales Team was supposed to have sold 5,000 bikes in the first 10 days of a given month, the Looker report would have displayed that only 3,000 bikes had been sold by the 10th day of that particular month, clearly showing that the Inside Sales Team was "tracking lower" than goal.  The sales goals set forth in the Looker Reports were the same as those set by Shannehan and conveyed to Varela.

84.    CW6  stated that they was "100 percent certain" that Defendants Foley and Lynch had access to the sales data in Looker.  CW6 further stated that Shannehan provided updates on actual sales data to Defendants Foley and Lynch and that Defendants Foley, Lynch, and other executives sourced their "insights" on what they were tracking during a month on the Looker reports.  CW6 reported that Shannehan would, at times, ask questions about sudden spikes in sales, which Shannehan would have only known about by looking at the Looker reports.  CW6 stated that Defendant Foley would send internal emails when Peloton hit sales milestones, thus indicating that Foley was aware of the sales data.

85.    "Salesforce" is customer relationship management ("CRM") tool utilized by sales personnel to record relationships and interactions with current customers and prospective buyers, record and track sales and other metrics, and generate reports reflecting such sales data, which can, in turn, be fed into Looker. According to CW2, AEs utilized Salesforce to place orders and to track sales goals in real-time – that is, as soon as an Account Executive processed a sale in Salesforce

and hit the "refresh" button, the sale was immediately reflected in the total sales number on Salesforce.  In particular, CW5 stated that through Salesforce, AEs could see their sales goal for a given month and how many units they had sold already for that month and CW2 stated that certain sales data was featured in a real-time bar graph. According to CW3, Beck, the VP of Operations, had access to Salesforce and for each region, could customize the reporting to his needs.  CW3 stated that there was "no way" that executives did "did not have access" to the same data in Salesforce that they had. CW3 based this knowledge on the fact that Foley delivered feedback to the warehouse employees in 2020 that corresponded with delivery data displayed in Salesforce. Further, CW5 stated that the sales data in Salesforce and Callidus were not difficult to find and that "as soon as you logged on, it was all right there and you could see everything." CW4 stated there was: "no way on God's green Earth" that Foley did not know what the sales numbers were.

86.    "CallidusCloud" ("Callidus") is an enterprise software now referred to as SAP Sales Cloud that helps sales teams manage and share content efficiently and effectively from the lead process to the closing process.  According to Calldius's Linkedin page, its software includes a "full suite of sales process tools includ[ing] sales automation, incentive management, Configure Price, Quote (CPQ), coaching and sales enablement."  Peloton also used Callidus to track sales. According to CW5, although Callidus did not offer "real time" data like Salesforce did, it allowed AEs to view month-to-month sales of units, accessories, and warranties, as well as how close AEs were to hitting their monthly sales targets.  The Callidus system also provided a breakdown of what an AE's expected paycheck would be based on their sales results.  CW  believes that the Callidus system interfaced with and pulled data from Salesforce. CW6 stated that Callidus was used to track commissions.

87.     "Slack" is a messaging program specifically designed for the workspace. According to CW5 , the inside sales team used Slack to communicate among one another concerning sales targets and other business related topics. For instance, according to CW6, the Outside Sales Team might have sold 10 bikes per day in 2020, whereas, each individual AE on the Inside Sales Team might have sold between 15 and 30 bikes per day in 2020. According to CW2, Slack was the main form of communication for the Inside Sales Team and the AEs were very vocal on Slack about the inability to attain sales goals.  CW2 stated that the sales managers reviewed the Slack communications.

### 4.     Peloton's Insides Sales Operations

88.     According to CW5 , each individual AE, sales team, and the entire sales organization had a monthly sales goal.

89.     CW5  had weekly meetings with their manager, Funke, one of Peloton's Inside Sales Managers and the other AEs on the team during which they would review customer chats and recorded phone calls. CW6  attended Zoom meetings with Varela and Wanek once or twice each week to discuss sales management and other related topics.

90.     According to CW5, in September 2021, the sales goal for each inside sales team member was around 200 units.   However, by December 2021, CW5 stated that sales goals might have been as high as 500 units per AE, however, the goal was later reduced to 300 units per AE, which was, according to CW5, "a stretch" as some AEs were not even selling 100 units per month.

91.     CW5 reported that Peloton hosted monthly all-hands, company-wide meetings ("All-Hands Meetings") via Zoom during which  Defendant Foley would discuss "how sales were" and "where they were at."  According to CW6 , inventory management was also discussed in the monthly All-Hands Meetings.  Defendant Foley also made specific statements quantifying Peloton

membership during these All-Hands Meetings.  Further, each department head would present their respective goals.

92.    CW7  reported that Peloton also held quarterly townhall meetings led by Defendant and CEO Foley who would represent to employees that sales would continue into perpetuity. In recalling these meetings, CW7  emphasized: "It was all hype – no questions and no details" and that most of the staff seemed to be "drinking the Kool-Aid" even though it was clear to CW7 that sales were declining.  CW7 stated that they had "never seen such fanaticism" and that "it was almost like religious devotion" and CW6  referred to Defendant Foley as the "energetic cheerleader."

93.    Peloton also hosted smaller, all-hands sales calls ("All-Hands Sales Meeting") for members of its sales organization.  CW6  recalled attending an All-Hands Sales Meeting in person in October 2021, which was also attended by Varela as well as Global Chief Supply Officer, Shannehan, who had a speaking part.

94.    Further, according to CW5 , after Peloton altered the pay structure for its sales employees, Peloton hosted another All-Hands Sales Meeting in November 2021, which was led by Varela.

95.    According to CW 6 , sales goals came from the top down at Peloton, and Peloton had a goal it **"had to hit."**   Shannehan, Peloton's Global Chief Sales Officer, would convey the monthly sales goals in units to be sold to Varela, who would in turn convey the goals to CW6  and Wanek. However, at one point, the sales goals were so high in 2021 that Varela began only assigning "80 to 90" percent out to the inside sales team, knowing that the sales team would not hit the goal.  Varela told Shananan this was the case, but the goals remained high month after month at Shanahan's insistence (and which  believed was because that was what the board and/or

executive management wanted to see).  For most months in 2021, beginning in February 2021, the inside sales team failed to even hit the 80 to 90 percent of the Shanahan-specified goal.  The lack of sales was conveyed in the Looker reports.  CW6  recalled that Foley and Lynch regularly reviewed the Looker reports, but experienced some difficulty recalling how they accessed the Looker data.

96.     CW5  reported that the Inside Sales Team did not hit its goals from September 2021 through the end of the 2021 calendar year.  CW5  also stated that there were "very few of us who hit or exceeded" goal month over month. CW6  reported that the Inside Sales Team "had these big goals" for 2021, but that **the team was not hitting the goals "month after month after month."**

### 5.     Peloton's inventory reporting and tracking processes

97.     Each of Peloton's warehouses in the United States performed monthly inventory counts.

98.     In particular, Peloton had a suite of inventory management software systems it used to track supply chain and inventory processes including: NetSuite, Manhattan Scale, Tableau, and Salesforce.

99.     NetSuite Inventory Management ("NetSuite") is an enterprise resource planning ("ERP") business management software tool/system offered by Oracle Corporation.  According to NetSuite.com, NetSuite provides a single, real-time view of inventory across all locations and sales channels.

100.    According to CW7, Peloton used NetSuite to track "materialized inventory." According to a document published by NetSuite's parent company, Oracle, a "materialized" view is a "replica of a target master from a single point in time." CW7 stated that the materialized inventory was the formal inventory account.

101.    Tableau is a supply chain analytics software tool that allows individuals to visualize data relating to optimizing inventory, streamlining transportation, and delivery.  CW8 stated that Peloton used Tableau for inventory reporting, that the Tableau reports were "available on demand," and that Tableau interfaced with Scale.

102.    As described in Section V(A)(3), above, Salesforce is a customer relationship management ("CRM") often used by sales personnel.  Salesforce also has supply chain and logistics reporting features. According to CW[1], [3], and [7] Peloton used Salesforce to track inventory and supply chain related data. CW[3] stated that Peloton's regional managers and warehouse employees viewed the drop in sales based on deliveries and inventory movement through Salesforce. CW3 received customized Salesforce reports via email that showed exactly how many vans were scheduled to go out in his region the next day, the exact amount of inventory to be loaded on the vans, such as the number of bikes, dumbbells, heart rate monitors, and shoes. According to CW[1], Senior Vice President of Supply Chain, Erwin Hermans's ("Hermans") team pulled data from Salesforce to track demand.

103.    CW3  reported that Peloton used NetSuite to track the volume of inventory and deliveries, among other things. Peloton used Netsuite to track the following data: monthly summaries of deliveries; the volume of inventory that went out during the month, referred to as the "monthly delivery summary;" the amount of inventory still in the warehouses, called the "still in-house inventory;" and inventory that had been moved into the "volume number" for a particular warehouse – that is, inventory that had been delivered to customers. In particular, each time a bike was taken out of "withholding inventory" and scanned for delivery to a customer, the serial number for that bike was added to the monthly volume number, which was recorded on the tracking sheet. CW3 stated that the NetSuite information system provided monthly summaries of deliveries

31

104.    According to CW1 and CW3, Peloton corporate and U.S.-based warehouses used both NetSuite and Scale information systems to track inventory and capacity. CW8 reported that NetSuite and Scale interfaced with one another and the "orders inventory" were the "touchpoints" between the two systems. In particular – according to CW8 – the two systems interfaced with one another to: (1) track orders from the manufacturing sites "going into distribution" as well as the orders placed for inventory to move product from the distribution centers to the final mile sites; and (2) to track orders that were going out to customers.

105.    Eventually, Peloton stopped using NetSuite to track inventory and began using Manhattan Scale.  Manhattan Scale is an inventory management software that, according to CW8, had an "intensive visualization function" and could interface with Tableau to provide detailed reporting on inventory. According to CW7, Peloton implemented Scale in 2021 for the primary purpose of resolving inventory-related problems and to provide improved visibility. CW8 reported that Peloton's distribution centers and final mile facilities frequently and regularly reported on their "inventory accuracy" using the reporting functions in Scale.  CW8 clarified that the Tableau reports on inventory were "available on demand."  CW8 had firsthand knowledge of this reporting because they "worked on data analysis" and saw the "dashboard reports."

### B.    BEFORE THE CLASS PERIOD, AS DEMAND SPIKED, PELOTON FACED SUPPLY CHAIN AND INVENTORY MANAGEMENT WOES

106.    Due to the unprecedented demand for its Connected Fitness products early in the pandemic, Peloton began to experience issues with its supply chain logistics and delivery backlogs.

107.    According to CW6, up until February 2020, Peloton's Inside Sales Team was actually "behind on sales goals."  In particular, CW6 recalled that in March of 2020, each AE had a sales quota of approximately 350 and 500 bikes per month.  As an Inside Sales Manager, CW6

even created and implemented a sales competition to motivate the AEs to reach their goals in which the AEs could earn 1.5x the normal incentive compensation for each bike they sold over the goal.

108.    CW2  reported that in 2020, she made between 12 and 15 sales per day without issue, and stated that 12 sales per day was considered a "bad day" in 2020.

109.    However, once COVID hit, Peloton experienced a dramatic surge in demand and bike sales  bike sales "went through the roof" as CW6 put it.  CW6 stated that some AEs sold as many as 700–800 bikes per month in 2020; and CW3  reported that during peak 2020, each location in the Southern region where he worked was delivering between "3,000 and 6,000 bikes per month, minimum" and so warehouses, such as those in Houston or Miami, were delivering at least 8,000 bikes per month. Peloton's Connected Fitness subscriber base  more than doubled with 1.09 million subscribers in June 2020 and 2.33 million subscribers in June 2021.

110.    Due to the sudden surge in demand, Peloton raised its sales goals in April 2020. CW6 recalled that the AEs were "working constantly to meet demand." However, by September 2020, Peloton's Inside Sales Team was not meeting its sales goals.

111.    Historically, Peloton manufactured 80% of its bike frames overseas, according to CW3.  After they were manufactured, the bike frames were shipped to the United States, where the final product was assembled  in and stored in Peloton's various warehouses. In particular, Peloton relied on  two Taiwanese manufacturers for its overseas manufacturing needs: (1) Tonic Fitness Technology ("Tonic") which it had acquired in October 2019 for $47.4 million and (2) Rexon which was also located in Taiwan.

112.    In January 2021, The New York Times Reported that even as wait times for deliveries of its Connected Fitness Products had grown in the summer of 2020, Peloton continued to take orders and advertise its bikes. In the fall of 2020, as the weather cooled and coronavirus

cases surged across the country, demand soared and the Company found itself unable to deliver all of its orders in a timely manner.

113.    At one point in late 2020, according to CW3, Peloton halted orders altogether as its supply was unable to keep up with demand for its products.  CW6  stated that prior to COVID, delivery times were about one to two weeks from the time an order was placed.  CW2  reported that for most of 2020, the lead time for delivery of products was anywhere from 10-12 weeks. However, according to both CW6  and CW2 , by the end of 2020, the lead time for delivery of products *was anywhere from 12 to 16 weeks* and lead times were even longer in more rural areas of the country.  CW6 further stated that the extended lead time was due to Peloton's insufficient supply of inventory to meet demand. CW3 explained further that Peloton instructed employees to "go home with pay" as the Company attempted to remedy its supply chain woes.

114.    CW2  stated that in late 2020 and into 2021, Peloton's sales began declining as gyms began reopening and people were "getting back out – no one was working out at home as much." CW2  further reported that into 2021 the trend of sales slowing continued, stating "sales were not what they wanted" and that to her dismay and concern, the "goals were not changing."

115.    In an attempt to rectify the disastrous supply chain hiccups hindering timely deliveries, Peloton announced on February 4, 2021, during its second quarter earnings call for fiscal year 2021, that it was "investing over $100 million" on "air shipments, expedited ocean freight, and incremental cost to get containers to other ports that are less congested."  A few days later, Peloton published a letter to its customers on its website disclosing that such investments would mean "incurring a transportation and delivery cost that is over ten times [its] usual cost per Bike and Tread."  In particular, according to CW1, Peloton spent "hundreds of millions of dollars" on airfreight in a period shorter than one quarter and, by the end of 2020 and into early 2021,

Peloton was airfreighting 60% of its bikes to the U.S. By March 2021, Peloton had already incurred $100 million on air freight alone as the Company was "chartering 747 jets to bring inventory to the U.S."

116.   In response to investor and analyst concerns with shipping delays, rather than acknowledge that the short-term uptick in demand was straining the Company's financial resources, management became hyper focused on increasing its domestic production capacity to distract investors from the supply chain chaos.

117.   Peloton's first foray into expanding domestic production capacity began when it announced in December 2020 that it was going to acquire Precor Fitness for $431 million dollars. In its press release announcing the deal, Peloton highlighted that the acquisition meant an additional 625,000 square feet of production capacity in North Carolina and Washington, which would help cut down on international shipping delays and alleviate Peloton's significant delivery backlog. Around the same time, Peloton also announced that it had built an additional international manufacturing plant in Shin Ji, Taiwan, to ramp up its international production capacity.

118.   A December 22, 2020 Cowen analyst report noted that the expansion of domestic manufacturing in order to deliver U.S. Connected Fitness products faster was "a critical point given the heightened demand and long delivery times during the ongoing pandemic."

119.   A few months later, on February 5, 2021, Peloton held its second quarter earnings call for fiscal year 2021.  During the call, in response to an analyst's question about Peloton's acquisition of Precor, Defendant Foley proclaimed: "As we invest in US manufacturing and getting ready to make millions, going to tens of millions, of treadmills and bikes in the US...we can have in-location manufacturing plants."

C.  **AS COVID-19 RESTRICTIONS EASED IN 2021, PELOTON TOUTED INVESTMENTS INTO ITS SUPPLY CHAIN CAPACITY AND SUPPLY CHAIN TO MASK EVIDENCE OF DECLINING DEMAND FOR ITS PRODUCTS**

120.    At the same time that Peloton was making additional investments in its domestic production capacity, however, the Management Defendants knew from internal reports that the gap between sales forecasts and actual sales was increasing and that unsold inventory was building up.  According to CW2  and others, this information was discussed at monthly meetings attended by Defendants Lynch and Woodworth, and former Chief Supply Chain Officer Jon Adee. During these meetings, Defendants Woodworth and Lynch were apprised of both inventory numbers and current demand forecasts through reports generated through Salesforce. CW2  confirmed that management knew that 2021 sales goals were not being attained, stating, "they definitely knew. There was no question." CW2 based her knowledge on the fact that the AEs regularly discussed the inability to attain the sales goals with their managers and in turn, the managers assured the AEs that their frustrations had been communicated to more senior management.  CW2  and CW6 also stated that the main channel of communication for the Inside Sales Team was Slack, and that the AEs were very vocal on Slack about their inability to attain sales goals.  CW2  stated that the sales managers reviewed the Slack messages.

121.    CW3 , stated that NetSuite began showing a decline in deliveries in 2021 and that, in particular, NetSuite revealed that "from month to month, less inventory was moving."  CW3 further reported that in 2021, sales were clearly declining and that there was no sign of sales rebounding at any time through November 2021.

122.    CW7  reported that in the fall of 2021, the Hazelwood, Minneapolis facility received a massive shipment of inventory, even after the Scale system which monitors inventory, had been implemented.  CW7 reported that Peloton was not shipping as many bikes from its Hazelwood facility in Minnesota as it had anticipated.  In particular, CW7 stated that the

36

Hazelwood facility had gone from shipping 180 bikes per day at the height of the holiday season in 2020 to no more than 100 bikes per day during the 2021 holiday season.

123.    According to CW1 , Peloton's Senior Vice President of Supply Chain, Hermans led the planning team and was responsible for creating the internal reports that tracked demand and showed the decline in demand.  CW1 believes that Hermans' team pulled data from Salesforce to track demand.  Hermans reported to Chief Supply Chain Officer Adee.

