**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ROBECO CAPITAL GROWTH FUNDS**
**SICAV – ROBECO GLOBAL CONSUMER**
**TRENDS,** *individually and behalf of all others*
*similarly situated,*

                              **Plaintiff,**

          **-against-**

**PELOTON INTERACTIVE, INC., JOHN**
**FOLEY, WILLIAM LYNCH, JILL**
**WOODWORTH, THOMAS CORTESE,**
**MARIANA GARAVAGLIA, and HISAO**
**KUSHI,**

                              **Defendants.**

**21-CV-9582 (ALC)(OTW)**


**OPINION AND ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

     Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends

("Robeco" or "Plaintiff") brings this securities class action against Peloton Interactive, Inc.

("Peloton" or "the Company"), John Foley ("Foley"), William Lynch ("Lynch"), Jill Woodworth

("Woodworth"), Thomas Cortese ("Cortese"), Mariana Garavaglia ("Garavaglia"), and Hisao

Kushi ("Kushi") (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder

on behalf of itself and a class of all persons who purchased Peloton common stock between

February 5, 2021 and November 4, 2021 (the "Class Period").

     Currently pending before the Court is Defendants' motion to dismiss the Amended

Complaint. (Mot., ECF No. 65.) Drawing all reasonable inferences in Plaintiff's favor, the Court

finds that Plaintiff has not articulated sufficient factual allegations to carry their assertions beyond

the speculative level: many of Defendants' alleged misstatements are statements of non-actionable

corporate optimism or are protected by the PSLRA safe harbor, and Plaintiff has not asserted sufficient facts demonstrating Defendants' statements were false when made.   For these reasons, Defendants' motion is **GRANTED**.

## BACKGROUND

I.     **Factual Background**[1]

A.   The Parties

Robeco is an "open-ended investment company based in Rotterdam, Netherlands" that purchased common stock at allegedly artificially inflated prices during the Class Period.   (Am. Compl., ECF No. 51 ¶¶ 34–35.)

Defendant Peloton is a fitness company that manufactures and produces stationary bikes and treadmills (referred to as "Connected Fitness products").   (*Id.* ¶ 36.)   The Company sells a monthly subscription service that allows users to participate in remote fitness classes using the Company's online fitness platform.   (*Id.*)

The "Management Defendants" consist of high-ranking members of Peloton's executive leadership.   Defendant Foley is the Executive Chair and co-founder of Peloton.   (*Id.* ¶ 37.)   He also served as Peloton's Chief Executive Officer and as a member of the Board of Directors.   (*Id.*) Defendant Lynch is another co-founder of Peloton and served as the President and a member of the Company's Board of Directors.   (*Id.* ¶ 38.)   Defendant Woodworth was Peloton's former Chief Financial Officer.   (*Id.* ¶ 39.)   Plaintiff alleges that the Management Defendants were provided with copies of the Company's reports and press releases alleged in the Amended Complaint to be

---

[1] The following facts are drawn from the Amended Complaint and documents relied upon therein, including documents attached to the Declaration of Susan Engel which are incorporated by reference into the Amended Complaint.

misleading and thus had the ability and opportunity to prevent their issuance or to cause them to be corrected. (*Id.* ¶ 40.)

The "Insider Trading Defendants" are alleged to have traded Peloton common stock on the basis of material, nonpublic information. (*Id.* ¶¶ 41–44.) Defendant Kushi is Peloton's Chief Legal Officer and another co-founder. (*Id.* ¶ 41.) Defendant Garavaglia was Peloton's Chief People Officer and Chief Business Officer. (*Id.* ¶ 42.) Defendant Cortese is another of Peloton's co-founders and its Chief Operations Officer until August 2021. (*Id.* ¶ 43.) He was subsequently named as the Company's Chief Product Officer. (*Id.*)

## B.  Allegations of Declining Demand for Peloton's Products

In the wake of the business closures enacted in the face of the COVID-19 pandemic, demand for Peloton's products increased exponentially. (*Id.* ¶¶ 4, 5, 60.) Peloton began to experience supply chain logistic issues and substantial backlogs in delivering its Connected Fitness products to its customers. (*Id.* ¶ 106.) In response, Plaintiff alleges that Peloton significantly ramped up its production capacity and told investors that it would be making investments into its supply chain in order to keep up with the soaring demand. (*Id.* ¶ 115.) By early 2021, however, Plaintiff alleges that this surge in demand had begun to wane as COVID-19 vaccines became more widely accessible and brick and mortar gyms began reopening. (*Id.* ¶ 9.) Plaintiff alleges that Defendants hid the true nature of the declining demand to investors and publicly stressed that its investment into its supply chain was necessary and appropriate given the sustained demand for its products. (*Id.* ¶¶ 146, 165, 174–175, 178.)