124.    Further, CW3  reported that there were hour-long meetings every Tuesday, during which the reports that CW3 and Hermans had prepared on Monday were discussed. During the meetings, they "revisited the previous week's numbers" and "looked at demand and what we could deliver based on manufacturing and material constraints."

125.    According to CW1, Defendants Woodworth and Lynch learned in February 2021 that demand for fitness equipment would likely decline by as much as 7%–20%  starting in March, 2021. CW1 further stated that as time passed, demand "continued to decline even further." Despite this knowledge, Peloton intentionally chose to ramp up production and manufacturing capacity at the expense of the financial wellbeing of the Company.  CW1 stated that despite clear evidence of waning demand, Chief Supply Chain Officer Adee instructed his team to continue to focus on ramping up capacity to produce more bikes and treadmills. Waning demand was made evident in internal presentations created by the planning team: which indicated that the gap between sales forecasts and actual sales was increasing. Defendants Woodworth and Lynch attended supply chain meetings on a monthly basis, and were copied on emails that contained action items after each of these meetings. Therefore, according to CW1, both Lynch and Woodworth were well aware of the growing supply of inventory and declining sales during the Class Period.

126.    According to CW3 [Morrsion], the decline in demand was known to both regional managers and warehouse staff beginning in early 2021. Each night, CW3 [Morrsion] received a Salesforce report via email from the sales team in Plano, Texas that detailed how many vans were scheduled to go out in his region the next day and the exact inventory to be loaded on the vans.  At the height of Peloton's rise in demand in 2020, the Southern Region was delivering between 3,000 to 6,000 bikes per month, minimum, while higher performing facilities in Houston and Miami were delivering at least 8,000 bikes per month.   By the time CW3 departed the Company in April 2021, however, the facilities he managed were delivering only half the amount of bikes they had delivered during a similar period in 2020, and by the fourth quarter of Peloton's fiscal year 2021, the warehouses were delivering just one quarter of the bikes they had been delivering on a monthly basis throughout 2020.

127.    When, in early 2021, CW1 voiced concerns about the growing inventory build-up at Peloton's distribution centers which it refers to as its "final mile" facilities ("final mile facility"), such concerns fell on deaf ears.  In fact, CW1 reported that there was retaliation against "people who spoke up" about the discrepancy between demand and production.  At one point, CW1  pushed back on the directive to drive capacity in the face of declining demand and told Defendants Lynch and Adee (in words or substance): "Look guys, the demand is not there. So, why are you doing this?" Instead, of slowing production, however, the Company decided to build new manufacturing plants and lease additional facilities to store its excess of products.  For example, on March 2, 2021, Peloton announced that it had entered into a five year lease for a 75,000 square foot last-mile distribution facility in Middleborough, Massachusetts.

128.    Several months later, on April 1, 2021, Peloton announced that the acquisition of Precor had been finalized.  In a press release by PR Newswire, Defendant Lynch boasted how

"enthusiastic" Peloton was about the acquisition which marked a "major milestone for Peloton," all the while failing to alert investors about the increasing overflow of inventory.  Yet, by April 2021, CW3 had already noticed the downturn in sales and stated that it was obvious that Peloton was "not going to surpass 2020." CW3 based this assessment of sales in 2021 on the number of deliveries going out from the 11 warehouses he managed in the Southern region. According to CW3 , by May 2021, the warehouses were doing "three quarters" of the 2020 monthly volume of deliveries and by the third calendar quarter of 2020, the warehouses were only delivering half of the monthly volume of bikes they had in 2020.  By the fourth calendar quarter of 2021, the warehouses were delivering just one quarter of the bikes they had on a monthly basis throughout 2020.

129.    Even after Defendants learned of the growing inventory buildup and slowed demand for its products, Defendant Foley continued to foster the illusion of continued organic growth post pandemic by continuing to unnecessarily ramp up domestic production capacity, in part, so that Peloton's stock price would remain artificially inflated so that he and other insiders could continue cashing out on their stock sales. On May 24, 2021 – when, according to CW1 and CW3, Defendants had been repeatedly made aware that demand was significantly declining – Peloton announced that it was going to invest $400 million to build its first domestic manufacturing facility in response to the "heightened demand" for its products.  The facility, which Peloton dubbed "Peloton Output Park," was to span more than 200 acres in Troy Township, Ohio and was expected to be fully operational by 2023.

130.    CW7  reported that at least by early 2021, Peloton management began to realize that there were problems with inventory.  While the Scale system was implemented to try to mitigate these issues – CW7 stated: "it just spiraled from there."

131.    In particular, CW7 stated that it was "wildly" apparent that sales were slowing during the class period. Although July was typically the "slow period" for sales at Peloton, sales "never picked up from there" in 2021. CW7 stated that Peloton "ramped down from the spring busy period" and "kept some consistency," but then sales "just tanked." CW7 stated that deliveries from the Hazelwood warehouse decreased from 180 bikes per day down to as few as 20 bikes per day and that this trend continued through September 2021. CW3 stated that during the height of 2020 sales, the Tampa warehouse was delivering 25 bike vans per day, with each bike van containing eight bikes; by the end of the 2021 calendar year, however, the Tampa warehouse was only delivering two or three bike vans per day. CW3 stated, based on the trends of which he was aware, that there was "no way you could project that business would be the same or pick up."

132.    Moreover, according to CW4, Defendants Foley and Lynch attended monthly supply chain meetings during which Senior Vice President and Head of Global Supply Chain McKeehan presented an analysis of forecasted sales versus actual sales. When CW4 began working for Peloton in August 2021, McKeehan presented data at the monthly meeting showing actual sales as "22 percent" below the forecast. At least as early as August 2021, Peloton had *three months* of excess inventory just sitting in containers at shipping ports. CW7 stated that the inventory discrepancies were discovered in August 2021. Nevertheless, Peloton "was absolutely full throttle on the manufacturing," according to CW4. By the time CW4 left in 2022, the variance between forecasted and actual sales had increased drastically and was "hanging anywhere *between 30 and 42 percent*."

D.   PELOTON ALSO CONCEALED AN ALARMING SURGE IN INVENTORY LEVELS
     WHEN DEMAND DECLINED

133.   While boasting about increasing its capacity to manufacture Connected Fitness Products both domestically and internationally, Defendants failed to disclose an alarming build-up of unsold inventory in its warehouses due to declining demand and sales.

134.   The glut of inventory as a result of its excessive production of fitness products quickly overwhelmed Peloton's existing distribution centers and warehouses.  To keep up with its overflow of inventory, Peloton entered into new multi-year leases for distribution centers and spent millions on demurrage costs.

135.   According to CW6 , by mid-2021, Peloton had "caught up and was back to a normal delivery time" (i.e., time from placing of order to delivery of the Bike or Tread) of one to two weeks, and according to CW6, by around September 2021, delivery times were as quick as two days to one week.

136.   On August 13, 2021, Peloton announced that it was opening up a new 80,000 square foot distribution center in Linden, New Jersey, marking the Company's largest center yet.  Two weeks later, on August 27, 2021, Peloton disclosed in its fiscal year 2021 10-K that it "recently expanded [its] manufacturing and assembly capabilities in North America by occupying facilities totaling approximately 459,000 rentable square feet in Washington and approximately 518,000 rentable square feet in North Carolina."

137.   Eventually Peloton's inventory became so backlogged that eventually the Company began letting its inventory sit at ports and had to pay substantial demurrage fees. After CW1 departed Peloton in November 2021, he heard from colleagues still employed that Peloton had "18 months of inventory on the bikes." CW1  reported that Defendants Lynch and Woodworth were

aware of the buildup of excess inventory because it was something that was discussed in weekly and monthly meetings they attended.

138.    Blackwells Capital, a Peloton shareholder, reported in its February 2022 investor publication that the value of Peloton's inventory on hand had doubled from $500 million to more than $1.3 billion between January and October 2021. By February 2022, when CW4 left Peloton, the Company had "a year's worth of inventory."

139.    By disclosing investments in its supply chain and the expansion of its domestic manufacturing capacity to investors but failing to disclose that demand for its Bike, Bike + and Tread was declining, Defendants misrepresented that organic consumer demand for its products remained steady and was expected to increase.  In reality, Defendants made supply chain investments to  assuage analysts' concerns about Peloton's ability to shorten its long lead times, and to catch up with order backlogs from prior quarters. As set forth above, beginning in February 2021, and continuing through November 2021, Defendants knew that demand for Peloton's products was steadily declining; that inventory shipped from overseas was piling up in U.S. ports and in Peloton's warehouses; and that the sales staff was no longer meeting sales goals set by management.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    ANALYST CONCERNS ABOUT COVID FUELED SUCCESS STORY PRIOR TO PELOTON'S FEBRUARY 4, 2021 EARNINGS CALL

140.    In the months prior to Peloton's 2021 second quarter earnings call for FY 2021, analysts and the market showed concern that the announcement of the vaccine in the fall of 2020 and the easing of pandemic restrictions would result in a decline in demand for Peloton Connected Fitness Products. After Peloton's earnings call on September 11, 2020, BMO Interactive expressed concern about Peloton's long term prospects because it appeared that it had "lapped the COVID

cohort." On November 24, 2020, *The Wall Street Journal* reported that Peloton shares had dropped 25% in early November 2020 when Pfizer announced that it had developed a vaccine for COVID-19.

141.    Analysts also expressed concern with Peloton's supply chain constraints and its ability to align the supply of bikes and treadmills with increased demand.  On November 24, 2020 the *Wall Street Journal* reported that "As Peloton Interactive Inc. races to meet demand for its connected stationary bikes and treadmills, promoting equipment it may not deliver until 2021, some would-be owners are losing patience as they endure months long delivery delays." In an article published by the *New York Times* on January 17, 2021, Simeon Siegel, a retail analyst at BMO Capital Markets commented that,  "[w]hat we're finding is that Peloton the idea has grown faster than Peloton the company…all companies need to figure out how to grow into their hype. Right now, the hype surrounding Peloton is like no other."

142.    On a September 11, 2020 earnings call, Defendant Foley assured investors that Peloton's long-term success was independent of COVID when he stated (emphasis supplied):

> "On Overbuilding supply-chain capacity—that's a term that has never come up in the Peloton senior leadership rooms or boardrooms. . . We feel like there's such a massive opportunity that we need to invest heavily in the supply chain for years and years to maintain it. When you say 'normalize coming out of Covid,' we don't see that."

143.    During Goldman Sachs' Builders and Innovators Summit on October 30, 2020, John Foley stated: "I hate the COVID dynamic. We want to win fitness in regular times. Anytime I hear about Peloton as a COVID story, I get annoyed. What we're building is here to stay. COVID is helping at-home fitness, but it's not a pull-forward of demand. It's an acceleration of demand. It's better to work out at home. There are 35 million homes with treadmills in them. They're crap treadmills. They want to work out at home, but it's not engaging."

144.     The *Financial Times* reported that during a Goldman Sachs conference in October 2020, Defendant Foley "seemed irked when the pandemic's impact on Peloton's fortunes came up." During the conference, a frustrated Foley even made air quotes around the "COVID story," arguing that Covid is not "a one-time booster of demand" and exasperated "it annoys the crap out of me because what we are building is here to stay."

145.     On December 9, 2020, Defendants held Peloton's annual shareholder meeting for Fiscal Year 2020 during which an investor asked Defendant Foley: "How should we think about how a post-COVID world impacts our view of our business opportunity?" Foley answered, in relevant part (emphasis supplied):

> "Now that Peloton is here and now that the experiences at home are incredible, that is not—**that has nothing to do with COVID**. That is a human need of I want to get fit, I want fitness in my life in a consistent way; every week, I want to get three or four workouts in, and I want it to be convenient, I want it to be fun, I want it to be motivating, and I want it to be a great value. And all of those things are foundational to what Peloton delivers, always delivered it. **We delivered it in pre-COVID, during COVID, and we will deliver it post-COVID.**

**B.      FEBRUARY 4, 2021 EARNINGS CALL:**

146.     The Class Period begins on February 4, 2021, when Defendants held Peloton's earnings call for the second quarter of FY 2021, ended December 31, 2020. Defendants Foley, Lynch, and Woodworth all participated and made statements. During that call, an analyst from JP Morgan asked: "Jill, you mentioned that manufacturing capacity exceeds demand. I just want to clarify that strictly because you ramped capacity, **or are you seeing any change to demand due to extended order to delivery times?** And then John, just on the Precor Opportunity, I hope you can talk a little bit more about how you're thinking about the commercial space and the opportunity there. And then also, if there's any way to quantify or provide any more color just around the manufacturing capacity and the benefits just in terms of proximity as well." Defendant Foley responded as follows (emphasis supplied):

Thanks Doug. We're going to do a switcher I'm going to take the first one, and then I think William and I can talk about Precor. **We are not seeing a softening in demand.  That is absolutely not what's happening here.  We are seeing incredibly strong organic demand even in the phase of light marketing.** As you know, the successes that we're seeing in getting the order to delivery down and getting our backlog down are 100% based on incredible upgrades, and our manufacturing capacity up to over six times – 6x increase in just the last 12 months in our capacity of them know - - we're now making more Bikes on a monthly basis than we did in all of fiscal 2018. So it's a Herculean effort based on our in-house manufacturing teams and our third-party partners.

And so yeah, I hope that answers your question. **But it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand.**

Defendant Woodworth then added (emphasis supplied): "And I would just highlight obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products**."

147.    These statements about demand for Peloton's Connected Fitness Products were materially false and misleading.  Both Foley and Woodworth knew through internal reports generated through Peloton's Inside Sales group that demand for its Connected Fitness Products was, in fact, showing evidence of decline. CW2 and CW6, who were both members of Peloton's Inside Sales Team, stated that Defendants knew that after months of meeting and exceeding sales goals, the sales staff had begun to miss their quotas as early as December 2020. Both Woodworth and Foley had access to data regarding the Inside Sales Team's missing sales quotas and percentage to quota based through the Looker Report which was updated daily and incorporated information from Peloton's Salesforce database.

148.    According to CW3, the Management Defendants also had access to monthly delivery summaries in the NetSuite database, which showed a decline in deliveries from one of Peloton's most active regions.

149.    In addition, during the February 4, 2021 earnings call, Bank of America Merrill Lynch analyst, Justin Post, asked the Management Defendants: "[J]ust thinking about the opening next year, some of the e-commerce companies had a showdown in September and October, and then reaccelerated due to lockdown. Did you see anything in the fall and how are you thinking about that."  Defendant Foley responded (emphasis supplied):

> When the vaccine was announced in the fall, , you saw a reaction to the stock, we did not see any reaction to our sales or demand. We still have not seen any softening since that vaccine was announced and since the vaccine has been rolling out. So other than investors getting nervous, the consumers are still feeling like they want to work out at home The experience to William's point is the best in the world and it's getting better as we launch more software features, more content types, more access on more different platforms.And I think what you're seeing is everyone's starting to realize that working out at home is a better place. It's a better value. And so, we're very bullish on our sales opportunities on the other side of the opening  to your point So we remain very, very bullish on our opportunity. And like Jill did say, we're excited to get on the offensive and start marketing because the story is incredible, the products and the experiences are incredible, and they're getting better by the month. So we've remained very, very bullish on our opportunity. **We haven't seen any softening of demand.**

150.    This statement was false and misleading when made because according to CW2 and CW6, Defendant Foley had in fact seen evidence that demand for Peloton Connected Fitness products was softening, by virtue of the fact that Peloton sales staff was struggling to meet its sales goals after December 2020. According to CW1, CW4 and CW6, this information was available to Defendant Foley in February 2021 through (1) presentations made at monthly supply chain meetings which included Chief Supply Chain Officer Jon Adee, where internal data was presented and circulated indicating that demand for Connected Fitness Products was likely to decline between by as much as 7 to 20 % between February and March of 2021 and (2) according to CW2 and CW6, Defendant Foley had access to and made use of the "Looker Report" which showed that the Inside Sales Team had begun missing their sales goals beginning in December 2020 after months of meeting and exceeding those goals.

151.     Also during the February 4, 2021 earnings call, analyst John Blackledge of Cowen asked: "And then just a question, on brand, with the pandemic, we see the shift in behavior to working out at home aside from incredible demand, you're seeing for the hardware and digital subscriptions, just any way to frame the impact on the brand . . ."  In response, Defendant Lynch stated:

> We do research on consumer perceptions around home fitness and going back to the gym, et cetera. . . . we study the consumer and we have quarterly tracking, and we do bespoke research. **And what's clear is the shift into the home is not a COVID-led phenomenon.** It has accelerated it. But we see, if anything, as we emerge to whatever the new normal is that the norms haven't changed. There is a secular shift into fitness in the home. As John [Foley] has said before, it's a better experience and a better place at a better value. And consumers are all seeing that. And so, everything we've seen in the data, I think Jill [Woodworth] has talked in the past about some of the bespoke research we've done on going back to gyms and consumer perception on that vis-à-vis home workout suggests that certainly, COVID has been a tailwind for our demand. . . . **in the home, we see continued momentum in foreseeable future.**" (emphasis supplied)

Lynch further claimed that the Company was able to accurately forecast demand "on a more mature product line like on the Bike product line."

152.     This statement was false and misleading when made. Lynch, Foley, and Woodworth knew, for Peloton, the sales boom of 2020 was a COVID-phenomenon, and Peloton would be unable to keep sales at that level throughout 2021 and beyond.  As of February 4, 2021, Defendant Lynch had access to evidence that demand for its Connected Fitness Products was declining as pandemic restrictions eased through (1) attending monthly supply chain meetings along with Chief Supply Chain Officer Jon Adee, where internal data was presented and circulated indicating that demand was likely to decline by as much as 7 to 20% between February and March of 2021; and (2) according to CW6, Defendant Lynch was directly responsible for setting sales goals, and had access to the "Looker Report" which integrated real time Salesforce data that indicated that Connected Fitness Product  sales had been declining beginning in December 2020.