As analysts and investors began to question whether Peloton's explosive success could be maintained after the peak of the COVID-19 pandemic, Defendants allegedly continued to assure the public that demand for Peloton's products remained strong. (*Id.* ¶¶ 64–65, 143–144, 149, 151,

158–159, 167, 180, 186.)   However, Plaintiff alleges that by early 2021, Peloton and its management knew that the demand for its products had begun to decline.  Specifically, Plaintiff alleges that Defendants received regular reports from sales management software such as Looker, Salesforce and Callidus, showing that sales had declined.  (*Id.* ¶¶ 73, 8—81, 85, 110, 114, 120–125.)  Plaintiff alleges that sales personnel were regularly missing their sales quotas (even after they had been reduced), which was reported to Defendants.  (*Id.* ¶ 78.)  Plaintiffs also cite Peloton's rising inventory levels as indication that demand for its products was decreasing.  (*Id.* ¶ 97–105.) Plaintiffs also note that Peloton was forced to reduce the price of its bikes in order to increase sales.  (*Id.* ¶ 178.)

Plaintiff substantiates these allegations by relying on the statements of several confidential witnesses ("CWs"), consisting of former Peloton employees.  (*Id.* ¶¶ 45–54.)  CW1—Peloton's former Senior Director of Operations and Supply Chain Program Management—states that as of February 2021, Woodward and Lynch had learned that demand for Peloton's products would decline from 7% to 20% beginning in March 2021.  (*Id.* ¶ 125.)  CW1 also states that the inventory backlog was so significant, that Peloton had to start letting its inventory sit at ports and was forced to pay "substantial demurrage fees."  (*Id.* ¶ 137.)  CW1 maintains that he attended regular meetings with Woodworth and Lynch.  (*Id.*)

CW2 is a former account executive in Peloton's sales division who states that sales had begun to decline as early as December 2020 when members of the sales team had been missing its sales goals.  (*Id.* 46.)

CW3—a regional operations manager—indicated that this precipitous decline in demand was known to regional managers and warehouse staff in early 2021.  (*Id.* 126.)  CW3 also notes that when he left the Company in April 2021, the facilities he managed were only delivering half

4

the number of bikes that it had been delivering during 2020.  (*Id.* ¶ 126.)  He states that he frequently discussed the decline in sales with other regional operations managers in early 2021 and that Foley Lynch and Woodworth "misrepresented the outlook for Peloton and misled investors that the 2020 growth trajectory was repeatable."  (*Id.* ¶ 49.)

CW 4—a senior analyst for Peloton's supply chain logistics team—is alleged by Plaintiff to have been "intimately familiar with Peloton's various supply chain and logistic software platforms."  (*Id.* ¶ 51.)  He states that he attended a meeting with Foley and Lynch in August 2021, where data showing that actual sales were 22% below what had been forecast was presented.  (*Id.* ¶ 132.)

The CWs also include a few junior members of Peloton's sales and inventory teams.  CW5 was a temporary account executive on Peloton's sales team who explained that the Company's sales data and reporting were easily accessible.  (*Id.* ¶ 85.)  CW6 states that he believed that sales goals were set with input from Lynch.  (*Id.* ¶ 53.)  CW7 worked in a Peloton warehouse in Minnesota as an inventory specialist.  (*Id.* ¶ 54.)  CW7 maintains that it was clear to him that sales were declining.  (*Id.*)  He also asserts that by early 2021, Peloton management knew that there were problems with inventory.  (*Id.* ¶ 130.)

## C.  The Alleged Misstatements

Plaintiffs allege that Defendants made the following materially false and misleading statements from February 5, 2021 and November 4, 2021 during the Class Period:

- Feb. 4, 2021 2Q21 Earnings Call[2]

  Analyst: "Jill, you mentioned that manufacturing capacity exceeds demand. I just want to clarify that strictly because you ramped capacity, **or are you seeing any change to demand due to extended order to delivery times**? [...]

---

[2] All italicized and bolded texts are as filed in the Amended Complaint.

Foley: "Thanks Doug. We're going to do a switcher I'm going to take the first one, and then I think William and I can talk about Precor. **We are not seeing a softening in demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand even in the phase of light marketing.** As you know, the successes that we're seeing in getting the order to delivery down and getting our backlog down are 100% based on incredible upgrades, and our manufacturing capacity up to over six times -- 6x increase in just the last 12 months in our capacity of them know - - we're now making more Bikes on a monthly basis than we did in all of fiscal 2018. So it's a Herculean effort based on our in-house manufacturing teams and our third-party partners. And so yeah, I hope that answers your question. **But it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand.**" (*Id.* ¶ 146 ("Statement 1").)

- Feb. 4, 2021 2Q21 Earnings Call

Woodworth: "And I would just highlight obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products.**" (*Id.* ¶ 146("Statement 2").)

- Feb. 4, 2021 2Q21 Earnings Call

Analyst: "[J]ust thinking about the opening next year, some of the e-commerce companies had a showdown in September and October, and then reaccelerated due to lockdown. Did you see anything in the fall and how are you thinking about that."