153.    According to CW3 , the Management Defendants also had access to monthly delivery summaries in the NetSuite database, which showed a decline in deliveries from one of Peloton's most active regions.  CW3 stated that there was "no way" the executives "did not have access" to the same data  did in SalesForce. For example, CW3 knew that Foley had  reviewed the data based on feedback from Beck in 2020.  recalled hearing from Beck in a meeting in 2020 that Foley mandated that warehouse workers put in overtime in 2020, perhaps in calendar Q3 2020, because the warehouse staff was falling short on making deliveries.

154.    To the extent that Defendant Lynch's statement, or any portion thereof, is deemed to be forward looking, such statement was not accompanied by meaningful cautionary language identifying important facts that that could cause actual results to differ materially from those in the statement or the portion thereof.  As of February 4, 2021, Defendant Lynch had knowledge of then-existing facts regarding declining demand that contradicted his statement regarding "momentum in the foreseeable future."

### C.    ANALYST REACTIONS TO THE PELOTON'S FISCAL YEAR 2021 SECOND QUARTER EARNINGS CALL

155.    Analysts were encouraged by the February 4 statements by the Management Defendants that the Company was continuing to experience sustained demand despite supply chain constraints persisting.  A February 5, 2021 JP Morgan report authored by Doug Amnuth stated that: " **Peloton remains supply constrained due to sustained strong demand**, West Coast port delays and delivery challenges during the pandemic, but we believe that PTON is now nearing a turning point, **with current manufacturing now *exceeding* strong demand** and normal order-to-delivery times (~ 4 weeks or less) possible by the end of June." (emphasis added)

156.    John Blackledge from Cowen expressed a similarly positive outlook on Peloton after the second quarter earnings call, and gave the company an "Outperform" rating.  Blackledge

noted in his report (emphasis supplied) that on the call, "management reiterated that demand has remained elevated throughout the pandemic **with no negative impact seen following the announcement of vaccines or their recent roll out.**"

157.   George Kelley from Roth Capital Partners was also encouraged by Peloton's statements regarding its investments in the Company. The report stated (emphasis supplied) as the basis for its buy rating  that "Management commented that momentum remains strong . Prior to the late fall COVID surge, there was no slowdown. **Neither has the vaccine caused demand to decline.** Management's guidance agrees with this commentary."

D.   **FEBRUARY 11 AND MARCH 1, 2021**

158.   On February 11, 2021, Defendant Foley participated in a question-and-answer session with a Goldman Sachs analyst during the Goldman Sachs Technology & Internet Virtual Conference. In response to a question "about what the other side of this pandemic looks like" and "what reopening does to demand for Peloton," Foley stated (emphasis supplied):

> "I know there's chatter of, we are a stay-at-home stock and we go back to normal and Peloton dies or whatever the anxiety would be. **We obviously are taking the other side of that.** And I'll tell people, I'll tell everyone on the call that for 20 years, 25 years, every year in the US, there's been 5 million treadmills sold, 5 million treadmills sold in the US every year pre-COVID. So it's not like working out at home was a COVID thing. It has always been a thing. It's just the products have been dopey and not connected.

159.   On March 1, 2021, Defendant Woodworth participated in a question-and-answer session with a JMP Securities analyst during the JMP Securities Technology Conference.  During the conference, an investor asked Woodworth, "How do you answer people who say the vaccine will hurt Peloton?" To which Woodworth replied:

> When you look at our engagement data, people have found a way not only to replicate exercising outside the home but enjoy it more and perhaps are doing even more than they were even pre-pandemic. So I feel like this is a trend that's here to stay. COVID just accelerated that trend and I think as you look out with respect to

what our growth algorithm looks like in a post-COVID world, it's continuing to further penetrate the markets we're in.

160.     These statements were materially false and misleading when made because at this time Defendants Foley and Woodworth knew that demand for Peloton's Connected Fitness products was declining as inoculations against COVID increased and gyms reopened. Specifically, according to CW2 and CW6, Defendants Foley and Woodworth had access to real time data generated through Salesforce which was compiled in the daily Looker Report. These internal reports showed that Bike and Bike+ and Tread sales were declining and that the gap between sales forecasts and actual sales was growing. These statements were also false and misleading when made because, according to CW1, by February 2021, Defendants Foley and Woodworth were already aware that demand for Peloton's Connected Fitness products was beginning to decline as vaccines became more accessible and pandemic restrictions eased.

161.     To the extent that Defendant Woodworth's statement, or any portion thereof, is deemed to be forward looking, such statement was not accompanied by meaningful cautionary language identifying important facts that that could cause actual results to differ materially from those in the statement or the portion thereof.  As of March 1, 2021, Defendant Woodworth had knowledge of then-existing facts regarding declining demand and an increasing gap between forecasts and sales that contradicted her statement that growth in demand was a trend that would continue and that market penetration would increase further into fiscal 2022.

**E.     MAY 6 AND 7, 2021**

162.     On May 6, 2021, Defendants held Peloton's earnings call for the third quarter of FY 2021, ended March 31, 2021, in which Defendants Foley, Lynch, and Woodworth participated. During the call, Defendant Woodworth stated that "obviously, last year was a big comp. It was the

first few months of COVID. But that type of growth, over a two-year stack, we're pretty excited about and we believe that that can continue into fiscal 2022."

163.    This statement was materially false and misleading when made because according to CW1 and CW4, Defendant Woodworth had access to internal sales data generated through the Looker Report which had indicated for months that the Inside Sales Team had was failing to meet their sales quotas.   According to CW1 and CW4, Woodworth had access to internal reports indicating that the number of deliveries was also declining during this time.   Therefore, Defendant Woodworth could not have honestly held   the belief that Peloton's growth could continue into Peloton's fiscal year 2022.

164.    To the extent that Defendant Woodworth's statement, or any portion thereof, is deemed to be forward looking, such statement was not accompanied by meaningful cautionary language identifying important facts that that could cause actual results to differ materially from those in the statement or the portion thereof.   As of May 6, 2021, Defendant Woodworth had knowledge of then-existing facts regarding inventory, demand, deliveries and missed forecasts that contradicted her statement that growth would continue into fiscal 2022.

165.    On page 47 of  Peloton's form 10-Q for the third quarter of its fiscal year 2021, which it filed on May 7, 2021, Peloton stated the following regarding the increase in the Net Operating assets and liabilities in the Cash Flows Section of the MD&A:

> "The increase in net operating assets and liabilities was primarily due to a $442 million increase in accounts payable and **accrued expenses related to increased inventory** and other expenditures  to promote general business growth, as well as the timing of payments, partially offset by a **363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**"

166.    This statement was false and misleading when made because the increase in inventory levels and the "ramped up supply" of products was not in fact a response to *current*

increased demand.  By this time, according to CW1, Defendants were well aware through internal discussions and documentation that demand was decreasing and would not be sustainable at levels created by the pandemic. Furthermore, according to CW3 the Management Defendants all had access to nightly salesforce reports which tracked deliveries and inventory movement, or would have likely discussed those reports with Chief Supply Chain Officer Jon Adee. According to CW3 these reports showed that, in May 2021, Peloton's warehouses were doing three quarters of the monthly volume in terms of deliveries. Furthermore, CW3 participated in two calls per week with other regional managers, where they frequently discussed the decline in deliveries in early 2021.

F.   **MAY 25, 2021 J.P. MORGAN GLOBAL TECHNOLOGY, MEDIA AND COMMUNICATIONS CONFERENCE**

167.   On May 25, 2021, Defendant Woodworth participated in a question-and-answer session with a J.P. Morgan Securities analyst during a J.P. Morgan Global Technology, Media and Communications Conference. In response to the question: "how do you get people comfortable with where Bike demand is heading into warmer weather and into strong reopening," Woodworth stated (emphasis supplied):

> Well, first, I would say, and I think we said this after the launch of Bike+ is that truly the technology and the innovation that we've brought with the Bike+ has been incredibly well received. And so I think we continue to see Bike+ exceeding our expectations on mix. And so with that said, the comments that I made around bike demand in Q4 is that we all know that COVID was a little bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, and everybody -- I mean, I was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this juncture, it's not relevant. So what I was trying to do was, okay, well, let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand.** And what's so interesting about our company today, versus 2 years ago, is that we now have the portfolio of products, right? We have the lower price bike at $49 a month. We have Bike+ which I've said is doing very well. We also are back marketing, again, which is something we haven't done and we were purely organic for so many months because we didn't want to exacerbate the OTD situation.

168.     This statement was false and misleading because it omitted to disclose that although sales were higher than they were pre-pandemic in 2019, according to CW2 and CW6, Woodworth had access to and utilized the Looker report which featured real-time sales data and was generated by the Inside Sales Team.  The Looker reports indicated that sales staff was continuing to fall short of sales goals month after month.

169.     This statement was false and misleading because it omitted to disclose that although sales were higher than they were pre-pandemic in 2019, according to CW2 and CW6, Woodworth had access to and utilized the Looker report which featured real-time sales data and was generated by the Inside Sales Team.  The Looker reports indicated that sales staff was continuing to fall short of sales goals month after month. Furthermore, according to CW1, Woodworth was also informed in monthly supply chain meeting presentations of  the increasing gap between sales forecasts and actual sales.

### G.     THE AUGUST 26, 2021 8-K, AUGUST 26, 2021 EARNINGS CALL, AND AUGUST 27, 2021 10-K

170.     On August 26, 2021, after the market closed, Peloton filed a Form 8-K with the SEC, signed by Defendant Woodworth, that attached a Letter to Shareholders signed by "Team Peloton" in connection with the Company's fiscal year 2021 fourth quarter and full year financial report. That letter disclosed that that "in the course of our fiscal 2021 audit process, a material weakness was identified in our internal controls over financial reporting with respect to identification and valuation of inventory."

171.     The Company's subsequent Annual Report for fourth quarter and FY 2021, filed with the SEC on Form 10-K on August 27 and signed by each of the Management Defendants, included additional information about the material weakness in the Company's internal controls over financial reporting. Specifically, Defendants disclosed that:

We have identified a material weakness in our internal control over financial reporting, and if our remediation of such material weakness is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.

In the course of preparing our financial statements for fiscal 2021, we identified a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness identified related to reporting involving inventory. We have concluded that this material weakness arose because our controls were not effectively designed, documented and maintained to verify that our physical inventory counts were correctly counted and communicated for reporting in our financial statements.

172.    Despite informing investors of deficiencies inventory and internal controls, in the Company's August 26, 2021 Form 8-K as well as its attendant earnings call and August 27, 2021 Form 10-K, Peloton made false, reassuring statements to investors.

173.    The disclosure of the internal control weaknesses regarding inventory concerned the market, particularly because inventory was viewed by the analysts and the market as a key indicator of Peloton's future performance.  During Peloton's earnings call for the fourth quarter of Fiscal Year 2021, analysts asked specifically about the impact inventory controls had on future revenues and results. Defendants reassured the market and investors that the weaknesses: (1) would not impact future sales or revenue *at all*; and (2) Peloton had a strong grasp on its inventory and that inventory was not excessive and was not indicative of waning demand.

174.    First, during its fourth quarter earning call for fiscal year 2021, held on August 26, 2021, Defendant Woodworth stated: "For fiscal [year] 2022 we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR." While discussing that guidance during its fourth quarter earnings call for fiscal year 2021, held on August 26, 2021, Defendant Woodworth claimed (emphasis supplied): "**We are entering fiscal 2022 with a normalized**

**backlog for our Bike portfolio and guidance reflects our expectation of continued strong demand.**" In response to an analyst's question about demand for the Peloton Bike line, Defendant Foley represented that "**the demand for Bike+ and Bike is robust**, and we feel good about the entire year's forecast."

175. The statements set forth above in paragraphs 171–175 were false and misleading when made because according to CW1 and CW4, Defendant Woodworth knew that by August 2021: (1) Peloton had more than three months of excess inventory on hand, and that the Company had already expended $30 million on demurrage costs because there was no warehouse space to store the overflow of inventory that had been shipped from overseas; and (2) that the gap between sales forecasts and actual sales had reached 22%, i.e., actual sales were 22% below Peloton's sales forecasts. According to CW1, Defendant Woodworth would have been made aware of these trends during the monthly supply chain meetings, where this data was shared in presentations presented by the planning team. Furthermore according to CW2 and CW6, Defendant Woodworth also had access to the Looker Report which indicated month after month starting in December 2020 that the Inside Sales Team was continuously missing its quotas.

176. During the same earnings call, Defendant Lynch was asked the following by Oppenheimer analyst Jason Heffstein:

> So, is there anything the data that suggest the kind of the longer pending Tread launch, meaning just it's been talked about obviously for a long time and all the issues that could have weighed on Bike sales, meaning you have some consumers who would only buy one device and they were kind of waiting and so that kept people potentially on the fence to decide what they wanted? **And the second question on the supply chain, we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet.** Outside of the cost headwinds that you talked about for supply chain, are you worried at all about actually getting product to the consumer over the next -- basically through the holiday season?

In response Lynch said:

Well, I can take the second question first. This is William. In terms of the guidance that Jill provided, we feel like we've built -- and the investments that John and Jill talked about, we built the infrastructure to support our holiday plans. As Jill noted, we feel like fiscal year '22 is going to be a return to more **seasonality. So a large part of our business is in Q2, Q3. And certainly, that's true of deliveries. And so everything in the supply chain from inventory that you're noting, the accumulation up on the balance sheet to warehousing and how we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.** We're very excited both in terms of the Bike growth that Jill noted and then the launch of Tread, which we expect to be very large over time. And so there's -- a lot of companies aren't in that position or reading in automotive, some of the shortages on chips and semis. So we're very proud of our team. We think our partners, TI, others who have helped us get in that position. So inventory is up.We are building inventory. As you know, the lead times with ocean freight and freight, in general, have extended. And so we've been diligent about learning from the past and feel like we're in a really good position to execute this plan this year.

177.    This statement was materially false and misleading when made because it omitted to disclose that the buildup of inventory was not in response to anticipated holiday demand, but rather due to decreased demand. In reality, the excess inventory was the result of actual sales continuing to fall below sales forecasts and goals. Defendant Lynch attended monthly supply chain meetings during which this information was presented, and thus was aware that declining demand and burgeoning inventory levels were not a result of preparing for the holiday season. According to CW6, Defendant Lynch would have also have known that the Inside Sales Team was continuing to miss its sales goals by reviewing the Looker Report which was generated by the sales organization daily.

178.    During the same earnings call the Management Defendants announced that the price of the Peloton Bike would be reduced by $400.  With regards to the relationship of the price drop to demand, Doug Anmuth from JP Morgan Chase asked:

One for John and one for Jill. John, we know there's seasonality. But just given the light 1Q guide, is the price -- is the Bike price gotten offensive or defensive? And how do you think about demand for Bike+ currently? And then, Jill, hoping you can walk through a little bit more detail around the Tread gross margin structure

perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you.

Foley Responded (emphasis supplied):

> **Thank you, Doug. So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness, which has, as you know, always been in our playbook.** This is actually the first year since we founded the company that we had the opportunity to do this, and we're super excited that the investments we've made in our supply chain certainly over the last few years, but definitely in the last 12 months, are bearing enough fruit that we have the capacity to make what will become -- what will look like close to 2 million fitness units of hardware this year, which is just incredible considering, when we founded the company, we approached the biggest contract manufacturer we could find, and they said that they were confident that they could make up to 10,000 Bikes a year. That was only eight years ago. So the scale of which we've seen and put in place and invested in across our entire supply chain with Bikes. And now, obviously, it includes Treads. And the lower-priced Tread as well allowed us to consider lowering the price of B1, and we think it's the right thing for our business, obviously, solving for net new sub adds, which was kind of our True North of getting more people into the tent and thinking about the LTV of those users, not just, Doug -- interestingly, not just as a subscriber for the $39 for a new Bike sub, which has always been kind of our True North and the golden goose of our business model, but think about selling those same people, the same households, future Treads, and future products, apparel and all the other stuff that becomes a much broader LTV picture over time.

179.    This statement was materially false and misleading when made because according to CW[6] the price reduction in Bike + was a reaction to declining demand made in direct response to declining sales, and was an effort to increase demand prior to the holiday season.  Furthermore, Foley could not have honestly held the belief that demand for the Bike would increase, because he had access to internal reports that indicated the contrary.

180.    During the same call  Truist Securities Analyst Youseff Squali asked the following:

> So, two questions. John, can you maybe speak to the -- just the quarter to the trend in demand you're seeing. Obviously, the guidance implies a sequential decline, but maybe you can parse out the effect of the reopening relative to others like pull back and add spend, etc. And then, Jill, I think you said something to the effect that you expect higher unit sales of bikes in '22 than you did in '21. If you just do

a back-of-the-envelope math, it looks like that would imply not a whole lot of sales for the new Tread. So, I was just wondering if you can maybe provide a little more color on that. Thank you.

Defendant Woodworth then replied (emphasis supplied):

Great. Well, it's a really great call-out. But what I might note is that in fiscal '21, our net adds were boosted a lot by the backlog that we went into. If you remember when COVID hit in March, we went directly red line on manufacturing and went in with a pretty massive backlog going into fiscal '21 given the long OTD. So, I would -- so first, I would say we have much better alignment in sales and delivery time frames in fiscal 2022. **And then -- so from my perspective, yes, we do forecast growth in our Bike portfolio this year on a year-over-year sales basis,** but you have to take into consideration how big the backlog was that we went in. And I think you'll see that that would then imply, even with the 50% of Tread buyers being existing members, that would imply a healthy first year of robust sales of Tread.