Foley: "When the vaccine was announced in the fall, you saw a reaction to the stock, we did not see any reaction to our sales or demand. We still have not seen any softening since that vaccine was announced and since the vaccine has been rolling out. So other than investors getting nervous, the consumers are still feeling like they want to work out at home The experience to William's point is the best in the world and it's getting better as we launch more software features, more content types, more access on more different platforms. And I think what you're seeing is everyone's starting to realize that working out at home is a better place. It's a better value. And so, we're very bullish on our sales opportunities on the other side of the opening to your point. So we remain very, very bullish on our opportunity. And like Jill did say, we're excited to get on the offensive and start marketing because the story is incredible, the products and the experiences are incredible, and they're getting better by the month. So we've remained very, very bullish on our opportunity. **We haven't seen any softening of demand.**" (*Id.* ¶ 149 ("Statement 3").)

- Feb. 4, 2021 2Q21 Earnings Call

Analyst: "And then just a question, on brand, with the pandemic, we see the shift in behavior to working out at home aside from incredible demand, you're seeing for the hardware and digital subscriptions, just any way to frame the impact on the brand . . ."

6

Lynch: "We do research on consumer perceptions around home fitness and going back to the gym, et cetera. . . . we study the consumer and we have quarterly tracking, and we do bespoke research. **And what's clear is the shift into the home is not a COVID-led phenomenon.** It has accelerated it. But we see, if anything, as we emerge to whatever the new normal is that the norms haven't changed. There is a secular shift into fitness in the home. As John [Foley] has said before, it's a better experience and a better place at a better value. And consumers are all seeing that. And so, everything we've seen in the data, I think Jill [Woodworth] has talked in the past about some of the bespoke research we've done on going back to gyms and consumer perception on that vis-à-vis home workout suggests that certainly, COVID has been a tailwind for our demand. . . **. in the home, we see continued momentum in foreseeable future**." (*Id.* ¶ 151 ("Statement 4").)

- Feb. 4, 2021 2Q21 Earnings Call

Lynch "further claimed that the Company was able to accurately forecast demand 'on a more mature product line like on the Bike product line.'" (*Id.* ¶ 151 ("Statement 5").)

- Feb. 11, 2021 Analyst Conference

Analyst: asking "'about what the other side of this pandemic looks like' and 'what reopening does to demand for Peloton.'"

Foley: "I know there's chatter of, we are a stay-at-home stock and we go back to normal and Peloton dies or whatever the anxiety would be. **We obviously are taking the other side of that.** And I'll tell people, I'll tell everyone on the call that for 20 years, 25 years, every year in the US, there's been 5 million treadmills sold, 5 million treadmills sold in the US every year pre-COVID. So it's not like working out at home was a COVID thing. It has always been a thing. It's just the products have been dopey and not connected." (*Id.* ¶ 158 ("Statement 6").)

- March 1, 2021 Analyst Conference

Investor: "How do you answer people who say the vaccine will hurt Peloton?"

Woodworth: "When you look at our engagement data, people have found a way not only to replicate exercising outside the home but enjoy it more and perhaps are doing even more than they were even pre-pandemic. So I feel like this is a trend that's here to stay. COVID just accelerated that trend and I think as you look out with respect to what our growth algorithm looks like in a post-COVID world, it's continuing to further penetrate the markets we're in." (*Id.* ¶ 159 ("Statement 7").)

- May 6, 2021 3Q21 Earnings Call

Woodworth: "obviously, last year was a big comp. It was the first few months of COVID. But that type of growth, over a two-year stack, we're pretty excited about and we believe that that can continue into fiscal 2022." (*Id.* ¶ 162 ("Statement 8").)

- <u>May 7, 2021 Form 10-Q</u>

  Peloton: "The increase in net operating assets and liabilities was primarily due to a $442 million increase in accounts payable and **accrued expenses related to increased inventory** and other expenditures to promote general business growth, as well as the timing of payments, partially offset by a **363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**" (*Id.* ¶ 165 ("Statement 9").)

- <u>May 25, 2021 Analyst Conference</u>

  Analyst: "how do you get people comfortable with where Bike demand is heading into warmer weather and into strong reopening[?]"

  Woodworth: "Well, first, I would say, and I think we said this after the launch of Bike+ is that truly the technology and the innovation that we've brought with the Bike+ has been incredibly well received. And so I think we continue to see Bike+ exceeding our expectations on mix. And so with that said, the comments that I made around bike demand in Q4 is that we all know that COVID was a little bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, and everybody -- I mean, I was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this juncture, it's not relevant. So what I was trying to do was, okay, well, let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand.** And what's so interesting about our company today, versus 2 years ago, is that we now have the portfolio of products, right? We have the lower price bike at $49 a month. We have Bike+ which I've said is doing very well. We also are back marketing, again, which is something we haven't done and we were purely organic for so many months because we didn't want to exacerbate the OTD situation." (*Id.* ¶ 167 ("Statement 10").)

- <u>Aug. 26, 2021 4Q21 Earnings Call</u>

  Woodworth: "For fiscal [year] 2022 we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR."

  "**We are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of continued strong demand.**" (*Id.* ¶ 174 ("Statement 11").)

- <u>Aug. 26, 2021 4Q21 Earnings Call</u>

  Analyst: asking a "question about demand for the Peloton Bike line."

Foley: "the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast." (*Id.* ¶ 174 ("Statement 12").)