Defendant Lynch  then added (emphasis supplied):

And Youssef, we can't comment too much on the quarter-to-date trends, as you can imagine. But I will say, and Jill alluded this in her opening remarks, is that we historically have been a very seasonal business where not only are people out running and riding their bikes in the summertime and getting outside. And this summer, I think, is exceptionally true in that sense coming out of last summer where people are on lockdown. But we obviously don't market aggressively, and I think Jill's opening comments talked about this in the Digital business. We couldn't be more excited about the Digital business. I think I've been one of the biggest champions for -- since day 1 in that business. And we think that it's an incredible lead-gen business, as well as a stand-alone business on its own. And it's just not smart for us to market it aggressively in the summer vis-a-vis other times of the year. So, when you think about a basket of advertising dollars against your businesses, summer is generally one of the least efficient. So we're trying to run a little bit more disciplined business, certainly on Digital, and you could extrapolate that more broadly. **But I will say, even in the face of light marketing, sales have been robust across our Bike business.** And I guess I'm not supposed to tell you, but how incredibly strong leads have been for our Tread business. **So we are excited about how many leads are in the hopper for people wanting Treads, and we're excited about the demand that we've consistently seen this quarter and, frankly, since COVID hit, as you know.**

181.    The statements made by Woodworth and Lynch in paragraphs 178 and 180 were false and misleading when made because Defendant Lynch had access to information that indicated that demand for Peloton's Connected Fitness Products was not consistent since COVID and there had been evidence that demand was declining as early as February 2021.  According to

CW1 and CW4, Lynch attended monthly supply chain meetings where presentations by the planning team illustrating burgeoning inventory levels (according to CW1 by August 2021, Peloton had three months of excess inventory on hand) and declining demand were discussed. Defendant Woodworth also attended monthly supply chain meetings where the growing gap between sales forecasts and actual sales was discussed.

182.    To the extent that any Defendants' statements during the fourth quarter earnings call, or any portions thereof, are deemed to be forward looking, such statements were not accompanied by meaningful cautionary language identifying important facts that that could cause actual results to differ materially from those in the statements or the portion thereof.  As of August 26, 2021, Defendants Woodworth, Lynch and Foley had knowledge of then-existing facts regarding increasing inventory, decreasing demand, increasing costs, and growing gaps between forecasts and sales that contradicted their statements about the future, including their expectation of 34% year over year growth in revenues.

## H.    ANALYST REACTION TO PELOTON'S FISCAL YEAR 2022 REVENUE GUIDANCE

183.    Six out of seven analysts covering Peloton did not lower their revenue guidance for Peloton for Fiscal Year 2022, despite Peloton's announcements during the fourth earnings call regarding: (1) a lapse in internal controls; (2) a $400 price reduction for the Bike; and (3) a return to a more seasonal demand cycle.

184.    Analysts instead were reassured by Defendants' own revenue guidance and statements regarding continuing demand despite Peloton's disappointing Q1 results and the news of the discount on the price of the Bike+.

185.    For example, George Kelly from Roth Capital Partners ("Roth Capital") noted that although management expected to return to a more seasonal demand pattern in FY 22, Roth Capital

remained confident in Peloton's revenue guidance of $5.4 Billion. Cannacord Genuity also maintained its estimate of $5.41 billion in revenue for FY 22 and noted that Peloton "continues to see heightened demand for its products amid the reopening and delivery times have returned to pre-covid levels, with Peloton also announcing a 20% price cut to its original Bike to make it more accessible to consumers."

### I.   SEPTEMBER 22, 2021 GOLDMAN SACHS COMMUNICOPIA CONFERENCE

186.   On September 22, 2021, Defendants Foley and Woodworth participated in a question-and-answer session with a Goldman Sachs analyst during the Goldman Sachs Communacopia Conference. At the start of the conference, Eric James Sheridan, an analyst for Goldman Sachs, asked Defendant Foley about how Peloton was "positioned as we exit calendar 2021 into calendar 2022," Foley stated, in relevant part:

> we see the opportunity in fitness as so huge in the US and abroad, as you think about the failure of fitness for decades of the gyms didn't really work, the gyms don't feel like they're going to work moving forward, and we can talk about that if you want to, home fitness was never a great category, you had some content and some hardware, but never had an integrated experience that really was engaging and immersive. . . . **So, we think that the future of fitness is in the home. . . . we think 2022 is going to be a fantastic year.**

187.   This statement was materially false and misleading when made. The statement that "2022 is going to be a fantastic year" was false in the context of the revenue guidance and year-over-year growth that Management Defendants had previously affirmed. In fact, the Management Defendants did not believe that 2022 was going to be a fantastic year, but knew that sales and revenue had slowed and would continue to slow.

188.   To the extent that Defendant Foley's statement, or any portion thereof, is deemed to be forward looking, such statement was not accompanied by meaningful cautionary language identifying important facts that that could cause actual results to differ materially from those in the statement or the portion thereof. As of September 22, 2021, Defendant Foley had knowledge of

then-existing facts regarding declining sales and revenues, increasing inventory, decreasing demand, and supply-chain and other issues affecting manufacturing and deliveries that contradicted his statements regarding fiscal 2022.

189.    Further, at the time this statement was made, Defendants Foley and Woodworth were both well aware through internal reports that demand for Peloton's products was decreasing dramatically, that inventory was building up at unprecedented levels and that Peloton was scrambling to support earlier-issued revenue guidance by churning out bicycles without a workable supply-chain, manufacturing and delivery system that could support sales at the levels represented. Furthermore, Defendants Foley and Woodworth had – by September, 22 2021 – disposed of a combined 850,000 shares of Peloton common stock, indicating that they were aware of declining demand and burgeoning inventory levels.

## VII.    DEFENDANT FOLEY TERMINATED HIS 10B5-1 TRADING PLAN WHILE IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION

190.    On September 22, 2020, Peloton filed a Form 8-K with the SEC notifying investors that Defendant Foley had entered into a 10b5-1 trading plan on September 16, 2020, which the SEC approved on September 17, 2020.  The plan provided that Foley would sell 100,000 shares of his Peloton common stock each month for the next two years.  Foley began selling shares pursuant to the plan on November 9, 2020, and continued to sell shares every month through August 2021. Defendant Foley entered into the trading plan with the intent of insulating his future trades from public scrutiny.  Once he actively began trading under the plan and demand began to decline, he began making false statements to the public as motivated to keep the stock price high in order to cash out under the guise of his plan.

191.    However, on August 30, 2021, just four days after Peloton disclosed – for the first time – that it had identified a "material weakness" in its "internal controls over financial reporting

with respect to identification and valuation of inventory," *Defendant Foley terminated his trading plan early.* By its terms, the trading plan had not been set to expire until October 31, 2022, and aled him the ability to trade up to 2,400,000 shares. Foley terminated the plan because he knew that Peloton would have to disclose its enormous build-up of inventory in its third quarter and the which would surprise the market and cause the Peloton's stock price to decline. Before terminating the Plan, Foley sold a total of *one million shares of Peloton Class A common stock*. Determined to keep Peloton's stock price high throughout the Class Period and benefit from his trading plan, Defendant Foley misled the market into believing that demand for Peloton's Connected Fitness products would continue, and that there were no inventory problems. Defendant Foley's scheme worked. Between February 4, 2021 and August 30, 2021, he sold his Peloton shares at an average price of *$115.39 per share*. After Peloton disclosed the weaknesses in internal controls over inventory and then the disclosure of November 4, 2021, Peloton's stock traded at  $43 per share, far below the average $115.39 per share Foley had received while selling during the period of the plan. But for the early termination of his trading plan, Foley would have been required to continue selling 100,000 shares of Peloton common stock each month until October 31, 2022, over one year later.

## VIII.   THE MANAGEMENT DEFENDANTS AND INSIDER TRADING DEFENDANTS ENGAGED IN ILLEGAL INSIDER TRADING IN VIOLATION OF SECTION 20A

192.   As detailed above, during the Class Period and while in possession of material, nonpublic information regarding Peloton's dwindling demand and inventory buildup, Management Defendants Foley, Lynch, and Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese collectively dumped more than 3 million shares of their common stock throughout the Class Period, taking in proceeds of more than $395 million and profits of $383 million.

193.    Although the majority of these sales were executed pursuant to 10b5-1 pre-arranged trading plans, the Management Defendants and the Insider Trading Defendants manipulated and deviated from their trading plans as they uncovered material, nonpublic information about Peloton's operations over the course of 2021, including, *inter alia*: facts pertaining to the excessive build-up of inventory in Peloton's warehouses and at shipping ports, and the waning demand for Connected Fitness products as pandemic related restrictions eased and consumers resumed their regular gym routines.

194.    The Management Defendants and the Insider trading Defendants were motivated to keep the stock price high for as long as possible so that they could cash out on their trading plans. Once these Defendants recognized that the truth could no longer be hidden from the public, they deviated from their trading plans, either abruptly halting all trading pursuant thereto, or terminating the plans entirely.

195.    The Management Defendants and the Insider Trading Defendants discovered material adverse facts and were in possession of material, non-public information through: (i) their positions of control and authority as senior executive officers of Peloton; and (ii) their personal knowledge of information reflecting the true problems afflicting Peloton's financial performance. Further, Management Defendants Foley, Lynch, and Woodworth made false and misleading statements and/or signed Peloton's SEC filings in which facts were misstated or omitted.

196.    Contemporaneous with the Management Defendants and Insider Trading Defendants' insider sales, Lead Plaintiff Robeco purchased a total of one million shares of Peloton common stock at artificially inflated prices. Other Class members similarly purchased artificially inflated shares of Peloton common stock contemporaneously with the Management Defendants and Insider Trading Defendants' mass liquidation of their Peloton common stock.

197.    On February 16, 2021, Defendant Foley sold 100,000 shares of Peloton common stock, realizing $15 million in proceeds.  This sale was contemporaneous with Lead Plaintiff Robeco's first Class Period purchase of 800,000 shares on February 23, 2021 (five trading days after Foley's sale) and second Class Period purchase of 200,000 shares on February 24, 2021 (six trading days after Foley's sale).

198.    Defendant Lynch also sold shares of Peloton common stock contemporaneously with Lead Plaintiff Robeco's February purchases.  On February 8, 2021, Lynch sold 500,000 shares of Peloton common stock amounting to total proceeds of more than $73 million.  Thereafter, on February 16, 2021, Defendant Lynch sold an additional 116,670 shares of Peloton common stock amounting to $17.6 million in proceeds.  Defendant Lynch's February sales were made contemporaneously with Lead Plaintiff Robeco's February 23 and 24, 2021 purchases.

199.    On February 16, 2021, Defendant Woodworth sold 50,000 shares of Peloton common stock, amounting to proceeds of more than $7.3 million.  Defendant Woodworth's sale was made contemporaneously with Lead Plaintiff Robeco's purchases of Peloton common stock on February 23 and 24, 2021.

200.    On February 8, 2021, Defendant Kushi sold 160,000 shares of Peloton common stock amounting to $22.42 million in proceeds.  This sale was made contemporaneously with Lead Plaintiff Robeco's February 23 and 24, 2021 purchases.

201.    On February 3, 2021, Defendant Garavaglia sold 5,188 shares of Peloton common stock, amounting to more than $764,000 in proceeds, contemporaneously with Lead Plaintiff Robeco's February 2021 share purchases. Defendant Garavaglia also sold 1,139 shares of Peloton common stock on February 15, 2021, which was contemporaneous with Lead Plaintiff Robeco's February 23 and 24 share purchases.

202.    On February 12, 2021, Defendant Cortese sold 40,000 shares of Peloton common stock, amounting to more than $6 million in proceeds. This sale was made contemporaneously with Lead Plaintiff Robeco's February share purchases made on February 23 and 24, 2021.

203.    Upon information and belief, other Class members similarly purchased shares of Peloton common stock contemporaneously with the Management Defendants and Insider Trading Defendants' insider sales.  As further alleged in this Amended Complaint, at the time of these insiders' sales and the purchases by Lead Plaintiff Robeco and other Class members, the price of Peloton's common stock was artificially inflated by Defendants' material misrepresentations and omissions.  The below chart sets forth Lead Plaintiff Robeco's purchases of Peloton common stock made contemporaneously with the Management Defendants and Insider Trading Defendants' sales.

| Insiders' Sales | | | | | Robeco's Purchases | |
|---|---|---|---|---|---|---|
| *Insider* | *Date* | *Shares Disposed* | *Price per Share* | *Gross Proceeds* | *Date* | *Shares Purchased* |
| Garavaglia | 2/3/21 | 1,644 | $146.41 | $240,698.04 | | |
| | | 2,082 | $147.34 | $306,761.88 | | |
| | | 1,062 | $148.26 | $157,452.12 | | |
| | | 400 | $149.33 | $59,732 | | |
| Lynch | 2/8/21 | 167,770 | $144.05 | $24,167,268.50 | | |
| | | 195,687 | $144.82 | $28,339,391.30 | | |
| | | 94,333 | $145.78 | $13,751,864.70 | | |
| | | 24,758 | $146.72 | $3,632,493.76 | | |
| | | 12,152 | $147.85 | $1,796,673.20 | | |
| | | 5,300 | $148.68 | $788,004.00 | | |
| Kushi | 2/8/21 | 52,952 | $144.05 | $7,627,735.60 | | |
| | | 62,921 | $144.82 | $9,112,219.22 | | |
| | | 30,351 | $145.78 | $4,424,568.78 | | |
| | | 7,710 | $146.70 | $360,057 | | |
| | | 4,266 | $147.85 | $630,728.10 | | |
| | | 1,800 | $148.69 | $267,642 | | |
| | | 1,474 | $145.66 | $214,702.84 | | |
| | | 1,486 | $146.34 | $217,461.24 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 2,800 | $147.80 | $413,840 | | |
| | | 9,771 | $148.65 | $1,452,459.15 | | |
| Cortese | 2/12/21 | 2,309 | $149.42 | $345,010.78 | | |
| | | 600 | $150.68 | $90,408 | | |
| | | 3,048 | $152.18 | $463,844.64 | | |
| | | 3,200 | $152.86 | $489,152 | | |
| | | 13,997 | $153.99 | $2,155,398.03 | | |
| | | 1,315 | $154.53 | $203,206.95 | | |
| Garavaglia | 2/15/21 | 1,139 | $154.67 | $176,169 | | |
| | | 21,927 | 146.22 | $3,206,165.94 | | |
| | | 22,628 | 147.22 | $3,331,294.16 | | |
| | | 15,090 | 148.14 | $2,235,432.60 | | |
| Lynch | 2/16/21 | 2,573 | 149.16 | $383,788.68 | | |
| | | 13,285 | 150.57 | $2,000,322.45 | | |
| | | 32,373 | 151.49 | $4,904,185.77 | | |
| | | 8,694 | 152.33 | $1,324,357.02 | | |
| | | 100 | 155.50 | $15,550 | | |
| Foley | 2/16/21 | 30,789 | $146.22 | $4,501,967.58 | | |
| | | 20,063 | $147.22 | $2,953,674.86 | | |
| | | 11,723 | $148.07 | $1,735,824.61 | | |
| | | 2,752 | $149.01 | $410,075.52 | | |
| | | 6,789 | $150.40 | $1,021,065.6 | | |
| | | 18,543 | $151.32 | $2,805,926.76 | | |
| | | 8,441 | $152.11 | $1,283,960.51 | | |
| | | 300 | $153.11 | $45,933 | | |
| | | 600 | $154.83 | $92,898 | | |
| Woodworth | 2/16/21 | 15,618 | $146.23 | $2,283,820.14 | | |
| | | 10,142 | $147.24 | $1,493,308.08 | | |
| | | 5,700 | $148.10 | $844,170 | | |
| | | 1,154 | $149.05 | $172,003.70 | 2/23/21 | 800,000 |
| | | 4,406 | $150.49 | $663,058.94 | | |
| | | 9,578 | $151.44 | $1,450,492.32 | 2/24/21 | 9,700 |
| | | 3,002 | $152.23 | $456,994.46 | | |
| | | 100 | $152.95 | $15,295 | 2/24/21 | 190,300 |
| | | 300 | $154.61 | $46,383 | | |

204.    Lead Plaintiff and other members of the Class who purchased shares of Peloton common stock contemporaneously with the sales of Peloton common stock by Management Defendants Lynch, Foley, and Woodworth and Insider Trading Defendants Garavaglia, Cortese,

and Kushi have suffered damages flowing from their share purchases at prices inflated by the Management Defendants' misstatements disseminated in violation of §§ 10(b) and 20(a) of the Exchange Act.  Lead Plaintiff and other members of the Class would not have purchased Peloton stock at the inflated prices they paid had they known the truth about inventory overflow and dwindling demand for Peloton's Connected Fitness products.

205.    Management Defendants Lynch, Foley, and Woodworth and Insider Trading Defendants Cortese, Garavaglia, and Kushi violated § 20A of the Exchange Act and are liable to Lead Plaintiff and other members of the Class for the significant damages incurred in connection with their purchases of Peloton common stock during the Class Period.

## IX.    THE TRUTH EMERGES

206.    On November 4, 2021, after the market closed, Peloton announced its financial results for its Fiscal Year 2022 first quarter (ended September 30, 2022). The Company disclosed that it had revised its full-year revenue guidance for Fiscal Year 2022 down to a range of $4.4 to $4.8 billion from the previous guidance of  $5.4 billion, due to declining demand as its customers were increasingly free to exercise outside the home. Peloton further disclosed that at of September 30, 2021 its inventory levels had skyrocketed to $1.27 billion, from $937.1 million as of June 30, 2021, a 35% increase, 91% of which were "finished products" that the Company still held. In other words, ***91% of the inventory that Peloton retained had on hand remained unsold.***

207.    These disclosures directly contradicted the representations that the Management Defendants had made about Peloton's growth, inventory, and the impact that emerging from COVID would have on the Company's business. As a direct result of these disclosures, Peloton's stock price plummeted by 35%, falling $30.42 per share in one day from a closing price of $86.06 per share on November 4, 2021 to a closing price of $55.64 per share on November 5, 2021.