- Aug. 26, 2021 4Q21 Earnings Call

Analyst: "…**And the second question on the supply chain, we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet**.  Outside of the cost headwinds that you talked about for supply chain, are you worried at all about actually getting product to the consumer over the next -- basically through the holiday season?"

Lynch: "Well, I can take the second question first. This is William. In terms of the guidance that Jill provided, we feel like we've built -- and the investments that John and Jill talked about, we built the infrastructure to support our holiday plans. As Jill noted, we feel like fiscal year '22 is going to be a return to more **seasonality. So a large part of our business is in Q2, Q3. And certainly, that's true of deliveries. And so everything in the supply chain from inventory that you're noting, the accumulation up on the balance sheet to warehousing and how we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.** We're very excited both in terms of the Bike growth that Jill noted and then the launch of Tread, which we expect to be very large over time. And so there's -- a lot of companies aren't in that position or reading in automotive, some of the shortages on chips and semis. So we're very proud of our team. We think our partners, TI, others who have helped us get in that position. So inventory is up. We are building inventory. As you know, the lead times with ocean freight and freight, in general, have extended. And so we've been diligent about learning from the past and feel like we're in a really good position to execute this plan this year."  (*Id.* ¶ 176 ("Statement 13").)

- Aug. 26, 2021 4Q21 Earnings Call

Analyst: "One for John and one for Jill. John, we know there's seasonality. But just given the light 1Q guide, is the price -- is the Bike price gotten offensive or defensive? And how do you think about demand for Bike+ currently? And then, Jill, hoping you can walk through a little bit more detail around the Tread gross margin structure perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you."

Foley: "**Thank you, Doug. So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness, which has, as you know, always been in our playbook.** This is actually the first year since we founded the company that we had the opportunity to do this, and we're super excited that the investments we've made in our supply chain certainly over the last few years, but definitely in the last 12 months, are bearing enough fruit that we have the capacity to make what will become -- what will look like close to 2 million fitness units of

9

hardware this year, which is just incredible considering, when we founded the company, we approached the biggest contract manufacturer we could find, and they said that they were confident that they could make up to 10,000 Bikes a year. That was only eight years ago. So the scale of which we've seen and put in place and invested in across our entire supply chain with Bikes. And now, obviously, it includes Treads. And the lower priced Tread as well allowed us to consider lowering the price of B1, and we think it's the right thing for our business, obviously, solving for net new sub adds, which was kind of our True North of getting more people into the tent and thinking about the LTV of those users, not just, Doug -- interestingly, not just as a subscriber for the $39 for a new Bike sub, which has always been kind of our True North and the golden goose of our business model, but think about selling those same people, the same households, future Treads, and future products, apparel and all the other stuff that becomes a much broader LTV picture over time." (*Id.* ¶ 178 ("Statement 14").)

- Aug. 26, 2021 4Q21 Earnings Call

    Woodworth: "Great. Well, it's a really great call-out. But what I might note is that in fiscal '21, our net adds were boosted a lot by the backlog that we went into. If you remember when COVID hit in March, we went directly red line on manufacturing and went in with a pretty massive backlog going into fiscal '21 given the long OTD. So, I would -- so first, I would say we have much better alignment in sales and delivery time frames in fiscal 2022. **And then -- so from my perspective, yes, we do forecast growth in our Bike portfolio this year on a year-over-year sales basis**, but you have to take into consideration how big the backlog was that we went in. And I think you'll see that that would then imply, even with the 50% of Tread buyers being existing members, that would imply a healthy first year of robust sales of Tread." (*Id.* ¶ 180 ("Statement 15").)

- Aug. 26, 2021 4Q21 Earnings Call

    Analyst: "So, two questions. John, can you maybe speak to the -- just the quarter to the trend in demand you're seeing. Obviously, the guidance implies a sequential decline, but maybe you can parse out the effect of the reopening relative to others like pull back and add spend, etc. And then, Jill, I think you said something to the effect that you expect higher unit sales of bikes in '22 than you did in '21. If you just do a back-of-the-envelope math, it looks like that would imply not a whole lot of sales for the new Tread. So, I was just wondering if you can maybe provide a little more color on that. Thank you."

    Lynch: "And Youssef, we can't comment too much on the quarter-to-date trends, as you can imagine. But I will say, and Jill alluded this in her opening remarks, is that we historically have been a very seasonal business where not only are people out running and riding their bikes in the summertime and getting outside. And this summer, I think, is exceptionally true in that sense coming out of last summer where people are on lockdown. But we obviously don't market aggressively, and I think Jill's opening comments talked about this in the Digital business. We couldn't be more excited about the Digital business. I think I've been one of the biggest champions for -- since day 1 in that business. And we think that it's an incredible lead-gen business, as well as a stand-alone business on its own.

And it's just not smart for us to market it aggressively in the summer vis-a-vis other times of the year. So, when you think about a basket of advertising dollars against your businesses, summer is generally one of the least efficient. So we're trying to run a little bit more disciplined business, certainly on Digital, and you could extrapolate that more broadly. **But I will say, even in the face of light marketing, sales have been robust across our Bike business.** And I guess I'm not supposed to tell you, but how incredibly strong leads have been for our Tread business. **So we are excited about how many leads are in the hopper for people wanting Treads, and we're excited about the demand that we've consistently seen this quarter and, frankly, since COVID hit, as you know.**" (*Id.* ¶ 180 ("Statement 16").)