208.   During the earnings call, Foley stated: "The swift timing of these changes since giving our initial guidance in August, is not lost on us. As we prepared our previous guidance, we had to make assumptions about consumer behavior coming out of COVID, the impact of our original bike price reduction and the cost structure within our connected fitness segment, all against the backdrop of a global supply chain crisis." This statement directly contradicted virtually evry one of the Management Defendants' prior statements during the Class Period regarding inventory and demand.

209.   Regarding the revised guidance Defendant Woodworth stated that, "our revised guidance reflects a reduction in our expected bike portfolio sales and Tread sales versus our original forecast, given traffic trends over the past several weeks." According to CW1, CW2 and CW4, Defendant Woodworth had access to reports generated by both the Inside Sales team and the Planning Team which indicated that Peloton's Bike Portfolio sales had been declining for *months* prior to Peloton issuing its revenue guidance.

210.   Analysts were shocked by Peloton's slashed revenue guidance, which it had issued just three months earlier.  On November 5, 2021, BMO Capital reported on Peloton's first quarter earnings call for FY 2022: (emphasis supplied):  "Last night's results suggest that Pton's pandemic surge had dissipated…. In racing to meet pandemic driven demand, the company embarked on a massive investment spree (Tonic, Precor, POP) dwindling cash and ballooning inventory ***just as demand tapered***." Wedbush analyst James Hardiman dubbed Peloton's "fall from grace" in such a short period of time as "fairly astonishing."

211.   According to Reuters, at least 15 analysts that followed Peloton lowered their price target on Peloton's stock after the Company cut its revenue guidance. JP Morgan reduced its price target from $138 to $90 per share. Truist Securities downgraded Peloton from "Buy" to "Hold"

and cut its price target on the stock from $130 to $68. Stifel changed its rating on Peloton from "Buy" to "Hold" and lowered its price target from $120 to $70.

212.    Analysts led by Scott W. Devitt said that prior guidance from management had given them confidence that Peloton could grow through the reopening period, with a new product launch and expansion into international markets as potential catalysts. That confidence proved unwarranted when Peloton revised its revenue guidance.

## X.    POST CLASS PERIOD DISCLOSURES

213.    On January 14, 2022 the NASDAQ announced that Peloton would be removed from the NASDAQ 100, just thirteen months after it had been added.

214.    On January 18, 2022, CNBC reported that Peloton was working with consulting group McKinsey & Co. to review its cost structure and potentially eliminate jobs.  CNBC further reported that beginning at the end of January 2022, Peloton would begin charging delivery and assembly fees for its Bikes and Treads to account for "historic levels of inflation and heightened supply chain costs."

215.    On January 20, 2022, CNBC reported that slides leaked by employees indicated that Peloton was planning to pause production of its Bikes and Treads due to a large buildup of inventory which had not been sold. *Business Insider* later reported that one former employee described the warehouses as "jigsaw puzzles" with employees trying to figure out where to stuff additional bikes.

216.    *Business Insider* later published an internal slide provided by a Peloton employee, which revealed that Peloton was planning a two-month production pause for the Bike, a five month production pause for its Bike+, and a six week production pause for the Tread. The pauses in production were necessitated by an excess of inventory and reversion to a seasonal demand cycle for equipment that had been the Company's norm prior to the pandemic.

A chart showing Peloton's plan to halt production in bikes and treadmills for six weeks.

FY22 Projected End-of-Quarter Inventory levels (units)
(after supporting F2 Demand plan)

| In Ku | Q1 | Q2 | Q3 | Q4 | Notes |
|---|---|---|---|---|---|
| Bike | 135 | 138 | 290 | 183 | 2 month pause production in Feb->Mar to align inventory to F2 |
| Bike+ | 47 | 122 | 210 | 172 | 5 month pause production in Dec->Jun to align inventory to F2 |
| Tread | 43 | 38 | 48 | 20 | 6 wk pause production in Feb->Mar to align inventory to F2 |
| Tread+ | 21 | 24 | 24 | 24 | No production in FY22 |
| Guide | 0 | 0 | 250 | 240 | Up to 9 months production pause btw Feb->Nov to align inventory to F2 |
| Total: | 246 | 322 | 822 | 639 | |



- Total Tread supply pegged to *30 DOH* target by CY close
- Projected to close fiscal 2022 carrying 19.7k on-hand/~51 DOH
  - This translates to 10K in US (oversold forecast 1.5K last wk)
- US deck production shut down planned ~6 weeks Feb-March
- An additional 10-12% plan reduction would reduce production by ~10K units

217.    Additional leaked slides published by Business Insider further confirmed Peloton's oversupply of its Bike, Bike+, and Treads in the Company's warehouses, as described by several CWs, and Peloton's plans for a production stoppage in order to allow inventory to "taper down."



218.    On February 8, 2022, during Peloton's second quarter FY 2022 earnings call, Peloton announced a "restructuring program" which entailed, among other things, laying off 2,800 employees and abandoning its plans to construct an additional manufacturing facility in Ohio, which would cause the Company to incur $60 million in restructuring capital expenditures. In particular, Defendant Foley stated:

> [w]e are taking significant structural actions to align our business and build our margin back into our hardware economics. This includes optimizing our logistics footprint by reducing our owned and operated warehousing and delivery network, as well as generating efficiencies across procurement and manufacturing. We've also made the decision to wind down the development of Peloton Output Park.

219.    Also on the February 8, 2022 earnings call, Peloton announced substantial leadership changes – namely, that John Foley would be stepping down as CEO and instead assume a new role as executive chair of the Board, and that Barry McCarthy would replace Foley as CEO. Peloton also announced the departure of several executives and Board members including Defendant Lynch during the call.

220.    Also on February 8, 2022, Defendant Foley sent a message to Peloton employees which stated, in pertinent part:

> After careful review, we'll be driving strategic initiatives across our global team that will help us focus on areas that are in need of adjustment, including implementing a comprehensive restructuring program. We've also embarked on a significant realignment and reduction of our North American warehousing and first

party logistics operations. During the pandemic we were forced to rapidly expand our warehouse infrastructure and last mile delivery teams, while also scaling our third party relationships. As our growth has moderated and returned to a more typical seasonal pattern, we've made the decision to significantly reduce our owned and operated warehousing and delivery footprint.

221.    On February 14, 2022, Peloton announced that Chief Supply Chain Officer Jon Adee, Chief Operating Officer Mariana Garavaglia, and Chief Business Officer Brad Olson would all be stepping down from their positions.

222.    On May 11, 2022, Peloton had its third quarter earnings call for fiscal year 2022 in which it further disclosed that its unreasonable overflow of inventory would persist well into fiscal year 2022 and cause the Company to incur additional inventory costs.  In particular, the Company announced that, for the third and fourth quarters of fiscal year 2022, it would experience "higher detention and demurrage and storage costs, given the fact that [their] inventory position is higher than  expected given the decline in  demand forecast." According to CW1 and CW4,  Defendant Woodworth was aware of the fact that Peloton had procured far more product than was warranted by sales forecasts during the Class Period.

223.    On May 16, 2022, Peloton announced in a Form 8-K filing with the SEC that it was searching for a $750 million loan to help finance its business affairs.  Peloton subsequently entered into a $750 million five-year debt arrangement with JPMorgan and Goldman Sachs.

## XI.    ALLEGATIONS OF SCIENTER

224.    The Management Defendants acted with scienter in that they knew, or recklessly disregarded that public documents and statements disseminated in the name of Peloton were materially false and misleading; knew that such statement or documents would be issued to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  These Defendants, by virtue of their association with and control which made them privy to

confidential internal information, including weekly, daily and monthly reports which showed declining demand and increasing inventory throughout the Class Period, participated in the fraudulent scheme designed to mask the decline in the demand for the Connected Fitness Products and the buildup of inventory in Peloton's warehouses and create the illusion that Peloton's prior fiscal year results could be replicated despite the introduction of vaccines and easement of COVID restrictions.

225.    Further, the Management Defendants were motivated to consciously and/or recklessly make such false and misleading statements and omissions throughout the Class Period in order to give themselves, the Insider Trading Defendants Garavaglia, Cortese, and Kushi, and other insiders the opportunity to sell their personally-held shares of Peloton common stock at artificially inflated prices, allowing them to collectively *realize profits of more than $383 million* during the Class Period.

### A.   JOHN FOLEY

226.    In addition to the allegations alleged in the above paragraphs Defendant Foley's scienter is further evidenced by the following facts:

227.    *First,* Lynch held the highest-level position in the Company, controlled the contents of Peloton's public statements, and according to CW1, CW2, CW3 and CW6 had access to material, adverse, nonpublic information in the form of (1) access to the Looker Report which was generated daily and incorporated real time sales data from Salesforce which indicated that sales for Connected Fitness Products were declining as early as December 2020 and continued to decline during the Class Period; (2) access to presentations made during monthly supply chain meetings which indicated that the gap between sales forecasts and actual sales was growing i.e. that demand was declining and inventory levels were increasing throughout the Class Period, and

; (3) internal SalesForce delivery reports which he likely discussed with Chief Supply Chain Officer Jon Adee.

228.    *Second,* Because of his high-level position, Foley was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about Peloton, Foley knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors that demand continued to be strong after pandemic restrictions eased were materially false, misleading and/or incomplete.  As the Company's senior-most executive, Foley was responsible for the accuracy of Peloton's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

229.    Finally, Foley entered into a 10b-51 trading plan just months before the Class Period began, and then abruptly terminated the trading plan on August 30, 2021, more than an entire year before it was set to expire, and having only sold 1,000,000 shares when the plan called for the sale of up to 2,400,000 shares of common stock, while in possession of material nonpublic information concerning the decline in demand for Peloton Connected Fitness Products and the increased levels of unsold inventory.

230.    Foley sold 700,000 shares of Peloton stock during the Class Period, realizing profits of $78 million.

## B.  JILL WOODWORTH

231.    In addition to the facts alleged in the above paragraphs, Defendant Woodworth's scienter evidenced by the following facts:

232.    First, according to CW 1, Woodworth attended monthly meetings along with Lynch and Chief Supply Chain Officer Jon Adee, where she was apprised of declining demand forecasts for Peloton's Connected Fitness Products and the growing surplus of unsold inventory, much of which the Company was paying tremendous demurrage fees on.

233.    Woodworth held one of the highest-level positions at the Company, controlled the contents of Peloton's public statements, and had access to material, adverse, nonpublic information concerning the fact that demand for Peloton's Connected Fitness products had declined once pandemic restrictions were lifted. She was also made aware through internal reports that inventory became increasingly misaligned with demand during the course of the class period. Because of her high-level position, Woodworth was provided to, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of her position and access to material non-public information about Peloton, Woodworth knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As the Company's second senior-most executive, Pope was responsible for the accuracy of Peloton's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

234.    Finally, Defendant Woodworth sold 150,000 shares during the Class Period, realizing profits of $16.82 million. Although she traded pursuant to a 10b5-1 trading plan, she amended the trading plan throughout the Class Period, and abruptly ceased trading under her plan in or around the Fall of 2021.

## C.  WILLIAM LYNCH

235.     In addition to the facts alleged in the above paragraphs, Defendant Lynch's scienter is further evidenced by the following facts:

236.     *First,* Lynch  held one of the highest-level positions at the Company, controlled the contents of Peloton's public statements, and had access to material, adverse, nonpublic information concerning the fact that demand for Peloton Connected Fitness Products had declined once pandemic restrictions were lifted during the Class Period. Because of his high-level position, Lynch was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information about Peloton, Lynch knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete.  As the Company's second senior-most executive, Lynch was responsible for the accuracy of Peloton's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

237.     *Second,* according to CW1, CW2, CW3 and CW6 had access to material, adverse, nonpublic information in the form of in the form of (1) access to  the Looker Report which was generated daily and incorporated real time sales data from Salesforce which indicated that sales for Connected Fitness Products were declining as early as December 2020 and continued to decline during the Class Period; (2) presentations made during monthly supply chain meetings which indicated that the gap between sales forecasts and actual sales was growing i.e. that demand was declining and inventory levels were increasing throughout the Class Period, and; (3) internal SalesForce delivery reports which he likely discussed with Chief Supply Chain Officer Jon Adee.

238.   *Second,* According to CW2 and CW6, Lynch was aware of Peloton's declining sales throughout the Class Period, because he had access to the Looker Report, which demonstrated that the Inside Sales Organization. Furthermore, according to CW6 Defendant Lynch was responsible for issuing sales goals for the Inside Sales Team in consultation with Peloton's Board of Directors.

Finally,  Defendant Lynch sold 700,000 shares during the Class Period, realizing profits in the amount of $78 million.

### D.   IMPUTED KNOWLEDGE OF FACTS CRITICAL TO THE COMPANY'S INVENTORY AND TRENDS IN DEMAND FOR CONNECTED FITNESS PRODUCTS

239.   Defendants Foley, Woodworth and Lynch were aware of and informed of matters relating to the Company's demand forecasts, sales and inventory levels. Consequently, their experience and responsibilities necessarily further support a strong inference that they knew (or at least recklessly disregarded) that the statements at issue herein and made during the Class Period were materially false and misleading and contained material omissions.

240.   As detailed above, Peloton's sales of Connected Fitness equipment is integrally important to the Company's success, and Defendants can therefore also be presumed to have had knowledge of inadequacies of their disclosures in this regard.

### E.   THE MANAGEMENT DEFENDANTS PLEDGED A SUBSTANTIAL PERCENTAGE OF THEIR SHARES DURING THE CLASS PERIOD AND THUS WERE MOTIVATED TO KEEP PELOTON'S STOCK PRICE HIGH TO PROTECT THEIR COLLATERAL

241.   According to a Blackwells report issued in February 2022, Foley, Kushi, Lych, and Cortese all pledged a substantial portion of their economic interest in Peloton during the Class Period.

242.    As of September 30, 2021, Defendant Foley had pledged 65% of his economic interest in Peloton; Defendant Lynch, 41%; Defendant Kushi, 50%; and Defendant Cortese pledged a startling 60% of his economic interest in Peloton.

243.    The below chart is from Blackwells's 2022 report:



244.    Blackwells also called attention to the total amount of economic interest pledged by certain Peloton insiders, warning that pledging "can lead to forced stock sales in the event of a margin call and accelerate a downward spiral in the stock price."



245.     That a number of Peloton insiders had pledged a large portion of their economic interest in Peloton suggests that they possessed the motive to maintain the appearance that Peloton was thriving in order to protect the value of the shares pledged.

**F.   THE MANAGEMENT DEFENDANTS AND THE INSIDER TRADING DEFENDANTS PROFITED FROM CLASS PERIOD STOCK SALES**

**1.     The Management Defendants and the Insider Trading Defendants Suspiciously Adopted, Modified, Amended, or Prematurely Terminated 10b5-1 Trading Plans During the Class Period and Thus the Plans do Not Absolve Them of Insider Trading Liability**

246.     In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1 ("Rule"), which provides that a person will be considered to have traded "on the basis of" material, nonpublic information if the person who engaged in the transaction was "aware of" that information at the time of the trade.

247.     Subsection "c" of the Rule, 10b5-1(c), provides a safe harbor under the "aware of" standard – that is, the SEC created an affirmative defense to insider trading claims for those trades made under a pre-existing binding agreement or plan ("10b5-1 Plans" or "Plans").  See Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51-727-28 (Aug. 24, 2000).  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan to scheme or evade the prohibitions" against insider trading.

248.     In light of these requirements, insiders are encouraged to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomas West, Corporate Counsel's Guide to Insider Trading and Reporting § 12:26 (2006).  On the other hand, the adoption and/or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

249.     10b5-1 trading plans have been, and still are, heavily scrutinized by the SEC and the public at large. For instance, in 2007, Bloomberg published an article, "The SEC Is Eyeing Insider Stock Sales," which detailed an academic study of such trading plans which demonstrated that insiders perform "substantially better" when they make trades under 10b5-1 Plans "than would be expected if trading were truly automatic" (as trades should be under these Plans).  The study revealed that trades made based on the Plans "beat the market by 6% over six months, while those at the same firms who traded outside of the plans only topped it by 1.9%."

250.     In 2009, Stanford Business School Graduate, Alan Jagolinzer, published an article in Management Science, criticizing 10b5-1 Plans for inducing "strategic trading" amongst corporate insiders who think they can fall back on Rule 10b5-1(c) as an affirmative defense when accused of insider trading.  Alan D. Jagolinzer, SEC Rule 1 0b5-1 and Insiders' Strategic Trade, 55 Mgmt. Sci. 224 (2009).

251.     Several years later, on November 27, 2012, *The Wall Street Journal* published an article written by Susan Pulliam and Rob Barry, called "Executives' Good Luck in Trading Own Stock" cautioning that executives trading under 10b5-1 Plans can strategically time their trades to avoid financial losses and yield greater returns because the plans are not public and therefore can be canceled, amended, or modified at any time unbeknownst to the public.

252.     On December 13, 2012, *The Wall Street Journal* published yet another article entitled "Trading Plans Under Fire," which stated that "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior."

253.     In March 2013, Wilson Sonsini cautioned clients that "[t]he floodlights now aimed at such plans are the result of recent Wall Street Journal articles showing that corporate insiders, even those executive trades pursuant to Rule 10b5-1 plans, have generated significant profits – or

avoided significant losses – by trading company stock in the days just before their companies issued market-moving news." The Sonsini Report further advised clients to avoid multiple trading plans, frequent modifications, and encouraged clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (e.g., 1,000 shares a month on the 15th day of the month)."

254.    One month later, on April 24, 2013, *The Wall Street Journal* published an article entitled, "Directors Take Shelter in Trading Plans," which warned that, "instead of selling a fraction of their shares at regular intervals, as envisioned when regulators created the plans as a way for executives to diversity their holdings, some directors use the plans to sell heavily in a short time."