- Aug. 27, 2021 Form 10-K

  Peloton: "We have identified a material weakness in our internal control over financial reporting, and if our remediation of such material weakness is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired. In the course of preparing our financial statements for fiscal 2021, we identified a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness identified related to reporting involving inventory. We have concluded that this material weakness arose because our controls were not effectively designed, documented and maintained to verify that our physical inventory counts were correctly counted and communicated for reporting in our financial statements."  (*Id.* ¶ 171 ("Statement 17").)

- Sept. 22, 2021 Analyst Conference

  Analyst: asking about how Peloton was "positioned as we exit calendar 2021 into calendar 2022." Foley: "we see the opportunity in fitness as so huge in the US and abroad, as you think about the failure of fitness for decades of the gyms didn't really work, the gyms don't feel like they're going to work moving forward, and we can talk about that if you want to, home fitness was never a great category, you had some content and some hardware, but never had an integrated experience that really was engaging and immersive. . . . So, we think that the future of fitness is in the home. . . .we think 2022 is going to be a fantastic year." (*Id.* ¶ 186 ("Statement 18").)

    D.  Peloton Reveals Decline in Demand to the Public

In Peloton's annual report for the fourth quarter of fiscal year 2021, the Company informed the market about a "material weakness" in the Company's internal controls related to inventory reporting.  (*Id.* ¶ 171.)   Plaintiff alleges that this disclosure "concerned the market", but that

Defendants assured investors that the weakness would not impact future sales or revenue and that Peloton "had a strong grasp on its inventory and that inventory was not excessive and was not indicative of waning demand." (*Id.* ¶ 173.) Plaintiff alleges that this "material weakness" was a fabrication, noting that CW 4—a senior analyst for Peloton's supply chain logistics team—reported that he was not aware of any system deficiencies that would have made it difficult for Peloton to accurately track or report its inventory. (*Id.* ¶ 51.)

Subsequently, on November 4, 2021, Peloton announced its financial result for the fiscal year 2022 and disclosed that it had revised its full-year revenue guidance to a range of $4.4 billion to $4.8 billion, down from $5.4 billion. (*Id.* ¶ 206.) The Company also announced that 91% of its inventory on hand remained unsold. (*Id.*) Plaintiff alleges that this decline in demand was because Peloton's customers "were increasingly free to exercise outside the home." (*Id.*)

In the 1Q22 Earnings Call, Foley explained to the public:

> "As you all well know, stay-at-home and work-from home orders, coupled with commercial gym closures drove massive awareness gains for Connected Fitness, accelerating an adoption curve that was already well underway. Given the unprecedented circumstances presented by the global pandemic, we said last quarter that modelling the exit from COVID and the massive growth we saw in fiscal 2021 would be a challenging task, and that has certainly proven to be true.
>
> We reduced backlogs, out visibility into our future performance has become more limited. From forecasting consumer demand to accurately predicting logistics costs, our teams have never seen a more complex operating environment in which to guide our expected results this year.
>
> As noted in our shareholder letter, we are reducing our guidance for fiscal year 2022. We have returned to presenting ranges given the uncertainty. The swift timing of these changes since giving our initial guidance in August is not lost on us.
>
> As we prepared our previous guidance, we had to make assumptions about consumer behavior coming out of COVID, the impact of our

original Bike price reduction and the cost structure within our Connected Fitness segment, all against the backdrop of a global supply chain crisis [….]

While we continue to see a nearly 100% two-year growth CAGR in both traffic and unit sales in Q1 and into Q2, we've seen a greater-than-anticipated taper of our website traffic levels over the past two months and a slower-than-expected pickup in retail showroom traffic, both of which are important inputs into our forward-looking demand model.  This reduction in traffic has added increased near-term uncertainty into our forecast.

As expected, our original Bike price reduction created a step shift in demand, helping to broaden our demographic mix and expand our market opportunity. The price move did significantly improve our e-commerce conversion rate, in fact, greater than we expected, but not enough to offset the year-over-year declines we have seen in overall traffic.

We saw a positive and sustained reception to the price moves in our international markets. This was anticipated as our international consumers have proven to be more price sensitive. To maintain a premium end-to-end member experience, we made significant investments over the past year to scale manufacturing, logistics and operations. Overall, we believe we met the challenge, but there's no doubt that in some cases, we overcorrected. That combined with the reduction to our demand picture and higher than expected costs across product, transportation and delivery are causing a near-term compression of our hardware margins.

[…]

We track our estimated market share closely. And while sales are currently not meeting our previous forecast, third-party data suggests that we continue to build on our leading share of the Connected Fitness market. We firmly believe at-home fitness customers will want one subscription for a comprehensive home fitness platform and we are determined to be that one subscription."

(Engel Decl., Ex. 11, ECF No. 68 at 3–5.)