255.    In January 2021, the Rock Center for Corporate Governance at Stanford University published the article entitled, "Gaming the System: Three 'Red Flags' of Potential 10b5-1 Abuse" which cautioned that "executives use 10b5-1 plans to engage in opportunistic, large-scale selling of company shares."

256.    Recently, on December 15, 2021, the SEC unanimously agreed to propose amendments to Rule 10b5-1(c), making it more difficult for executives to use its safe harbor for unlawful trades executed under 10b5-1 trading plans. Rule 10b5-1 and Insider Trading, Exchange Act Release No. 33-11013; 34-93782 (proposed Dec. 15, 2021).

257.    Shortly before, and consistently throughout the entire Class Period, Defendants Foley, Woodworth, Lynch, Kushi, Garavaglia, and Cortese engaged in highly erratic and irregular trading behavior, as did certain Peloton directors. On September 14, 2020 alone, Defendants Lynch, Kushi, and Cortese dumped 746,390 of their stockholdings in the Company, taking in combined proceeds of more than $60 million.

258.    As further detailed herein, the irregular trading behavior carried out by the Management Defendants leading up to and during the Class Period is sufficiently suspicious so as to preclude any affirmative defense that might otherwise have been available to their pre-planned sales made under such plans.

### 2.    Defendant Foley

259.    Although Foley sold his shares of common stock pursuant to a 10b5-1 trading plan throughout the Class Period, he deviated from the trading plan by terminating it early.  Foley's trading plan had an expiration date of October 31, 2022, however, he abruptly terminated his 10b5-1 Trading Plan on August 30, 2021, just four days after Peloton filed its Form 8-K with the SEC, informing investors that the Company had identified "a material weakness" in its "internal controls over financial reporting with respect to identification and valuation of inventory," causing Peloton's stock price to drop 8.5%.

260.    During the Class Period, Defendant Foley profited by more than $78.82 million from his sales of Peloton common stock.  That Foley's trades were executed under the guise of his 10b5-1 Plan, does not rid them of their stench of informed and illicit insider trading because, as alleged herein, Foley possessed material non-public information about Peloton's supply and demand problems at the time he entered into the trading plan.

261.    As Defendant Foley sold 100,000 shares of Peloton common stock each month, he was continuously issuing bullish statements to the investors and analysts, and even his employees about the future success of Peloton.

262.    Below is a chart detailing Foley's suspicious Class Period trades:

| | Date | No. shares | Price    per | Proceeds | Trade |
|---|---|---|---|---|---|
| | | 30,789 | $146.22 | $4,501,967.58 | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | | 20,063 | $147.22 | $2,953,674.86 | Yes |
| | | 11,723 | $148.07 | $1,735,824.61 | Yes |
| | | 2,752 | $149.01 | $410,075.52 | Yes |
| | | 6,789 | $150.40 | $1,021,065.60 | Yes |
| | | 18,543 | $151.32 | $2,805,926.76 | Yes |
| | | 8,441 | $152.11 | $1,283,960.51 | Yes |
| | | 300 | $153.11 | $45,933 | Yes |
| | | 600 | $154.83 | $92,898 | Yes |
| TOTAL | 2/16/2021 | 100,000 | | $14,851,326 | |
| | | 4,889 | 108.07 | $528,354.23 | Yes |
| | | 11,176 | $109.10 | $1,219,301.60 | Yes |
| | | 22,577 | $110.02 | $2,483,921.54 | Yes |
| | | 32,663 | $111.05 | $3,627,226.15 | Yes |
| | | 28,595 | $111.79 | $3,196,635.05 | Yes |
| | | 100 | $112.68 | 11,268 | Yes |
| TOTAL | 3/15/2021 | 100,000 | | $11,066,707 | |
| | | 28,615 | $118.95 | $3,403,754.25 | Yes |
| | | 64,504 | $119.64 | $7,717,258.56 | Yes |
| | | 6,285 | $120.79 | $759,165.15 | Yes |
| | | 596 | $121.55 | $72,443.80 | Yes |
| TOTAL | 4/15/2021 | 100,000 | | $11,952,622 | |
| | | 15,218 | $90.18 | $1,372,359.24 | Yes |
| | | 18,608 | $90.96 | $1,692,583.68 | Yes |

83

|  |  | 38,287 | $91.97 | $3,521,255.39 | Yes |
|---|---|---|---|---|---|
|  |  | 6,719 | $92.93 | $$624,396.67 | Yes |
|  |  | 13,621 | $93.96 | $1,279,829.16 | Yes |
|  |  | 4,147 | $95.06 | $394,213.82 | Yes |
|  |  | 3,300 | $95.90 | $316,470 | Yes |
|  |  | 100 | $96.60 | $9,660 | Yes |
| TOTAL | 5/17/2021 | 100,000 |  | $8,586,371 |  |
|  |  | 18,067 | $106.22 | 1,919,076.74 | Yes |
|  |  | 11,523 | $107.18 | $1,235,035.14 | Yes |
|  |  | 28,260 | $108.18 | $3,057,166.80 | Yes |
|  |  | 22,449 | $109.22 | $2,451,879.78 | Yes |
|  |  | 11,101 | $110.23 | $1,223,663.23 | Yes |
|  |  | 8,400 | $110.99 | $932,316 | Yes |
|  |  | 200 | $111.96 | $22,392 | Yes |
| TOTAL | 6/15/2021 | 100,000 |  | $10,841,530 |  |
|  |  | 3,198 | $108.72 | $347,686.56 | Yes |
|  |  | 24,385 | $109.90 | $2,679,911.50 | Yes |
|  |  | 43,885 | $110.88 | $4,865,968.80 | Yes |
|  |  | 13,078 | $111.47 | $1,457,804.66 | Yes |
|  |  | 6,154 | $112.72 | $69,322.80 | Yes |
|  |  | 7,500 | $113.77 | $853,275 | Yes |
|  |  | 1,800 | $114.46 | $206,028 | Yes |
| TOTAL | 7/15/2021 | 100,000 |  | $10,479,997 |  |

| | | | | | |
|---|---|---|---|---|---|
| | | 5,009 | $107.79 | $539,920.11 | Yes |
| | | 9,793 | $108.71 | $1,064,597.03 | Yes |
| | | 51,272 | $109.88 | $5,633,767.36 | Yes |
| | | 30,426 | $110.62 | $3,365,724.12 | Yes |
| | | 3,500 | $111.47 | $390,145 | Yes |
| TOTAL | 8/16/2021 | 100,000 | | 10,994,154 | |
| | | 376 | $100.17 | $37,663.92 | No |
| | | 110 | $100.91 | $11,100.10 | No |
| TOTAL | 8/31/2021 | 486 | | 48,764 | |
| TOTAL | | 700,486 | | $78,821,470.71 | |

263.     According to CW5, in late 2021, Peloton employees, concerned about Defendant Foley's stock sales, took to Slack to discuss the sales, with one employee asking: "Should we be concerned if our CEO is selling his stock?"  According to CW5, the post "created a tizzy" and was immediately deleted about one hour after it was posted.

### 3.     Defendant Woodworth

264.     Defendant Woodworth also sold a massive amount of her shares of Peloton common stock throughout the Class Period.  Although Defendant Woodworth executed all sales pursuant to her 10b5-1 Plan, sales made under a pre-arranged trading plan should be executed in adherence to a prescribed and predetermined rhythm of trading (e.g., 1,000 shares per month on the first of each month), however, Defendant Woodworth's trading patterns were abnormal.  For instance, Woodworth traded highly irregular amounts of shares leading up to and during the Class Period, including: 130,000 shares on May 8, 2020; 35,000 shares on May 12, 2020; 40,000 shares

on June 15; 45,000 shares on June 22, 2020; 100 shares on June 26, 2020; 49,900 shares on July 1, 2020; 150,000 shares on November 9, 2020; and 50,000 shares on February 16, 2021.

265.    Defendant Woodworth liquidated 300,000 shares of Peloton common stock just months before the Class Period began, and another 150,000 shares during the Class Period – all of which were traded under the façade of her 10b5-1 Plan.  During the Class Period, Defendant Woodworth realized profits in the amount of $16.82 million from her sales of Peloton common stock.

|  | Date | # shares | Price per | Proceeds | Trade |
|---|---|---|---|---|---|
|  |  | 15,618 | 146.23 | $2,283,820.10 | yes |
|  |  | 10,142 | 147.24 | $1,493,308.00 | yes |
|  |  | 5,700 | 148.10 | $844,170.00 | yes |
|  |  | 1,154 | 149.05 | $172,003.70 | yes |
|  |  | 4,406 | 150.49 | $663,058.94 | yes |
|  |  | 9,578 | 151.44 | $1,450,492.30 | yes |
|  |  | 3,002 | 152.23 | $456,994.46 | yes |
|  |  | 100 | 152.95 | $15,295.00 | yes |
|  |  | 300 | 154.61 | $46,383.00 | yes |
| TOTAL | 2/16/2021 | 50,000 |  | $7,425,525.64 |  |
|  |  | 8,454 | 90.22 | $762,719.88 | yes |
|  |  | 8,847 | 91.02 | $805,253.94 | yes |
|  |  | 19,318 | 91.99 | $1,777,062.80 | yes |
|  |  | 3,200 | 93.09 | $297,888 | yes |
|  |  | 6,681 | 94.00 | $628,014 | yes |

| | | 2,300 | 95.15 | $218,845 | yes |
| | | 1,200 | 96.05 | $115,260 | yes |
| TOTAL | 5/17/2021 | 50,000 | | $4,605,043.64 | |
| | | 10,582 | 104.60 | $1,106,877.20 | yes |
| | | 25,488 | 105.49 | $2,688,729.10 | yes |
| | | 12,430 | 106.15 | $1,319,444.50 | yes |
| | | 400 | 107.53 | $43,012 | yes |
| | | 1,100 | 108.39 | $119,229 | yes |
| TOTAL | 9/15/2021 | 50,000 | | $5,277,291.82 | |
| TOTAL | | 150,000 | | $17,307,861.10 | |

### 4.    Defendant Lynch

266.    On September 14, 2020, William Lynch sold 313,500 shares of Peloton common stock, netting proceeds of $25,356,000.  One month later, on October 14, 2020, Lynch sold 183,500 shares of his stock; followed by a sale of 169,424 shares on November 16, and 163,500 shares on December 14.  Defendant Lynch then dumped 500,000 shares of his stockholdings on February 8, 2021, and another 116,670 shares just one week later, on February 16.  Then, beginning on April 14, 2021, Defendant Lynch took to selling 28,333 shares each month until September 14, 2021, at which point he suddenly halted trading under the Plan.

267.    During the Class Period alone, Defendant Lynch liquidated 1,616,592 of his shares of Peloton common stock, causing him to profit by $103.57 million.

268.    Defendant Lynch's pre-Class Period sales were significantly lower on average than his sales made throughout the Class Period.  For instance, before the Class Period, Lynch's largest

sale was 147,132 shares on May 12, 2020; however, at the very beginning of the Class Period, on September 14, 2020, Lynch more than doubled that when he sold 313,500 shares in one day.  Then, on February 8, 2021, just four days after one of Peloton's earnings call during which the Management Defendants reassured investors that demand for their products was not declining, Defendant Lynch suspiciously sold 500,000 shares, netting proceeds of more than $73 million, evidencing that Lynch was aware of the stark decline in demand the Company was facing.

269.    The following chart details William Lynch's stock sales leading up to and during the Class Period.

|  | Date | No. shares | Price per | Proceeds | Trade |
|---|---|---|---|---|---|
|  |  | 167,770 | $144.05 | $24,167,268.50 | Yes |
|  |  | 195,687 | $144.82 | $28,339,391.34 | Yes |
|  |  | 94,333 | $145.78 | $13,751,864.74 | Yes |
|  |  | 24,758 | $146.72 | $3,632,493.76 | Yes |
|  |  | 12,152 | $147.85 | $1,796,673.20 | Yes |
|  |  | 5,300 | $148.68 | $788,004.00 | Yes |
| TOTAL | 2/8/2021 | 500,000 |  | $72,475,695.54 |  |
|  |  | 21,927 | $146.22 | $3,206,165.94 | Yes |
|  |  | 22,628 | $147.22 | $3,331,294.16 | Yes |
|  |  | 15,090 | $148.14 | $2,235,432.60 | Yes |
|  |  | 2,573 | $149.16 | $383,788.68 | Yes |
|  |  | 13,285 | $150.57 | $2,000,322.45 | Yes |
|  |  | 32,373 | $151.49 | $4,904,185.77 | Yes |
|  |  | 8,694 | $152.33 | $1,324,357.02 | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | | 100 | $155.50 | $15,550 | Yes |
| TOTAL | 2/16/2021 | 116,670 | | $17,401,096.62 | |
| | | 9,160 | $117.94 | $1,080,330.40 | Yes |
| | | 10,439 | $118.96 | $1,241,823.44 | Yes |
| | | 4,625 | $119.77 | $553,936.25 | Yes |
| | | 1,700 | $121.28 | $206,176.00 | Yes |
| | | 2,409 | $122.16 | $294,283.44 | Yes |
| TOTAL | 4/14/2021 | 28,333 | | $3,376,549.53 | |
| | | 28,333 | $100.04 | $2,834,433.32 | |
| TOTAL | 5/20/2021 | 28,333 | | $2,834,433.32 | |
| | | 16,309 | $112.12 | $1,828,565.08 | Yes |
| | | 10,624 | $113.02 | $1,200,724.48 | Yes |
| | | 1,300 | $114.07 | $148,291.00 | Yes |
| | | 100 | $114.66 | $11,466.00 | Yes |
| TOTAL | 6/14/2021 | 28,333 | | $3,189,046.56 | |
| | | 6,304 | $113.72 | $716,890.88 | Yes |
| | | 20,129 | $114.85 | $2,311,815.65 | Yes |
| | | 1,400 | $115.81 | $162,134.00 | Yes |
| | | 500 | $116.58 | $58,290.00 | Yes |
| TOTAL | 7/14/2021 | 28,333 | | $3,249,130.53 | |
| | | 2,228 | $108.03 | $240,690.84 | Yes |
| | | 4,587 | $109.29 | $501,313.23 | Yes |
| | | 18,200 | $110.20 | $2,005,640.00 | Yes |

89

| | | 3,318 | $111.14 | $368,762.52 | Yes |
|---|---|---|---|---|---|
| TOTAL | 8/16/2021 | 28,333 | | $3,116,406.59 | |
| | | 8,044 | $108.34 | $871,486.96 | Yes |
| | | 4,312 | $109.33 | $471,430.96 | Yes |
| | | 2,646 | $110.46 | $292,277.16 | Yes |
| | | 2,802 | $111.71 | $313,011.42 | Yes |
| | | 8,929 | $112.58 | $1,005,226.82 | Yes |
| | | 1,600 | $113.38 | $181,408 | Yes |
| TOTAL | 9/14/2021 | 28,333 | | $3,134,841.32 | |
| TOTAL | | 786,668 | | $108,777,200 | |

### 5.    Defendant Kushi

270.    Defendant Kushi's trading was highly suspicious throughout the Class Period. Although Kushi traded strictly under the guise of his 10b5-1 Plan, his trades were irregular in amount and timing, and he appears to have even modified his trading plan on multiple occasions throughout the Class Period, eliminating any possibility that his trades were made with good faith.

271.    Like Defendant Lynch, Kushi suspiciously made his first sale of Peloton common stock on September 14, 2020, when he liquidated 132,890 shares yielding proceeds of nearly $11 million.  He thereafter sold 160,000 shares on February 8, 2021; and 80,000 shares on March 12, 2021.  Defendant Kushi abruptly ceased trading altogether on October 20, 2021, right before the end of the Class Period.

272.    During the Class Period, Defendant Kushi liquidated a total of 800,000 shares of his stock in Peloton, realizing total profits of $91.71 million.