Plaintiffs allege that this disclosure directly contradicted Defendants' representations from the prior few months and that this information shocked the market.  (*Id.* ¶ 207.)  Peloton's stock price dropped by 35%, declining from a price of $86.06 per share to a closing price of $55.64 per

share.  (*Id.*)  On a February 8, 2022 earnings call, Peloton announced that Foley would be stepping down as CEO and instead serve as executive chair of the Company's board of directors.  (*Id.* ¶ 219.)  The Company also announced that Lynch would be stepping down from the board of directors.  (*Id.*)  As of September 12, 2022, Foley had resigned from the board of directors.  (Pl.'s Mem., ECF No. 69 at 7 n.3.)

E. <u>Scienter Allegations</u>

Plaintiff alleges that when Defendants learned that demand for their products was declining, the Management Defendants and Insider Trading Defendants sold their shares of Peloton stock at inflated prices.  (*Id.* ¶¶ 257–277.)  In particular, Plaintiffs allege that the Management Defendants and Insider Trading Defendants either suspiciously deviated from their 10b5-1 trading plans or engaged in "highly erratic and irregular trading behavior", suggesting that they had sold Peloton shares during the class period on the basis of material nonpublic information before the truth emerged that demand for Peloton's products was declining.  (*Id.* ¶ 257.)  Plaintiff also alleges that because the Management and Insider Trading Defendants had pledged a "substantial percentage" of their shares during the Class Period, they were motivated to keep Peloton's stock price artificially high.  (*Id.* ¶¶ 241–245.)

## II.   Procedural Background

The Complaint was filed on November 18, 2021.  (ECF No. 1.)  On May 2, 2021, Robeco was appointed as Lead Plaintiff and this action was consolidated with 21-cv-10266 (ALC)(OTW) *Deulina v. Peloton Interactive, Inc. et al*.  (ECF No. 42.)  Thereafter, Plaintiff filed an Amended Complaint on June 25, 2022.  (Am. Compl., ECF No. 51.)

Defendants filed a motion to dismiss on August 22, 2022, arguing that the Amended Complaint fails to state a claim based on an alleged misstatement or omission because (1) Plaintiff

does not allege falsity because all of the challenged statements were true; (2) the statements are protected by the PSLRA's safe harbor for forward-looking statements; (3) the statements are non-actionable opinions or statements of corporate optimism; (4) Plaintiff does not sufficiently allege scienter; (5) Plaintiff fails to plead loss causation; and (6) Plaintiff fails to state a claim based on alleged insider trading. (*See generally* Defs.' Mem., ECF No. 66.) Plaintiff filed its opposition on October 4, 2022. (Pl.'s Mem., ECF No. 71.) Defendants filed a reply memorandum on November 3, 2022. (R., ECF No. 74.) Both parties also filed motions requesting oral argument. (ECF Nos. 69, 71.)

## **LEGAL STANDARDS**

### I.     **Motions to Dismiss under Rule 12(b)(6)**

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The

Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

## II.    Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Importantly, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "However, Section 10(b) and

16

Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 397 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, issuers have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

### III.    Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## ANALYSIS

**I.    Plaintiff Has Not Pleaded an Actionable Misstatement or Omission**

### A.  Safe Harbor for Forward-Looking Statements

Defendants argue that the majority of the challenged statements are not actionable because they fall within the PSLRA's statutory safe harbor.  (Defs.' Mem., ECF No. 66 at 13–15.)  Plaintiff argues that the statements are not forward looking and thus are not covered by the safe harbor. (Pl.'s Mem., ECF No. 70 at 12–14.)

A "forward-looking statement" is (1) "a statement containing a projection of revenues, income. . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(A)-(C); *see also In re Vivendi*, 838 F.3d at 246.  These statements are subject to the PSLRA's safe harbor which provides, in relevant part, that:

> [A] defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies.

*Id.* at 245–46 (citation omitted).  To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague."  *Id.* at 247 (citation omitted). However, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful."  *Gray v. Wesco Aircraft Holdings, Inc*., 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton v. American Exp. Co.*, 604 F.3d 758, 768–69 (2d Cir. 2010)).

First, the Court finds that Statements 1, 6, 7, 8 11, 13, 15 and 18 constitute forward-looking statements. These statements relate to Defendants' projections regarding the future demand for its products and "fall squarely within the definition of a statement containing a projection of ... income (including income loss), earnings (including earnings loss) per share, ... or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." *Gray*, 454 F. Supp. 3d at 386 (quoting 15 U.S.C. § 78u-5(i)(1)(A) & (C)).

Second, the Court finds that these forward-looking statements were accompanied by meaningful cautionary language. Meaningful cautionary language must include the "important factors that could realistically cause results to differ materially." *Slayton*, 604 F.3d at 773. This language must be both "extensive and specific. . . .and must contain substantive company-specific warnings." *Gray*, 454 F. Supp. 3d at 392 (internal quotations and citations omitted).