90

273.    Defendant Kushi terminated his 10b5-1 pre-arranged trading plan on or around
October 20, 2021 before the truth fully emerged to the public about the fraudulent scheme at
Peloton.  Had Defendant Kushi not terminated his plan in October 2021, he would have been
required to - as set forth by the terms of his trading plan - to continue selling 80,000 shares each
month as Peloton's stock price declined rapidly.

|  | Date | No. shares | Price    per | Proceeds | Trade |
|---|---|---|---|---|---|
|  |  | 52,952 | $144.05 | 7,627,735.60 | Yes |
|  |  | 62,921 | $144.82 | 9,112,219.22 | Yes |
|  |  | 30,351 | $145.78 | 4,424,568.78 | Yes |
|  |  | 7,710 | $146.70 | 1,131,057.00 | Yes |
|  |  | 4,266 | $147.85 | 630,728.10 | Yes |
|  |  | 1,800 | $148.69 | 267,642.00 | Yes |
| TOTAL | 2/8/2021 | 160,000 |  | 23,193,950.70 |  |
|  |  | 17,389 | $109.90 | 1,911,051.10 | Yes |
|  |  | 39,173 | $110.80 | 4,340,368.40 | Yes |
|  |  | 14,738 | $111.58 | 1,644,466.04 | Yes |
|  |  | 5,800 | $112.74 | 653,892.00 | Yes |
|  |  | 1,500 | $113.82 | 170,730.00 | Yes |
|  |  | 1,400 | $114.55 | 160,370.00 | Yes |
| TOTAL | 3/12/2021 | 80,000 |  | 8,880,877.54 |  |
|  |  | 15,005 | $115.93 | 1,739,529.65 | Yes |
|  |  | 22,235 | $116.86 | 2,598,382.10 | Yes |
|  |  | 16,601 | $118.04 | 1,959,582.04 | Yes |

| | | 26,159 | $118.89 | 3,110,043.51 | Yes |
|---|---|---|---|---|---|
| TOTAL | 4/12/2021 | 80,000 | | 9,407,537.30 | |
| | | 80,000 | $90.15 | 7,212,000.00 | Yes |
| TOTAL | 5/12/2021 | 80,000 | | 7,212,000.00 | |
| | | 38,564 | $112.20 | 4,326,880.80 | Yes |
| | | 33,990 | $113.08 | 3,843,589.20 | Yes |
| | | 7,446 | $114.02 | 848,992.92 | Yes |
| TOTAL | 6/14/2021 | 80,000 | | 9,019,462.92 | |
| | | 11,050 | $115.17 | 1,272,628.50 | Yes |
| | | 3,529 | $116.22 | 410,140.38 | Yes |
| | | 11,570 | $117.18 | 1,355,772.60 | Yes |
| | | 13,257 | $118.12 | 1,565,916.84 | Yes |
| | | 5,830 | $119.15 | 694,644.50 | Yes |
| | | 32,053 | $120.20 | 3,852,770.60 | Yes |
| | | 2,711 | $120.75 | 327,353.25 | Yes |
| TOTAL | 7/12/2021 | 80,000 | | 9,479,226.67 | |
| | | 26,249 | $112.44 | 2,951,437.56 | Yes |
| | | 36,757 | $113.11 | 4,157,584.27 | Yes |
| | | 16,994 | $113.95 | 1,936,466.30 | Yes |
| TOTAL | 8/12/2021 | 80,000 | | 9,045,488.13 | |
| | | 7,000 | $110.79 | 775,530.00 | Yes |
| | | 31,462 | $111.76 | 3,516,193.10 | Yes |
| | | 19,849 | $112.87 | 2,240,356.60 | Yes |

| | | 21,378 | $113.82 | 2,433,243.90 | Yes |
|---|---|---|---|---|---|
| | | 311 | $114.43 | 35,587.73 | Yes |
| TOTAL | 9/13/2021 | 80,000 | | 9,000,911.44 | |
| | | 29,780 | $91.33 | 2,719,807.40 | Yes |
| | | 47,320 | $92.27 | 4,366,216.40 | Yes |
| | | 2,900 | $92.68 | 268,772.00 | Yes |
| TOTAL | 10/20/2021 | 80,000 | | 7,354,796.00 | |
| TOTAL | | 800,000 | | $92,594,251 | |

### 6.     Defendant Garavaglia

274.     Defendant Garavaglia's trading behavior throughout the Class Period is suspicious in amount, frequency, and pattern, and strongly indicates informed insider trading.  Although Defendant Garavaglia had an active 10b5-1 trading plan during the Class Period, she regularly traded outside of the trading plan and also regularly modified and/or amended her 10b5-1 Plan throughout the Class Period as she learned adverse and nonpublic information concerning Peloton's inventory and demand problems.  For example, for several months Defendant Garavaglia would sell 4,688 shares of common stock followed by a subsequent sale of 5,208 shares; however, on March 22, 2021, she ceased trading according to this prescribed pattern when she sold 98,294 shares pursuant to her trading plan.  Thereafter, on March 31, 2021, Garavaglia sold 9,375 shares, followed by a sale of 10,416 shares on April 5, 2021, a pattern that she repeated until August 2021, at which point she again made two trades outside of her trading plan: a sale of 1,854 shares on August 3, 2021, and 4,443 shares on August 1, 2021.  On September 3, 2021, Garavaglia seems to have again modified her plan, when she increased the volume of shares sold to 21,924 shares.

275.    During the Class Period Defendant Garavaglia sold a total of 260,051 shares of Peloton Common Stock, resulting in profits of $25.22 million.  Defendant Garavaglia's suspicious trading behavior, including trading outside of her plan on several occasions and seemingly modifying the plan a number of times, forecloses any possibility that her trades will be protected by Rule 10b5-1(c)'s safe harbor.

|  | Date | # shares sold | Price per share | Proceeds | Trade executed under 10b5-1 plan? |
|---|---|---|---|---|---|
|  |  | 1,664 | 146.41 | $243,626.24 | yes |
|  |  | 2,082 | 147.34 | $306,761.88 | yes |
|  |  | 1,062 | 148.26 | $157,452.12 | yes |
|  |  | 400 | 149.33 | $59,732 | yes |
| TOTAL | 2/3/2021 | 5,208 |  | $767,572.24 |  |
|  | 3/22/2021 | 65,453 | $110.09 | $7,205,720.77 | Yes |
|  | 3/23/2021 | 29,820 | $110.24 | $3,287,356.80 | Yes |
|  | 3/23/2021 | 3,021 | $111.17 | $335,844.57 | Yes |
| TOTAL |  | 98,294 |  | $10,828,922.14 |  |
|  |  | 9,375 | $110.10 | $1,032,187.50 | yes |
| TOTAL | 3/31/2021 | 9,375 |  | $1,032,187.50 |  |
|  |  | 8,181 | $111.41 | $911,445.21 | Yes |
|  |  | 2,235 | $112.44 | $251,303.40 | yes |
| TOTAL | 4/5/2021 | 10,416 |  | $1,162,748.61 |  |

| | | 1 | $90.71 | $90.71 | No |
|---|---|---|---|---|---|
| | | 1,895 | $93.82 | $177,788.90 | No |
| TOTAL | 5/17/2021 | 1,896 | | $177,879.61 | |
| | | 21,512 | $110.07 | $2,367,825.84 | Yes |
| TOTAL | 5/26/2021 | 21,512 | | $2,367,825.84 | |
| | | 9,375 | $112.27 | $1,052,531.25 | Yes |
| TOTAL | 5/28/2021 | 9,375 | | $1,052,531.25 | |
| | | 10,416 | $110 | $1,145,760.00 | Yes |
| TOTAL | 6/7/2021 | 10,416 | | $1,145,760.00 | |
| | | 1,302 | $122.26 | $159,182.52 | Yes |
| | | 1,294 | $123.42 | $159,705.48 | Yes |
| | | 700 | $124.50 | $87,150.00 | Yes |
| | | 2,772 | $125.54 | $347,996.88 | Yes |
| | | 3,198 | $126.55 | $404,706.90 | Yes |
| | | 109 | $127.28 | $13,873.52 | Yes |
| TOTAL | 6/28/2021 | 9,375 | | $1,172,615.30 | |
| | | 1,000 | $120.80 | $120,800.00 | Yes |
| | | 3,850 | $121.82 | $469,007.00 | Yes |
| | | 2,832 | $122.59 | $347,174.88 | Yes |
| | | 2,734 | $123.61 | $337,949.74 | Yes |
| TOTAL | 7/6/2021 | 10,416 | | $1,274,931.62 | |
| | | 6,575 | 121.47 | $798,665.25 | Yes |
| | | 2,100 | $122.08 | $256,368.00 | Yes |

| | | 700 | $123.12 | $86,184.00 | Yes |
|---|---|---|---|---|---|
| TOTAL | 7/28/2021 | 9,375 | | $1,147,000.00 | |
| | | 3,676 | $118.80 | $436,708.80 | Yes |
| | | 5,140 | $119.56 | $614,538.40 | Yes |
| | | 900 | $120.78 | $108.702.00 | Yes |
| | | 700 | $122.17 | $85,519.00 | Yes |
| TOTAL | 8/3/2021 | 10,416 | | $1,245,468.20 | |
| | | 1,854 | $110.92 | $205,645.68 | No |
| TOTAL | 8/15/2021 | 1,854 | | $205,645.68 | |
| | | 1,749 | $110 | $192,390.00 | Yes |
| TOTAL | 8/17/2021 | 1,749 | | $192,390.00 | |
| | | 4,443 | $102.05 | $453,408.15 | No |
| TOTAL | 8/30/2021 | 4,443 | | $453,408.15 | |
| | | 3,364 | $97.97 | $329,571.08 | Yes |
| | | 11,861 | $98.77 | $1,171,510.97 | Yes |
| | | 2,706 | $99.78 | $270,004.68 | Yes |
| | | 3,993 | $100.81 | $402,534.33 | Yes |
| TOTAL | 9/3/2021 | 21,924 | | $2,173,621.06 | |
| | | 3,947 | $87.90 | $346,941.30 | Yes |
| | | 4,528 | $88.87 | $402,403.36 | Yes |
| | | 800 | $89.70 | $71,760 | Yes |
| | | 100 | $90.65 | $9,065 | Yes |
| TOTAL | 9/28/2021 | 9,375 | | $830,169.66 | |

| | | 8,417 | $81.47 | $685,732.99 | Yes |
| | | 1,300 | $83.04 | $107,952.00 | Yes |
| | | 400 | $84.06 | $33,624.00 | Yes |
| | | 300 | $85.42 | $25,626.00 | Yes |
| TOTAL | 10/4/2021 | 10,417 | | $852,934.99 | |
| | | 6,463 | $89.14 | $576,111.82 | Yes |
| | | 2,912 | $90.18 | $262,604.16 | Yes |
| TOTAL | 10/28/2021 | 9,375 | | $841,000 | |
| | | 5,936 | $89.54 | $531,509.44 | Yes |
| | | 4,064 | $90.20 | $366,572.80 | Yes |
| | | 416 | $91.16 | $37,922.56 | Yes |
| TOTAL | 11/3/2021 | 10,416 | | $936,005.00 | |
| TOTAL | | 260,051 | | $29,920,017.01 | |

### 7.   Defendant Cortese

276.   Defendant Cortese also traded shares of Peloton Common Stock erratically throughout the entire Class Period.  Like Defendants Lynch and Kushi, Cortese suspiciously began liquidating a substantial portion of his holdings in the Company on September 14, 2020, when he sold 300,000 shares of Peloton Class A Common Stock.  Cortese subsequently sold 40,000 shares on December 9, 2020; 150,000 shares on December 22, 2020; and 40,000 shares on January 12, 2021 – which amount he continuously sold each month until June 21, 2021.  Cortese then appeared to modify and/or amend his 10b5-1 Plan when he sold 95,618 shares on June 24, 2021 followed

by a sale of 154,382 shares on June 28, 2021.  On July 12, 2021 he resumed "regular" trading under his Plan when he sold another 40,000 shares.

277.    When all was said and done, Defendant Cortese liquidated a total of 1,100,000 shares of Peloton Common Stock pursuant to his 10b5-1 trading plan during the Class Period, yielding substantial profits of approximately $67.01 million.

|  | Date | # shares sold | Price per share | Proceeds | Trade executed under 10b5-1 plan? |
|---|---|---|---|---|---|
|  |  | 1,486 | $146.34 | $217,461.24 | Yes |
|  |  | 2,800 | $147.80 | $413,840.00 | Yes |
|  |  | 9,771 | $148.65 | $1,452,459.15 | Yes |
|  |  | 2,309 | $149.42 | $345,010.78 | Yes |
|  |  | 600 | $150.68 | $90,408.00 | Yes |
|  |  | 3,048 | $152.18 | $463,844.64 | Yes |
|  |  | 3,200 | $152.86 | $489,152.00 | Yes |
|  |  | 13,997 | $153.99 | $2,155,398.03 | Yes |
|  |  | 1,315 | $154.53 | $203,206.95 | Yes |
| TOTAL | 2/12/2021 | 40,000 |  | $5,830,780.79 |  |
|  |  | 9,192 | $109.95 | $1,010,660.40 | Yes |
|  |  | 16,948 | $110.80 | $1,877,838.40 | Yes |
|  |  | 7,520 | $111.67 | $839,758.40 | Yes |
|  |  | 4,685 | $112.84 | $528,655.40 | Yes |

| | | 1,655 | $114.48 | $189,464.40 | Yes |
|---|---|---|---|---|---|
| TOTAL | 3/12/2021 | 40,000 | | $4,446,377.00 | |
| | | 5,088 | $115.84 | $589,393.92 | Yes |
| | | 8,626 | $116.80 | $1,007,516.80 | Yes |
| | | 7,589 | $118.03 | $895,729.67 | Yes |
| | | 18,697 | $118.87 | $2,222,512.30 | Yes |
| | 4/12/2021 | 40,000 | | $4,715,152.78 | |
| | | 40,000 | $100.02 | $4,000,800 | Yes |
| | 5/20/2021 | 40,000 | | $4,000,800.00 | |
| | | 3,701 | $104.86 | $388,086.86 | Yes |
| | | 5,339 | $105.82 | $564,972.98 | Yes |
| | | 7,129 | $106.80 | $761,377.20 | Yes |
| | | 18,704 | $107.96 | $2,019,283.80 | Yes |
| | | 5,127 | $108.85 | $558,073.95 | Yes |
| | 6/21/2021 | 40,000 | | $4,291,794.83 | |
| | | 95,618 | $124.05 | $11,861,412 | Yes |
| | 6/24/2021 | 95,618 | | $11,861,412.00 | |
| | | 154,382 | $124.26 | $19,183,507.00 | Yes |
| | 6/28/2021 | 154,382 | | $19,183,507.00 | |
| | | 7,655 | $115.17 | $881,626.35 | Yes |
| | | 2,448 | $116.29 | $284,677.92 | Yes |
| | | 9,399 | $117.30 | $1,102,502.70 | Yes |
| | | 7,345 | $118.28 | $868,766.60 | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | | 2,517 | $119.52 | $300,831.84 | Yes |
| | | 10,636 | $120.29 | $1,279,404.40 | Yes |
| | 7/12/2021 | 40,000 | | $4,717,809.85 | |
| | | 16,388 | $112.56 | $1,844,633.20 | Yes |
| | | 19,412 | $113.38 | $2,200,932.50 | Yes |
| | | 4,200 | $114.09 | $479,178.00 | Yes |
| | 8/12/2021 | 40,000 | | $4,524,743.84 | |
| | | 3,100 | $110.68 | $343,108.00 | Yes |
| | | 15,914 | $111.70 | $1,777,593.80 | Yes |
| | | 8,676 | $112.74 | $978,132.24 | Yes |
| | | 11,510 | $113.72 | $1,308,917.20 | Yes |
| | | 800 | $114.39 | $91,512.00 | Yes |
| | 9/13/2021 | 40,000 | | $4,499,263.00 | |
| TOTAL | | 570,000 | | $68,071,643.00 | |

## XII.   PELOTON INSIDERS SOLD MORE THAN 5.2 MILLION SHARES OF PELOTON COMMON STOCK DURING THE CLASS PERIOD, REALIZING COMBINED PROFITS OF $383 MILLION

278.    The Management Defendants and the Insider Trading Defendants realized tremendous profits from their sales of Peloton common stock while the stock price was artificially inflated as a result of their misleading and fraudulent statements and representations to investors.

279.    Not only did the Management Defendants and Insider Trading Defendants liquidate millions in Peloton common stock, certain of Peloton's board members were also selling shares

consistently throughout the Class Period in irregular and suspicious intervals and accrued proceeds of more than $69.23 million as a result of such sales.

280.    During the six week period between February 8, 2021 and March 22, 2021 alone, insiders unloaded a whopping **1.25 million shares** of Peloton stock, totaling more than **$172 million in proceeds**, **$166 million in profits**, and accounting for approximately **44% of their total Class Period sale proceeds.**

281.    The below chart is an aggregate of data based on Form 4s filed with the SEC and displays the proceeds realized by the Management Defendants and Insider Trading Defendants as a result of their Class Period sales.

| Defendant | Class Period Proceeds |
|---|---|
| John Foley | $78,821,470 |
| William Lynch | $108,777,200 |
| Jill Woodworth | $17,307,861 |
| Hisao Kushi | $92,594,251 |
| Mariana Garavaglia | $28,112,202 |
| Thomas Cortese | $68,071,643 |
| **TOTAL PROCEEDS** | **$393,684,627** |

282.    As a result of these insider trades, Defendants Foley, Woodworth, Lynch, Kushi, Cortese, and Garavaglia generated proceeds of more than $393.5 million during the Class Period while lying to investors about the true nature of Peloton's business.

**A.** **PELOTON INSIDERS SUSPICIOUSLY EXERCISED THEIR STOCK OPTIONS YEARS BEFORE THEY WERE SET TO EXPIRE, THEN IMMEDIATELY SOLD THE SHARES ACQUIRED BEFORE THE PRICE OF PELOTON'S COMMON STOCK TANKED**

283.    Under typical circumstances – that is, absent material and adverse inside information about a company – it makes little economic sense for an individual to early-exercise long-term executive compensation options for a stock.  This is because, at the time of the grant, exercise price equals the current stock price, intrinsic value is zero, and 100% of the value of the option comes from time-value.

284.    As for long-term executive compensation stock options, on stocks such as Peloton, the time value of the option will always be positive during the life of the option, and as such, it is better for executives to hold on to their options until maturity.  However, when an executive becomes privy to material nonpublic and adverse information and has good reason to believe that such information might cause the stock price to decline, that executive might sacrifice the time value of the option and instead, exercise the option early, acquire the stock, only to immediately sell the stock before the price declines.  This allows insiders to avoid holding on to executive compensation options at the time that the stock price dips below the exercise price and depreciates in its value.  That insiders are early exercising executive compensation options strongly indicates scienter.

285.    During the Class Period, the Management Defendants and the Insider Trading Defendants did not make any open market purchases of Peloton common stock, however, they did convert and acquire prior granted stock options at prices significantly lower than the artificially inflated prices for which the stock was selling on the market.