Here, the forward-looking statements were prefaced with the warning that "[a]ctual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated with our business." (*See e.g.*, Engel Decl., Ex. 7, ECF No. 68-7 at 2; *id.*, Ex. 8, ECF No. 68-8 at 2; *id.*, Ex. 9, ECF No. 68-9 at 2l; *id.*, Ex. 11, ECF No. 68-11 at 3.) This more general warning was accompanied by disclosures of specific risks made in Peloton's regular filings with the S.E.C. For instance in Peloton's Form 10-Q, issued on February 4, 2021, Peloton issued extensive warnings about the risk and uncertainty of future subscriber growth, explaining that "the market for our products and services is still in the early stages of growth and if it does not continue to grow, grows more slowly than we expect, or fails to grow as large as we expect, our business, financial condition, and operating results may be adversely affected" and warned that "[w]e have a limited operating history and our past financial results may

19

not be indicative of our future performance. Further, our revenue growth rate is likely to slow as our business matures." (*Id.*, Ex. 1, ECF No. 68-1 at 40.)  Peloton also warned that it "derive[s] a significant majority of our revenue from sales of our Bike. A decline in sales of our Bike would negatively affect our future revenue and operating results." (*Id.*)  An inability to continue to attract subscribers was also identified as a material risk, which Peloton warned could be caused by "deteriorating general economic conditions or a change in consumer spending preferences or buying trends, whether as a result of the COVID-19 pandemic or otherwise." (*Id.* at 41.)  The disclosures even warned of the very risk that was alleged to have occurred here, warning that "while [the Company had] experienced a significant increase in [its] Subscriber base since the outbreak of COVID-19, it remains uncertain how the COVID-19 pandemic will impact Subscriber renewal rates in the long-term." (*Id.* at 51.)

These very detailed warnings were substantively repeated in Peloton's SEC filings throughout the Class Period. (*See, e.g.*, *id.*, Ex. 2, ECF No. 68-2 at 17 ("The full extent of the impact of COVID-19 on our business and financial results will depend largely on future developments, including upon the removal of lockdowns may cause, consumers to go back to their pre-COVID routines…"); *id.* Ex. 3, ECF No. 68-3 at 45 (same).)  Far from being "boiler-plate", as Plaintiff tries to characterize them, these warnings are both specific and realistic about the precise risks factors faced by Peloton as a company—namely that the relaxation of the COVID protocols closures that had promoted the Company's growth could hamper its future subscriber growth.  These warnings are not "garden variety" and do not relate to "any company's financial well-being".  *C.f. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) (finding that a "kitchen-sink disclaimer, listing garden-variety business concerns that could affect any company's financial well-being, was not meaningful cautionary language…")  Instead, the warnings

specifically detail how the COVID-19 pandemic could potentially affect Peloton's business, which unlike many other businesses, viewed the lessening of restrictions as a material risk rather than as an opportunity for growth.  Moreover, as will be set out more fully below, Plaintiff has not alleged the actual falsity of these forward-looking statements.

Accordingly, the Court finds that this language is sufficiently specific to shield Defendants from liability for their forward-looking statements.  *See In re Bemis Co. Sec. Litig*., 512 F. Supp. 3d 518, 534 (S.D.N.Y. 2021).

### B.  Statements of Corporate Optimism

Defendants further argue that the challenged statements are inactionable because they constitute corporate puffery.  (Defs.' Mem., ECF No. 66 at 16–17.)  Plaintiff argues that the challenged statements are not puffery because "they were made specifically to alleviate investor concerns about Peloton's rising inventory levels."  (Pl.'s Mem., ECF No. 70 at 14–15.)

Statements of puffery are "optimistic statement[s] that [are] so vague, broad, and non-specific that a reasonable investor would not rely on [them]."  *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 (citations omitted).  Challenged statements that are properly viewed as "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

The Court finds that Statements 4, 6, 7, 8 and 9 are inactionable corporate puffery. Statements by Defendants such as "we think the future of fitness is in the home…we think 2022 is going to be a fantastic year" (Statement 18), "[we] feel like [at home fitness] is a trend that's

here to stay" (Statement 7), and "COVID has been a tailwind for our demand…we see continued momentum in [the] foreseeable future" (Statement 4) reflect Defendants' general optimism in the Company and are "textbook cases" of corporate optimism. *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018); *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398-99 (S.D.N.Y. 2018) (statements about the company's "competitive advantage" were mere puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (statements suggesting "Xerox's confidence in its competitiveness" and "vaguely and enthusiastically describ[ing] Xerox's performance, [and] expectations of business success" were non-actionable puffery).  Likewise, Foley's statement that Peloton was "obviously taking the other side of that" in a response to a question about what the relaxation of COVID restrictions would mean for demand in Peloton's products is clearly puffery and not a specific metric on which the investing public would reasonably rely. *Schaffer*, 2018 WL 481883, at *9.

Accordingly, the Court finds that the above-listed statements are inactionable as a matter of law.