286.    During the Class Period, the Management Defendants and Insider Trading Defendants also suspiciously exercised their stock options years before their expiry date by sacrificing the time value of the options, received Peloton common stock and immediately

thereafter sold the stock before the price of the stock dropped.   The below chart contains information gathered from Forms 4 filed with the SEC, and reflects the total number of shares the reporting Defendants' acquired during the Class Period through converting vested options:

| Filer Name | Transaction | Transaction Date | No. of Shares | option expiry date | Price | Amount |
|---|---|---|---|---|---|---|
| Lynch | Conversion | 02/08/21 | 500,000 | 01/16/2029 | $8.82 | $4,410,000 |
| Lynch | Conversion | 02/16/21 | 116,670 | 08/07/2027 | $2.89 | $337,176.30 |
| Lynch | Conversion | 04/14/21 | 28,333 | 04/01/2028 | $3.28 | $92,932 |
| Lynch | Conversion | 05/20/21 | 28,333 | 05/20/2021 | $3.28 | $92,932 |
| Lynch | Conversion | 06/14/21 | 28,333 | 05/20/2021 | $3.28 | $92,932 |
| Lynch | Conversion | 07/14/21 | 28,333 | 05/20/2021 | $3.28 | $92,932 |
| Lynch | Conversion | 08/16/21 | 28,333 | 05/20/2021 | $3.28 | $92,932 |
| | | | 758,335 | | | **$5,211,836** |
| Woodworth | Conversion | 02/16/21 | 50,000 | 04/01/2028 | $3.28 | $164,000 |
| Woodworth | Conversion | 05/17/21 | 50,000 | 04/01/2028 | $3.28 | $164,000 |
| Woodworth | Conversion | 09/15/21 | 50,000 | 04/01/2028 | 3.28 | $164,000 |
| | | | 150,000 | | | **$492,000** |
| Kushi | Conversion | 02/08/21 | 160,000 | 04/19/2026 | $0.75 | 120,000 |
| Kushi | Conversion | 03/12/21 | 80,000 | 04/19/2026 | $0.75 | $60,000 |
| Kushi | Conversion | 04/12/21 | 80,000 | 04/19/2026 | $0.75 | $60,000 |
| Kushi | Conversion | 05/12/21 | 80,000 | 04/19/2026 | $0.75 | $60,000 |
| Kushi | Conversion | 06/14/21 | 80,000 | 04/19/2026 | $0.75 | $60,000 |
| Kushi | Conversion | 07/12/21 | 80,000 | 04/19/2026 | $0.75 | $60,000 |

| Kushi | Conversion | 08/12/21 | 80,000 | 04/19/2026 | $0.75 | $60,000 |
| Kushi | Conversion | 09/13/21 | 27,110 | 04/19/2026 | $0.75 | $20,332.50 |
| Kushi | Conversion | 09/13/21 | 52,890 | 10/12/2027 | $2.89 | $152,852.10 |
| Kushi | Conversion | 10/20/21 | 80,000 | 10/12/2027 | $2.89 | $231,200 |
| TOTAL | | | 800,000 | | | **$884,384.60** |
| | | | | | | |
| Cortese | Conversion | 02/12/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 03/12/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 04/12/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 05/20/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 06/21/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 06/24/21 | 95,618 | 10/12/2027 | $2.89 | $276,336.02 |
| Cortese | Conversion | 06/28/21 | 154,382 | 10/12/2027 | $2.89 | $446,163.98 |
| Cortese | Conversion | 07/12/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 08/12/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 09/13/21 | 40,000 | 04/19/2026 | $0.75 | $30,000 |
| Cortese | Conversion | 10/05/21 | 122,000 | | $00.188 | $22,875 |
| TOTAL | | | 692,000 | | | **$985,375** |
| | | | | | | |
| Garavaglia | Conversion | 03/22/21 | 29,392 | 06/13/2029 | $14.59 | $428,829 |
| Garavaglia | Conversion | 03/22/21 | 32,551 | 02/27/2030 | $14.59 | $474,919 |
| Garavaglia | Conversion | 03/23/21 | 18,521 | 06/13/2029 | $14.59 | $270,221 |
| Garavaglia | Conversion | 03/23/21 | 14,320 | 02/27/2030 | $26.69 | $382,201 |
| Garavaglia | Conversion | 03/31/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 04/05/21 | 10,416 | 06/13/2029 | $14.59 | $151,969 |
| Garavaglia | Conversion | 05/26/21 | 10,416 | 06/13/2029 | $14.59 | $151,969 |

| Garavaglia | Conversion | 05/26/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
|---|---|---|---|---|---|---|
| Garavaglia | Conversion | 05/28/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 06/07/21 | 10,416 | 06/13/2029 | $14.59 | $151,969 |
| Garavaglia | Conversion | 06/28/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 07/06/21 | 10,416 | 06/13/2029 | $14.59 | 151,969 |
| Garavaglia | Conversion | 07/28/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 08/03/21 | 10,416 | 06/13/2029 | $14.59 | $151,969 |
| Garavaglia | Conversion | 09/03/21 | 10,416 | 06/13/2029 | $14.59 | $151,969 |
| Garavaglia | Conversion | 09/03/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 09/28/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 10/28/21 | 9,375 | 02/27/2030 | $26.69 | $250,219 |
| Garavaglia | Conversion | 11/03/21 | 10,416 | 06/13/2029 | $14.59 | $151,969 |
| TOTAL | | | 247,904 | | | **$4,621,706** |

287.    The Class Period insider stock sales referenced above resulted in $383 million net profits for Defendants Foley, Lynch, Woodworth, Kushi, Cortese, and Garavaglia.

| Defendant | Class Period Profits |
|---|---|
| Foley | $78,821,470 |
| Lynch | $103,565,364 |
| Woodworth | $16,815,861 |
| Kushi | $91,709,866 |
| Cortese | $67,086,268 |
| Garavaglia | $25,298,311 |

| TOTAL PROFITS | $383,297,140 |
|---|---|

**B.**   **THE MANAGEMENT DEFENDANTS AND INSIDER TRADING DEFENDANTS SOLD A SUBSTANTIAL PORTION OF THEIR STOCKHOLDINGS DURING THE CLASS PERIOD**

288.   During the Class Period, Defendant Foley sold 104.79% of his total stockholdings; Defendant Lynch sold 205.83%; Woodworth sold 57.95%; Kushi sold 307.04%; Cortese sold 167.17%; and Garavaglia sold 81.13% of her total holdings.  By exercising options and converting Class B shares to Class A shares, certain Defendants were able to sell more Class A shares than Peloton's SEC filings indicated that they owned, yielding percentages greater than 100%.

289.   The below chart breaks down the percentage of stock holdings sold by each insider:

| Defendant | % of Class A Stockholdings Sold | % of Class A and Class B Stockholdings Sold |
|---|---|---|
| Foley | 104.79% | 3.95% |
| Lynch | 205.83% | 14.07% |
| Woodworth | 57.95% | 4.75% |
| Kushi | 307.04% | 21.58% |
| Cortese | 167.17% | 12.55% |
| Garavaglia | 81.13% | |

## XIII.   LOSS CAUSATION

290.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants knowingly misstated the nature of the Company's business functions so as to glorify the market's perception of Peloton's stock value in order to allow Peloton executives the chance to cash out their shares before the fraud was revealed. This artificially inflated the price of Peloton common stock and operated as a fraud or deceit on the Class (as defined below). Later, when the truth concealed by Defendants' prior misrepresentations and omissions was disclosed to the market and

on November 4, 2021, the price of Peloton common stock fell precipitously. As a result of their acquisition of Peloton common stock during the Class Period—and Defendants' material misstatements and omissions— Lead Plaintiff and other member of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## XIV.   CLASS ACTION ALLEGATIONS

291.     Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Peloton common stock during the Class Period. Excluded from the Class are Defendants and their families, directors and officers of Peloton and their families and affiliates.

292.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims as a class action will provide substantial benefits to the parties and the Court. As of the date of this Amended Complaint, Peloton had approximately 307 million shares of common stock outstanding, owned by hundreds of thousands of investors.

293.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

294.     Whether Defendants violated the Exchange Act;

295.     Whether Defendants omitted and/or misrepresented material facts;

296.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

297.     Whether the Management Defendants are personally liable for the alleged misrepresentations and omissions described herein;

298.     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

299.    Whether Defendants' conduct impacted the price of Peloton's common stock;

300.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

301.    The extent of damages sustained by Class members and the appropriate measure of damages.

302.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

303.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

304.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XV.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

305.    Peloton's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

306.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Peloton who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when they were made, nor were any of the projections or forecasts made by Defendant expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XVI.   PRESUMPTION OF RELIANCE

307.   At all relevant times, the market for Peloton's common stock was an efficient market for the following reasons, among others:

(a)   Peloton's common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)   Peloton filed periodic public reports with the SEC and NASDAQ;

(c)   Peloton regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Peloton was followed by securities analysts employed by numerous major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

308.   As a result of the foregoing, the market for Peloton's common stock promptly digested current information regarding Peloton from all publicly available sources and reflected such information in the price of Peloton's common stock. Under these circumstances, all purchasers of Peloton common stock during the Class Period suffered similar injury through their purchase of Peloton common stock at artificially inflated prices and the presumption of reliance applies.

309.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because certain of the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose the true, material, negative financial impact facing

the Company as the COVID pandemic began to abate, as well as Peloton's true inventory levels and their relationship with customer demand—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the sustainability of Peloton's financial results and growth post-COVID and the Company's inventory levels, and the impact that could have on the Company's near-term and long-term financial condition, that requirement is satisfied here.

## XVII.  CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Against Peloton and The Management Defendants

310.    Lead Plaintiff repeats, incorporates, and realleges every allegation above as if fully set forth herein.

311.    During the Class Period, Defendant Peloton and The Management Defendants – Foley, Lynch, and Woodworth – carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did (i) deceive the investing public, including Lead Plaintiff and other Class Members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Peloton common stock at artificially inflated prices.

312.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Peloton common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

313.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

314.    During the Class Period, Defendants made false statements which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically:

> (i)     Foley:   Defendant Foley made, or caused Peloton to make the false statements specified in Paragraphs 147, 150, 159, 166, 171, 178, 179, 186, above.
>
> (ii)    Lynch:   Defendant Lynch made, or caused Peloton to make the false statements specified in Paragraphs 152, 166, 171, 176, above.
>
> (iii)   Woodworth:  Defendant Woodworth made, or caused Peloton to make the false statements specified in Paragraphs 147, 160, 163, 166, 171, 174, 179, and 189, above.

315.    Peloton:  Defendant Peloton is responsible for all of the false statements specified in Sections 147 - 189, above. These Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Peloton's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

316.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Peloton's common stock. Lead

Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Peloton common stock had been artificially inflated by Defendants' fraudulent course of conduct.

317.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

318.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>
**For Violations of Section 20(a) of the Exchange Act**
**Against the Management Defendants**

319.    Lead Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

320.    The Management Defendants acted as controlling persons of Peloton within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Peloton, the Management Defendants had the power and ability to control the actions of Peloton and its employees. By reason of this conduct, the Management Defendants are liable under Section 20(a) of the Exchange Act.

321.    Defendant Foley controlled Peloton by virtue of the fact that: (1) at all relevant times, he controlled 39.6% of the total voting power; was the Chief Executive Officer; and (3) issued public statements to investors and analysts alike.

322.    Defendant Lynch controlled Peloton by virtue of the following facts: (1) he controlled 12.3% of the total voting power; (2) was the President of Peloton at all relevant times;

and (3) he made statements to the public concerning the state of affairs of Peloton's demand and supply.

323.    Defendant Woodworth controlled Peloton by virtue of the following facts: (1) she controlled 6.8% of the total voting power; (2) was the Chief Financial Officer of Peloton at all relevant times; and (3) issued statements to the public regarding the nature of Peloton's supply and demand.

324.    As officers and/or directors of a publicly owned company, the Management Defendants had a duty to disseminate truthful and valid information regarding Peloton's supply and demand levels and financial performance, and to timely revise any public statements and documents issued by the Company which had become materially false and/or misleading.

## COUNT III
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against the Insider Trading Defendants

325.    Lead Plaintiff Robeco repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

326.    This Claim is brought against the Insider Trading Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

327.    The information provided to the Insider Trading Defendants – Defendants Cortese, Kushi, and Garavaglia about Peloton's inability to maintain the widening gap between demand and actual sales; excessive inventory buildup at warehouses and ports across the U.S.; and slowing sales as COVID restrictions eased, was material non-public information ("MNPI"). Further, the information was, in each case, considered confidential by Peloton, which was the source of the information, and which provided information to the Insider Trading Defendants for the purpose of enabling them to operate and manage the Company.

328.    The Insider Trading Defendants obtained MNPI regularly by virtue of their executive-level positions at the Company which entailed regularly frequenting meetings where declining demand and sales, inventory problems, among other things, were discussed.

329.    Defendant Kushi regularly had access to MNPI throughout the Class Period by virtue of his position as Chief Legal Officer of Peloton.  In this capacity,  Further, Defendant Kushi is, and was at all relevant times, Defendant Foley's "trusted best friend." The two developed a very close relationship over the course of 20 years, and Kushi was the very first person that Foley invited to join Peloton. By virtue of his close relationship with Foley, Defendant Kushi had regular access to MNPI regarding Peloton's business operations.

330.    Defendant Cortese had regular access to MNPI throughout the entire Class Period. By virtue of his position as Peloton's Chief Operations Officer and subsequently, Chief Product Officer during the Class Period,  Defendant Cortese was regularly informed of Peloton's business operations.  In particular, according to CW1, Defendant Cortese attended Peloton's weekly supply chain meetings during which problems pertaining to inventory overflow outpacing slowing demand was discussed.Defendant Cortese is and was at all relevant times very good friends with Defendant Foley. Foley and Cortese founded Peloton together in 2012 and prior to doing so, the two had worked at IAC for a number of years, as further alleged above.  Defendant Cortese was the second person (after Kushi), that Defendant Foley invited to be a co-founder of Peloton. By virtue of his long-term relationship of trust and loyalty wit Foley, as well as his positions as COO and CPO of Peloton during the Class Period, Defendant Cortese had regular access to MNPI regarding Peloton's business operations.

331.    Defendant Garavaglia was brought on board at Peloton by Defendant and CEO Foley. Defendant Garavaglia had regular access to MNPI throughout the Class Period. Defendant

Garavaglia was Peloton's Company's Chief Operating Officer and Chief People Officer In this role, Defendant Garavaglia attended meetings executive-level meetings where confidential and adverse information about Pelotons business operations were discussed.  Further, Defendant Foley personally recruited Garavaglia to join Peloton's management team in 2019.  By virtue of Garavaglia's position at Peloton and Foley's trust and confidence in her, Garavaglia had access to MNPI regarding Peloton's business operations.

332.    The Insider Trading Defendants knew, recklessly disregarded, or should have known that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence to Peloton's shareholders to keep the information confidential.

333.    Nevertheless, while in possession of material, non-public adverse information, the Insider Trading Defendants collectively sold millions of dollars' worth of Peloton's common stock.

334.    By virtue of the foregoing, Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

      a.    employed devices, schemes, or artifices to defraud;

      b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.    engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

335.    By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5. 341.

336.    Lead Plaintiff Robeco contemporaneously purchased and/or sold securities of the same classes as those in which the Insider Trading Defendants traded.

337.    The measure of damages for trading while in possession of MNPI information under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b5, is the disgorgement of profits gained and losses avoided by such trading.

338.    During the Class Period, the Insider Trading Defendants sold Peloton's shares while in possession of MNPI and avoided substantial losses on such transactions. Lead Plaintiff Robeco, and the other members of the Class who purchased shares of Peloton contemporaneously with the Insider Trading Defendants' sales, are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

339.    By virtue of the foregoing, The Insider Trading Defendants are jointly and severally liable to Lead Plaintiff Robeco and other members of the Class who purchased contemporaneously with the Insider Trading Defendants' sales pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

**<u>COUNT IV</u>**
**For Violations of Section 20A of the Exchange Act**
**Against the Management Defendants and The Insider Trading Defendants**

340.    Lead Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

341.    This Count is asserted for violations of §20A of the Exchange Act, 15 U.S.C. §78t1, on behalf of Lead Plaintiff Robeco and all other members of the Class, who purchased shares of Peloton common stock contemporaneously with the sale of Peloton common stock, by

Management Defendants Foley, Lynch, Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese while they were in possession of material, nonpublic information, as alleged herein, including concerning Peloton's diminishing demand, excessive inventory levels, and failing financial performance.

342.    Section 20A(a) of the Exchange Act provides that:

343.    Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

344.    As alleged herein, the Management Defendants violated §10(b) of the Exchange Act, Rule 10b-5, and §20(a) of the Exchange Act for the reasons stated in Counts I and II above. The Management Defendants also violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. §240.10b5-1) by selling shares of Peloton common stock while in possession of material, nonpublic information the Company's excessive inventory buildup despite sinking demand for its exercise products, which information they owed a duty to disclose and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

345.    Contemporaneously with Management Defendants Foley, Lynch, Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese's insider sales of Peloton common stock, Lead Plaintiff Robeco and other Class members purchased shares of Peloton common stock on a national securities stock exchange and in an open and efficient market, while these Defendants were in possession of material, nonpublic information which they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning the true nature of Peloton's

financial and business performance – namely, the Company's excessive supply despite dwindling demand.

346.    Lead Plaintiff and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

347.    By reason of the violations of the Exchange Act alleged herein, Management Defendants Foley, Lynch, Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese are liable to Lead Plaintiff and the other members of the Class who purchased shares of Peloton common stock contemporaneously with these Defendants' mass sales of Peloton common stock during the Class Period.

348.    Lead Plaintiff and the other members of the Class, who purchased Peloton stock contemporaneously with the Management Defendants and Insider Trading Defendants' insider sales of Peloton common stock, seek disgorgement by the Management Defendants of profits gained or losses avoided from the Management Defendants' transactions in Peloton common stock contemporaneous with the §20A Lead Plaintiff and the other members of the Class.

349.    This Action was brought within five years after the date of the last transaction that is the subject of the Management Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count I above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Management Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

350.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

351.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

352.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

353.    Ordering an accounting and disgorgement of certain of the unjust profits realized by certain of the Defendants; and

354.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: New York, New York          Respectfully submitted,
June 24, 2022

/s/ Daniel L. Berger
Daniel L. Berger
Karin Fisch
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: kfisch@gelaw.com
*Counsel for Robeco Capital Growth Funds*
*SICAV – Robeco Global Consumer Trends*