### C. Falsity

Defendants also argue that Plaintiff has failed to adequately plead falsity as to any of the challenged statements.  (Defs.' Mem., ECF No. 66 at 8–13.)  Plaintiffs argue that the Amended Complaint adequately pleads falsity because Defendants knew that Peloton's sales team was consistently missing the sales quotas that has been increased in the wake of heightened demand during COVID restrictions, Peloton's sales software was reporting that sales quotas were not being met, there was a significant backlog of unsold inventory after production had been ramped up, Woodward and Lynch were informed in February 2021 that demand would decline by 7% to 20%

starting in March 2021, and that presentations were made to the Management Defendants during monthly meetings showing that there was an increasing gap between sales forecasts and actual sales.  (Pl.'s Mem., ECF No. 7o at 9–10.)

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996).  A statement believed to be true when made, but later shown to be false, is insufficient. *Id.* (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance"); *see also Novak v. Kasaks*, 216 F.3d at 309 ("refus[ing] to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (internal citations omitted), *cert. denied*, 531 U.S. 1012 (2000).  Indeed, the Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why and how that is so."  *Rombach*, 355 F.3d at 174.

The Court finds that Plaintiff has not pleaded that the challenged statements were actually false.  First, Peloton's performance exceeded its sales guidance throughout the Class Period. Plaintiff alleges that Defendants knew that sales were declining in February 2021, but that Defendants continued to characterize Peloton's sales as "strong" or "robust".  (Am. Compl. ¶¶ 146, 149).  However, the entirety of the public disclosures, incorporated by reference into the Amended Complaint, actually reveal that the challenged statements were entirely consistent with Peloton's actual financial results.  For instance, on May 6, 2021, when Peloton announced its 3Q21 results, the Company had actually beaten its forecast of $1.1 billion.  (Engel Decl., Ex. 8, ECF No. 68-8

at 6.)  Its subscription membership had increased to 2.08 million users, an 135% increase from the prior year.  (*Id.* at 7.)  The Company also announced that it was seeing record low number is churn. (*Id.*)  Thus, Plaintiff's allegations that Defendants were concealing an actual decrease in overall demand, including that Defendants purportedly had access to a report indicating that demand would decrease by 7 to 20 percent, are not borne out by the totality of the facts alleged and need not be credited.  *See 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) ("if the documents contradict the allegations of a plaintiff's complaint, the documents control and the [c]ourt need not accept as true the allegations in the complaint") (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)).

Second, and most importantly, Defendants explicitly told the public that demand for Peloton's products would be returning to pre-COVID levels after the surge in demand it had seen during COVID.  Plaintiff's allegations that Defendants knew that "the sales boom of the 2020 was a COVID-phenomenon, and Peloton would be unable to keep sales at that level throughout 2021 and beyond" is reflected in Peloton's disclosures to the market.  In May 2021, Peloton told investors that sales were "tapering from COVID highs" "[a]s anticipated" and that it was "expecting a gradual return to historical seasonal sales trends."  (Engel Decl., Ex. 8, ECF No. 68-8 at 7.)  Peloton also highlighted that a return to seasonality would mean lower demand in the summer months, as people are more able to exercise outside of the home.  (*Id.*)  In this vein, in response to a question about whether vaccines and reopenings would negatively impact demand for Peloton, Woodworth stated that "yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand."  (Am. Compl. ¶ 168.)  In other words, Woodworth

24

specifically compared demand in Peloton's products with pre-COVID levels, rather than promising that the unprecedented demand that Peloton had seen during COVID closures would remain at the same level.

"The key question in considering the misleading nature of a statement is 'whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor[.]'" *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *19 (S.D.N.Y. Mar. 29, 2021) (citing *S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) (summary order)). Thus, because Defendants did in fact disclose to the investing public that the Company knew that the rapid increase in demand for Peloton's products could not be sustained at COVID levels, and a full review of Defendants' public disclosures would have given the investing public the information it needed to make an informed decision about Peloton stock, Defendants have not pleaded the actual falsity of Defendants' statements. Accordingly, the Court finds that Plaintiffs fail to allege sufficient facts to show any actionable misrepresentations or omissions by Defendants. *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."); *see also Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978)*.

## II.   Scienter

Because Plaintiff has failed to plead any actionable misstatement or omission, the Court need not reach the question of whether Plaintiff has adequately pleaded scienter. *See Singh v.*

*Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *see also Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020).

### III.    Section 20(a) and Section 20A Claims

As Plaintiffs have failed to adequately allege their § 10(b) claim, the claims under § 20(a) also fail as a matter of law.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).  Likewise, Plaintiff's insider trading allegations necessarily fail because it has failed to plead an adequate predicate § 10(b) claim.  *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364 (S.D.N.Y. 2005).

### IV.    Leave to Amend

In the event that the Court determines that any part of the Amended Complaint is legally deficient, Plaintiff has requested leave to amend.  (Pl's Mem., ECF No. 70 at 25 n.15.)  Given that the Second Circuit has recognized that "it is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citation omitted), the Court will grant Plaintiff leave to amend.

### CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is **GRANTED**.  The motions for oral argument are **DENIED** as moot.  The Clerk of Court is respectfully requested to terminate the pending motions at ECF Nos. 65, 69 and 71.  Plaintiff is granted leave to file a second amended complaint by **April 28, 2023**

Dated:  **March 30, 2023**
      **New York, New York**                                  _____
                                                              **ANDREW L. CARTER, JR.**
                                                              **United States District Judge**