## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL CONSUMER TRENDS and CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  -v-<br><br>PELOTON INTERACTIVE, INC., JOHN FOLEY, WILLIAM LYNCH, JILL WOODWORTH, THOMAS CORTESE, MARIANA GARAVAGLIA, and HISAO KUSHI,<br><br>     Defendants. | 21-CV-09582 (ALC) (OTW)<br><br>The Honorable Andrew L. Carter<br><br>The Honorable Ona T. Wang<br><br><u>CLASS ACTION</u> |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW</u>

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................... 4

III. PARTIES ....................................................................................................... 4

    A.   PLAINTIFFS .......................................................................................... 4

    B.   PELOTON AND THE MANAGEMENT DEFENDANTS ................................ 5

    C.   INSIDER TRADING DEFENDANTS ........................................................... 6

IV.  FACTS .......................................................................................................... 7

    A.   CONFIDENTIAL WITNESSES ("CWs") ................................................... 7

    B.   BACKGROUND OF PELOTON .............................................................. 31

    C.   PELOTON'S SALES OPERATIONS ......................................................... 31

    D.   PELOTON'S SUPPLY CHAIN ............................................................... 32

    E.   PELOTON'S INTERNAL REPORTING DATABASES THAT TRACKED INVENTORY AND DEMAND ........................................................................ 33

        1.   Peloton's Internal Sales Reporting Tools ................................. 33

        2.   Peloton's Internal Inventory Reporting Documents ................................. 35

    F.   BEGINNING IN FEBRUARY 2021, PELOTON HAD EXCESS INVENTORY THAT DRASTICALLY EXCEEDED DEMAND FOR ITS PRODUCTS ......................................... 36

        1.   Evidence from CWs ................................................................... 36

        2.   Evidence from Peloton's Internal Documents ......................................... 43

        3.   Evidence from Documents Showing Peloton's Shipments of Inventory to the United States ............................................................. 45

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................ 46

    A.   STATEMENTS MADE DURING PELOTON'S FEBRUARY 4, 2021 EARNINGS CALL ......... 47

        1.   Statement 1 (Foley) ................................................................... 47

2.       Statement 2 (Woodworth) ........................................................ 48

3.       Statement 3 (Foley) ................................................................. 48

B.    STATEMENTS MADE IN PELOTON'S MAY 7, 2021 10-Q FOR THE THIRD QUARTER OF 2021 ........................................................................... 53

1.       Statement 9 (Foley and Woodworth) ...................................... 53

C.    STATEMENT AT THE MAY 25, 2021, J.P. MORGAN GLOBAL TECHNOLOGY, MEDIA & COMMUNICATIONS CONFERENCE .......................................... 58

1.       Statement 10 (Woodworth) .................................................... 58

D.    STATEMENTS DURING THE AUGUST 26, 2021 EARNINGS CALL ............ 62

1.       Statement 11 (Woodworth) .................................................... 62

2.       Statement 13 (Lynch) ............................................................. 62

3.       Statement 14 (Foley) ............................................................. 63

E.    STATEMENT DURING PELOTON'S NOVEMBER 4, 2021 EARNINGS CALL ............... 72

G.    THE STATEMENTS IN PELOTON'S "RISK DISCLOSURES" SECTION OF THEIR CLASS PERIOD SEC FILINGS ............................................................... 76

VI.    INVESTORS LEARN THE TRUTH ........................................................... 78

A.    NOVEMBER 4, 2021: PELOTON ANNOUNCES Q1 2022 RESULTS AND SLASHES REVENUE GUIDANCE .......................................................... 78

B.    JANUARY 20, 2022: PELOTON HALTS PRODUCTION AS ITS COSTLY EXCESS INVENTORY COMES TO LIGHT ........................................................... 80

C.    PELOTON'S ADMISSIONS AFTER THE CLASS PERIOD THAT IT SUFFERED FROM EXCESS SUPPLY AND LACKLUSTER DEMAND ............................... 83

D.    DEFENDANTS PROFITED FROM THEIR FRAUD, WITH COMBINED TRADING PROFITS TOTALING MORE THAN $383 MILLION ................................... 85

VII.   THE MANAGEMENT DEFENDANTS AND INSIDER TRADING DEFENDANTS ENGAGED IN ILLEGAL INSIDER TRADING IN VIOLATION OF SECTION 20A ...................................................................... 85

A.    ROBECO TRADED CONTEMPORANEOUSLY WITH DEFENDANTS ............. 86

B.    HIALEAH TRADED CONTEMPORANEOUSLY WITH DEFENDANTS ............. 88

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 89

    A.   THE MANAGEMENT DEFENDANTS WERE PELOTON'S TOP EXECUTIVES ............... 89

        1.   Foley ....................................................................................... 89

        2.   Woodworth .............................................................................. 90

        3.   Lynch ...................................................................................... 91

    B.   PELOTON'S HIGHLY CONNECTED MANAGEMENT TEAM AND BOARD OF
       DIRECTORS ....................................................................................... 92

    C.   DEFENDANTS PLEDGED A SUBSTANTIAL PERCENTAGE OF THEIR ECONOMIC
       INTEREST IN PELOTON DURING THE CLASS PERIOD, AND WERE THUS
       MOTIVATED TO KEEP PELOTON'S STOCK PRICE HIGH TO PROTECT THEIR
       COLLATERAL ..................................................................................... 94

    D.   DEFENDANT FOLEY TERMINATED HIS 10B5-1 TRADING PLAN WHILE IN
       POSSESSION OF MATERIAL NON-PUBLIC INFORMATION ......................... 95

    E.   DEFENDANTS PROFITED $383 MILLION FROM THEIR CLASS PERIOD STOCK
       SALES ............................................................................................... 96

        i.   The Trading Plans Adopted by the Management Defendants and
          Insider Trading Defendants Do Not Absolve Them of Insider
          Trading Liability .................................................................. 96

        ii.   Defendant Foley Profited $80 Million ................................... 98

        iii.   Defendant Woodworth Profited $16.8 Million ....................... 99

        iv.   Defendant Lynch Profited $103.47 Million ........................... 99

        v.   Defendant Kushi Profited $91.7 Million ............................... 100

        vi.   Defendant Garavaglia Profited $23.9 Million ....................... 100

        vii.   Defendant Cortese Profited $67.3 Million ............................. 101

    F.   PELOTON INSIDERS EXERCISED THEIR STOCK OPTIONS YEARS BEFORE
       THEY WERE SET TO EXPIRE, THEN IMMEDIATELY SOLD THE SHARES
       ACQUIRED BEFORE THE PRICE OF PELOTON'S COMMON STOCK DROPPED .......... 102

XII.   LOSS CAUSATION ................................................................................................ 102

XIII.   CLASS ACTION ALLEGATIONS ............................................................................ 103

XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 104

iii

XV.    PRESUMPTION OF RELIANCE ................................................................... 105

XVI.    CLAIMS FOR RELIEF ............................................................................... 106

      COUNT I  For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
          Against Peloton and the Management Defendants ................................ 106
      COUNT II  For Violations of Section 20(a) of the Exchange Act  Against the
          Management Defendants ...................................................................... 108
      COUNT III For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
          Against the Insider Trading Defendants ............................................... 109
      COUNT IV For Violations of Section 20A of the Exchange Act Against the
          Management Defendants and the Insider Trading Defendants ............................ 113

XVII.    PRAYER FOR RELIEF ............................................................................ 115

XVIII. JURY DEMAND ....................................................................................... 115

Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends and additional Plaintiff City of Hialeah Employees' Retirement System (together, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Peloton Interactive, Inc. ("Peloton" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Peloton; (d) other public information regarding the Company; and (e) investigative interviews with over 30 former Peloton employees having first-hand knowledge of the Company's business operations, sales, inventory, and supply chain operations.

## I.    INTRODUCTION

1.    During the height of the COVID pandemic in 2020, Peloton experienced enormous and unexpected growth in demand for and sales of its Connected Fitness Products.  However, by the start of the Class Period on February 5, 2021, restrictions were lifting and vaccines were available, and demand for Peloton's bikes and treads began to decline substantially and inventory of unsold equipment began to build.  These changed circumstances worsened each month during 2021.  But rather than disclose these critical facts to investors, Peloton and its former top executives, including then-CEO John Foley, told the market throughout 2021 the opposite: that "We are not seeing a softening in demand," we are "selling everything we can make," and "inventories are healthy."

2.    The truth was revealed to investors on November 4, 2021, and January 20, 2022, when Peloton disclosed it had enormous quantities of unsold inventory and lacked the demand to absorb it. In response, Peloton's stock price dropped by over 59%, wiping out over $12.5 billion

in shareholder value; investors and Wall Street analysts expressed shock; and Foley and his fellow top executives were fired from their positions, but only after having realized profits of $383 million from selling their personal shares at prices as high as $154/share inflated by their false statements and omissions.  New CEO Barry McCarthy admitted in September 2022 that, when he arrived at Peloton in March 2022, "we were drowning in inventory," which created "an existential threat to the business"—facts hidden from investors during the Class Period.

3.      This Amended Complaint is supported by the detailed accounts of 32 former Peloton employees.  They describe how demand for Peloton's Connected Fitness products across the country had dropped precipitously by the start of the Class Period and worsened thereafter, with Peloton's warehouses stuffed to the brim with unsold Bikes and Treads.  They also report how Peloton and its top executives knew—or, at minimum, were severely reckless in not knowing—these facts.  The facts are also corroborated by internal Peloton documents demonstrating class period decline in demand and excess unsold inventory disclosed after the Class Period, and by new documents showing shipments of Peloton's products dramatically reduced by the end of June 2021.

4.      Peloton imported virtually all (80%) of its bikes and tread from manufacturers abroad (*see infra*, ¶ 108).  As the chart from the import data analysis firm Zauba shows, Peloton had received enormous shipments of inventory in early 2020 through June 2021.

5.      By February 2021, Peloton management knew that this influx of inventory greatly exceeded known current demand; that Peloton was "drowning" in inventory given the mismatch between inventory and demand; and that the imported product was sitting unsold, including in containers at ports and in trucks at Peloton warehouses.  Armed with this knowledge, at least by the end of June 2021 (and likely earlier due to lead times), management dramatically reduced the

import of equipment, with a full production halt to follow belatedly by December of 2021.



6.      The undisclosed level of unsold inventory, coupled with rising costs and declining sales, created a massive cash crunch within Peloton with free cashflow ultimately reported at a $2.4 billion loss in 2022.  Peloton had created a glut of inventory about which insiders knew.

7.      On November 4, 2021, during its earnings call for the first quarter of fiscal year 2022 after the market closed, Peloton disclosed that it had revised its full year revenue guidance down from $5.4 billion to a range of $4.4 to $4.8 billion (or 18%) due to declining demand; and that quarter-end inventory had increased to $1.27 billion, an astounding 35% jump over the prior quarter. Of this, 91% were finished products that remained unsold.

8.      On January 20, 2022, *CNBC* reported that, based on internal reports, Peloton had paused production of the Bike+ in December, and was planning a two-month production freeze of all of its other Connected Fitness products. *CNBC* reported that the demand decline was so significant that a production pause — commenced just one month after Foley stated that inventory levels were "healthy" — was necessary to reset the Company's inventory levels. On January 24, 2022, *Business Insider* published a January 10, 2022, presentation leaked by a Peloton employee confirming that Peloton would be putting a pause on the production of its Bike, Bike+, and Treads

due to declining demand for its products and a "glut of excess inventory" in its warehouses, as described by former Peloton employees.

9. Plaintiffs bring this action under Section 10(b) of the Exchange Act to recover for Defendants' misleading statements to investors between February 4, 2021 through January 19, 2022 (the "Class Period"). Plaintiffs also bring this action under Section 20A of the Exchange Act to recover for Foley and his fellow insiders' personal stock sales of over $383 million during the Class Period.

## II.  JURISDICTION AND VENUE

10. Plaintiffs' claims arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Peloton maintains its headquarters in New York City and many of the acts giving rise to the violations complained of in this action occurred in substantial part in this District.

12. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  PARTIES

### A.  PLAINTIFFS

13. Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends ("Robeco" or "Lead Plaintiff"), established in 1929, is an open-ended investment company based in Rotterdam, Netherlands. Robeco Global Consumer Trends is an actively managed fund

that invests in stocks in developed and emerging countries across the world. The fund invests in a number of structural growth trends in consumer spending.  Robeco purchased Peloton common stock at artificially inflated prices during the Class Period and was damaged thereby. Lead Plaintiff's purchases of Peloton common stock are detailed in ECF No. 16-2.

14.     Plaintiff City of Hialeah Employees' Retirement System is a benefit pension plan based in Hialeah, Florida, that provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah. As indicated in the certification attached hereto as Exhibit 1, Hialeah purchased Peloton common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

**B.     PELOTON AND THE MANAGEMENT DEFENDANTS**

15.     Defendant PELOTON INTERACTIVE, INC. ("Peloton" or the "Company") is a fitness-equipment and media company, whose principal products are internet-connected stationary bicycles and treadmills (referred to herein as "Connected Fitness" products). Incorporated in Delaware, the Company maintains its corporate headquarters at 441 Ninth Avenue, 6th Floor, New York, New York. Throughout the Class Period, Peloton common stock traded on NASDAQ under the ticker symbol "PTON."  Peloton's fiscal year begins on July 1 and ends on June 30.

16.     Defendant JOHN FOLEY ("Foley") was Peloton's Chief Executive Officer ("CEO") from the Company's founding until he was terminated as CEO on February 7, 2022. Foley also was a member of Peloton's Board of Directors (the "Board").  As set forth in ¶¶ 152-217, *infra*, during the Class Period, Foley made misleading statements to investors while in possession of material, non-public adverse information about Peloton. During the Class Period, Foley profited over $80 million from selling his personal Peloton shares.

17.     Defendant WILLIAM LYNCH ("Lynch") was Peloton's President from the Company's founding until his employment was terminated on February 7, 2022.  As set forth in

5

¶¶ 152-217, *infra*, during the Class Period, Lynch made misleading statements to investors while in possession of material, non-public adverse information about Peloton. During the Class period, Lynch profited over $103.4 million from selling his personal Peloton shares.

18.     Defendant JILL WOODWORTH ("Woodworth") was Peloton's Chief Financial Officer ("CFO"), from April 2018 until she was terminated in June 2022.  As set forth in ¶¶ 152-217, *infra*, during the Class Period, Woodworth made misleading statements to investors while in possession of material, non-public adverse information about Peloton. During the Class Period, Woodworth profited over $16.8 million from selling her personal Peloton shares.

19.     Defendants Foley, Lynch, Woodworth, and Peloton are collectively referred to herein as the "Management Defendants."

C.     **INSIDER TRADING DEFENDANTS**

1.     Defendant HISAO KUSHI ("Kushi") was a Co-Founder of Peloton and Peloton's Chief Legal Officer ("CLO") from the founding of the Company until he left Peloton in September 2022. Foley and Kushi as his  worked together and became close friends over the course of more than two decades, and Foley referred to Kushi as his "trusted, best friend" (Forbes Magazine, February 4, 2021).  Kushi sold 800,000 shares of Peloton common stock during the class period, realizing profits of $91.71 million.

20.     Defendant MARIANA GARAVAGLIA ("Garavaglia") was Peloton's Chief People Officer ("CPO") and Chief Business Operations Officer ("CBO") from around June 2019 until February 14, 2022.  Garavaglia sold approximately 270,419 shares of Peloton common stock during the Class Period, resulting in profits of nearly $24 million.

21.     Defendant THOMAS CORTESE ("Cortese") was one of Peloton's co-founders and Peloton's Chief Operations Officer ("COO") from the Company's founding until August 2021, at which time he became Peloton's Chief Product Officer ("CPO"), a role he remained in for the

remainder of the Class Period.  Cortese sold 570,000 shares of Peloton common stock during the Class Period, resulting in profits of approximately $67.3 million.

22.     Defendants Kushi, Garavaglia, and Cortese are collectively referred to as the "Insider Trading Defendants."

## IV.   FACTS

### A.   CONFIDENTIAL WITNESSES ("CWs")

23.     The facts set forth in this Complaint include facts taken from interviews of 32 former Peloton employees, identified herein as CW1 through CW31.[1]  These former employees occupied various positions and roles throughout the Company, and provided consistent and corroborating accounts, as detailed below.

### 1.   CW1

24.     CW1 is a former employee of Peloton who served as a Senior Director, Operations and Supply Chain Program Management. CW1 worked remotely from Georgia during their employment at Peloton, but sometimes traveled to the New York office. CW1 worked at Peloton from July 2020 to November 2021. CW1 reported to Senior Vice President of Sourcing and Procurement Patty Johnson ("Johnson"), until July 2021, when Randy Chu ("Chu") replaced Johnson. Johnson and Chu reported to Chief Supply Chain Officer Jon Adee ("Adee").

25.     As Senior Director, Operations and Supply Chain Program Management, CW1 met with the Senior Vice President of Supply Chain Erwin Hermans ("Hermans") who, in turn, reported to Adee. CW1 stated that every Monday CW1 met with Hermans and Adee to put together Google Slides presentations detailing demand and capacity. Every Tuesday, CW1 met with Adee

---

[1] Certain former employees expressed concern that Peloton would retaliate for providing their truthful accounts. In light of these concerns, this Complaint includes information about each witness' job titles, tenure, and role, without identifying any by name. To keep the CWs identities anonymous, the CW descriptions use gender neutral pronouns.

and Defendant Cortese for one hour during which they discussed the Google Slides prepared the day before as well as supply operations and demand.

26.     CW1 also attended monthly meetings, held on Wednesdays with Adee and Woodworth and Lynch, to discuss capacity and demand. During these monthly meetings, the participants also discussed the same data addressed in the Tuesday weekly meetings – specifically, Google Slides that displayed data about supply and operations as well as demand. CW1 stated that during the Class Period, Woodworth and Lynch were kept apprised of the fact that demand for Peloton's bikes was expected to decline as early as February 2021.  During these meetings, Woodworth and Lynch, as well as Adee, saw data that showed demand had declined by March 2021 and that excess inventory had accumulated.

27.     CW1 stated that at the end of February 2021 or in March 2021, internal reports showed a significant softening of demand for the Bike and Bike+ and that Woodworth and Lynch learned through presentations made at monthly supply chain meetings in February 2021 that demand for fitness equipment was expected to decline starting in March, 2021. CW1 further stated that by March 2021, demand had declined by 7-20% and that there was no sign of sales rebounding during the remainder of CW1's employment through November 2021.

28.     CW1 further stated that between February and November of 2021, demand for Peloton Bikes and Treads continued to decline. CW1 stated that Adee and Lynch instructed the team to continue to focus on ramping up capacity to produce more bikes and treadmills. In particular, Adee and Lynch instructed CW1 and their team to ensure that supply was 30% in excess of demand. Waning demand was evidenced in internal presentations created by the planning team which indicated that the gap between sales forecasts and actual sales was increasing throughout

the Class Period.  Woodworth and Lynch attended supply chain meetings on a monthly basis, and were copied on emails that contained action items after each of these meetings.

29.     In March or April of 2021, CW1 voiced concerns about the growing inventory build-up at Peloton's distribution centers which it referred to as its "final mile" facilities. CW1 reported that Peloton retaliated against people who spoke up about the discrepancy between demand and production, among other issues. CW1 pushed back on Lynch's directive to drive capacity in the face of declining demand – and told Lynch and Adee "Look guys, the demand is not there. So, why are you doing this?" CW1 also confirmed that Peloton's internal reporting software, specifically, NetSuite, tracked and showed the decline in demand. (*See infra* ¶¶ 124-125.)

30.     Finally, CW1 stated that by the time they left in November 2021 there was no slowdown in capacity. CW1 further stated that through November 2021, sales were clearly declining and there was no sign of a rebound in sales. According to CW1, the Bikes took up a lot of space with a very large quantity of product just sitting in warehouses. CW1 stated that excess inventory was stored in containers outside of the actual warehouses or other warehouse locations that Peloton secured. CW1 also stated that the August 2021 price reduction on the original Bike was an attempt to increase sales because Peloton had so much excess inventory.

31.     After CW1 departed Peloton in November 2021, they heard from colleagues still employed that Peloton had 18 months' worth of inventory of bikes – which aligns with *Business Insider*'s January 2022 article which reported that Peloton had more than 500 days of Bike inventory on hand.

### 2.      CW2

32.      CW2 is a former employee of Peloton who worked remotely as an Account Executive ("AE") within Peloton's inside sales organization ("Inside Sales Team") from May 2020 to September 2021. CW2 reported to Senior Sales Manager Jeff Manek who in turn, reported to Senior Director of Inside Sales Israel Varela ("Varela").  CW2's job duties included working with prospective customers on calls and online chats to complete sales.

33.      CW2 observed through data generated via Salesforce and the Looker report (described in ¶117-120, below) that Peloton's sales organization had begun missing sales goals starting as early as December 2020.  CW2 confirmed that management knew that 2021 sales goals were not being attained, stating, "They definitely knew. There was no question."  CW2 stated that the AEs regularly discussed the inability to attain the sales goals with their managers and in turn, the managers assured the AEs that their frustrations had been communicated to more senior management.  CW2 (and CW6, *see infra*, ¶¶ 42-45) also stated that the main channel of communication for the Inside Sales Team was Slack, and that the AEs were very vocal on Slack about their inability to attain sales goals.  CW2 stated that the sales managers reviewed the Slack messages.

34.      At the beginning of every workday, CW2, along with the other AEs, received a Looker report in PDF format which included data about how many units each AE had sold; and each AE's percentage to goal. Whereas, in early 2020, CW2 had no problem meeting sales goals, CW2 stated that by late 2020 and into early 2021, Peloton's sales had begun to decline.

### 3.      CW3

35.      CW3 is a former employee of Peloton who worked as a Regional Operations Manager for the South Region from April 2018 until April 2021 and then worked as a consultant

to Peloton for the next month, advising the Company on management and logistics. As a Regional Operations Manager, CW3 was responsible for 11 distribution facilities and oversaw approximately 1,000 employees. CW3 reported to Vice President of Operations Jamie Beck who reported to Chief Supply Chain Officer Jon Adee who reported to Defendants Foley and Lynch. CW3 stated that Adee did not operate in a vacuum and likely made decisions in conjunction with Foley and Lynch.

36.     CW3 stated that by April 2021, there was a downturn in sales and stated that it was obvious that Peloton was not going to surpass its 2020 sales. CW3 stated that this assessment was based on the number of deliveries going out from the 11 warehouses they managed in the South region. According to CW3, by May 2021, the warehouses were doing "three quarters" of the 2020 monthly volume of deliveries and by the third calendar quarter of 2021, the warehouses were only delivering half of the monthly volume of bikes they had in 2020. After they left, CW3 continued to receive reports on deliveries and communicate with warehouse staff they had supervised who apprised them about the declining number of deliveries. CW3 learned that by October of 2021, the warehouses were delivering just one quarter of the bikes that they had on a monthly basis throughout 2020.

37.     CW3 stated that each night they received and reviewed the Salesforce delivery reports which tracked deliveries and inventory movement; these reports were widely distributed at Peloton.  CW3 discussed the decline in sales and deliveries on calls with other regional operations managers held two times per week. CW3 stated that there was a build-up of excess inventory in Peloton's warehouse facilities in the spring of 2021.

### 4.    CW4

38.    CW4 worked for Peloton from August 2021 to February 2022, at which point CW4 was laid off along with thousands of other colleagues.  CW4 was a Senior Analyst, warehousing and distribution on Peloton's supply chain logistics team. In this capacity, CW4 specifically worked on "downstream" distribution systems, from the time that bikes entered the distribution centers to the point at which they were shipped to customers.  CW4 worked with the warehouse information systems and was also on the product team to assist with new software assessment.

39.    As further alleged in ¶¶ 124-126, CW4 was familiar with Peloton's various supply chain and logistics software platforms such as NetSuite and Scale. CW4 stated that orders inventory were the "touchpoints" between NetSuite and Scale. Meaning that, the two systems interfaced with one another to track orders from the manufacturing sites that were going into distribution and the orders placed for inventory to move the product from the distribution centers to the final mile sites. CW4 stated that the "directors of operations" all had access to the Tableau and Scale repots.

### 5.    CW5

40.    CW5 was a Seasonal Account Executive within Peloton's Inside Sales Team from September 2021 to January 2022 and worked remotely from Texas. CW5 reported to Sales Manager Brenda Funke.

41.    CW5 reported that Peloton hosted monthly all-hands, company-wide meetings ("All-Hands Meetings") via Zoom during which Defendant Foley would discuss sales figures. According to CW6, inventory management was also discussed during the monthly All-Hands Meetings.

## 6.    CW6

42.    CW6 worked at Peloton from June 2015 until February 2022, at which point CW6 was laid off.  For their first few years of employment, CW6 was a member of Peloton's Outside Sales Team. From around June 2015 until March 2016, CW6 was a general manager of a showroom and from March 2016 until October 2018, CW6 was a regional manager.  In October 2018, CW6 moved to the Inside Sales Team as a supervisor, which role they continued in until March 2020. From March 2020 until January 2021, CW6 was a manager for the Inside Sales Team. In January 2021, CW6 became the Senior Sales Manager of Training and Enablement, and remained in that role until February 2022.

43.    CW6 reported to Varela, the Senior Director of Inside Sales. Varela reported to Chief Sales Officer, Tim Shannehan. CW6 believed Shannehan reported to either President William Lynch or Chief Executive Officer John Foley.  CW6 stated that each month, sales goals were conveyed by Shannehan to Varela.

44.    CW6 stated that, during early 2021, management saw Looker reports which showed Peloton's inability to attain sales goals. According to CW6, Looker was the "source of truth" for Peloton's actual sales and actual sales to goal and was updated every 24 hours based on data from Salesforce. CW6 stated that the Looker reports were generated automatically and sent to the Inside Sales Team and managers "every single morning." CW6 stated that they were 100 percent certain that Foley and Lynch had access to the Looker data.

45.    CW6 further stated that Peloton held All-Hands Meetings during which inventory management was discussed. Finally, CW6 stated that Peloton implemented promotions in 2021 in order to increase sales because sales were not where they were forecasted to be.

### 7.   CW7

46.     CW7 worked at Peloton's Minneapolis, Minnesota final mile warehouse from December 2020 until February 2022, at which point they were laid off.  CW7 was an inventory specialist from December 2020 until April 2021.  In this role, CW7 was responsible for physical inventory counts and managing inventory flow. In April 2021, CW7 became a warehouse management system specialist ("Warehouse Specialist") after Peloton implemented the Scale information system to manage inventory and continued in this role until February 2022.  CW7 reported to an Operations Manager of the Minneapolis warehouse, who in turn reported to a director of inventory for the region.

47.     CW7 reported that by early 2021, Peloton management realized that it had a problem with excess inventory.

48.     CW7 also stated that it was "wildly" apparent that sales were slowing during the Class Period. For instance, the Hazelwood facility had gone from shipping 180 bikes per day at the height of the 2020 holiday season to as few as 20 bikes per day. CW stated that trend continued through September 2021. Although July was typically the slow period for sales at Peloton, CW7 stated that sales never picked up in the fall of 2021.

49.     CW7 stated that Peloton cut the price of the Bike by 20% in August of 2021, around the time that "shit hit the fan" with inventory issues and sales had declined.

50.     CW7 further stated that when they attempted to better understand inventory issues their questions were "deflected."

## 8.    CW8[2]

51.    CW8 was employed by Peloton as an Operations Supervisor from 2017 until the Summer of 2022 in Carteret, New Jersey. CW8 stated that, by early summer 2021, there was more product being delivered to their warehouse than demand required. CW8 began spending a good deal of their time figuring out how to reallocate bikes and trailers full of bikes, an activity which CW8 stated they continued for the rest of the year. CW8 stated that finding places for excess inventory became the focus of their role for the remainder of 2021. In early summer 2021, CW8 started to allow containers to be left in the yard of the Carteret warehouse because there was nowhere inside the warehouse to put the Peloton product being shipped to the facility.

52.    Because CW8's facility fed product to the other warehouses, CW8 was frequently in touch with the inventory managers of other facilities, trying to find out where there was space to store more bikes. As soon as CW8 saw inventory had accumulated early Summer of 2021, CW8 voiced concerns regarding inventory in meetings and recommended stopping production. CW8 also stated that in daily meetings with senior managers, managers, and directors, CW8 repeatedly communicated their concern that there was far too much inventory coming into the warehouse to be absorbed by the clearly dropping demand. CW8 also conveyed their concerns about too much inventory entering the warehouse via email and "in-house escalation" including to Peloton's head of planning; however, CW8 stated that their concerns "were not being heard."

53.    CW8 reported that the Company's failure to address the reality of the inventory overflow resulted in ports flooded with excess inventory because there was nowhere else to store equipment.

---

[2]CW8 through CW31 are additional Confidential Witnesses that were not included in Lead Plaintiff's First Amended Complaint.

54.      CW8 further stated that as demand continued to decline and product sat at the ports, Peloton began to incur substantial demurrage fees.

### 9.      CW9

55.      CW9 worked remotely as a cost and invoice analyst at Peloton from April 2021 until February 2022. CW9 reported to International Freight Manager Martina Scholz.  CW9's role was specifically created in 2021 to audit freight invoices. In this position, CW9 was tasked with building out a process on "how to properly audit" the freight invoices (for both international and domestic freight charges) and validate them. CW9 audited invoices that were submitted to Peloton by Flexport and Expeditors, freight forwarders with whom Peloton worked.

56.      CW9 stated that by June of 2021, Peloton's warehouses had run out of room to store inventory. During their employment at Peloton, CW9 and their colleagues discussed the problem of excess inventory at the warehouses and how warehouses were forced to turn away shipments of inventory because they had no room and how the warehouses lacked space for shipments of bikes. One colleague, a senior accountant at Peloton's UK office, informed CW9 in late 2021 that given the amount of inventory on hand, Peloton did not plan on placing any orders for equipment for another six months.

57.      CW9 stated that because of their job responsibilities, they knew that Peloton was paying demurrage fees, because the excess inventory that Peloton could not store at its warehouses had to remain at the ports of entry into the United States. CW9 estimated that Peloton was paying about $275 in fees per day for each of the containers to sit at the ports. CW9 stated that the fees were also incurred when trucks with Peloton's products sat at the ports. The demurrage fees showed up as line items on freight invoices. The freight forwarders, Flexport and Expeditors, paid the demurrage fees on Peloton's behalf, and then billed Peloton for reimbursement. According to

CW9, Flexport and Expeditors regularly complained that Peloton was not paying the invoices on time.

### 10.   CW10

58.    CW10 worked at Peloton from April 2014 until February 2022, first in New York and then remotely from Denver, Colorado beginning in 2020.  During their tenure, CW10 held several different roles: Between April 2014 and December 2015, CW10 was a Senior Manager of Customer Service; from December 2015 until April 2016, CW10 was a Senior Manager of Operations; and from April 2016 until February 2022, CW24 was the Director of Inside Sales. As the Director of Inside Sales, CW10 reported to Chief Sales Officer Tim Shannehan.

59.    CW10 reported that during the sales season around Christmastime 2020, the Inside Sales Team achieved 80-85% of its goal, but beginning in 2021, the Inside Sales Team only hit around 70-75% of its goal. CW10 stated that sales continued to deteriorate in spring of 2021 and that by the summer of 2021, sales had dropped off. By the summer of 2021, only 10 to 12 individuals out of Peloton's roughly 200-person Inside Sales Team had hit their goals.

60.    CW10 further stated that Foley and Lynch had direct access to the Looker reports which reflected sales trends and that they "knew the numbers." CW10 also stated that they did not see how anyone at Peloton could not know that sales were declining or that the sales representatives were not hitting sales goals. According to CW10, these trends were all reflected in the Looker reports and Foley and Lynch knew that the sales team was not hitting the internal goals month after month. CW10 sat next to Foley for the first several years of their employment and knew from their direct interaction with Foley that he had direct access to the Looker report and reviewed the data it contained.

61.     CW10 stated that the Looker report data could be viewed by day, week, month, or year, and that the reports were updated each day. Moreover, sales operations employees, such as Ian Clark, pulled the Looker reports and distributed them via email daily. According to CW10, both Foley and Lynch were on the email distribution list for the Looker reports. CW10 also noted that Shannehan provided at least weekly sales updates to Foley and Lynch.

62.      CW10 further stated that they knew Foley and Lynch reviewed the data in the Looker reports based on comments they made; for instance, when sales were high during Black Friday or other promotional periods, Foley and Lynch would email the Inside Sales Team as a group with comments regarding their performance based on the data in the Looker reports.

63.     Finally, CW10 stated that during 2021, Peloton was buying more inventory than it could sell. CW10 stated that they knew this because Varela made statements indicating that Peloton had bought more inventory than it could sell.  CW10 stated that they also knew inventory levels were increasing because of the drastic reduction of the lead time for bike delivery between April and August of 2021. In April of 2021, the lead time to receive a bike was 8-10 weeks; by August of 2021, it was as short as 1-2 days in New York City.

### 11.   CW11

64.     CW11 worked at Peloton's Perris, California distribution center as a Warehouse Associate from September 2020 to November 2022. CW11 was a member of Peloton's inventory team and was responsible for inventory cycle counts and assessing physical inventory numbers. CW11 reported to team leads Kyle Bigelow and Katherine Boyd.

65.     CW11 stated that Peloton's Perris, California distribution center, which opened in September 2020, was approximately "half a million" square feet in size and was the Company's largest distribution center in the country at the time it was created. CW11 further stated that the

Perris distribution center was the intermediary between the port and other Peloton final mile delivery facilities or "3PLs," i.e., third party logistics providers that Peloton worked with to deliver products to consumers. CW11 reported that almost every piece of inventory that came from Peloton's supplier in Taiwan to the port in California was routed to the Perris distribution center, which in turn sent the inventory to wherever it needed to go.  CW11 confirmed that Flexport was the company that handled the product at the port and taking the containers off the ships. CW11 also described the inconsistent and erratic inbound of inventory into the Perris distribution center, stating that there was never really any normal number of inbound containers coming into the Perris center. CW11 stated that into 2021 there was talk about the port being backed up and then there was a "floodgate" of containers in addition to an "insane" amount of inbound product.  As a result, CW11 stated that Peloton opened up its San Bernardino facility to alleviate the buildup of containers and that the San Bernardino site contained exclusively excess, overflow product. CW11 further stated that Peloton was charged a daily rental fee of approximately $100 per day per container.

66.     CW11 stated that by April or May 2021 the Perris distribution center had become so overwhelmed with incoming inventory shipments that the employees spent most of their time moving products internally, because so few deliveries were going out of the warehouse. CW11 also reported that by April or May 2021, the yard at the Perris warehouse was filled with containers which could not be unloaded because there was no place inside the warehouse to store the product.

67.     Like several other CWs, CW11 confirmed the inventory tracking systems that Peloton used during 2021, including: NetSuite and Manhattan Scale. In particular, CW11 stated that NetSuite was replaced by the Manhattan Scale system as the warehouse management system ("WMS") used across the Company and that during CW11's employment, the two systems ran in

parallel with one another. CW11 stated that the employees at the corporate office had access to both NetSuite and Manhattan Scale. CW11 further noted that the inventory that was stored at the Perris distribution facility yard (rather than inside) was tracked via spreadsheet rather than in NetSuite or Scale.

68.     Finally, CW11 stated that during their employment, Peloton's refurbished products sat in warehouses for years at a time. CW11 estimated that 10-15% of the inventory at the Perris distribution center consisted of refurbished bikes that had not been moving out of the warehouse and/or may have become obsolete.

**12.    CW12**

69.     CW12 worked as a Refurb Team Lead between May 2020 and June 2021 in Peloton's Houston, Texas warehouse and reported to the Refurb Supervisor Joshua Doucet. In this role, CW12 was in charge of refurbishing Peloton bikes and was the Team Lead for 12 to 15 associates. CW12 stated that everyone knew sales had slowed down by June 2021, when CW12 left Peloton. CW12 further reported that the warehouse they worked at was a super fill warehouse and was considered a docking station.

**13.    CW13**

70.     CW13 was an Inbound Specialist at Peloton's Houston, Texas warehouse between July 2020 and June 2021. CW 13 reported to Warehouse Supervisor Juan Garcia. CW13 stated that they first noticed excessive inventory at the Houston warehouse around Christmastime in 2020. CW13 stated that the Houston warehouse was getting eight to ten trucks a day, and that each truck had a shipment container with a couple hundred bikes each and there was not enough inventory going out to account for what was coming in.

71.     CW13 further stated that there was not a good system for inventory and recalled in their first year with Peloton: "They couldn't keep track of inventory, it was a shit show." CW13 also reported that returns were adding to the inventory issues and that Peloton was outgrowing the space in the Houston warehouse and that returns were slowing them down even more.

72.      As an Inbound Specialist, CW13 received all items that entered the warehouse – including bikes, treadmills, and accessories – and put them away. CW13 received primarily new product shipments but also dealt with returns, of which Bikes were the most common.

### 14.    CW14

73.     CW14 was a Senior Director, Global Marketing IT at Peloton from August 2020 to September 2021.  CW14 reported to acting CIO Mindy Lieberman. CW14 was in charge of a group that handled anything that Marketing needed from an IT perspective, and primarily assisted with Peloton's marketing technology.

74.     CW14 stated that the hiring freeze implemented in July 2021 for Peloton's fiscal year 2022 was telling as it indicated that things were not going so well and that something was shifting. CW14 attributed the hiring cuts to decreased demand and sales, explaining, "That is the only thing it could be. If sales were increasing, we would need to increase headcount as efficiently as we possibly can to meet that demand." On the other hand, CW14 stated that if there is no demand, you need to stay flat or decrease hiring, which they thought ultimately occurred at Peloton after they left in September 2021.

75.     CW14 reported, based on communications with their counterparts in Marketing and Sales, that hiring freezes and budget cuts were occurring across the board at Peloton until they departed from the Company in September 2021. CW14 heard from the sales business team that they also had to make across-the-board adjustments to their hiring requests.

### 15.   CW15

76.     CW15 was a Quality Team Member at Peloton between July 2020 and July 2021 in Minneapolis, Minnesota and reported to Field Operations Supervisor Chadwick Shugart. In this role, CW15 checked all the outgoing equipment orders to ensure that everything got onto the delivery van.

77.     CW15 stated that in December 2020, the Minneapolis warehouse delivered 100-125 bikes per day but that by April and May 2021, the Minneapolis warehouse was delivering only 60-80 bikes per day. As a result of the decreased sales, Peloton cut the Minneapolis workforce from about 100 to 60 employees in the spring of 2021.

78.     CW15 discussed the inventory problems at Peloton, noting that the inventory side of the business was "bananas, especially last year [2021]."

### 16.   CW16

79.     CW16 was a Field Operations Specialist and Warehouse Associate at Peloton's Richmond, California location from November 2020 through August 2021. In this position, CW16 delivered bikes and reported to Field Operations Manager Michael Wagner and Operations Supervisor Dustin Dudenhoeffer.

80.     CW16 stated that in December 2020 through February 2021 their facility delivered 7 to 8 bikes per day, but deliveries slowed in February or March of 2021. CW16 reported that the change was dramatic; one day they delivered 8 bikes and the next they only delivered 3 bikes. The Richmond, California warehouse had 20 vans, and at peak they were all doing deliveries; however, by February 2021, certain routes were not going out and there was a decrease in deliveries. Further, CW16 noted that Peloton was overstaffed with drivers in February of 2021 and that these drivers

were being paid without any work. CW16 reported that refurbished bikes were taking up a lot of space in the warehouse and that they were stacking up.

### 17.    CW17

81.    CW17 was a Sales Specialist at Peloton's Bellevue, Washington showroom between July 2017 and September 2021. CW17 reported to Jonathan Domoleczny, Bellevue's Showroom Manager. CW17 stated that Peloton's business declined beginning around March 2021. CW17 stated that the decline was quite drastic in the Bellevue showroom and that hours would go by when no one would walk into their showroom.

### 18.    CW18

82.    CW18 was a Sales Specialist at Peloton's Santa Monica, California showroom between August 2020 through August 2021 (CW18 initially worked remotely for the first few months of their employment before working in the showroom). CW18 reported that after the holiday season in 2020, business plummeted. CW18 stated that in the last few months of their tenure – i.e., in the spring and summer months of 2021, sales were very slow. When CW18 left Peloton, there was barely any traffic in the showroom. CW18 estimated that sales dropped off significantly beginning in February 2021. CW18 stated that sales specialists were selling about 4-5 bikes each day from March - January 2021 but that sales dropped to just 1-2 bikes per day once business slowed.

### 19.    CW19

83.    CW19 was a Field Operations Specialist at Peloton in Peloton's Santa Ana, California warehouse from December 2020 through September 2021. As a Field Operations Specialist, CW19 was responsible for bike and tread assembly as well as delivery. At the outset of COVID, CW19 recalled delivering 7-9 bikes per day. CW19 also recounted that deliveries slowed

down significantly in July 2021. As a result, CW19's hours went from 40 hours a week to 30 hours a week, and they delivered only 4-6 bikes a day. CW19 also stated that the Santa Ana warehouse had a WMS system to track the inventory and that a WMS specialist handled the inventory. CW19 stated that later in 2021, the warehouse began receiving an influx of "dusty bikes," i.e. bikes that seemed to have a lot of dust and had been sitting in a different warehouse for an extended period of time. CW19 stated that they received these shipments directly from Peloton's Perris, California, distribution warehouse.

### 20.   CW20

84.     CW20 worked as a Sales Manager at Peloton from June 2017 until June 2021 in Seattle, Washington. In this role, CW20 reported to Showroom Manager John Domoleczny. CW20 departed the Company voluntarily in June of 2021.

85.     According to CW20, sales peaked between March and October of 2020 but began to slow down drastically in early 2021.  CW20 knew this because, in their role as Sales Manager, CW20 would receive a monthly sales report generated via Salesforce. These sales reports showcased all new memberships and sales. From these reports, CW20 forecasted and set goals for the upcoming months. CW20 stated that Peloton management would calculate sales goals from the monthly sales reports. Even though they got close to hitting the goals, many times their location was unable to do so.  CW20 also reported that monthly sales reports came from senior management and were distributed through regional managers to the location managers. CW20 left because sales had really started to slow down in the spring of 2021 even though the same sales projections and same pushes were still in place at retail levels. CW20 stated that there was a disconnect between the sales forecast and what the business analysts presented to their sales team.

### 21.    CW21

86.    CW21 worked as a Sales Specialist at Peloton from May 2019 until October of 2021 in the Tampa, Florida showroom and reported to Showroom Manager Don Moore and Regional Sales Manager Brooke Raymond. During the peak of the pandemic, CW21 sold between 100 and 120 bikes each month, almost triple their sales made prior to the pandemic.  CW21 stated that Peloton's sales slowed down significantly in February and March of 2021 and that sales associates were only sold about 30-40 bikes per month. Although management expected sales staff to sell "a million pelotons" in the summer of 2021, ultimately the summer continued to be very slow for sales, though sales quotas did not decrease.  CW21 noted that they did not understand why the quotas had not decreased, since there was not enough traffic for all the associates to do well with commissions.

### 22.    CW22

87.    CW22 was a Sales Expert at Peloton from May 2020 to June 2021. CW22 worked in a showroom in Murray, Utah, and then sold Peloton equipment remotely by phone during some of the pandemic. CW22 reported to Regional Sales Manager Eric Manibog.  CW22 recalled that during the height of the pandemic, the individual quota for monthly bike sales reached 100 bikes. But after demand and sales decreased, the sales quota reached a low of 30 bikes/month, and Peloton's salespeople were struggling to sell even 20 bikes. As an example of the demand and sales trending downwards, CW22 explained that at the height of sales, the sales staff earned on average $120,000 annually, which decreased to $40,000. CW22 recalled that the reduced demand began in fall 2020. CW22 left the Company in June 2021, when sales declined even further after the treadmill recall occurred, recounting, "The sales team was screwed by that."

### 23.   CW23

88.    CW23 worked as a Field Operations Coordinator at Peloton from October 2020 until the end of March 2021 in Peloton's San Jose, California warehouse. CW23 reported to Patrick White.  CW23 left Peloton due to increasing layoffs in March of 2021.

89.    CW23 recalled that while the warehouse had been very busy when they began in October of 2020, when COVID restrictions eased in California in February of 2021, business slowed down significantly. Once business slowed, Peloton cut hours for all the warehouse staff. CW23 reported that when asked about the slowdown, management would skirt around the issue of when business would get back to normal.  CW23 recounted that prior to February 2021, the San Jose warehouse delivered 180 bikes per day. By February 2021, deliveries dropped to about 50-60 bikes a day and then declined even further.

90.    As a result of the drop in demand, CW23 reported that the warehouse let go of half of their workforce in March of 2021. CW23 also stated that in 2021, field operations employees became busy with bike returns.  CW23 heard from drivers who were picking up the bikes that the feedback was that customers said it was cheaper to go to the gym.  Most people obtained bikes right when the pandemic occurred, and the bikes started being returned right as things were opening up.  When CW23 noticed that the Company was reducing drivers' hours and laying people off, they decided to leave.

### 24.   CW24

91.    CW24 worked at Peloton's last-mile warehouse in Kent, Washington between August 2019 through April 2022. CW24 held four different positions: (i) from August 2019 through early 2020, CW24 delivered treadmills to customers' homes; (ii) from early 2020 through October 2020, CW24 performed services on Peloton products; (iii) from October 2020 through

September 2021, CW24 worked in inventory; and (iv) from September 2021 through April 2022, CW24 worked in a hybrid inventory and service role.

92.     CW24 reported that the last-mile warehouse in Kent, Washington, was 6,000 square feet and housed hundreds of rusty bikes which came from Tonic and Rexon. According to CW24, the bikes had rusted while sitting at a port in the U.S. for an extended period of time in shipping containers. CW24 reported that the rusty bikes seemed to occupy the "entire warehouse."

93.     CW24 stated that demand for bikes declined and inventory increased in the summer of 2021. According to CW24, in August or September 2021, orders were slowing down and a lot of inventory was accumulating in the warehouse. CW24 also noted that by around January 2022, the number of delivery appointments dropped by about one-third and that information regarding the dropping number of delivery appointments was easily available in Salesforce.

### 25.     CW25

94.     CW25 was an Operations Coordinator at Peloton from August 2021 to December 2021. In that role, CW25 was responsible for managing the fleet of vans and facilities and maintenance in the warehouse.

95.     CW25 stated that Peloton's success was COVID related and that the Company could not sustain its success post-COVID. CW25 further stated that recruiters and managers at Peloton started to cut hours.

96.     CW25 learned that people were getting laid off from the warehouse or leaving in high numbers starting in July of 2021. CW25 recalled attending a team meeting where Field Operations Manager Wagaman told CW25 and other employees that Peloton was budgeting employees' salaries and hours because the Company was trying to cut down costs. CW25 left Peloton because their working hours decreased and were never consistent.

### 26.  CW26

97.     CW26 was the Head of Financial Systems at Peloton between December 2018 and October 2021. CW26 worked remotely from Texas and reported to Defendant Jill Woodworth. In this role, CW26 was responsible for an information system that was used for "internal expense accruals."   CW26 reported to Defendant Woodworth. CW26 was in meetings with senior leadership personnel such as Defendant Woodworth, Chief Accounting Officer Klingsick, and Senior Vice President of Internal Audit Melissa Kandel. CW26 reported that Defendant Woodworth was "aware" of inventory reporting discrepancies based on their attendance at a May 2021 senior leadership meeting CW26 attended, where the audit of Peloton's inventory controls was discussed. Finally, CW26 stated that 80% of Peloton's bike frames were produced overseas, mainly in Taiwan.

### 27.  CW27

98.     CW27 was a Warehouse Manager at Peloton's San Marcos, Texas warehouse from January 2021 to October 2021 and reported to the Field Operations Manager at Peloton, Briseida Garcia. A total of 16 associates reported to CW27. CW27 handled inventory including day-to-day operations from building bikes, receiving shipments, making sure bikes went out and vehicles were on par.  CW27 had approximately 84 employees reporting to them. CW27 attended weekly Zoom calls with all the station managers, supervisors, CEO John Foley, Chad Wagner, and Nicholas Salinas.

99.     CW27 observed a significant slowdown in the work in their warehouse starting in August of 2021. CW27 noted that the San Marcos, Texas warehouse went from 120 bikes and 30 treads sold each day, which had been consistent from January to around June 2021, to an estimated 95 bikes in June and July 2021 when things were super slow. The number of bikes sold then

continued to decrease to 75 toward August of 2021 and then went down to 50 bikes. CW27 further stated that the San Marcos, Texas warehouse throttled down deliveries from 12 vans to five vans per day.

### 28.    CW28

100.    CW28 was a Sales Specialist at Peloton from October 2019 to August 2021. CW28 worked in the showroom at Brookfield Place, a mall in New York City. After the showroom closed down due to the pandemic, CW28 took phone orders for nationwide sales. CW28 stated that there was absolutely a concern about the decrease in demand associated with the COVID vaccine rollout in December 2020.

101.    CW28 recalled that after December 2020, sales got really quiet. In January and February 2021, sales numbers grew progressively worse, and the monthly quota decreased from around 15 to 16 bikes to about 8 bikes.

### 29.    CW29

102.    CW29 was a part-time Field Operations Specialist from October 2019 through January 2020 until they were hired full-time as a Field Operations Specialist in January 2020, which role they worked in through October 2020. They were later promoted to Field Operations Team Lead in October 2020, which role CW29 worked in until the end of their employment in November 2021. CW29 handled bike deliveries at Peloton's San Marcos, Texas warehouse throughout their entire employment. As Field Operations Team Lead, CW29 oversaw the field operations team while continuing to do deliveries. CW29 reported to the Field Operations Manager. CW29 stated that there was a slowdown in business starting around July 2021, and it was consistently slow until they left in November 2021. CW29 stated that when they tried to ask management about what was going on, they ducked and dodged him.

103.    CW29 also stated that during the pandemic, the San Marcos warehouse received two shipments per week and that every Wednesday, the warehouse physically counted all inventory including bikes, tablets, consoles, and treads.

### 30.    CW30

104.    CW30 was a Sales Specialist at a Peloton retail micro store in Portland, Oregon, from April 2019 to October of 2021.   CW30 reported to Assistant Showroom Manager Noelle Smith. CW30 stated that the pandemic increased sales for Peloton, but that sales decreased significantly starting in March 2021 and continued to decrease through August 2021. CW30 said that the sales associates were barely making their goals and were just scraping by. CW30 reported that the decline in demand was evident in their sales numbers, and from the fact that it was hard to get people into the stores.

### 31.    CW31

105.    CW31 was the Director for Supply Chain Development at Peloton from June 2021 to September 2021. CW31 worked on the remediation efforts for the material weakness in Peloton's inventory. CW31 reported to Peloton's Former Vice President of Global Supply Chain Operations Meghan Milks Nicholas.

106.    CW31 reported that within a few weeks, or a month and half, after joining the Company – i.e., in June 2021 – they realized demand wasn't there. CW31 also described the relationship between Peloton and two of its manufacturers: Peloton owned Tonic fully and had a contractual obligation with Rexon.

107.    CW31 stated that Peloton warehouses were running out of space and they were trying to look for ways to create space either by getting creative or securing additional storage. CW31 further stated that some warehouses began holding containers in the yard of their facilities

instead of bringing the containers into the warehouse and further, that Peloton sourced additional housing with its third-party logistic providers XPO and JB Hunt.

**B.   BACKGROUND OF PELOTON**

108.   Peloton is a fitness-equipment and media company. During the Class Period, Peloton's products consisted primarily of internet-connected stationary bicycles and internet-connected treadmills. Peloton's revenues were generated almost entirely from these products, constituting 80% of the Company's revenues during fiscal year 2020 and 72% during fiscal year 2021. Peloton manufactured 80% of its exercise equipment overseas. Of the Bikes that Peloton manufactured overseas, approximately 93% came from Taiwan.

109.   For most of calendar year 2020 and the very early months of 2021, the COVID-19 pandemic was a boon for Peloton. Because stay-at-home orders and business closures kept many people out of the gym, the demand for in-home exercise options increased dramatically. In the months leading up to the Class Period, Peloton experienced unprecedented demand for its products and services.

**C.   PELOTON'S SALES OPERATIONS**

110.   Peloton had two primary channels for sales of its Connected Fitness products: (ii) "Inside Sales," where sales come from interested customers who reach out to Peloton directly to inquire about purchasing fitness products, for instance, by messaging a representative about purchasing a product via the chat feature on Peloton's website, or from customers who are directly contacted by the Company's sales representatives; and (ii) an "Outside Sales Team" or "Retail Organization" wherein sales are made in a brick-and-mortar location called a "showroom." Peloton's Inside and Outside sales teams both sold Bikes and Treads, accessories for the workout equipment, as well as warranties for the equipment.

31

111.    According to Peloton's Form 10-K for FY 2021, as of June 2021, Peloton had a total of 123 retail showrooms. Members of Peloton's Outside Sales Team or Retail Organization, including CW17, CW18, CW20, CW21, CW22, CW28, and CW30 worked at Peloton's retail showrooms across the U.S.

112.    According to CW2, during 2021, the Inside Sales Team had several sales managers including, among others, Brenda Funke and Meleah Willis. Above the Insider Sales Team's managers were Senior Sales Manager, Continuous Improvement and Operations Jeff Wanek ("Wanek"), among others. Wanek worked primarily in sales operations, although he also developed the front-line sales managers.  Wanek obtained information from Peloton's logistics team, for instance, regarding shipping lead times and in turn, would share that data with CW6. The Insider Sales Team was led by Varela, the Senior Director, Inside Sales, who reported to Tim Shannehan, Peloton's Global Chief Sales Officer. Shannehan in turn reported to Foley or Lynch

113.    During the Class Period, Peloton established sales quotas for its sales force. Accounts from CW5, CW2, CW10, CW20 and CW28 together confirm that each individual AE, sales team, and the entire sales organization had a monthly sales goal. Sales goals were related from Shannehan to Varela.

### D.   PELOTON'S SUPPLY CHAIN

114.    According to CW3, Peloton had five geographic distribution centers in the United States: West, East, North, South, and Midwest and a warehouse in Toronto, Canada. The West region spanned from California to Washington; the East region included New York and Pennsylvania; and the South region ranged from Texas to the Carolinas, including Florida, Alabama, and Georgia.

115.    As of September 16, 2020, Peloton had 105 last-mile hubs, which the Company referred to as its "last mile facilities." The Company also had seven "super distribution centers"

which fed the last-mile facilities in the U.S., totaling approximately 1.2 million square feet of warehouse space.

### E.   PELOTON'S INTERNAL REPORTING DATABASES THAT TRACKED INVENTORY AND DEMAND

#### 1.  Peloton's Internal Sales Reporting Tools

116.    Peloton used several software tools to track sales and communicate internally throughout the Class Period including: Looker, Salesforce, Slack, and Callidus. CW2, CW5 and CW6 confirmed that Defendants regularly utilized the internal sales reporting tools described below:

##### a.    Salesforce

117.    "Salesforce" is customer relationship management ("CRM") tool utilized by sales personnel to record relationships and interactions with current customers and prospective buyers, record and track sales and generate reports reflecting sales data, which can, in turn, be fed into Looker (described below).  Management Defendants received regular Salesforce reports about actual sales data (see CW2, CW6, CW10) which, in turn, were used to forecast demand and to form the basis of the revenue guidance that they provide to the market.

118.    AEs used Salesforce to place orders and to track sales goals in real-time, and sales were immediately reflected in Peloton's total sales numbers on Salesforce. (*See* CW2, CW6, CW20.) Salesforce showed AEs their sales goal for the month and how many units they had sold already for that month. Certain sales data was featured in a real-time bar graph. Sales data from Salesforce was then incorporated into the Looker report.

##### b.    Looker

119.    "Looker" is a business intelligence tool that allows businesses to view dashboards, insights, workflows, and analytics in real-time.  Peloton used Looker to compile sales reports,

which, according to CW6, and was the source of truth on actual sales and how actual sales compared to sales to goals. According to CW10 (who sat next to Foley for the first several years of their employment), Foley and Lynch reviewed the Looker reports.

120.    CW2 confirmed that the Looker report was generated in PDF format and contained a comprehensive set of sales data including: how many units each AE sold; and each AE's percentage to goal.  Looker displayed the total bikes and treadmills sold, actual sales to sales goal, and other data which the Management Defendants viewed on a daily, weekly, monthly, or yearly basis. Both Foley and Lynch were on the daily email distribution list containing the Looker report, and used Looker to track real-time sales results according to CW2, CW6, and CW10.

### c.    CallidusCloud

121.    "CallidusCloud" ("Callidus") is an enterprise software now referred to as SAP Sales Cloud that helps sales teams manage and share content from the lead process to the closing process.  Peloton used Callidus to track sales and also allowed AEs to view month-to-month sales of units, accessories, and warranties, as well as how close AEs were to hitting their monthly sales targets.  Callidus also provided a breakdown of what an AE's expected paycheck would be based on their sales results.

### d.    Slack

122.    "Slack" is a messaging program specifically designed for the workspace.  The Inside Sales team at Peloton regularly used Slack to discuss sales targets.  According to a presentation called "Peloton Gets Peak Performance from Their Inside Sales Team," given by Matt Heiss, Peloton's former Global Head of Sales Operations and Enablement, in or around 2017, Peloton's C-suite executives received admin login access so that they could listen to and moderate calls in real-time and send chats to employees via Slack. *See infra,* CW2, ¶¶ 32-34.

34

## 2. Peloton's Internal Inventory Reporting Documents

123.    Peloton also had a suite of inventory management software systems, commonly referred to as warehouse management systems or "WMS," which it used to track supply chain and inventory including: NetSuite, Manhattan Scale ("Scale"), Tableau, Salesforce, Salesforce's Field Service Lighting, and RF-Smart. Together, accounts from CW1, CW3, CW7, CW8, CW11, CW12 and CW25 confirm that Defendants regularly used the internal inventory reporting tools described below:

### e. NetSuite

124.    NetSuite Inventory Management ("NetSuite") is an enterprise resource planning ("ERP") business management software tool/system offered by the Oracle Corporation. Peloton used NetSuite to track the following data for each warehouse: monthly summaries of deliveries; the volume of inventory, referred to as the "monthly delivery summary;" the amount of inventory still in the warehouses, called the "still in-house inventory;" and "volume number" – which showed inventory that had been delivered to customers. Each time a bike was taken out of "withholding inventory" and scanned for delivery to a customer, the serial number for that bike was added to the monthly volume number.

125.    Peloton's warehouses used both NetSuite and Scale information systems to track inventory and capacity. The two systems interfaced with one another to: (i) track orders from the manufacturing sites "going into distribution" as well as the orders placed for inventory to move product from the distribution centers to the final mile sites; and (ii) to track orders that were going out to customers.

### f. Manhattan Scale

126.    "Manhattan Scale" is an inventory management software that, according to CW4 and CW7 had an intensive visualization function and could interface with Tableau to provide

detailed reporting on inventory. In 2021, Peloton also began using Manhattan Scale to track inventory. According to CW7, Peloton implemented Scale in 2021 to provide improved visibility into inventory movement. Peloton's distribution centers and final mile facilities frequently and regularly reported on their "inventory accuracy" using the reporting functions in Scale.  According to CW7, Tableau reports on inventory were "available on demand."

g.    **Tableau**

127.    Tableau is a supply chain analytics software tool that allowed individuals to visualize data relating to optimizing inventory, streamlining transportation, and delivery.  Peloton used Tableau to report inventory. According to CW4, Tableau interfaced with Peloton's Scale system to provide detailed reporting on inventory. CW4 also stated that Tableau's inventory reports were "available on demand."

h.    **Salesforce**

128.    Peloton used Salesforce's supply chain and logistics reporting features to track inventory and supply chain related data. Peloton's regional managers and warehouse employees viewed the drop in sales based on deliveries and inventory movement through Salesforce. Regional managers received customized Salesforce reports via email that showed exactly how many delivery vans were scheduled to go out in their respective region and the amount of inventory loaded onto each van. *See supra*, CW3 and CW24.

F.    BEGINNING IN FEBRUARY 2021, PELOTON HAD EXCESS INVENTORY THAT DRASTICALLY EXCEEDED DEMAND FOR ITS PRODUCTS

1.    **Evidence from CWs**

129.    Numerous CW accounts reveal that, contrary to Defendants' statements during the Class Period about demand and inventory, the Company internally recognized as early as February 2021 that demand was declining and would continue to decline throughout 2021. As CW2, CW6

and CW10 stated, all Defendants had access to and reviewed, sales data that documented Peloton's waning demand in real-time. As demand and sales declined, inventory began to accumulate. Peloton responded by lowering sales quotas (but CWs 2, 22, and 28 stated that even the lower quotas were not being achieved), devising new marketing efforts, and slashing the Company's costs—measures that all Defendants knew about and personally directed. Indeed, as further discussed in Count III, below, Garavaglia along with Adee headed Peloton's FY 2022 initiative to cut $100 million in costs. *See infra* ¶ 349.

130.    For instance, CW1 recounted that, in February 2021, during a monthly supply chain meeting attended by Lynch and Woodworth, presentations forecasted that starting in March 2021, demand for fitness equipment would decline. CW1 stated that by March 2021, demand had declined by 7 – 20%. CW1 further stated that between February and November of 2021, demand "continued to decline even further." Waning demand was made evident in internal presentations created by the planning team, which indicated that the gap between sales forecasts and actual sales was increasing throughout the Class Period.

131.    The accounts of 11 additional CWs confirm that throughout the Class Period, it was widely known within the Company that, contrary to Defendants' statements to investors, demand for Peloton's products had cratered and was continuing to tail off:

- CW28 recounted there was "absolutely" a concern about the decrease in demand associated with a vaccine rollout for COVID, and recalled that after *December 2020*, sales got "really quiet."

- CW18 reported that after the holiday season in 2020, business declined, and that "from *February [2021]* there was not much going on."

- CW22 stated that Peloton's sales slowed down significantly in *February and March of 2021*.

- CW17 noticed business started to decline around *March 2021*.

- CW28 explained that when they joined the Company in December 2020, Peloton was still pretty busy until gyms started reopening in *March 2021 or early 2021*. After that, things just dropped, which CW28 stated was "absolutely" due to a lack of demand.

- CW30 reported that sales decreased significantly starting in *March 2021* and continued to decrease through August 2021. CW30 reported that the decline in demand was evident in their sales numbers, and from the fact that it was hard to get people into the stores.

- CW15 recalled that in December 2020, the Minneapolis warehouse delivered 100-125 bikes in one day, and that by *April and May 2021*, the warehouse was delivering only 60-80 bikes per day; it essentially dropped to half.

- CW3 reported that by *May 2021*, Peloton's warehouses were doing "three quarters" of the 2020 monthly volume of deliveries and by the third calendar quarter of 2021, the warehouses were only delivering half of the monthly volume of bikes they had in 2020. By the fourth calendar quarter of 2021, the warehouses were delivering just one quarter of the bikes they had on a monthly basis throughout 2020.

- CW12 confirmed that everyone knew sales had slowed down by the time they departed from Peloton in *June 2021*.

132.   Additional CWs state that Management Defendants discussed the declining demand for Peloton Bikes and Treads at a host of meetings that Management Defendants personally attended. For instance, CW1 reported that Woodworth and Lynch attended the Company's monthly supply chain meetings, during which growing supply of inventory and declining sales were discussed and were copied on emails that contained action items after each of these meetings. CW5 stated that Peloton hosted All-Hands Meetings via Zoom, during which Defendant Foley would discuss "how sales were" and "where they were at."

133.   Management Defendants also knew about deteriorating demand because they had access to and reviewed the Internal Reporting Documents described in Section IV E, above. CW10 stated that "Looker" reports were "around from day one"—i.e., since at least 2014, when CW10 began working at Peloton. Looker reports tracked the Company's top sellers, the total bikes and treadmills sold, actual sales versus sales goals, and other sales data. CW10 stated that "upper

management" had direct access to the Looker reports, including Foley and Lynch, who "knew the numbers and all could see what was going on." CW10 sat next to Foley in Peloton's New York office for the first "five or six years" of their employment and thus knew from their direct interaction with Foley that he had direct access to the Looker report and reviewed the data it contained. CW10 further confirmed that both Foley and Lynch were on the email distribution list for the Looker reports. CW10 recounted that, when sales were high during Black Friday or other promotional periods, Foley and Lynch would email the Inside Sales Team as a group with comments like "great job." CW10 also stated that Foley and Lynch received sales updates from Tim Shannehan, Peloton's Chief Sales Officer, at least weekly. Similarly, CW21 reported that monthly sales reports, which showed a drastic slowdown in sales beginning in early 2021, came from senior management and were distributed by regional managers to the location managers. CW6 described Looker as the source of truth on actual sales and actual sales to goal because Looker updated automatically every 24 hours based on data from Salesforce.  Like CW10, CW6 was "100 percent certain" that Foley and Lynch had access to the Looker data, and that they reviewed it frequently.

134.    Moreover, many of Peloton's former sales employees recounted that as salespeople repeatedly failed to meet their sales quotas, management responded by lowering sales quotas on numerous occasions. For instance, CW2 observed through data generated via Salesforce and Looker reports that Peloton's sales organization had begun missing sales goals starting as early as December 2020. CW2 reported that Peloton's account executives regularly discussed the inability to attain the sales goals with their managers, and in turn, the managers assured the account executives that their frustrations had been communicated to more senior management. Similarly, CW3 recalled that Peloton's sales declined in early 2021 when pandemic restrictions began to

ease, and recounted frequently discussing the decline in sales on calls with other regional operations managers. CW28 likewise reported that in January and February 2021, as sales numbers grew progressively worse, Peloton decreased the monthly sales quota from 15-16 bikes to about 8 bikes. CW22 recalled that during the height of the pandemic, the individual quota for monthly bike sales reached 100 bikes. But after demand and sales decreased, the sales quota reached a low of 30 bikes per month, and Peloton's salespeople were struggling to sell even 20 bikes. CW21 also stated that during the peak of COVID, they sold 100-120 bikes per month, but that by February or March of 2021, sales associates were only selling about 30 or 40 bikes per month.

135.    The Company's declining demand was further reflected, in the Spring of 2021, Peloton's began laying off employees and cutting hours of those who remained. For instance, CW15 recalled that Peloton started firing workers in the spring of 2021. CW15 reported that at the Minneapolis site, Peloton cut the workforce from about 100 to 60 employees, as they were "systematically trying to thin the herd of people." CW14 reported that a hiring freeze and budget slashing were occurring across the board at Peloton. CW14 understood that hiring freezes and budget slashing were happening across the Company because they heard about this occurring from their counterparts in Marketing and Sales. CW14 also heard from the sales business team that they had to make across-the-board adjustments to their hiring requests. CW25 heard that people were getting laid off from the warehouse or leaving in high numbers starting in July of 2021. During a team meeting, Wagaman (CW25's manager) told CW25 and other employees that Peloton was budgeting employees' salaries and hours because the Company was trying to cut down costs.

136.    Numerous former Peloton employees have detailed how, as early as February 2021, Peloton had excess inventory far exceeding demand. For example, CW13 recounted that they first noticed excessive inventory at the Houston warehouse around Christmastime in 2020.  CW13

stated, "We were getting eight to ten trucks a day, and each truck had a big shipment container with a couple hundred bikes each," and that "there was not enough going out to keep up with what was coming in." (*See* ¶¶70-72  ).

137.    The inventory-demand imbalance continued to worsen throughout 2021. CW11 stated that, around April or May 2021, the Perris distribution center "started to get full for inbound" and that "inbound was increasing significantly" so that the employees were "moving stuff internally," rather than out of the warehouse. CW11 reported that by April or May 2021, the yard at the Perris warehouse was full of containers which could not be unloaded because there was no place inside the warehouse to store the product. As a result, CW11 stated that Peloton opened up its San Bernardino facility to "alleviate all the containers," and that the San Bernardino site contained exclusively "excess, overflow product." CW11 recalled other employees at the Perris facility observing that "we have enough supply available in the warehouse to meet demand," and asking, "why are we continuing to manufacture and have product delivered?"  (¶¶64-66, above).

138.    CW8 stated that by early summer 2021 there was more product being delivered to their warehouse than demand required. Finding places for excess inventory became the focus of CW8's role for the remainder of 2021, as demand continued to decline precipitously. Because CW8's facility fed product to the other warehouses, CW8 was frequently in touch with the inventory managers of other facilities, trying to find out where there was space to store more bikes. By June of 2021, Peloton's warehouses were "running out of room" and "turning away inventory because they had no room." (¶54, above).

139.    Other CWs confirm that throughout the Class Period, Peloton accumulated unmanageable levels of inventory that vastly exceeded demand for the Company's products:

- CW3 reported a significant build-up of inventory in Peloton's warehouse facilities.

- CW7 reported that at least by early 2021, Peloton management began to realize that there were problems with inventory.

- CW10 reported that during 2021, Peloton was "buying more inventory and we could not even sell what we had."

140. CWs explained how Peloton's excess inventory resulted in astronomical costs to the Company. CW9, for instance, explained that Peloton was "getting hit over the head with demurrage fees," estimating that Peloton was paying about $275 per day for each of the containers to sit at the ports. CW11 recalled that Peloton also was charged a daily rental fee of approximately $100 per day, per container that remained loaded with Peloton inventory. And CW11 reported that Peloton had to dedicate its San Bernardino site exclusively to storing "excess, overflow product." These accounts are consistent with post-Class Period admissions by Peloton's current CEO, Barry McCarthy, who acknowledged that Peloton's excessive "inventory has consumed an enormous amount of cash." *See infra* Part **Error! Reference source not found.**.

141. Numerous CW accounts make clear that Defendants knew about the Company's bloated inventory, which was discussed at a host of meetings that Defendants personally attended. For instance, CW1 recalled that the buildup of excess inventory was discussed in weekly and monthly meetings, which Defendants Lynch and Woodworth personally attended. CW1 voiced concerns about the growing inventory build-up at Peloton's distribution centers. After CW1 departed Peloton in November 2021, he heard from colleagues still employed by the Company that Peloton had "18 months of inventory on the bikes." Similarly, CW5 reported that inventory management was discussed during Peloton's All-Hands Meetings, which Foley attended.

142. Employees also communicated concerns about excess inventory to management. CW8 repeatedly communicated that there was far too much inventory coming into the warehouse during "daily meetings with Senior Managers, Managers and Directors." As soon as CW8 saw

42

inventory accumulating significantly in early summer of 2021, he "flagged multiple times" that "we need to put these somewhere, and to stop production."

### 2.     Evidence from Peloton's Internal Documents

143.     CW accounts are consistent with Peloton's internal documents, which were leaked to *Business Insider* and published on January 24, 2022, shortly after the end of the Class Period. These documents show that Peloton had so much excess inventory that to align inventory with demand, it would need to freeze production of the Bike+ for 5 months; the Bike for 2 months; the Tread for 6 weeks; and the Tread+ for all of FY 2022:

FY22 Projected End-of-Quarter Inventory levels (units)
(after supporting F2 Demand plan)

| In Ku | Q1 | Q2 | Q3 | Q4 | Notes |
|---|---|---|---|---|---|
| Bike | 135 | 138 | 290 | 183 | 2 month pause production in Feb->Mar to align inventory to F2 |
| Bike+ | 47 | 122 | 210 | 172 | 5 month pause production in Dec->Jun to align inventory to F2 |
| Tread | 43 | 38 | 48 | 20 | 6 wk pause production in Feb->Mar to align inventory to F2 |
| Tread+ | 21 | 24 | 24 | 24 | No production in FY22 |
| Guide | 0 | 0 | 250 | 240 | Up to 9 months production pause btw Feb->Nov to align inventory to F2 |
| Total: | 246 | 322 | 822 | 639 | |



144.    These documents also contained graphs showing that Peloton's excess inventory for the Bike ("V1") totaled a remarkable 225 days of product on hand, while excess inventory for the Bike+ ("Titan") totaled more than 500 days of product on hand. This greatly exceed Peloton's target days on hand for inventory of less than 50 days. These graphs also confirm that, consistent with the CW accounts detailed herein, Peloton's inventory dwarfed demand for its products:

145.    This excess inventory had been on Peloton's books since June 2021.  As the documents reflecting Peloton's shipments into the US show (¶151, below), Peloton received virtually all of its inventory of Bikes and Treads from its foreign suppliers during the period from September 2020 through June 2021; it received essentially no inventory after June 2021.  (As stated in ¶ 4, *supra*, 80% of Peloton's Bikes and Treads were manufactured abroad).  Thus, the excess inventory reflected in these documents and that caused the production halt had been at Peloton since at least the Summer of 2021."

3.    **Evidence from Documents Showing Peloton's Shipments of Inventory to the United States**

146.    During the Class Period, Peloton manufactured virtually all of Bikes and Treads in Taiwan. Peloton worked with two Taiwanese manufacturers: Rexon Industrial Corp., Ltd., and Tonic Fitness Technology, Inc.

147.    Founded in 2012, Zauba is a company based in Bangalore, India that assembles and provides access to detailed data regarding company imports to and exports from the U.S. and other countries. According to Zoom Info, Zauba is "India's largest business research platform." According to Crunch Base, Zauba is: "an online database that provides access to search import and export shipment records" that "gathers data from more than 10,000 ports around the world using shipping manifests, bill of lading, bill of entries, and shipping bills."

148.    Data from Zauba for Peloton shows that during the Class Period, Peloton imported 278,255 units of Bikes, Treads, and touch screen media consoles that are affixed to the Bikes and Treads from primarily Taiwan into the U.S. The chart below is a screenshot of an interactive chart which can be accessed on Zauba.com, and displays the total weight of shipments (in KGs) and total number of shipments that Peloton received at its U.S. ports each month.



149.    According to Zauba, Peloton imported 30,144 units of exercise equipment in February 2021; 51,531 units of exercise equipment in March 2021; 41,964 units of exercise

equipment in April 2021; 37,140 units of exercise equipment in May 2021; 40,434 units of exercise equipment in June 2021; 25,455 units of exercise equipment in July 2021; and 18,963 units of exercise equipment in August 2021. After August, Peloton essentially stopped importing any exercise equipment.  By November 2021, Peloton's monthly shipment of exercise equipment from abroad was 3,640 units, ***81% less*** than its August 2021 shipment.

150.     The Zauba graph shows that after receiving huge amounts of inventory from September 2020 through June 2021, Peloton's shipments of Bikes and Treads dropped off a cliff at the end of June 2021.  The time from when Peloton placed orders for Bikes and Treads with its Taiwan manufacturers through production, shipment and arrival in the United States was months. Thus, for shipments to have stopped by July 2021, Peloton would have determined months earlier not to place any more orders, thus acknowledging that it expected to have more than enough inventory by end of June to satisfy any demand for its products through the end of 2021.

151.     Data from these shipping records also corroborates the statements from CW8, CW26, CW11, and CW15 about Peloton's supply chain and logistics operations during the Class Period. For instance, CW26 reported that 80% of Peloton's Bike frames came from Taiwan; CW11 stated that inventory imported from Peloton's supplier in Taiwan was sent to a port in California; and CW8 stated that Bike production orders were placed with Peloton's manufacturer in Taiwan on a monthly basis by the demand planning team.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

152.     Peloton and the Management Defendants made a series of false and misleading statements during the Class Period in violation of Sections 10(b) and 20(a) Exchange Act and Rule 10b-5 promulgated thereunder, as follows:

### A.   STATEMENTS MADE DURING PELOTON'S FEBRUARY 4, 2021 EARNINGS CALL

#### 1.   Statement 1 (Foley) [3]

153.    On February 4, 2021, Defendants held Peloton's earnings call for the second quarter of FY 2021, ended December 31, 2020 (the "February 4, 2021 Earnings Call"). Defendants Foley, Lynch, and Woodworth all spoke. As reflected in the transcript of that call, Doug Anmuth, an analyst from J.P. Morgan, asked: "Jill, you mentioned that manufacturing capacity exceeds demand. I just want to clarify that strictly because you ramped capacity, **or are you seeing any change to demand due to extended order to delivery times?** And then John, just on the Precor Opportunity, I hope you can talk a little bit more about how you're thinking about the commercial space and the opportunity there. And then also, if there's any way to quantify or provide any more color just around the manufacturing capacity and the benefits just in terms of proximity as well." Defendant Foley responded as follows (emphasis supplied):

> Thanks Doug. We're going to do a switcher I'm going to take the first one, and then I think William and I can talk about Precor. **We are not seeing a softening in demand.   That is absolutely not what's happening here.   We are seeing incredibly strong organic demand even in the phase of light marketing.** As you know, the successes that we're seeing in getting the order to delivery down and getting our backlog down are 100% based on incredible upgrades, and our manufacturing capacity up to over six times – 6x increase in just the last 12 months in our capacity of them know – we're now making more Bikes on a monthly basis than we did in all of fiscal 2018. So it's a Herculean effort based on our in-house manufacturing teams and our third-party partners.

> And so yeah, I hope that answers your question. **But it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand.**

---

[3] The statement numbers correspond to those designated by the Court in its March 30, 2023 Opinion and Order with respect to the First Amended Complaint (ECF No. 88). Plaintiffs no longer challenge ten of the Statements from that Complaint, i.e., those that the Court labeled Statements 4, 5, 6, 7, 8, 12, 15, 16, 17, and 18. (See ECF No. 88, pp. 5-11.)

## 2.    **Statement 2 (Woodworth)**

154.    In response to Doug Anmuth's question, Defendant Woodworth stated (emphasis supplied): "And I would just highlight obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products.**"

## 3.    **Statement 3 (Foley)**

155.    Also, during the February 4, 2021 Earnings Call, Bank of America Merrill Lynch analyst Justin Post, asked the Management Defendants: "[J]ust thinking about the opening next year, some of the e-commerce companies had a showdown in September and October, and then reaccelerated due to lockdown. Did you see anything in the fall and how are you thinking about that?"  As reflected in the transcript, Defendant Foley responded (emphasis supplied):

> When the vaccine was announced in the fall, you saw a reaction to the stock, we did not see any reaction to our sales or demand. We still have not seen any softening since that vaccine was announced and since the vaccine has been rolling out. So other than investors getting nervous, the consumers are still feeling like they want to work out at home.  The experience, to William's point, is the best in the world and it's getting better as we launch more software features, more content types, more access on more different platforms. And I think what you're seeing is everyone's starting to realize that working out at home is a better place. It's a better value. And so, we're very bullish on our sales opportunities on the other side of the opening to your point So we remain very, very bullish on our opportunity. And like Jill did say, we're excited to get on the offensive and start marketing because the story is incredible, the products and the experiences are incredible, and they're getting better by the month. So we've remained very, very bullish on our opportunity.  **We haven't seen any softening of demand.**

156.    The statements by Foley and Woodworth during the February 4, 2021 Earnings Call about demand highlighted above, i.e., Statements 1, 2, and 3, violated Section 10(b) of the Exchange Act.

157.    **The statements were false and misleading.**  By February 4, 2021:

(i)     According to CW1, Woodworth learned via Google Slides presented during a monthly supply chain meeting held in February 2021, that demand for Peloton's Connected Fitness Products would decline starting in March of 2021. So, Defendants were seeing evidence that demand was in fact "softening" in February of 2021. See ¶¶ 25-27, above.

(ii)    Internal sales reports generated by Peloton's sales teams such as Looker and Salesforce which displayed real time sales results, confirmed that sales of Peloton's Connected Fitness Products had declined after the holiday season of 2020, i.e., there was a softening of demand by February of 2021. See ¶¶ 33, 44, 60, 61, 62, *supra.*

(iii)   CW2, CW6 and CW10 who were members of Peloton's Inside Sales team, stated that in February 2021, after months of meeting and exceeding sales goals, the sales staff had begun to regularly miss their quotas beginning in December 2020. See ¶¶ 32-33, 42-44, 58-63, *supra.*

(iv)    According to CW17, CW18, CW20, CW21, and CW28, who worked as Account Associates, Sales Managers or Sales Specialists at Peloton's retail showrooms across the country, by at least February 2021, Peloton's Outside Sales Team saw progressively worse sales numbers because demand had dropped off dramatically, and sales quotas had been reduced due to the drop- off in demand. CW28 stated the monthly quota for sales representatives had decreased from 15-16 bikes per month to about 8 bikes per month by February 2021. See ¶¶ 81-82, 86, 100-101, *supra.*

(v)     According to CW13, CW16 and CW23 who worked in some of Peloton's biggest warehouses across the U.S., the number of deliveries had also significantly declined in early February 2021 due to waning demand.  This trend was apparent in the NetSuite and Salesforce databases, to which Foley and Woodworth had access. See ¶¶ 70-71, 79-80, 88-90, *supra.*

(vi)    According to CW3, CW7, CW16, and CW28 who worked as Field Operations Specialists and Field Operations Coordinators in Peloton's warehouses across the U.S., Peloton reduced its employees' working hours and began laying off employees beginning in February of 2021 because of the reduction in deliveries due to declining sales.

158.    **Statements 1, 2, and 3 Were Not Forward-Looking.**  Foley's and Woodworth's statements were not forward-looking as they were not projections regarding future demand, but rather statements about then-current facts.  In response to a specific question about a change in demand, Foley responded with details about current demand: "we are not seeing a softening in demand," "we are seeing incredibly strong organic demand…," "it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand," "we haven't seen any softening in demand." Woodworth said "we're still seeing very strong organic demand" as of February 4, 2021.

159.    **Statements 1, 2, and 3 Were Material, and Were Not Puffery or General Statements of Corporate Optimism**. The highlighted statements were not corporate puffery or statements of corporate optimism.  Foley's and Woodworth's statements were made in response to a specific question regarding demand and a reasonable investor was entitled to rely on them as reflective of the current state of demand for Peloton's products. The statements addressed concrete

and specific aspects of Peloton's operations about which investors were reasonably interested at the time the statements were made.

160.    **Statements 1, 2, and 3 Were Not Statements of Opinion.** The highlighted statements were not statements of opinion, as they described verifiable facts regarding current demand existing at the time the statements were made.  As confirmed by CW1, CW4, CW11, Peloton tracked its demand, orders and inventory in real time, through the software tools described in ¶¶ 116-0, *supra*.  Further, Foley used the term "absolutely" twice when refuting that there was any softening of demand, further eliminating any possibility that his statements could be characterized as statements of opinion.

161.    **Defendants Foley and Woodworth Made Statements 1, 2 and 3 with Scienter**. Foley and Woodworth knew or recklessly disregarded that his February 4, 2021 statements were false and misleading because:

> (i)    According to CW2, CW5, CW6 and CW10 Foley and Woodworth had access to and made use of the Looker report which showed that the Inside Sales Team had begun missing their sales goals beginning in December 2020.

> (ii)    CW1 and CW3 confirmed that Foley and Woodworth had access to monthly delivery summaries through Salesforce which confirmed that deliveries from one of Peloton's most active regions had declined between December 2020 and February 2021 due to diminishing sales.

162.    As described in Section VII, below, Foley was motivated to misrepresent demand for Peloton's products as of February 2021 having established a 10b5-1 trading plan in September 2020.  Foley's trading plan required sales of 100,000 shares of Peloton per month for 24 months.

On February 16, 2021 alone, Foley sold 100,000 shares of Peloton common stock for proceeds of $14,851,326, at an average price per share exceeding $150. Foley was further motivated to prop up Peloton's stock price having pledged 65% of his holdings. See ¶ 244, *infra.*

163. As described in Section VII, below, Woodworth was motivated to misrepresent demand for Peloton's products as of February 2021 because she sought to maximize the proceeds realized from the stock sold pursuant to her 10b5-1 plan, which she abruptly ceased trading under in or around the fall of 2021. On February 16, 2021, Woodworth sold 50,00 shares of Peloton common stock at the artificially inflated average share price of $150.3 for proceeds of more than $7.4 million.

164. **The Market Reacted Positively to Foley's and Woodworth's Statements About Demand.** Analysts were encouraged by the February 4 statements by the Management Defendants that the Company was continuing to experience sustained demand despite supply chain constraints persisting. A February 5, 2021 J.P. Morgan report authored by Doug Amnuth stated: "**Peloton remains supply constrained due to sustained strong demand**, West Coast port delays and delivery challenges during the pandemic, but we believe that PTON is now nearing a turning point, **with current manufacturing now *exceeding* strong demand** and normal order-to-delivery times (~ 4 weeks or less) possible by the end of June." (emphasis added).

165. In a Cowen & Co. report dated February 5, 2021, John Blackledge expressed a similarly positive outlook on Peloton after the second quarter earnings call and gave the company an "Outperform" rating. Blackledge noted in his report (emphasis supplied) that on the call, "management reiterated that demand has remained elevated throughout the pandemic **with no negative impact seen following the announcement of vaccines or their recent roll out.**"

166.    In a Roth Capital Partners report dated February 5, 2021, George Kelley picked up on the Management Defendants' statements about demand during the February 4, 2021 Earnings Call. As the basis for Roth's buy rating on Peloton, Kelly stated (emphasis supplied) that: "Management commented that momentum remains strong. Prior to the late fall COVID surge, there was no slowdown. **Neither has the vaccine caused demand to decline.** Management's guidance agrees with this commentary."

B.    **STATEMENTS MADE IN PELOTON'S MAY 7, 2021 10-Q FOR THE THIRD QUARTER OF 2021**

1.    **Statement 9 (Foley and Woodworth)**

167.    Peloton filed its 10-Q for the third quarter of its fiscal year 2021 on May 7, 2021 (the "3Q 2021 10-Q"). Foley and Woodworth each signed the 3Q 2021 10-Q. On page 47 of the 10-Q, Peloton stated the following in the Cash Flows Section of the MD&A:

> The increase in net operating assets and liabilities was primarily due to a $442 million increase in accounts payable and accrued expenses related to increased inventory and other expenditures to promote general business growth, as well as the timing of payments, partially offset by a **363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.** (emphasis supplied).

168.    The 10-Q's statements about inventory and demand highlighted above violated Section 10(b) as follows:

169.    **The 10-Q statement that increased inventory levels were a response to current increased demand was false and misleading.** By May 7, 2021:

(i)    According to CW1, Foley instructed the supply chain team to ensure that supply exceeded demand by 30%. So, the increase in inventory levels could not be attributed to current increased demand, because inventory supply greatly exceeded demand.

53

(ii)     According to CW1, Peloton's executives, including Woodworth, Foley, and
Adee, attended monthly supply chain meetings during which they saw
evidence via Google Slides that by March 2021, sales had decreased and
were continuing to decrease and inventory levels had grown and continued
to grow; therefore, increasing inventory levels during Peloton's third
quarter of FY 2021 did not coincide with a current increase in demand.

(iii)    CW2, CW6 and CW10 who worked as account executives and managers
within Peloton's Inside Sales Team, stated that by May 2021, the sales team
had missed their sales quotas, that sales of Peloton's Connected Fitness
products continued to decline. CW10 stated that Director of Inside Sales
Varela confirmed this, told CW10 that Peloton had bought more inventory
than it could sell.

(iv)    According to CW1, CW6, CW10, Foley had access to Peloton's internal
sales reports including the Looker report which demonstrated that Peloton's
sales of Connected Fitness products had already by May 2021. CW5 and
CW10 stated that Peloton's Inside Sales Managers communicated to sales
staff that the decline in sales was causing an inventory buildup (not
increased demand). See ¶¶ 41, 63, *supra.*

(v)     CW17, CW18, CW20, CW21, CW22, CW28, and CW30 – members of
Peloton's Outside Sales Team who worked at showrooms across the U.S. –
confirmed that by May 2021, sales of Connected Fitness Products at
Peloton's showrooms had declined.

(vi)    According to CW8, CW11, CW13, CW16 and CW24 who worked in Peloton's warehouses and final mile facilities, Peloton's warehouses were filled with excess inventory **due to a significant decrease in demand** for Connected Fitness products and Peloton's warehouse employees struggled to find space to store incoming shipments of exercise equipment. CW11 stated that in April or May of 2021, the yard at Peloton's Perris, California warehouse (one of the largest in the country) was full of unloaded shipping containers because there was no room for the containers inside the Perris warehouse, since little inventory was leaving the Perris warehouse. ¶ **Error! Reference source not found.**, *supra*. CW3 stated that the significant buildup of inventory in Peloton's warehouses was a frequent topic of discussion among regional managers of Peloton's warehouses across the country. *See supra* ¶ **Error! Reference source not found.**. CW1 expressed their concerns to Lynch and Adee about growing demand in March or April of 2021, and CW8 relayed their concerns about too much inventory entering the warehouse to Peloton's "in-house" escalation and the head of planning.

(vii)   According to CW3, CW15, and CW16, who worked in Peloton's major warehouse facilities across the United States, the number of deliveries of Peloton's Connected Fitness products declined into May of 2021 due to decreasing demand for those products. CW3 reported that by May of 2021, Peloton's South region was doing just 3/4 of the monthly volume of deliveries that it had in December of 2020. According to CW1, CW3, CW4, CW7, and CW11, nightly Salesforce reports and the NetSuite database –

which Foley and Woodworth had access to – also showed that deliveries were continuing to decline due to decreased demand. **¶¶ Error! Reference source not found.-Error! Reference source not found.**, *supra.*

170.     **Statement 9 Was Not Forward-Looking.** Peloton's statements were not projections regarding future demand, but rather about then-current facts about the relationship between the $363.7 million increase in inventory and a "current increase" in demand, which simply did not exist. The statement used "current" to describe "increased demand" i.e., a statement about then-existing facts. All of these statements about "demand" as of May 7, 2021 were false.

171.     **Statement 9 Was Material, and Was Not Puffery or a General Statement of Corporate Optimism.** Peloton's statement was made specifically to explain the large increase in unsold inventory and attributed that increase to current demand. A reasonable investor was entitled to rely on this statement as an explanation of Peloton's $363.7 million increase in inventory: that a significant amount of inventory was on hand in order to meet *current* demand for Peloton's products.  Peloton's statements addressed concrete and specific facts about Peloton's increased inventory levels about which investors were reasonably interested at the time the statements were made.

172.     **Statement 9 Was Not a Statement of Opinion.** This statement was not a statement of opinion as it described verifiable facts regarding the relationship between current demand and the increasing inventory levels existing at the time the statement was made. As CW1, CW4, CW7, and CW11 stated, Peloton tracked demand, orders, and inventory in real time, through the software tools described in **¶¶ Error! Reference source not found.-Error! Reference source not found.**, **Error! Reference source not found.-Error! Reference source not found.**, *supra.*

173. **Foley and Woodworth Made Statement 9 with Scienter**. Foley and Woodworth knew or recklessly disregarded that the 10-Q statement was false and misleading because:

    (i)    CW2, CW6 and CW10 confirmed that internal documents seen by Foley and Woodworth via Looker and Salesforce showed that sales were continuing to decline and that the inside sales organization was continuing to miss sales quotas by May 2021. CW10 confirmed that Foley received at least weekly updates on declining sales performance from Chief Global Sales Officer Tim Shannehan.

    (ii)    According to CW1 and CW3, the Foley and Woodworth had access to monthly delivery summaries through Salesforce which showed a significant reduction of deliveries due to decreased demand.

    (iii)    CW1 stated that Woodworth attended monthly supply chain meetings during which presentations given via Google Slides demonstrated that by March of 2021 there was a decline in demand for Peloton's Connected Fitness products and a growing amount of unsold inventory.

174. As described in ¶¶ **Error! Reference source not found.**, *infra*, Foley was motivated to misrepresent demand for Peloton's products as of February 2021 having established a 10b5-1 trading plan in September 2020. Foley's trading plan required sales of 100,000 shares of Peloton per month for 24 months. On February 16, 2021 alone, Foley sold 100,000 shares of Peloton common stock for proceeds of $14,851,326, at an average price per share exceeding $150. Foley was further motivated to prop up Peloton's stock price having pledged 65% of his shares. See ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, *infra.*

175.    As described in ¶¶ **Error! Reference source not found.**, *infra*, Woodworth was motivated to misrepresent demand for Peloton's products as of February 2021 because she sought to maximize the proceeds realized from the stock sold pursuant to her 10b5-1 plan, which she abruptly ceased trading under in or around the fall of 2021.  On February 16, 2021, Woodworth sold 50,00 shares of Peloton common stock at the artificially inflated average share price of $150.3 for proceeds of more than $7.4 million.

C.    STATEMENT AT THE MAY 25, 2021, J.P. MORGAN GLOBAL TECHNOLOGY, MEDIA & COMMUNICATIONS CONFERENCE

1.    **Statement 10 (Woodworth)**

176.    On May 25, 2021, Defendant Woodworth participated in a question-and-answer session with a J.P. Morgan Securities analyst during a J.P. Morgan Global Technology, Media & Communications Conference. In response to the question: "how do you get people comfortable with where Bike demand is heading into warmer weather and into strong reopening," Woodworth stated (emphasis supplied):

> Well, first, I would say, and I think we said this after the launch of Bike+ is that truly the technology and the innovation that we've brought with the Bike+ has been incredibly well received. And so I think we continue to see Bike+ exceeding our expectations on mix. And so with that said, the comments that I made around bike demand in Q4 is that we all know that COVID was a little bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, and everybody -- I mean, I was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this juncture, it's not relevant. So what I was trying to do was, okay, well, let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand.** And what's so interesting about our company today, versus 2 years ago, is that we now have the portfolio of products, right? We have the lower price bike at $49 a month. We have Bike+ which I've said is doing very well. We also are back marketing, again, which is something we haven't done and we were purely organic for so many months because we didn't want to exacerbate the OTD situation.

177.    Defendant Woodworth's statements about sales of and demand for Peloton's Bikes, highlighted above violated Section 10(b) of the Exchange Act.

178.    **Woodworth's statement was false and misleading.** By May 25, 2021:

(i)     CW2, CW6, CW10, CW20, and CW30 all stated that internal reports generated through Peloton's Sales organization showed that sales of Peloton's Connected Fitness products were continuing to decline significantly. **¶¶ Error! Reference source not found., Error! Reference source not found., Error! Reference source not found., Error! Reference source not found.,** 33, **Error! Reference source not found.,** *supra.*

(ii)    CW2, CW6 and CW10 who were members of Peloton's Inside Sales Team, stated that Defendants knew that Peloton's sales personnel had missed and continued to miss their sales quotas despite those quotas being reduced. **¶¶ Error! Reference source not found.,** 34, 45, **Error! Reference source not found., Error! Reference source not found.,** *supra.*

(iii)   According to CW1, CW3, CW7, CW8, CW11, CW13, CW16, CW19, and CW31 who all worked in Peloton's warehouses and in supply chain management unsold inventory was filling up at Peloton's warehouses and warehouse yards because inventory levels greatly exceeded demand by May 25, 2021.

(iv)    According to CW17, CW18, CW21, CW22, CW28, CW30 – members of Peloton's Outside Sales Team who worked at Peloton's showrooms across

the U.S. – sales at Peloton's showrooms had already slowed significantly beginning in March 2021 and continued to decrease.

179.     **Statement 10 Was Not Forward-Looking.** Woodworth's statements were not projections regarding future demand, but rather about then-current facts.  In response to a specific question about a change in demand, Woodworth responded that "**we're still seeing** a ton of demand."  This statement was about what Woodworth "was seeing" as of May, 25, 2021, when contrary to her statement, demand for Peloton's Bikes and Treads had significantly declined.

180.     **Statement 10 Was Material, and Was Not Puffery or a General Statement of Corporate Optimism.** Woodworth's May 25, 2021 statement was not corporate puffery or a statement of corporate optimism.   Woodworth's statement was made in response to a direct question regarding demand and a reasonable investor was entitled to rely on her statement as reflective of the current state of demand for Peloton's products. Woodworth's statements addressed concrete and specific aspects of Peloton's operations about which investors were reasonably interested at the time the statements were made.

181.     **Statement 10 Was Not a Statement of Opinion**. Woodworth's May 25, 2021 described verifiable facts regarding current demand existing for Peloton's Bike at the time the statement was made.  As CW1, CW4, and CW11 stated, Peloton tracked its demand, orders, and inventory in real time, through the software tools described in ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, *supra.*

182.     **Woodworth Made Statement 10 with Scienter.** Woodworth knew or recklessly disregarded that her May 25, 2021 statement was false and misleading because:

(i)     CW1, CW2, CW6, and CW10 stated that internal sales reports seen by Woodworth showed that sales numbers were continuing to drop and that the Inside Sales team was consistently missing sales quotas by May 25, 2021.

(ii)    According to CW11, Woodworth had access to monthly delivery summaries through NetSuite and Scale.

(iii)   Woodworth had access to Peloton's Looker Reports which showed sales quotas being missed in real time. ¶¶ **Error! Reference source not found.**, **Error! Reference source not found.**, 120, *supra*.

(iv)    According to CW1, Woodworth attended monthly supply chain meetings wherein evidence was repeatedly presented that by May 25, 2021, that inventory levels continued to balloon and while demand had continued to decline.

(v)     CW26 stated that Woodworth was aware of Peloton's inventory discrepancies because they attended a May 2021 senior leadership meeting with Woodworth wherein this subject matter was discussed.

183.    As described in ¶ **Error! Reference source not found.**, *infra*, Woodworth was motivated to misrepresent demand for Peloton's products as of February 2021 because she sought to maximize the proceeds realized from the stock sold pursuant to her 10b5-1 plan, which she abruptly ceased trading under in or around the fall of 2021.  On February 16, 2021, Woodworth sold 50,00 shares of Peloton common stock at the artificially inflated average share price of $150.3 for proceeds of more than $7.4 million.

### D.  STATEMENTS DURING THE AUGUST 26, 2021 EARNINGS CALL

#### 1.  Statement 11 (Woodworth)

184.     During Peloton's August 26, 2021 earnings call for its fourth quarter and fiscal year ended June 30, 2021 (the "August 26, 2021 Earnings Call"), Defendant Woodworth stated: "For fiscal [year] 2022 we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR." While discussing that guidance for FY 2022, Defendant Woodworth claimed (emphasis supplied): "We are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of **continued strong demand.**"

#### 2.  Statement 13 (Lynch)

185.     According to the transcript of Peloton's August 26, 2021 Earnings Call, held after the market had closed, Defendant Lynch was asked the following by Oppenheimer analyst Jason Heffstein:

> So, is there anything the data that suggest the kind of the longer pending Tread launch, meaning just it's been talked about obviously for a long time and all the issues that could have weighed on Bike sales, meaning you have some consumers who would only buy one device and they were kind of waiting and so that kept people potentially on the fence to decide what they wanted? **And the second question on the supply chain, we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet.** Outside of the cost headwinds that you talked about for supply chain, are you worried at all about actually getting product to the consumer over the next -- basically through the holiday season?

In response Lynch said:

> Well, I can take the second question first. This is William. In terms of the guidance that Jill provided, we feel like we've built -- and the investments that John and Jill talked about, we built the infrastructure to support our holiday plans. As Jill noted, we feel like fiscal year '22 is going to be a return to more seasonality. **So a large part of our business is in Q2, Q3. And certainly, that's true of deliveries. And so everything in the supply chain from inventory that you're noting, the accumulation up on the balance sheet to warehousing and how we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.** We're very excited both in terms of the Bike growth that Jill noted

and then the launch of Tread, which we expect to be very large over time. And so there's -- a lot of companies aren't in that position or reading in automotive, some of the shortages on chips and semis. So we're very proud of our team. We think our partners, TI, others who have helped us get in that position. So inventory is up. We are building inventory. As you know, the lead times with ocean freight and freight, in general, have extended. And so we've been diligent about learning from the past and feel like we're in a really good position to execute this plan this year.

### 3.   Statement 14 (Foley)

186.    Also during the August 26, 2021 Earnings Call, Peloton announced that the price

of the Peloton Bike would be reduced by $400.  Regarding the relationship of the price drop to

demand, Doug Anmuth from J.P. Morgan Chase asked:

> One for John and one for Jill. John, we know there's seasonality. But just given the light 1Q guide, is the price -- is the Bike price gotten offensive or defensive? And how do you think about demand for Bike+ currently? And then, Jill, hoping you can walk through a little bit more detail around the Tread gross margin structure perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you.

Foley responded (emphasis supplied):

> **Thank you, Doug. So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness, which has, as you know, always been in our playbook**. This is actually the first year since we founded the company that we had the opportunity to do this, and we're super excited that the investments we've made in our supply chain certainly over the last few years, but definitely in the last 12 months, are bearing enough fruit that we have the capacity to make what will become -- what will look like close to 2 million fitness units of hardware this year, which is just incredible considering, when we founded the company, we approached the biggest contract manufacturer we could find, and they said that they were confident that they could make up to 10,000 Bikes a year. That was only eight years ago. So the scale of which we've seen and put in place and invested in across our entire supply chain with Bikes. And now, obviously, it includes Treads. And the lower-priced Tread as well allowed us to consider lowering the price of B1, and we think it's the right thing for our business, obviously, solving for net new sub adds, which was kind of our True North of getting more people into the tent and thinking about the LTV of those users, not just, Doug -- interestingly, not just as a subscriber for the $39 for a new Bike sub, which has always been kind of our True North and the golden goose of our business model, but think about selling those same people, the

same households, future Treads, and future products, apparel and all the other stuff that becomes a much broader LTV picture over time.

187.    The statements by Woodworth, Lynch, and Foley about Peloton's inventory and sales, highlighted above, (i.e., Statements 11, 13, and 14), violated Section 10(b) of the Exchange Act.

188.    **The statements were false and misleading.** By August 26, 2021:

(i)    According to CW1, CW3, CW7, CW8, CW11 and CW12, the increased inventory on Peloton's balance sheet was because Peloton had more than three months of excess inventory on hand. This surge in inventory levels was unrelated to anticipated holiday demand. CW8 and CW9 stated that the overwhelming inflow of inventory, resulted in the Company being forced to expend significant sums on demurrage costs to store shipping containers at the ports of entry because there was no warehouse space to store the overflow of inventory that had been shipped from overseas. ¶¶ **Error! Reference source not found.**, **Error! Reference source not found.**, *supra.*

(ii)    According to CW1, CW3, CW8, CW9, CW11 and CW12, Peloton's warehouses across the country continued to see an alarming level of excess inventory because demand had progressively declined, and Peloton's warehouse personnel struggled to find places for the inventory to be stored and resorted to storing containers of inventory in warehouse yards. CW11 confirmed that the expansion of warehouses was due to needing additional places to store excess inventory, not due to anticipated holiday demand. ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, *supra.*

64

(iii) According to CW1, data presented at monthly supply chain meetings showed the increased amount of inventory levels on Peloton's balance sheet was not due to preparation for the holiday season, but because had deteriorated while the supply chain team was directed to produce more inventory. ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, *infra*.

(iv) CW2, CW6, and CW 10 stated that the vast majority of Peloton's Inside Sales Team continued to miss sales quotas as 2021 progressed, and that Peloton's sales numbers declined each month. ¶¶ 32-34, 42-45, **Error! Reference source not found.-Error! Reference source not found.**, *infra.*

(v) The Looker report and delivery summaries generated through NetSuite database regarding inventory movement demonstrated that sales and deliveries of Peloton's Connected Fitness Products were continuing to decline. ¶¶ **Error! Reference source not found.**-120, 124-125, *supra.*

(vi) CW12, CW13 CW15, CW16, CW19, CW23, CW24, CW25, CW27, and CW29, who worked Peloton's warehouses and final facilities across the United States, stated that the number of deliveries had significantly declined by the summer of 2021. CW19, CW23, and CW25 also recounted that the declining number of deliveries resulted in continuing layoffs and reduced hours for warehouse staff. ¶¶ **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, *supra.*

(vii) According to CW1, the August 2021 price reduction on the Bike was an attempt to increase sales because Peloton had excess inventory.

(viii)   Shipping records from Zauba, show that by August of 2021, Peloton's shipments of exercise equipment to the United States had dropped off significantly, demonstrating that Peloton knew it had a glut of excess inventory.

(ix)   That inventory levels had skyrocketed as demand declined by August 2021 is confirmed in the leaked slides published by *Business Insider* on February 2, 2022, discussed in detail in **¶¶ Error! Reference source not found.-Error! Reference source not found.**, *supra.*

189.   **Statements 11, 13, and 14 Were Not Forward-Looking.** Woodworth was not speaking about projections regarding future demand but rather about then-current facts regarding Peloton's "continued strong demand" for its Bike as justification for the Company's guidance entering fiscal year 2022.

190.   Lynch was not speaking about projections regarding future holiday demand.  He was speaking about then-current facts regarding dramatically rising inventory levels, and the reasons that those levels were rising so quickly. In response to an analyst's question about demand for the Peloton products during the holiday season, and the dramatic uptick in inventory levels, Defendant Lynch represented that the uptick in inventory was in anticipation for the upcoming holiday season, in reality, Defendant Lynch was aware that the uptick in inventory was due to declining sales.

191.   Foley's statements were not projections about future demand, but rather, about then-current facts regarding Peloton's decision to reduce the price of its bikes. Foley's statement was made in response to a specific question about whether the price reduction was "offensive" or "defensive," and Foley falsely represented that the price reduction was "offensive" and an attempt

to "democratize fitness" rather than disclose the truth: that the price reduction was an attempt to reduce the alarming amount of inventory that Peloton had on hand.

192.    **Statement 11, 13, and 14 Were Material, and Were Not Puffery or General Statements of Corporate Optimism.** Woodworth's statement was made regarding demand and a reasonable investor was entitled to rely on her statement as reflective of the current state of demand for Peloton's products.   Woodworth's statements addressed concrete and specific aspects of Peloton's operations about which investors were reasonably interested at the time the statements were made. Lynch's statements were made in response to a direct question regarding the relationship between rising inventory levels and demand and a reasonable investor was entitled to rely on them as reflective of the current state of demand for Peloton's products.  Foley's statements addressed concrete and specific aspects of Peloton's rising inventory levels about which investors were reasonably interested at the time the statements were made. Foley's statements were made in response to a direct question regarding the strategy behind the price reduction for the Bike and Bike+.  Foley's statements addressed concrete and specific aspects of Peloton's operations about which investors were reasonably interested at the time the statements were made.

193.    **Statement 11, 13, and 14 Were Not Statements of Opinion:** Woodworth's August 26, 2021 statement was not a statement of opinion as it described verifiable facts regarding current demand existing for Peloton's Bike at the time the statement was made. Statement 14 escribes verifiable facts regarding the rationale behind the decision to reduce the price of Peloton's bikes, a policy which already existed at the time the statements were made.

194.    **Woodworth Made Statement 11 with Scienter:** Defendant Woodworth knew or recklessly disregarded that her August 26, 2021 statements was false and misleading because:

(i)     CW1 confirmed that internal documents seen by Woodworth showed sales numbers continuing to decline in August of 2021.

(ii)    According to CW3, Woodworth had access to monthly delivery summaries through NetSuite which showed that Peloton's most active distribution centers were doing only half the volume of deliveries that it had during 2020.

(iii)   Management Defendants had access to Peloton's Looker Reports which showed sales quotas being missed in real time.

(iv)    According to CW1, Woodworth had seen evidence that as inventory levels were continuing to rise as sales were continuing to decline during monthly supply chain meetings.

(v)     According to CW8, CW9, and CW11, Defendants would have been made aware by August 2021 that Peloton was paying as much as $275 per day for multiple shipping containers to sit at ports of entry, because warehouses could not store any more Peloton products.

(vi)    According to CW1, Peloton reduced the price of the original Bike in August 2021 as an attempt to drive sales because the Company had too much inventory.

195.    As described in ¶ **Error! Reference source not found.**, *infra*, Woodworth was motivated to misrepresent demand for Peloton's products as of February 2021 because she sought to maximize the proceeds realized from the stock sold pursuant to her 10b5-1 plan, which she abruptly ceased trading under in or around the fall of 2021.  On February 16, 2021, Woodworth

sold 50,00 shares of Peloton common stock at the artificially inflated average share price of $150.3 for proceeds of more than $7.4 million.

196. **Lynch Made Statement 13 with Scienter:** Lynch knew or recklessly disregarded that his August 26, 2021 statements were false and misleading because:

    (i)    CW1 confirmed that internal documents seen by Lynch showed decline in sales and missed sales quotas by August 26, 2021.

    (ii)    CW11 confirmed Lynch had access to monthly delivery summaries through NetSuite which showed that the number of deliveries began declining by December 2020 and continued to decline in the summer of 2021.

    (iii)    According to CW2, CW6, and CW10, Lynch had access to and made use of the Looker report which showed that the Inside Sales Team had begun missing their sales goals beginning in December 2020 after months of meeting and exceeding those goals.

    (iv)    According to CW2 and CW6, Lynch had seen evidence that demand for Peloton Connected Fitness products was softening, by virtue of the fact that Peloton sales staff was struggling to meet its sales goals after December 2020.

    (v)    According to CW1, CW2, and CW6, Lynch attended monthly supply chain meetings during which he saw presentations showing that demand for Connected Fitness products had declined and inventory levels had grown by March 2021; and thus, Lynch knew that burgeoning inventory levels were not because Peloton was preparing for the holiday season, but because demand had declined.

69

(vi)     In March or April of 2021, in response to Lynch's directive to drive capacity despite declining demand, CW1 told Lynch (and Adee): "Look guys, the demand is not there. So, why are you doing this?" So, Lynch knew by August 26, 2021, that demand for Connected Fitness products had already declined and was continuing to decline throughout 2021.

197.    As described in **¶¶ Error! Reference source not found.-Error! Reference source not found.**, *infra*, Lynch was motivated to misrepresent demand for Peloton's products in order to maximize the proceeds of stock sales made pursuant to his 10b5-1 trading plan. In particular, Lynch sold 28,333 shares of Peloton common stock three weeks after issuing the above false statement.  In particular, Lynch realized proceeds of $3.13 million from selling 28,333 shares of common stock at the artificially inflated average share price of $111 on September 14, 2021.

198.    **Foley Made Statement 14 with Scienter:** Foley knew or recklessly disregarded that the highlighted portion of the August 26, 2021 statement above was false and misleading because:

(i)     According to CW6, the price reduction in Bike+ was a reaction to declining demand made in direct response to declining sales, and was an effort to increase demand prior to the holiday season.

(ii)    CW2 stated that internal documents seen by or accessible to Foley showed continuing decline in demand and missed sales quotas by August 26, 2021.

(iii)    CW11 confirmed that Foley had access to monthly delivery summaries through NetSuite which showed that the number of deliveries were continued to decline.

(iv)     According to CW1, C-Suite executives were aware through presentations at monthly supply chain meetings that by August 26, 2021 that sales numbers had fallen significantly, and that the Bike price was lowered in the hopes of selling off excess inventory, not to democratize fitness.

199.     As described in detail at ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, herein, Foley was motivated to misrepresent demand for Peloton's products as of February 2021 having established a 10b5-1 trading plan in September 2020 which required sales of 100,000 shares of Peloton per month which he abruptly halted in or around the fall of 2021.

200.     **Analyst Reaction to Peloton's Statements During the August 26, 2021 Earnings Call.** Six out of seven analysts covering Peloton did not lower their revenue guidance for Peloton for Fiscal Year 2022, despite Peloton's announcements during the fourth earnings call regarding: (i) a lapse in internal controls; (ii) a $400 price reduction for the Bike; and (iii) a return to a more seasonal demand cycle.

201.     Analysts also confirmed their price targets in the days following these statements about "robust demand" as well as Lynch's dismissal of inventory build-up as preparation for the holiday season. In an Equity Research Report dated August 27, 2021 entitled "Still Just Warming Up," Barclays confirmed a price target of $130 per share on expectations that bike unit sales would be up year over year from Fiscal Year 2021.  Canaccord Genuity Capital Markets confirmed a price target of $150 per share in a research report entitled "**Demand Persists**, investments to pressure margins."  (emphasis added).  On August 27, 2021, J.P. Morgan confirmed a price target of $138 per share stating: "**We remain bullish on multiple growth drivers including:** 1) strong Bike/+ demand . . ." (emphasis in original).

202.    Analysts were also reassured by Defendants' own revenue guidance and statements regarding continuing demand despite Peloton's disappointing Q1 results and the news of the discount on the price of the Bike+.

203.    For example, George Kelly from Roth Capital noted that although management expected to return to a more seasonal demand pattern in Fiscal 22, Roth Capital remained confident in Peloton's revenue guidance of $5.4 Billion. Canaccord Genuity also maintained its estimate of $5.41 billion in revenue for FY 22 and noted that Peloton "continues to see heightened demand for its products amid the reopening and delivery times have returned to pre-covid levels, with Peloton also announcing a 20% price cut to its original Bike to make it more accessible to consumers."

### E.    STATEMENT DURING PELOTON'S NOVEMBER 4, 2021 EARNINGS CALL[4]

204.    On November 4, 2021, Peloton held earnings call with analysts and investors to discuss Peloton's earnings for the first quarter of fiscal year 2022, ended September 30, 2021 ("1Q22"). During the call, Foley stated: "Looking ahead, we're about to enter our busiest time of the year. **Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period**." In order to assuage investors' concerns about the reduction in guidance, and what it portended for future demand.

205.    Foley's statement violated Section 10(b) of the Exchange Act.

206.    **Defendant Foley's statement was false and misleading.** By November 4, 2021:

(i)      According to CW1, Peloton had "18 months of inventory on the bikes" by November 2021, which far exceeded projected demand. This excess of

---

[4] This false statement was not included in the First Amended Complaint, and accordingly has not been numbered.

inventory would have been displayed in Peloton's internal databases used to track supply and demand such as NetSuite, Scale, Tableau, and Salesforce, as confirmed by CW1, CW3, CW4, CW7, and CW11.

(ii)    Peloton had expended millions of dollars on demurrage costs because there was no warehouse space to store the overflow of inventory that had been shipped from overseas.

(iii)   According to CW9, by late 2021, Peloton had acquired so much inventory that the Company did not plan to purchase any additional inventory for another six months.

(iv)    According to CW1, C-Suite executives were aware through monthly supply chain meetings presentations of the substantial gap between sales forecasts and actual sales. Therefore, inventory levels were not healthy.

(v)     CW1 and CW3 confirmed that Peloton's internal systems demonstrated that sales were declining and that there was no sign of sales rebounding at any time through November 2021

(vi)    CW3, CW7, CW8, CW11, CW13, and CW24 all worked at Peloton's warehouses and distributions centers, reported a build-up of unsold inventory as the year progressed.

(vii)   Import data from Zauba showed that by November 2021, Peloton's monthly shipments from overseas were 81% less than the Company's shipment volume in August 2021, demonstrating that Peloton's inventory levels were not healthy as of November 2021.

(viii)    Moreover, internal slides published by *Business Insider* confirmed that due to the excess of inventory, production of the Bike and Bike+ halted just one month after Foley stated that Peloton's inventory levels were healthy. Peloton had already halted production of its Bike+ beginning in December 2021, planned a six-week production pause of its regular Bikes and Treads beginning in February 2022, and had stopped all production of its Tread+ for fiscal year 2022.   The slides also confirmed that Peloton's inventory levels greatly exceeded demand See **¶¶ Error! Reference source not found.-Error! Reference source not found.**, *infra*.

(ix)    CW14 stated that by September 2021, Peloton had implemented a hiring freeze and was slashing budgets and attributed these changes to decreased demand. CW25 and CW14 stated that Peloton had started cutting costs because of decreased demand before November 2021.

(x)    According to CW3, by November 2021, Peloton's warehouses in the South Region were only doing "one quarter" of the 2020 monthly volume of deliveries, and thus, was just sitting in the warehouses. According to CW23, deliveries of Bikes out of Peloton's San Jose, California warehouse declined from 180 bikes per day before February 2021, to 50-60 Bikes per day in February 2021, and then declined even further thereafter. CW23 stated that because of the drop in demand, half of the San Jose, California Warehouse employees were let go in March 2021.

(xi)    According to CW7, Peloton had already cut the price of its Bike by 20% by this time, around the time that the "shit hit the fan" with inventory issues and declining sales.

207.    **Foley's 1Q22 Statement Was Not Forward-Looking.** The highlighted statement was not forward-looking.  Foley was not speaking about projections regarding Peloton's inventory; rather, he was speaking about then-current facts regarding Peloton's inventory levels. Despite his assurances to the contrary, Foley knew that Peloton's inventories were *unhealthy* because inventory far exceeded demand for Peloton's products such that the Company had nowhere to store its excess inventory and ultimately had to pay substantial demurrage fees to store inventory at ports.

208.    **Foley's 1Q22 Statement Was Not Corporate Puffery or a Statement of Corporate Optimism.** Foley's statement that inventory was healthy was a concrete, measurable, and specific statement about a precise aspect of Peloton's business about which the investing public was interested at the time Foley issued this statement.

209.    **Foley's 1Q22 Statement Was Not a Statement of Opinion.** The highlighted statement described verifiable and facts regarding Peloton's inventory levels which existed and were measurable at the time the statements were made.

210.    **Foley's 1Q22 Statement Was Made with Scienter.** Foley knew or recklessly disregarded that his November 4, 2021 statement was false and misleading because:

(i)    CW1 confirmed that internal data presented during monthly supply chain meetings showed a glut of excess inventory in Peloton's warehouses by November 4, 2021.

(ii)     Internal slides published by *Business Insider* discussed ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, *infra.* showed that Foley knew that inventory levels were not healthy in November of 2021, because a production pause for the Bike + was instituted just one month later

(iii)    CW11 stated that Foley had access to Peloton's NetSuite and Scale systems which tracked, in real-time, the Company's inventory across all locations and sales channels, among other systems that tracked inventory, as further discussed ¶¶ 124-126, *infra.*

(iv)     NetSuite showed that the number of deliveries began declining by December 2020 and continued to decline precipitously into the fall of 2021 thereby demonstrating that the amount of inventory on hand would have grown.

211.    As described in detail at ¶¶ **Error! Reference source not found.-Error! Reference source not found.**, *infra*, Foley was motivated to misrepresent demand for Peloton's products having pledged 65% of his economic interest in the Company by September 30, 2021.

       **G.**    **THE STATEMENTS IN PELOTON'S "RISK DISCLOSURES" SECTION OF THEIR CLASS PERIOD SEC FILINGS**

212.    To the extent that any Defendants' statements are deemed to be forward looking, such statements were not accompanied by meaningful cautionary language identifying important facts that that could cause actual results to differ materially from those in the statements or the portion thereof.  As of May 7, 2021, Woodworth, Lynch and Foley had knowledge that the risks outlined in the risk factors outlined in their public filings, had already come to fruition.

213.    At the start of the Class Period, and at the close of each financial quarter during it, Peloton filed a report with the SEC on Forms 10-Q or 10-K.  These quarterly reports were published to investors on May 6, 2021; August 26, 2021; and November 4, 2021.  Each of 10-Q quarterly reports were signed by Foley, and Woodworth. The August 26, 2021 Form 10-K was signed by Foley, Lynch and Woodworth.  In all of them, in a section titled "Risks Related to Our Business," Defendants stated that "*If* we fail to accurately forecast consumer demand, we *may* experience excess inventory levels . . .".

214.    Contrary to Defendants' statements, Peloton *already had* "experience[d] excess inventory levels." Excess inventory already had started to accumulate at Peloton's warehouses starting around Christmastime in 2020, i.e., in December of 2020, and continued to balloon thereafter.  It was materially misleading for Defendants to represent that Peloton *might* fail to accurately forecast consumer demand and that Peloton *might* experience excess inventory levels when Peloton *already had* excess inventory.

215.    Defendants represented in their SEC filing that contingencies "may" occur—i.e., that Peloton *may* have "excess inventory levels"—when, in fact, inventory levels had become excessive by May 6, 2021, August 26, 2021 and November 4, 2021.

216.    Defendants' statement identified in ¶ **Error! Reference source not found.** from Peloton's SEC filings was not "puffery" or a mere statement of "corporate optimism."  Defendants represented to investors they *might* have excess inventory in the future—when, in fact, they already had. Defendants' statements addressed a concrete and specific aspects of Peloton's operations, about which investors were particularly interested at the time the statements were made.

217.    Defendants misrepresented verifiable facts—namely, they *already had already had* excess inventory by May 6, 2021, August 26, 2021, and November 4, 2021.

## VI.    INVESTORS LEARN THE TRUTH

### A.    NOVEMBER 4, 2021: PELOTON ANNOUNCES Q1 2022 RESULTS AND SLASHES REVENUE GUIDANCE

218.    Investors first began to learn the truth on November 4, 2021, when Peloton announced, after the close of business financial results for its first quarter of fiscal year 2022 and disclosed that it had cut its full-year revenue guidance for fiscal year 2022 to a range of $4.4 to $4.8 billion from its previous guidance of $5.4 billion.

219.    During the Company's quarterly earnings call after the close of business on November 4, 2021, Foley described a "greater-than-anticipated taper of our website traffic levels," "slower-than-expected pickup in retail showroom traffic," and "year-over-year declines in overall traffic." These phenomena, which Foley claimed accounted for the "reduction to our demand picture and higher-than-expected costs across product," had all existed within Peloton since at least February 2021, as detailed herein. Foley further referenced previously undisclosed "extreme supply shocks," after having assured investors throughout 2021 that inventory had been ramped up and was appropriate to match current increased demand.

220.    Foley acknowledged that these disclosures were an about-face from Defendants' previous statements, stating, "*The swift timing of these changes since giving our initial guidance in August, is not lost on us*."

221.    Peloton's writing down the guidance was an admission that they had too much supply and too little demand.  In a report issued on November 5, 2021, analysts with Macquarie Research described Peloton's announcement as "Bad news," and highlighted that "*demand is also not what it seemed*." Analysts with Credit Suisse, also on November 5, likewise observed that "demand has slowed and the focus has turned to cost leverage, efficiency initiatives, and right sizing." According to an article published by *Business Insider*, analysts with Jeffries remarked that

COVID "pulled forward sales" for Peloton, which "compressed years of growth, and *now they're stuck with dying demand, bloated inventory, bloated cost structure*."

222.    On November 5, 2021, Peloton filed its 10-Q for the first quarter of fiscal year 2022, in which it disclosed that as of September 30, 2021, its inventory had skyrocketed to $1.27 billion—representing a 35% increase from the $937.1 million in inventory that Peloton had reported as of June 30, 2021. Peloton revealed that 91% of its inventory consisted of "finished products," meaning that 91% of Peloton's inventory remained unsold.

223.    Later that evening, at or around 5:09 pm on November 5, 2021, *CNBC* reported that, during an All-Hands Meeting held that same day, Peloton announced a Company-wide hiring freeze, effective immediately. *CNBC* further reported that during the meeting, Defendant Woodworth stated that "identified areas of savings include making significant adjustments to our hiring plans across the company, optimizing marketing spend and limiting showroom development."

224.    As a direct result of these disclosures, Peloton's stock price dropped by 35%, falling $30.42 per share in one day from a closing price of $86.06 per share on November 4, 2021, to a closing price of $55.64 per share on November 5, 2021.

225.    Shortly thereafter, on November 11, 2021, *Business Insider* reported that during an "all hands on deck" meeting held on November 10, Defendant Foley admitted to Peloton employees that the Company had rushed its growth, which made Peloton "a little undisciplined."[5] Foley further remarked that Peloton would need to shift to a "back to the basics" approach in order to sustain its business and improve its profit margins.  During the same call, Defendant Woodworth

---

[5] https://www.businessinsider.com/peloton-ceo-cfo-all-hands-stock-price-wall-street-covid-2021-11

described recent conversations with investors as "challenging," and acknowledged the Company's need to "make some adjustments to [its] cost structure in the near term."

226.     To stem the tide of this negative news regarding demand, Foley assured investors on November 4, 2021 that the increase in Peloton's inventory was "healthy." *See* ¶ **Error! Reference source not found.**, *infra*. This statement continued to mislead investors.

### B.     JANUARY 20, 2022: PELOTON HALTS PRODUCTION AS ITS COSTLY EXCESS INVENTORY COMES TO LIGHT

227.     Starting on January 20, 2022, a flurry of additional disclosures revealed that, contrary to Defendants' representations, Peloton's demand had been declining, costs had ballooned out of control due to massive inventory surpluses and that there was an enormous mismatch between inventory and demand for months.

228.     On January 20, 2022, *CNBC* released another report, which disclosed that Peloton was "temporarily halting production of its connected fitness products as consumer demand wanes and the company looks to control costs, according to internal documents obtained by *CNBC*." The article described Peloton's oversupply problem, noting that the Company has "thousands of cycles and treadmills sitting in warehouses or on cargo ships, and it needs to reset its inventory levels." The article further reported, "Peloton plans to pause Bike production for two months, from February to March, the documents show. It already halted production of its more expensive Bike+ in December and will do so until June." *Business Insider* later obtained and published portions of these internal documents, which detailed the severity of Peloton's oversupply problem and planned cuts. *See supra*, Part **Error! Reference source not found.**.i.F.2.

229.     The *CNBC* article published on January 20, 2022, also highlighted Peloton's lackluster demand, citing an internal presentation dated January 10, in which Peloton acknowledged that demand for its products has faced a "significant reduction" around the world.

230.    Later that day, the *New York Post* reported that "Peloton is delaying the opening of a $400 million US factory by a year because the company is stuck with a glut of exercise machines and too little demand." Citing an account from a Peloton employee, the *Post* reported that Peloton's "Troy Township, Ohio, factory will now open in 2024 rather than 2023"—a "delay [that] is expected to save between $100 million and $200 million during the fiscal year 2022 to 2023." Further highlighting the severity of Peloton's excessive supply and declining demand, the *Post* reported that "*Peloton's warehouse and delivery centers have had their hours cut to 20 hours per week*" and, quoting a Peloton employee, that "*the company had been scaling back production* at factories in North Carolina and Washington to a '*snails' pace' for months prior to the reported pause* in an attempt to 'keep [workers] happy and the public quiet without announcing a shutdown.'" The Peloton employee also told the *Post* that "Peloton currently has about *500 days' worth of bike and treadmill inventory on hand*"—a drastic change from "the boom times *in late 2020 and early 2021*." The *Post* article recounted Peloton's "*attempt[s] to clear out the excess of machines*," including when "Peloton slashed prices during a 2021 Black Friday sale." Although slashing prices boosted Peloton's sales "for a few days," "demand dropped off immediately after the promotion ended, according to company figures shared with *The Post* by a source close to the company."

231.    After close of market on January 20, 2022, Peloton issued a press release disclosing the results for the second quarter of fiscal year 2022.  In it, Peloton was forced to admit that "Adjusted EBITDA in a range of $(270) million to $(260) million, versus previously provided guidance of $(350) million to $(325) million," with staggering net losses for the quarter totaling between $423 million and $481 million. In the press release, Foley finally acknowledged that

Peloton was "*taking significant corrective actions* to improve our profitability outlook and optimize our costs across the company."

232.    Analysts expressed shock at this series of disclosures. For instance, on January 21, 2022, analysts with Evercore ISI described "CEO Foley's statements in the release as *an acknowledgement that the company is seeing meaningful decline in consumer demand*," and observed that "while PTON may not be halting all production, *the company may be slowing down its production while also planning to cut costs*." The report also cited concerns about Peloton's "*Rising Inventory Levels*," noting that "*the company has 500 days of Bike and Tread inventory*," and identified knowing "*where are PTON's inventory levels*" as a "Key Investor Question[]" for the upcoming earnings call. An analyst report issued by Needham, also on January 21, cited the "report by CNBC" as a basis for "*substantially lowering our estimates*, near and long-term." The same report expressed concerns about Peloton's "*Management credibility*," citing "*an array of questionable events* [that] have taken place in a relatively short amount of time." A January 21 report issued by Roth Capital Partners likewise described the "issues" facing Peloton as "*absolutely concerning*."

233.    On January 23, 2022 *Business Insider* published internal Peloton slides which confirmed that rising inventory levels and lack of demand necessitated a production pause of nearly all of Peloton's products.

234.    As a result of these disclosures, Peloton's stock price fell 24% in a single trading day, from a closing price of $31.84 on January 19, 2022, to a closing price of $24.22 on January 20, 2022, as compared to analyst targets as high as $150 per share immediately after the August 26, 2021 earnings call.

C. **PELOTON'S ADMISSIONS AFTER THE CLASS PERIOD THAT IT SUFFERED FROM EXCESS SUPPLY AND LACKLUSTER DEMAND**

235. On February 8, 2022, during Peloton's earnings call for the second quarter of fiscal year 2022, Defendant Woodworth emphasized that "*rightsizing*" Peloton's costs would require its "*inventories to decrease* sequentially in Q3 and further in Q4." She acknowledged that Peloton had "*slowed production* to better match our current demand outlook. Our aim is to get back to a *normalized inventory balance* no later than the end of fiscal 2023, driving a more efficient use of our balance sheet going forward." Woodworth also tacitly acknowledged Defendants' role in driving up costs through excess inventory, stating, "We are implementing *stronger processes and greater discipline in our inventory management* and intend to bring our days on hand down over time with a goal of a more *neutral annual cash impact going forward*."

236. On February 8, 2022, Peloton's Board of Directors fired Foley as CEO, Woodworth as CFO, and Lynch as President.

237. On February 8, 2022, Barry McCarthy became Peloton's new CEO, replacing Foley.

238. During Peloton's earnings call for its third quarter of FY 2022, McCarthy confirmed that, contrary to Defendants' statements, Peloton had accumulated a surplus of inventory during the Class Period as demand for its products waned, stating: "Our inventory position is higher than we expected" and further that "we were weaker on everything supply chain than I expected."

239. On September 12, McCarthy spoke during the Goldman Sachs Communacopia Technology Conference. McCarthy discussed the circumstances existing at Peloton when he became CEO on February 8, 2022 and confirmed that Peloton had been "drowning in inventory," which "posed an existential threat to the business":

Shortly after I arrived in – was it March, I think we slashed pricing in order to survive. *We were drowning in inventory*. And we had come to understand that there was significantly more of it on the way. *It posed an existential threat to the business. We had to fix it*. I started managing the business for cash. Very clarifying in that way. And so, we dropped prices in order to move hardware.

240.    In a letter to shareholders dated May 10, 2022, Peloton reported a net loss of $751.1 million for the third quarter of fiscal year 2022, and explained that *"[p]rimary drivers of our underperformance were higher inventory payments*, *softer than anticipated demand* (both Peloton and Precor) as well as *higher detention & demurrage*, shipping and logistics, and *storage costs*." In the letter, McCarthy admitted the severity and impact of Peloton's excess inventory, stating, "*The balance sheet challenge has been managing inventory. We have too much* for the current run rate of the business, and that *inventory has consumed an enormous amount of cash*, more than we expected, which has caused us to rethink our capital structure (more on this in a moment)." During earnings call on the same day, McCarthy acknowledged, "[W]e also haven't made quite as much progress in rightsizing the production as we needed to."

241.    Two weeks later, at the J.P. Morgan Global Tech, Media & Communications Conference, McCarthy acknowledged the magnitude of the costs that had been weighing on Peloton's business during 2021, stating, "Yeah. I mean, $700 million of free cash burn, *how is that even possible*, you have to ask yourself. I mean, that is a *shockingly big number, certainly unsustainable* and that's the bad news." He confirmed that these costs resulted from Defendants' failure "to manage the supply chain," noting his efforts to manage the supply chain "more effectively than it had been managed – was being managed when I walked in the door." As to Peloton's excess inventory, McCarthy further acknowledged that Peloton still was "*working [its] way through the abundant supply* that we currently have." McCarthy described these efforts as "managing a hangover. But we stopped drinking."

**D.    DEFENDANTS PROFITED FROM THEIR FRAUD, WITH COMBINED TRADING PROFITS TOTALING MORE THAN $383 MILLION**

242.    The Management Defendants and the Insider Trading Defendants realized tremendous profits by selling Peloton stock while the stock price was artificially inflated as a result of their fraud.

243.    The below chart aggregates the information Defendants disclosed on their required Forms 4 filed with the SEC to show profits realized by the Management Defendants and Insider Trading Defendants as a result of their Class Period sales of Peloton common stock.

| Defendant | Class Period Profits |
|---|---|
| John Foley | $80,070,288 |
| William Lynch | $103, 472,430 |
| Jill Woodworth | $16,815,861 |
| Hisao Kushi | $91,709,866 |
| Mariana Garavaglia | $23,917,420 |
| Thomas Cortese | $67,323,850 |
| **TOTAL PROFITS** | **$383,309,715** |

244.    As shown above and in **Appendices B-F**, Defendants Foley, Woodworth, Lynch, Kushi, Cortese, and Garavaglia generated profits of more than $383 million during the Class Period while lying to investors about the true status of Peloton's business.

**VII.   THE MANAGEMENT DEFENDANTS AND INSIDER TRADING DEFENDANTS ENGAGED IN ILLEGAL INSIDER TRADING IN VIOLATION OF SECTION 20A**

245.    As detailed above, during the Class Period and while in possession of material, nonpublic information regarding Peloton's dwindling demand and inventory buildup, the Management Defendants and Insider Trading Defendants collectively sold more than 3 million shares of Peloton common stock, taking in profits of more than $383 million.

246.     Although the majority of these sales were executed pursuant to 10b5-1 pre-arranged trading plans, the Management Defendants and Insider Trading Defendants manipulated and deviated from their trading plans as they uncovered material, nonpublic information about Peloton's operations over the course of 2021, including, inter alia: facts pertaining to the excessive build-up of inventory in Peloton's warehouses and at shipping ports, and the waning demand for Connected Fitness products.

247.     The Management Defendants and the Insider trading Defendants were motivated to keep Peloton's stock price high for as long as possible so that they could capitalize on their trading plans. Once these Defendants recognized that the truth could no longer be hidden from the public, they deviated from their trading plans, either abruptly halting all trading pursuant thereto, or terminating the plans entirely.

248.     Upon information and belief, Plaintiffs and other Class members purchased shares of Peloton common stock contemporaneously with the Management Defendants and Insider Trading Defendants' insider sales.  The chart in **Appendix A** attached hereto sets forth Plaintiffs' purchases of Peloton common stock made contemporaneously with the Management Defendants and Insider Trading Defendants' sales.

249.     Other Class members similarly purchased artificially inflated shares of Peloton common stock contemporaneously with the Management Defendants and Insider Trading Defendants' sales of their Peloton common stock.

A.     ROBECO TRADED CONTEMPORANEOUSLY WITH DEFENDANTS

250.     Contemporaneous with the Management Defendants and Insider Trading Defendants' insider sales, Lead Plaintiff Robeco purchased a total of *one million* shares of Peloton common stock at artificially inflated prices.

251. **Foley:** On February 16, 2021, Defendant Foley sold 100,000 shares of Peloton common stock, realizing $15 million in proceeds. This sale was contemporaneous with Lead Plaintiff Robeco's purchase of 800,000 shares on February 23, 2021 (five trading days after Foley's sale) and subsequent purchase of 200,000 shares on February 24, 2021 (six trading days after Foley's sale).

252. **Lynch:** On February 8, 2021, Defendant Lynch sold 500,000 shares of Peloton common stock for proceeds of more than $73 million, and on February 16, 2021, Defendant Lynch sold an additional 116,670 shares of Peloton common stock for $17.6 million in proceeds. Defendant Lynch's February 2021 stock sales were made contemporaneously with Robeco's stock purchases of 800,000 shares on February 23, 2021, and 200,000 shares on February 24, 2021.

253. **Woodworth:** On February 16, 2021, Defendant Woodworth sold 50,000 shares of Peloton common stock, amounting to proceeds of more than $7.3 million.  This stock sale was made contemporaneously with Lead Plaintiff Robeco's purchase of 800,000 shares of Peloton common stock on February 23, 2021, and 200,000 shares on February 24, 2021.

254. **Kushi:** On February 8, 2021, Defendant Kushi sold 160,000 shares of Peloton common stock for over $22 million in proceeds.  This sale was made contemporaneously with Lead Plaintiff Robeco's purchase of 800,000 shares of common stock on February 23, 2021 and 200,000 shares on February 24, 2021.

255. **Garavaglia:** On February 15, 2021, Defendant Garavaglia also sold 1,139 shares of Peloton common stock on February 15, 2021, which was contemporaneous with Lead Plaintiff Robeco's February 23 and 24 share purchases.

256. **Cortese:** On February 12, 2021, Defendant Cortese sold 40,000 shares of Peloton common stock, amounting to more than $6 million in proceeds. This sale was made

contemporaneously with Lead Plaintiff Robeco's purchase of 800,000 share of Peloton common stock on February 23, 2021 and 200,000 shares on February 24, 2021.

### B.   HIALEAH TRADED CONTEMPORANEOUSLY WITH DEFENDANTS

257.   Contemporaneous with insider sales made by Defendant Cortese, Foley, Lynch, and Kushi, Plaintiff Hialeah purchased 2,140 shares of Peloton common stock at an artificially inflated price of $121.50 per share.

258.   **Cortese:** On June 21, 2021, Defendant Cortese sold 40,000 shares of Peloton common stock, amounting to proceeds of approximately $4.3 million, and on June 24, 2021, Defendant Cortese sold 95,618 shares of Peloton common stock, amounting to proceeds of nearly $11.9 million. Cortese's stock sales on June 21 and 24 were made contemporaneously with Plaintiff Hialeah's purchase of 2,140 shares of Peloton common stock on June 25, 2021.

259.   **Foley:** On June 15, 2021, Defendant Foley sold 100,000 shares of Peloton common stock for proceeds of $10.8 million

260.   **Lynch:** On June 14, 2021, Defendant Lynch sold 28,333 shares of common stock for proceeds of approximately $3.2 million.

261.   **Kushi:** On June 14, 2021, Defendant Kushi sold 80,000 shares of Peloton common stock for proceeds of over $9 million.

262.   The June 14 and 15 stock sales by Foley, Woodworth, and Kushi were made contemporaneously with Plaintiff Hialeah's purchase of 2,140 shares of Peloton common stock on June 25, 2021.

263.   Lead Plaintiff and other members of the Class who purchased shares of Peloton common stock contemporaneously with the sales of Peloton common stock by Lynch, Foley, Woodworth, Garavaglia, Cortese, and Kushi have suffered damages flowing from their share purchases at prices inflated by the Management Defendants' misstatements disseminated in

violation of §§ 10(b) and 20(a) of the Exchange Act.  Lead Plaintiff and other members of the Class would not have purchased Peloton stock at the inflated prices they paid had they known the truth about inventory overflow and dwindling demand for Peloton's Connected Fitness products.

264.    Management Defendants Lynch, Foley, and Woodworth and Insider Trading Defendants Cortese, Garavaglia, and Kushi violated § 20A of the Exchange Act and are liable to Plaintiffs and other members of the Class for the significant damages incurred in connection with their purchases of Peloton common stock during the Class Period.

## VIII.  ADDITIONAL ALLEGATIONS OF SCIENTER

### A.    THE MANAGEMENT DEFENDANTS WERE PELOTON'S TOP EXECUTIVES

265.    The Management Defendants, by virtue of their association with and control which made them privy to confidential internal information, including weekly, daily and monthly reports which showed declining demand and increasing inventory throughout the Class Period, participated in the fraudulent scheme designed to mask the decline in the demand for the Connected Fitness Products and the buildup of inventory in Peloton's warehouses and create the illusion that Peloton's prior fiscal year results could be replicated despite the introduction of vaccines and easement of COVID restrictions.

#### 1.    Foley

266.    Foley held the highest-level position in the Company, controlled the contents of Peloton's public statements, and according to CW1, CW2, CW3 and CW6 had access to material, adverse, nonpublic information in the form of (i) access to  the Looker report which was generated daily and incorporated real time sales data from Salesforce which indicated that sales for Connected Fitness Products were declining as early as December 2020 and continued to decline during the Class Period; (ii) access to presentations made during monthly supply chain meetings which indicated that the gap between sales forecasts and actual sales was growing i.e. that demand

was declining and inventory levels were increasing throughout the Class Period; and (3) internal Salesforce delivery reports which he likely discussed with Chief Supply Chain Officer Adee.

267.   Because of his high-level position, Foley was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information about Peloton, Foley knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors that demand continued to be strong after pandemic restrictions eased were materially false, misleading and/or incomplete.  As the Company's senior-most executive, Foley was responsible for the accuracy of Peloton's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

### 2.   Woodworth

268.   According to CW1, Woodworth attended monthly meetings along with Lynch and Chief Supply Chain Officer Adee, where she was apprised of declining demand forecasts for Peloton's Connected Fitness Products and the growing surplus of unsold inventory, much of which the Company was paying tremendous demurrage fees on.

269.   Woodworth held one of the highest-level positions at the Company, controlled the contents of Peloton's public statements, and had access to material, adverse, nonpublic information concerning the fact that demand for Peloton's Connected Fitness products had declined once pandemic restrictions were lifted. She was also made aware through internal reports that inventory became increasingly misaligned with demand during the course of the class period.  Because of her high-level position, Woodworth was provided to, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability

and opportunity to prevent their issuance or cause them to be corrected.  Because of her position and access to material non-public information about Peloton, Woodworth knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete.  As the Company's second senior-most executive, Woodworth was responsible for the accuracy of Peloton's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

### 3.      Lynch

270.    Lynch held one of the highest-level positions at the Company, controlled the contents of Peloton's public statements, and had access to material, adverse, nonpublic information concerning the fact that demand for Peloton Connected Fitness Products had declined once pandemic restrictions were lifted during the Class Period. Because of his high-level position, Lynch was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information about Peloton, Lynch knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete.  As the Company's second senior-most executive, Lynch was responsible for the accuracy of Peloton's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

271.    According to CW1, CW2, CW3 and CW6, Lynch had access to material, adverse, nonpublic information in the form of in the form of (i) access to the Looker report which was generated daily and incorporated real time sales data from Salesforce which indicated that sales

for Connected Fitness Products were declining as early as December 2020 and continued to decline during the Class Period; (ii) presentations made during monthly supply chain meetings which indicated that the gap between sales forecasts and actual sales was growing i.e. that demand was declining and inventory levels were increasing throughout the Class Period, and; (iii) internal Salesforce delivery reports which he likely discussed with Chief Supply Chain Officer Adee.

272.    According to CW2, CW6, and CW10, Lynch was aware of Peloton's declining sales throughout the Class Period, because he had access to the Looker report, which demonstrated that the Inside Sales Organization. Furthermore, according to CW6 Defendant Lynch was responsible for issuing sales goals for the Inside Sales Team in consultation with Peloton's Board of Directors.

273.    As detailed above, Peloton's sales of Connected Fitness equipment are integrally important to the Company's success, and Defendants can therefore also be presumed to have had knowledge of inadequacies of their disclosures in this regard.

274.    Foley, Lynch, and Woodworth repeatedly singled out the Company's purported past and current "supply constraints" and "demand" as reasons to buy Peloton stock. The Management Defendants stressed to investors repeatedly the strength and importance of the "demand" and "supply constraints" for Peloton bikes. Either Foley, Lynch, and Woodworth knew their statements were false or, at minimum, was severely recklessness in not finding out the truth before repeatedly speaking to investors on the subject.

### B.    PELOTON'S HIGHLY CONNECTED MANAGEMENT TEAM AND BOARD OF DIRECTORS

275.    Peloton's executive team is comprised of a highly interconnected group of long-term friends and colleagues who, at all relevant times, controlled 70% of Peloton' voting power.

276.    According to a January 2021 Fortune Magazine interview published on February 4, 2021, Defendants Foley, Kushi, Cortese, and Lynch met at IAC/InterActiveCorp in the late 1990s – early 2000s.

277.    CW1 stated that Defendants Foley, Lynch, and Kushi, as well as Peloton's former Chief Supply Chain Officer, Jonathan Adee, have had a long and storied history of working together.  According to CW1, and as confirmed by public sources such as *CNBC*, prior to working at Peloton, Foley, Lynch, and Adee worked together at Barnes & Nobles ("B&N") for more than 20 years.  There, they were responsible for launching B&N's Nook product, which is an e-reader akin to Amazon's Kindle. CW1 stated that while Defendants Foley and Lynch and Jonathan Adee worked at B&N, they had a sales goal of 2.8 million Nooks and "forced" the contract manufacturer in China to add capacity and be prepared to deliver on the goal.  However, according to CW1, only about 1.2 million Nooks were sold. As a result, Defendants Foley and Lynch, as well as Adee, "walked away" from the contract manufacturer without accepting any responsibility or liability for the overproduction of inventory and the costs incurred.  CW1 stated that the issues at Peloton were a "significant repeat offense" for Defendants Foley and Lynch, and Adee.

278.    CW1 stated that Foley, Lynch, and Adee were a tight knit team at Peloton. According to CW1, the three supported one another's decisions, regardless of the merit or cogence of such decisions.

279.    CW3 stated that Adee was close to Lynch and Foley "personally and work-wise."

280.    In January 2021, Fortune Magazine interviewed Defendants Foley, Cortese, and Kushi regarding the evolution of Peloton.  The interview, published on February 4, 2021, confirms that Defendants Foley is good friends with Defendants Kushi and Cortese. During the interview, Defendant Foley referred to Defendant Kushi as his "trusted, best friend" and reminisced about

the time that he invited Defendant Cortese to join the Peloton team over "several bottles of wine to loosen him up a bit so he would be weakened when I made my pitch."

### C. DEFENDANTS PLEDGED A SUBSTANTIAL PERCENTAGE OF THEIR ECONOMIC INTEREST IN PELOTON DURING THE CLASS PERIOD, AND WERE THUS MOTIVATED TO KEEP PELOTON'S STOCK PRICE HIGH TO PROTECT THEIR COLLATERAL

281.    According to the Blackwells report issued in February 2022, Foley, Kushi, Lynch, and Cortese all pledged a substantial portion of their economic interest in Peloton during the Class Period.

282.    According to Blackwells, as of September 30, 2021, Defendant Foley had pledged 65% of his economic interest in Peloton; Defendant Lynch, 41%; Defendant Kushi, 50%; and Defendant Cortese pledged 60% of his economic interest in Peloton.[6]



6    *See* Blackwells Capital, "A Call For Action" (February 2022), https://www.blackwellscap.com/wp-content/uploads/2022/02/BW_Peloton_Presentation_Feb072022.pdf.



283.    That a number of Peloton insiders had pledged a large portion of their economic interest in Peloton suggests that they possessed the motive to maintain to protect the value of the shares pledged.

### D.    DEFENDANT FOLEY TERMINATED HIS 10B5-1 TRADING PLAN WHILE IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION

284.     On September 22, 2020, Peloton filed a Form 8-K with the SEC notifying investors that Foley had entered into a 10b5-1 trading plan on September 16, 2020, which the SEC approved on September 17, 2020.  The plan provided that Foley would sell 100,000 shares of his Peloton common stock each month for the next two years.  Foley began selling shares pursuant to the plan on November 9, 2020, and continued to sell shares every month through August 2021. Foley entered into the trading plan with the intent of insulating his future trades from public scrutiny. Once he actively began trading under the plan and demand began to decline, he began making false statements to the public as motivated to keep the stock price high in order to cash out under the guise of his plan.

285.    However, on August 30, 2021, just four days after Peloton disclosed – for the first time – that it had identified a "material weakness" in its "internal controls over financial reporting

with respect to identification and valuation of inventory," *Defendant Foley terminated his trading plan early.* By its terms, the trading plan had not been set to expire until October 31, 2022, and allowed him the ability to trade up to 2,400,000 shares. Foley terminated the plan because he knew that Peloton would have to disclose its enormous build-up of inventory in its third quarter and the which would surprise the market and cause the Peloton's stock price to decline. Before terminating the Plan, Foley sold a total of *one million shares of Peloton Class A common stock*. Determined to keep Peloton's stock price high throughout the Class Period and benefit from his trading plan, Defendant Foley misled the market into believing that demand for Peloton's Connected Fitness products would continue, and that inventory levels were appropriate to match that demand.

286.    Between February 4, 2021 and August 30, 2021, he sold his Peloton shares at an average price of *$115.39 per share*. By November 4, 2021, Peloton's stock traded at $43 per share, far below the average $115.39 per share Foley had received while selling during the period of the plan. On January 20, 2022, Peloton's stock price dropped to $24.22. But for the early termination of his trading plan, Foley would have been required to continue selling 100,000 shares of Peloton common stock each month until October 31, 2022, over one year later.

### E.   DEFENDANTS PROFITED $383 MILLION FROM THEIR CLASS PERIOD STOCK SALES

       i.   The Trading Plans Adopted by the Management Defendants and Insider Trading Defendants Do Not Absolve Them of Insider Trading Liability

287.    The Management Defendants and the Insider Trading Defendants suspiciously adopted, modified, amended, or prematurely terminated their 10b5-1 trading plans during the Class Period; therefore, the plans do not absolve them of insider trading liability.

288.     SEC's Rule 10b5-1, 17 C.F.R. § 240.10b5-1 ("Rule"), provides that a person will be considered to have traded "on the basis of" material, nonpublic information if the person who engaged in the transaction was "aware of" that information at the time of the trade.

289.     Subsection "c" of the Rule, 10b5-1(c), provides a safe harbor under the "aware of" standard – that is, the SEC created an affirmative defense to insider trading claims for those trades made under a pre-existing binding agreement or plan ("10b5-1 Plans" or "Plans").  A 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan to scheme or evade the prohibitions" against insider trading. The adoption and/or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

290.     Throughout the Class Period, Foley, Woodworth, Lynch, Kushi, Garavaglia, and Cortese – and several other Peloton insiders – engaged in highly erratic and irregular trading behavior.

291.     The irregular trading behavior carried out by the Management Defendants leading up to and during the Class Period is sufficiently suspicious so as to preclude any affirmative defense that might otherwise have been available to their pre-planned sales made under such plans.

292.     The stock sales of the Management Defendants and Insider Trading Defendants represented a substantial portion of their stockholdings during the Class Period.  Defendant Foley sold 77.83% of his total stockholdings; Defendant Lynch sold 99.62%; Woodworth sold 37.81%; Kushi sold 89.55%; Cortese sold 99.93%; and Garavaglia sold 96.57% of her total holdings.  By exercising options and converting Class B shares to Class A shares, certain Defendants were able

to sell more Class A shares than Peloton's SEC filings indicated that they owned, yielding percentages greater than 100%.

293.    The below chart breaks down the percentage of stock holdings sold by each insider:

| Defendant | % of Class A Stockholdings Sold | % of Class A and Class B Stockholdings Sold |
|-----------|--------------------------------|---------------------------------------------|
| Foley | 77.83% | 11.55% |
| Lynch | 99.62% | 24.68% |
| Woodworth | 37.81% | 37.81% |
| Kushi | 89.55% | 42.25% |
| Cortese | 99.93% | 27.57% |
| Garavaglia | 96.57% | 96.57% |

ii.    Defendant Foley Profited $80 Million

294.    Although Foley sold his shares of common stock pursuant to a 10b5-1 trading plan throughout the Class Period, he deviated from the trading plan by terminating it early.  Foley's trading plan had an expiration date of October 31, 2022; however, he abruptly terminated his 10b5-1 Trading Plan on August 30, 2021, just four days after Peloton filed its Form 8-K with the SEC, informing investors that the Company had identified "a material weakness" in its "internal controls over financial reporting with respect to identification and valuation of inventory," causing Peloton's stock price to drop 8.5%.

295.    During the Class Period, Defendant Foley profited by more than $80 million from his sales of Peloton common stock. As Defendant Foley sold 100,000 shares of Peloton common stock each month, he was continuously issuing bullish statements to investors and analysts, and even his employees, about the future success of Peloton.  A chart detailing Foley's insider trading can be found in **Appendix B.**

iii.     Defendant Woodworth Profited $16.8 Million

296.    Defendant Woodworth sold a significant amount of her shares of Peloton common stock throughout the Class Period.  Specifically, Defendant Woodworth liquidated 150,000 shares during the Class Period under the façade of her 10b5-1 Plan.  During the Class Period, Defendant Woodworth realized profits of $16.82 million from her sales of Peloton common stock. Defendant Woodworth's trades are detailed in **Appendix C.**

iv.     Defendant Lynch Profited $103.47 Million

297.    Defendant Lynch sold 500,000 shares of his stockholdings on February 8, 2021, and another 116,670 shares just one week later, on February 16, 2021.  Then, beginning on April 14, 2021, Defendant Lynch sold 28,333 shares each month until September 14, 2021, at which point he suddenly halted trading under the Plan.

298.    During the Class Period, Defendant Lynch liquidated 786,668 shares of his personal Peloton common stock, realizing profits of $103.47 million.

299.    Defendant Lynch's pre-Class Period sales were lower on average than his sales made throughout the Class Period.  For instance, before the Class Period, Lynch's largest sale was 147,132 shares on May 12, 2020; however, at the very beginning of the Class Period, on September 14, 2020, Lynch more than doubled that when he sold 313,500 shares in one day.  Then, on February 8, 2021, just four days after one of Peloton's earnings call during which the Management Defendants reassured investors that demand for their products was not declining, Defendant Lynch suspiciously sold 500,000 shares, netting proceeds of more than $73 million, evidencing that Lynch was aware of the stark decline in demand the Company was facing.

300.    A chart detailing Lynch's insider trades can be found in **Appendix D.**

v.    Defendant Kushi Profited $91.7 Million

301.    Defendant Kushi's trading was suspicious throughout the Class Period.  Although Kushi traded strictly under the guise of his 10b5-1 Plan, his trades were irregular in amount and timing, and he appears to have even modified his trading plan on multiple occasions throughout the Class Period, eliminating any possibility that his trades were made with good faith.

302.    Like Defendant Lynch, Kushi suspiciously began selling his common stock right when the Class Period began, having sold 160,000 shares on February 8, 2021; and 80,000 shares on March 12, 2021.  Defendant Kushi abruptly ceased trading altogether on October 20, 2021, right before the end of the Class Period.

303.    During the Class Period, Defendant Kushi sold a total of 800,000 shares of his stock in Peloton, realizing total profits of $91.71 million.

304.    Defendant Kushi terminated his 10b5-1 pre-arranged trading plan on or around October 20, 2021.  Had Defendant Kushi not terminated his plan in October 2021, he would have been required – as set forth by the terms of his trading plan – to continue selling 80,000 shares each month as Peloton's stock price declined rapidly.

305.    A chart detailing Defendant Kushi's insider trading can be found in **Appendix E.**

vi.    Defendant Garavaglia Profited $23.9 Million

306.    Defendant Garavaglia's trading behavior throughout the Class Period is suspicious in amount, frequency, and pattern, and strongly indicates informed insider trading.  Although Defendant Garavaglia had an active 10b5-1 trading plan during the Class Period, she regularly traded outside of the trading plan and also regularly modified and/or amended her 10b5-1 Plan throughout the Class Period as she learned adverse and nonpublic information concerning Peloton's inventory and demand problems.  For example, for several months Defendant Garavaglia sold either 4,688 shares or 5,208 shares of Peloton common stock; however, on March 22, 2021,

she ceased trading according to this prescribed pattern when she sold 98,294 shares pursuant to her trading plan.  Thereafter, on March 31, 2021, Garavaglia sold 9,375 shares, followed by a sale of 10,416 shares on April 5, 2021, a pattern that she repeated until August 2021, at which point she again made two trades outside of her trading plan: a sale of 1,854 shares on August 3, 2021, and 4,443 shares on August 1, 2021.  On September 3, 2021, Garavaglia modified her trading plan again, when she increased the volume of shares sold to 21,924.

307.    During the Class Period Defendant Garavaglia sold a total of 270,419 shares of Peloton Common Stock, for profits of $23.9 million.  Defendant Garavaglia traded outside of her plan on several occasions and modified the plan a number of times.

308.    A chart of Defendant Garavaglia's insider trades throughout the Class Period can be found in **Appendix F.**

vii.    Defendant Cortese Profited $67.3 Million

309.    Defendant Cortese also traded shares of Peloton Common Stock erratically throughout the Class Period.  Defendant Cortese sold 40,000 shares on February 12, 2021 – which amount he continuously sold each month until June 21, 2021.  Cortese then modified and/or amend his 10b5-1 Plan when he sold 95,618 shares on June 24, 2021, and 154,382 shares on June 28, 2021.  On July 12, 2021 he resumed "regular" trading under his Plan when he sold another 40,000 shares.

310.    Defendant Cortese sold a total of 570,000 shares of Peloton Common Stock during the Class Period, yielding profits of $67.3 million.

311.    A chart detailing Cortese's insider trades during the Class Period can be found in **Appendix G.**

F.   **PELOTON INSIDERS EXERCISED THEIR STOCK OPTIONS YEARS BEFORE THEY WERE SET TO EXPIRE, THEN IMMEDIATELY SOLD THE SHARES ACQUIRED BEFORE THE PRICE OF PELOTON'S COMMON STOCK DROPPED**

312.   During the Class Period, the Management Defendants and the Insider Trading Defendants did not make any open market purchases of Peloton common stock, however, they did convert and acquire prior granted stock options at prices significantly lower than the artificially inflated prices at which the stock was selling on the market.

313.   During the Class Period, the Management Defendants and Insider Trading Defendants also suspiciously exercised their stock options years before their expiry date by sacrificing the time value of the options, received Peloton common stock and immediately thereafter sold the stock before the price of the stock dropped.  The charts in **Appendix A-G** contain information gathered from Forms 4 filed with the SEC, and reflects the total number of shares the reporting Defendants' acquired during the Class Period through converting vested options.

## XII.   LOSS CAUSATION

314.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants misled investors about demand for Peloton's products and inventory.  This artificially inflated the price of Peloton common stock and operated as a fraud or deceit on the Class. Later, when the truth concealed by Defendants' prior misrepresentations and omissions was fully disclosed to the market, the price of Peloton common stock fell precipitously. As a result of their acquisition of Peloton common stock during the Class Period—and Defendants' material misstatements and omissions—Plaintiffs and other member of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## XIII.   CLASS ACTION ALLEGATIONS

315.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of: All persons or entities who purchased or otherwise acquired Peloton common stock during the period from February 5, 2021 through and including January 19, 2022 (the "Class Period"); excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, and members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

316.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims as a class action will provide substantial benefits to the parties and the Court. As of the date of this Amended Complaint, Peloton had approximately 307 million shares of common stock outstanding, owned by hundreds of thousands of investors.

317.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iv) whether the Management Defendants are personally liable for the alleged misrepresentations and omissions described herein; (v) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading; (vi) whether Defendants' conduct impacted the price of Peloton's common stock; (vii) whether Defendants' conduct caused the members of the Class to sustain damages; and (viii) the extent of damages sustained by Class members and the appropriate measure of damages.

318.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

319.     Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

320.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

321.     The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Peloton's current and historical demand, and its present and past inventory levels.

322.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Peloton's current and historical demand, and its present and past inventory levels. Given the then-existing facts contradicting Defendants' statements, any risk disclosures made by Peloton were not sufficient to insulate Defendants from liability for their materially false and misleading statements

323.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Peloton who knew that the statement was false when made.

## XV.   PRESUMPTION OF RELIANCE

324.   At all relevant times, Peloton's common stock traded in an efficient market for the following reasons, among others:

(a)   Peloton's common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)   Peloton filed periodic public reports with the SEC and NASDAQ;

(c)   Peloton regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Peloton was followed by securities analysts employed by numerous major brokerage firms such as J.P. Morgan, Oppenheimer, and Roth Capital, and Cowen, among others, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

325.   As a result of the foregoing, the market for Peloton's common stock promptly digested current information regarding Peloton from all publicly available sources and reflected such information in the price of Peloton's common stock. Under these circumstances, all purchasers of Peloton common stock during the Class Period suffered similar injury through their

purchase of Peloton common stock at artificially inflated prices and the presumption of reliance applies.

326. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because certain of the Class' claims are grounded on Defendants' material omissions.

## XVI. CLAIMS FOR RELIEF

### <u>COUNT I</u>
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against Peloton and the Management Defendants**

327. Plaintiffs repeat, incorporate, and reallege every allegation above as if fully set forth herein.

328. During the Class Period, Defendant Peloton and the Management Defendants – Foley, Lynch, and Woodworth – carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did (i) deceive the investing public, including Plaintiffs and other Class Members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Peloton common stock at artificially inflated prices.

329. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Peloton common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

330. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

331.    During the Class Period, Defendants made false statements which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically:

(i)     Foley:  Defendant Foley made, or caused Peloton to make Statements 1, 3, 9, and 14 specified in ¶¶ **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, *infra.*

(ii)    Woodworth:  Defendant Woodworth made, or caused Peloton to make Statements 2, 9, 10, and 11 specified in ¶¶ **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**, *infra.*

(iii)   Lynch:  Defendant Lynch made, or caused Peloton to make Statement 13 specified in ¶ **Error! Reference source not found.**, *infra.*

(iv)    Peloton:  Defendant Peloton is responsible for all of the Statements in ¶¶ 152-217, *infra.*

332.    As set forth in ¶¶ 152-217, *infra*, these Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Peloton's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

333.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Peloton's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Peloton common stock had been artificially inflated by Defendants' fraudulent course of conduct.

334.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Class members have suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

335.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Management Defendants**

336.    Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

337.    The Management Defendants acted as controlling persons of Peloton within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Peloton, the Management Defendants had the power and ability to control the actions of Peloton and its employees. By reason of this conduct, the Management Defendants are liable under Section 20(a) of the Exchange Act.

338.    Defendant Foley controlled Peloton by virtue of the fact that: (i) at all relevant times, he controlled 39.6% of the total voting power; was the Chief Executive Officer; and (ii) issued public statements to investors and analysts alike.

108

339.    Defendant Lynch controlled Peloton by virtue of the following facts: (i) he controlled 12.3% of the total voting power; (ii) was the President of Peloton at all relevant times; and (iii) he made statements to the public concerning the state of affairs of Peloton's demand and supply.

340.    Defendant Woodworth controlled Peloton by virtue of the following facts: (i) she controlled 6.8% of the total voting power; (ii) was the Chief Financial Officer of Peloton at all relevant times; and (iii) issued statements to the public regarding the nature of Peloton's supply and demand.

341.    The Section 20(a) Defendants are culpable for participation in the matters alleged herein because they did not act in good faith in connection with the conduct at issue, acted with knowledge that Peloton's public statements were materially false or misleading, or omitted material information, and/or or they acted with reckless disregard for the truth.

342.    By virtue of their positions as controlling persons of Peloton, and their culpable participation in the Defendants' violation of Section 10(b) and Rule 10b-5(b) as alleged herein, the Section 20(a) Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act.

### COUNT III
### For Violations of Section 10(b) of the Exchange Act and
### SEC Rule 10b-5 Against the Insider Trading Defendants

343.    Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

344.    This Claim is brought against the Insider Trading Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

345.    The information provided to the Insider Trading Defendants – Defendants Cortese, Kushi, and Garavaglia about Peloton's inability to maintain the widening gap between demand

and actual sales; excessive inventory buildup at warehouses and ports across the U.S.; and slowing sales as COVID restrictions eased, was material non-public information ("MNPI"). Further, the information was, in each case, considered confidential by Peloton, which was the source of the information, and which provided information to the Insider Trading Defendants for the purpose of enabling them to operate and manage the Company.

346.    The Insider Trading Defendants obtained MNPI regularly by virtue of their executive-level positions at the Company which entailed regularly frequenting meetings where declining demand and sales, inventory problems, among other things, were discussed.

347.    Defendant Kushi regularly had access to MNPI throughout the Class Period by virtue of his position as Chief Legal Officer of Peloton and his close relationship with Foley. Defendant Kushi is, and was at all relevant times, Defendant Foley's "trusted best friend." The two developed a very close relationship over the course of 20 years, and Kushi was the very first person that Foley invited to join Peloton.

348.    Cortese had regular access to MNPI throughout the entire Class Period.  By virtue of his position as Peloton's Chief Operations Officer and subsequently, Chief Product Officer during the Class Period, Defendant Cortese was regularly informed about Peloton's business operations.  In particular, according to CW1, Defendant Cortese attended Peloton's weekly supply chain meetings during which problems pertaining to inventory overflow outpacing slowing demand were discussed. According to CW10, Defendant Cortese dealt with inventory planning and related concerns.  Defendant Cortese is and was at all relevant times very good friends with Defendant Foley. Foley and Cortese founded Peloton together in 2012 and prior to doing so, the two had worked at IAC for a number of years, as further alleged above.  Defendant Cortese was the second person (after Kushi), that Defendant Foley invited to be a co-founder of Peloton. By

virtue of his long-term relationship of trust and loyalty with Foley, as well as his positions as COO and CPO of Peloton during the Class Period, Cortese had regular access to MNPI regarding Peloton's business operations.

349.    Garavaglia was brought on board at Peloton by Foley. Garavaglia had regular access to MNPI throughout the Class Period. Defendant Garavaglia was Peloton's Company's Chief Operating Officer and Chief People Officer In this role, Defendant Garavaglia attended executive-level meetings where confidential and adverse information about Peloton's business operations was discussed.   Further, Defendant Foley personally recruited Garavaglia to join Peloton's management team in 2019.  By virtue of Garavaglia's position at Peloton and Foley's trust and confidence in her, Garavaglia had access to MNPI regarding Peloton's business operations. According to CW31, who attended meetings with Garavaglia during the Class Period, Garavaglia was aware of issues with Peloton's inventory. CW31 further stated that Peloton had a FY 2022 initiative to cut out $100 million in costs, a decision which originated with Adee and later Garavaglia. In particular, Garavaglia had three or four FY2022 top priorities on her agenda which included robust sales and operations planning and supply and operations.

350.    The Insider Trading Defendants knew, recklessly disregarded, or should have known that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence to Peloton's shareholders.

351.    Nevertheless, while in possession of material, non-public adverse information, the Insider Trading Defendants collectively sold millions of dollars' worth of Peloton's common stock.

352.    By virtue of the foregoing, Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

353.    By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5. 341.

354.    Plaintiffs contemporaneously purchased and/or sold securities of the same classes as those in which the Insider Trading Defendants traded.

355.    The measure of damages for trading while in possession of MNPI information under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b5, is the disgorgement of profits gained and losses avoided by such trading.

356.    During the Class Period, the Insider Trading Defendants sold Peloton's shares while in possession of MNPI and avoided substantial losses on such transactions. Plaintiffs and the other members of the Class who purchased shares of Peloton contemporaneously with the Insider Trading Defendants' sales, are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

357.    By virtue of the foregoing, the Insider Trading Defendants are jointly and severally liable to Plaintiffs, and other members of the Class who purchased contemporaneously with the Insider Trading Defendants' sales pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

### COUNT IV
**For Violations of Section 20A of the Exchange Act**
**Against the Management Defendants and the Insider Trading Defendants**

358.    Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

359.    This Count is asserted for violations of §20A of the Exchange Act, 15 U.S.C. §78t1, on behalf of Plaintiffs, and all other members of the Class, who purchased shares of Peloton common stock contemporaneously with the sale of Peloton common stock, by Management Defendants Foley, Lynch, Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese while they were in possession of material, nonpublic information, as alleged herein, including concerning Peloton's diminishing demand, excessive inventory levels, and failing financial performance.

360.    Section 20A(a) of the Exchange Act provides that: Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

361.    As alleged herein, the Management Defendants violated §10(b) of the Exchange Act, Rule 10b-5, and §20(a) of the Exchange Act for the reasons stated in Counts I and II above. The Management Defendants also violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. §240.10b5-1) by selling shares of Peloton common stock while in possession

of material, nonpublic information the Company's excessive inventory buildup despite sinking demand for its exercise products, which information they owed a duty to disclose and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

362.    Contemporaneously with Management Defendants Foley, Lynch, Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese's insider sales of Peloton common stock, Plaintiffs, and other Class members purchased shares of Peloton common stock on a national securities stock exchange and in an open and efficient market, while these Defendants were in possession of material, nonpublic information which they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning the true nature of Peloton's financial and business performance – namely, the Company's excessive supply despite dwindling demand.

363.    Plaintiffs, and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

364.    By reason of the violations of the Exchange Act alleged herein, Management Defendants Foley, Lynch, Woodworth, and Insider Trading Defendants Kushi, Garavaglia, and Cortese are liable to Plaintiffs, and the other members of the Class who purchased shares of Peloton common stock contemporaneously with these Defendants' mass sales of Peloton common stock during the Class Period.

365.    Plaintiffs, and the other members of the Class, who purchased Peloton stock contemporaneously with certain of the Defendants' insider sales of Peloton common stock, seek disgorgement by Defendants of profits gained or losses avoided from Defendants' transactions in Peloton common stock contemporaneous with Plaintiffs' purchases and the purchases of other members of the Class.

366.     This Action was brought within five years after the date of the last transaction that is the subject of the Management Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count I above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Management Defendants.

## XVII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

367.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

368.     Awarding compensatory damages in favor of Plaintiffs, and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

369.     Awarding Plaintiffs, and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

370.     Ordering an accounting and disgorgement of certain of the unjust profits realized by certain of the Defendants; and

371.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVIII. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, New York          Respectfully submitted,
May 5, 2023

                                                    /s/ Daniel L. Berger
                                                    Daniel L. Berger
                                                    Karin Fisch
                                                    Cecilia E. Stein
                                                    Mica A. Cocco

GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: kfisch@gelaw.com
Email: cstein@gelaw.com
Email: mcocco@gelaw.com

*Lead Counsel for Lead Plaintiff Robeco
Capital Growth Funds SICAV – Robeco
Global Consumer Trends*

Hannah Ross
Avi Josefson
Jonathan D. Uslaner
Caitlin C. Bozman
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: hannah@blbglaw.com
Email: avi@blbglaw.com
Email: jonathanU@blbglaw.com
Email: caitlin.bozman@blbglaw.com

*Counsel for Additional Plaintiff City of Hialeah
Employees' Retirement System*

**APPENDIX A:**
§20A CONTEMPORANEOUS TRADES

| | | Insiders' Sales | | | Plaintiffs' Stock Purchases |
|---|---|---|---|---|---|

| Date | Insider/Seller | Shares Disposed | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| 2/8/21 | Lynch | 167,770 | $144.05 | $24,167,268.50 |
| | | 195,687 | $144.82 | $28,339,391.30 |
| | | 94,333 | $145.78 | $13,751,864.70 |
| | | 24,758 | $146.72 | $3,632,493.76 |
| | | 12,152 | $147.85 | $1,796,673.20 |
| | | 5,300 | $148.68 | $788,004.00 |
| | Kushi | 52,952 | $144.05 | $7,627,735.60 |
| | | 62,921 | $144.82 | $9,112,219.22 |
| | | 30,351 | $145.78 | $4,424,568.78 |
| | | 7,710 | $146.70 | $360,057 |
| | | 4,266 | $147.85 | $630,728.10 |
| | | 1,800 | $148.69 | $267,642 |
| 2/12/21 | Cortese | 1,474 | $145.66 | $214,702.84 |
| | | 1,486 | $146.34 | $217,461.24 |
| | | 2,800 | $147.80 | $413,840 |
| | | 9,771 | $148.65 | $1,452,459.15 |
| | | 2,309 | $149.42 | $345,010.78 |
| | | 600 | $150.68 | $90,408 |
| | | 3,048 | $152.18 | $463,844.64 |
| | | 3,200 | $152.86 | $489,152 |
| | | 13,997 | $153.99 | $2,155,398.03 |
| | | 1,315 | $154.53 | $203,206.95 |
| 2/15/21 | Garavaglia | 1,139 | $154.67 | $176,169 |
| 2/16/21 | Lynch | 21,927 | 146.22 | $3,206,165.94 |
| | | 22,628 | 147.22 | $3,331,294.16 |
| | | 15,090 | 148.14 | $2,235,432.60 |
| | | 2,573 | 149.16 | $383,788.68 |
| | | 13,285 | 150.57 | $2,000,322.45 |
| | | 32,373 | 151.49 | $4,904,185.77 |
| | | 8,694 | 152.33 | $1,324,357.02 |
| | | 100 | 155.50 | $15,550 |
| | Foley | 30,789 | $146.22 | $4,501,967.58 |
| | | 20,063 | $147.22 | $2,953,674.86 |
| | | 11,723 | $148.07 | $1,735,824.61 |
| | | 2,752 | $149.01 | $410,075.52 |

117

| Date | Name | Shares | Price | Value |
|---|---|---|---|---|
| | | 6,789 | $150.40 | $1,021,065.6 |
| | | 18,543 | $151.32 | $2,805,926.76 |
| | | 8,441 | $152.11 | $1,283,960.51 |
| | | 300 | $153.11 | $45,933 |
| | | 600 | $154.83 | $92,898 |
| 2/16/21 | Woodworth | 15,618 | $146.23 | $2,283,820.14 |
| | | 10,142 | $147.24 | $1,493,308.08 |
| | | 5,700 | $148.10 | $844,170 |
| | | 1,154 | $149.05 | $172,003.70 |
| | | 4,406 | $150.49 | $663,058.94 |
| | | 9,578 | $151.44 | $1,450,492.32 |
| | | 3,002 | $152.23 | $456,994.46 |
| | | 100 | $152.95 | $15,295 |
| | | 300 | $154.61 | $46,383 |

**Robeco's Purchases:**

| Date | | |
|---|---|---|
| 2/23/21 | | 800,000 |
| 2/24/21 | | 200,000 |

| Date | Name | Shares | Price | Value |
|---|---|---|---|---|
| 06/14/21 | Lynch | 16,309 | $112.12 | $1,828,565 |
| | | 10,624 | $113.02 | $1,200,724 |
| | | 1,300 | $114.07 | $148,291 |
| | | 100 | $114.66 | $11,466 |
| | Kushi | 38,564 | 112.20 | $4,326,881 |
| | | 33,990 | $113.08 | $3,843,589 |
| | | 7,446 | $114.02 | $848,993 |
| 06/15/21 | Foley | 18,067 | $106.22 | $1,919,077 |
| | | 11,523 | $107.18 | $1,235,035 |
| | | 28,260 | $108.18 | $3,057,167 |
| | | 22,449 | $109.22 | $2,451,880 |
| | | 11,101 | $110.23 | $1,223,663 |
| | | 8,400 | $110.99 | $932,316 |
| | | 200 | $111.96 | $22,392 |
| 06/21/21 | Cortese | 3,701 | $104.86 | $388,087 |
| 06/24/21 | Cortese | 5,339 | $105.82 | $564,973 |
| | | 7,129 | $106.80 | $761,377 |
| | | 18,704 | $107.96 | $2,019,284 |
| | | 5,127 | $108.85 | $558,074 |
| | | 95,618 | $124.26 | $11,861,413 |

**Hialeah's Purchases:**

| Date | | |
|---|---|---|
| 06/25/21 | | 2,140 |

**APPENDIX B:**
FOLEY'S CLASS PERIOD TRADES

| Transaction | Date | Shares | Price | Amount |
|---|---|---|---|---|
| Sale | 2/16/21 | 30,789 | $146.22 | $4,501,968 |
| Sale | 2/16/21 | 20,063 | $147.22 | $2,953,675 |
| Sale | 2/16/21 | 11,723 | $148.07 | $1,735,825 |
| Sale | 2/16/21 | 2,752 | $149.01 | $410,076 |
| Sale | 2/16/21 | 6,789 | $150.40 | $1,021,066 |
| Sale | 2/16/21 | 18,543 | $151.32 | $2,805,927 |
| Sale | 2/16/21 | 8,441 | $152.11 | $1,283,961 |
| Sale | 2/16/21 | 300 | $153.11 | $45,933 |
| Sale | 2/16/21 | 600 | $154.83 | $92,898 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$14,851,326** |
| Sale | 3/15/21 | 4,889 | $108.07 | $528,354 |
| Sale | 3/15/21 | 11,176 | $109.10 | $1,219,302 |
| Sale | 3/15/21 | 22,577 | $110.02 | $2,483,922 |
| Sale | 3/15/21 | 32,663 | $111.05 | $3,627,226 |
| Sale | 3/15/21 | 28,595 | $111.79 | $3,196,635 |
| Sale | 3/15/21 | 100 | $112.68 | $11,268 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$11,066,707** |
| Sale | 4/15/21 | 28,615 | $118.95 | $3,403,754 |
| Sale | 4/15/21 | 64,504 | $119.64 | $7,717,259 |
| Sale | 4/15/21 | 6,285 | $120.80 | $759,228 |
| Sale | 4/15/21 | 596 | $121.55 | $72,444 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$11,952,685** |
| Sale | 5/17/21 | 15,218 | $90.18 | $1,372,359 |
| Sale | 5/17/21 | 18,608 | $90.96 | $1,692,584 |
| Sale | 5/17/21 | 38,287 | $91.97 | $3,521,255 |
| Sale | 5/17/21 | 6,719 | $92.93 | $624,397 |
| Sale | 5/17/21 | 13,621 | $93.96 | $1,279,829 |
| Sale | 5/17/21 | 4,147 | $95.06 | $394,214 |
| Sale | 5/17/21 | 3,300 | $95.90 | $316,470 |
| Sale | 5/17/21 | 100 | $96.60 | $9,660 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$9,210,768** |
| Sale | 6/15/21 | 18,067 | $106.22 | $1,919,077 |
| Sale | 6/15/21 | 11,523 | $107.18 | $1,235,035 |
| Sale | 6/15/21 | 28,260 | $108.18 | $3,057,167 |
| Sale | 6/15/21 | 22,449 | $109.22 | $2,451,880 |
| Sale | 6/15/21 | 11,101 | $110.23 | $1,223,663 |
| Sale | 6/15/21 | 8,400 | $110.99 | $932,316 |
| Sale | 6/15/21 | 200 | $111.96 | $22,392 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$10,841,530** |
| Sale | 7/15/21 | 3,198 | $108.72 | $347,687 |
| Sale | 7/15/21 | 24,385 | $109.90 | $2,679,912 |
| Sale | 7/15/21 | 43,885 | $110.88 | $4,865,969 |
| Sale | 7/15/21 | 13,078 | $111.47 | $1,457,805 |
| Sale | 7/15/21 | 6,154 | $112.72 | $693,679 |
| Sale | 7/15/21 | 7,500 | $113.77 | $853,275 |
| Sale | 7/15/21 | 1,800 | $114.46 | $206,028 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$11,104,353** |
| Sale | 8/16/21 | 5,009 | $107.79 | $539,920 |
| Sale | 8/16/21 | 9,793 | $108.71 | $1,064,597 |
| Sale | 8/16/21 | 51,272 | $109.88 | $5,633,767 |
| Sale | 8/16/21 | 30,426 | $110.62 | $3,365,724 |
| Sale | 8/16/21 | 3,500 | $111.47 | $390,145 |
| | **Subtotal:** | **100,000** | **Subtotal:** | **$10,994,154** |

| | | | | |
|---|---|---|---|---|
| Sale | 8/31/21 | 376 | $100.17 | $37,665 |
| Sale | 8/31/21 | 110 | $100.91 | $11,100 |
| | **Subtotal:** | **486** | **Subtotal:** | **$48,765** |
| | **Total Shares:** | **700,486** | **Total Proceeds:** | **$80,070,288** |
| | | | **CLASS PERIOD PROFIT:** | **$80,070,288** |

**APPENDIX C:**
WOODWORTH'S CLASS PERIOD TRADES

| Transaction | Date | Shares | Price | Amount |
|---|---|---|---|---|
| Sale | 2/16/21 | 15,618 | 146.23 | $2,283,820 |
| Sale | 2/16/21 | 10,142 | 147.24 | $1,493,308 |
| Sale | 2/16/21 | 5,700 | 148.1 | $844,170 |
| Sale | 2/16/21 | 1,154 | 149.05 | $172,004 |
| Sale | 2/16/21 | 4,406 | 150.49 | $663,059 |
| Sale | 2/16/21 | 9,578 | 151.44 | $1,450,492 |
| Sale | 2/16/21 | 3,002 | 152.23 | $456,994 |
| Sale | 2/16/21 | 100 | 152.95 | $15,295 |
| Sale | 2/16/21 | 300 | 154.61 | $46,383 |
| | **Subtotal:** | **50,000** | **Subtotal:** | **$7,425,526** |
| Sale | 5/17/21 | 8,454 | 90.22 | $762,720 |
| Sale | 5/17/21 | 8,847 | 91.02 | $805,254 |
| Sale | 5/17/21 | 19,318 | 91.99 | $1,777,063 |
| Sale | 5/17/21 | 3,200 | 93.09 | $297,888 |
| Sale | 5/17/21 | 6,681 | 94 | $628,014 |
| Sale | 5/17/21 | 2,300 | 95.15 | $218,845 |
| Sale | 5/17/21 | 1,200 | 96.05 | $115,260 |
| | **Subtotal:** | **50,000** | **Subtotal:** | **$4,605,044** |
| Sale | 9/15/21 | 10,582 | 104.6 | $1,106,877 |
| Sale | 9/15/21 | 25,488 | 105.49 | $2,688,729 |
| Sale | 9/15/21 | 12,430 | 106.15 | $1,319,445 |
| Sale | 9/15/21 | 400 | 107.53 | $43,012 |
| Sale | 9/15/21 | 1,100 | 108.39 | $119,229 |
| | **Subtotal:** | **50,000** | **Subtotal:** | **$5,277,292** |
| | **Total Shares:** | **150,000** | **Total Proceeds:** | **$17,307,861** |
| Conversion | 2/16/21 | 50,000 | $3.28 | $164,000 |
| Conversion | 5/17/21 | 50,000 | $3.28 | $164,000 |
| Conversion | 9/15/21 | 50,000 | $3.28 | $164,000 |
| | | **150,000** | **Total Conversion Costs:** | **$492,000** |
| | | | **CLASS PERIOD PROFIT:** | **$16,815,861** |

**APPENDIX D:**
LYNCH'S CLASS PERIOD TRADES

| Transaction | Date | Shares | Price | Amount |
|---|---|---|---|---|
| Sale | 2/8/21 | 167,770 | $144.05 | $24,167,269 |
| Sale | 2/8/21 | 195,687 | $144.82 | $28,339,391 |
| Sale | 2/8/21 | 94,333 | $145.78 | $13,751,865 |
| Sale | 2/8/21 | 24,758 | $146.72 | $3,632,494 |
| Sale | 2/8/21 | 12,152 | $147.85 | $1,796,673 |
| Sale | 2/8/21 | 5,300 | $148.68 | $788,004 |
| Sale | 2/16/21 | 21,927 | $146.22 | $3,206,166 |
| Sale | 2/16/21 | 22,628 | $147.22 | $3,331,294 |
| Sale | 2/16/21 | 15,090 | $148.14 | $2,235,433 |
| Sale | 2/16/21 | 2,573 | $149.16 | $383,789 |
| Sale | 2/16/21 | 13,285 | $150.57 | $2,000,322 |
| Sale | 2/16/21 | 32,373 | $151.49 | $4,904,186 |
| Sale | 2/16/21 | 8,694 | $152.33 | $1,324,357 |
| Sale | 2/16/21 | 100 | $155.50 | $15,550 |
| | **Subtotal:** | **616,670** | **Subtotal:** | **$89,876,792** |
| Sale | 4/14/21 | 9,160 | $117.94 | $1,080,330 |
| Sale | 4/14/21 | 10,439 | $118.96 | $1,241,823 |
| Sale | 4/14/21 | 4,625 | $119.77 | $553,936 |
| Sale | 4/14/21 | 1,700 | $121.28 | $206,176 |
| Sale | 4/14/21 | 2,409 | $122.16 | $294,283 |
| | **Subtotal:** | **28,333** | **Subtotal:** | **$3,376,550** |
| Sale | 5/20/21 | 28,333 | $100.04 | $2,834,433 |
| | **Subtotal:** | **28,333** | **Subtotal:** | **$2,834,433** |
| Sale | 6/14/21 | 16,309 | $112.12 | $1,828,565 |
| Sale | 6/14/21 | 10,624 | $113.02 | $1,200,724 |
| Sale | 6/14/21 | 1,300 | $114.07 | $148,291 |
| Sale | 6/14/21 | 100 | $114.66 | $11,466 |
| | **Subtotal:** | **28,333** | **Subtotal:** | **$3,189,047** |
| Sale | 7/14/21 | 6,304 | $113.72 | $716,891 |
| Sale | 7/14/21 | 20,129 | $114.85 | $2,311,816 |
| Sale | 7/14/21 | 1,400 | $115.81 | $162,134 |
| Sale | 7/14/21 | 500 | $116.58 | $58,290 |
| | **Subtotal:** | **28,333** | **Subtotal:** | **$3,249,131** |
| Sale | 8/16/21 | 2,228 | $108.03 | $240,691 |
| Sale | 8/16/21 | 4,587 | $109.29 | $501,313 |
| Sale | 8/16/21 | 18,200 | $110.20 | $2,005,640 |
| Sale | 8/16/21 | 3,318 | $111.14 | $368,763 |
| | **Subtotal:** | **28,333** | **Subtotal:** | **$3,116,407** |
| Sale | 9/14/21 | 8,044 | $108.34 | $871,487 |
| Sale | 9/14/21 | 4,312 | $109.33 | $471,431 |
| Sale | 9/14/21 | 2,646 | $110.46 | $292,277 |
| Sale | 9/14/21 | 2,802 | $111.71 | $313,011 |
| Sale | 9/14/21 | 8,929 | $112.58 | $1,005,227 |
| Sale | 9/14/21 | 1,600 | $113.38 | $181,408 |
| | **Subtotal:** | **28,333** | **Subtotal:** | **$3,134,841** |
| | **Total Shares:** | **786,668** | **Total Proceeds:** | **$108,777,200** |
| Conversion | 2/8/21 | 500,000 | $8.82 | $4,410,000 |
| Conversion | 2/16/21 | 116,670 | $2.89 | $337,176 |
| Conversion | 4/14/21 | 28,333 | $3.28 | $92,932 |
| Conversion | 5/20/21 | 28,333 | $3.28 | $92,932 |
| Conversion | 6/14/21 | 28,333 | $3.28 | $92,932 |
| Conversion | 7/14/21 | 28,333 | $3.28 | $92,932 |

| | | | | |
|---|---|---|---|---|
| Conversion | 8/16/21 | 28,333 | $3.28 | $92,932 |
| Conversion | 9/14/21 | 28,333 | $3.28 | $92,932 |
| | | **786,668** | **Total Conversion Costs:** | **$5,304,770** |
| | | | **CLASS PERIOD PROFIT:** | **$103,472,430** |

**APPENDIX E:**
KUSHI'S CLASS PERIOD TRADES

| Transaction | Date | Shares | Price | Amount |
|---|---|---|---|---|
| Sale | 2/8/21 | 52,952 | $144.05 | $7,627,736 |
| Sale | 2/8/21 | 62,921 | $144.82 | $9,112,219 |
| Sale | 2/8/21 | 30,351 | $145.78 | $4,424,569 |
| Sale | 2/8/21 | 7,710 | $146.70 | $1,131,057 |
| Sale | 2/8/21 | 4,266 | $147.85 | $630,728 |
| Sale | 2/8/21 | 1,800 | $148.69 | $267,642 |
| | **Subtotal:** | **160,000** | **Subtotal:** | **$23,193,951** |
| Sale | 3/12/21 | 17,389 | $109.90 | $1,911,051 |
| Sale | 3/12/21 | 39,173 | $110.80 | $4,340,368 |
| Sale | 3/12/21 | 14,738 | $111.58 | $1,644,466 |
| Sale | 3/12/21 | 5,800 | $112.74 | $653,892 |
| Sale | 3/12/21 | 1,500 | $113.82 | $170,730 |
| Sale | 3/12/21 | 1,400 | $114.55 | $160,370 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$8,880,878** |
| Sale | 4/12/21 | 15,005 | $115.93 | $1,739,530 |
| Sale | 4/12/21 | 22,235 | $116.86 | $2,598,382 |
| Sale | 4/12/21 | 16,601 | $118.04 | $1,959,582 |
| Sale | 4/12/21 | 26,159 | $118.89 | $3,110,044 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$9,407,537** |
| Sale | 5/12/21 | 80,000 | $90.15 | $7,212,000 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$7,212,000** |
| Sale | 6/14/21 | 38,564 | $112.20 | $4,326,881 |
| Sale | 6/14/21 | 33,990 | $113.08 | $3,843,589 |
| Sale | 6/14/21 | 7,446 | $114.02 | $848,993 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$9,019,463** |
| Sale | 7/12/21 | 11,050 | $115.17 | $1,272,629 |
| Sale | 7/12/21 | 3,529 | $116.22 | $410,140 |
| Sale | 7/12/21 | 11,570 | $117.18 | $1,355,773 |
| Sale | 7/12/21 | 13,257 | $118.12 | $1,565,917 |
| Sale | 7/12/21 | 5,830 | $119.15 | $694,645 |
| Sale | 7/12/21 | 32,053 | $120.20 | $3,852,771 |
| Sale | 7/12/21 | 2,711 | $120.75 | $327,353 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$9,045,488** |
| Sale | 8/12/21 | 26,249 | $112.44 | $2,951,438 |
| Sale | 8/12/21 | 36,757 | $113.11 | $4,157,584 |
| Sale | 8/12/21 | 16,994 | $113.95 | $1,936,466 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$9,045,488** |
| Sale | 9/13/21 | 7,000 | $110.79 | $775,530 |
| Sale | 9/13/21 | 31,462 | $111.76 | $3,516,193 |
| Sale | 9/13/21 | 19,849 | $112.87 | $2,240,357 |
| Sale | 9/13/21 | 21,378 | $113.82 | $2,433,244 |
| Sale | 9/13/21 | 311 | $114.43 | $35,588 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$9,000,911** |
| Sale | 10/20/21 | 29,780 | $91.33 | $2,719,807 |
| Sale | 10/20/21 | 47,320 | $92.27 | $4,366,216 |
| Sale | 10/20/21 | 2,900 | $92.68 | $268,772 |
| | **Subtotal:** | **80,000** | **Subtotal:** | **$7,354,796** |
| | **Total Shares:** | **800,000** | **Total Proceeds:** | **$92,594,251** |
| Conversion | 2/8/21 | 160,000 | $0.75 | $120,000 |
| Conversion | 3/12/21 | 80,000 | $0.75 | $60,000 |
| Conversion | 4/12/21 | 80,000 | $0.75 | $60,000 |
| Conversion | 5/12/21 | 80,000 | $0.75 | $60,000 |

124

| Conversion | 6/14/21 | 80,000 | $0.75 | $60,000 |
|------------|---------|--------|-------|---------|
| Conversion | 7/12/21 | 80,000 | $0.75 | $60,000 |
| Conversion | 8/12/21 | 80,000 | $0.75 | $60,000 |
| Conversion | 9/13/21 | 27,110 | $0.75 | $20,333 |
| Conversion | 9/13/21 | 52,890 | $2.89 | $152,852 |
| Conversion | 10/20/21 | 80,000 | $2.89 | $231,200 |
| | | **800,000** | **Total Conversion Costs:** | **$884,385** |
| | | | **CLASS PERIOD PROFIT:** | **$91,709,866** |

**APPENDIX F:**
GARAVAGLIA'S CLASS PERIOD TRADES

| Transaction | Date | Shares | Price | Amount |
|---|---|---|---|---|
| Sale | 3/22/21 | 65,453 | $110.09 | $7,205,721 |
| Sale | 3/23/21 | 29,820 | $110.24 | $3,287,357 |
| Sale | 3/23/21 | 3,021 | $111.17 | $335,845 |
| Sale | 3/31/21 | 9,375 | $110.10 | $1,032,188 |
| | **Subtotal:** | **107,669** | **Subtotal:** | **$11,861,110** |
| Sale | 4/5/21 | 8,181 | $111.41 | $911,445 |
| Sale | 4/5/21 | 2,235 | $112.44 | $251,303 |
| | **Subtotal:** | **10,416** | **Subtotal:** | **$1,162,749** |
| Sale | 5/17/21 | 1 | $90.71 | $91 |
| Sale | 5/17/21 | 1,895 | $93.82 | $177,789 |
| Sale | 5/26/21 | 21,512 | $110.07 | $2,367,826 |
| Sale | 5/28/21 | 9,375 | $112.27 | $1,052,531 |
| | **Subtotal:** | **32,783** | **Subtotal:** | **$3,598,237** |
| Sale | 6/7/21 | 10,416 | $110 | $1,145,760 |
| Sale | 6/28/21 | 1,302 | $122.26 | $159,183 |
| Sale | 6/28/21 | 1,294 | $123.42 | $159,705 |
| Sale | 6/28/21 | 700 | $124.50 | $87,150 |
| Sale | 6/28/21 | 2,772 | $125.54 | $347,997 |
| Sale | 6/28/21 | 3,198 | $126.55 | $404,707 |
| Sale | 6/28/21 | 109 | $127.28 | $13,874 |
| | **Subtotal:** | **19,791** | **Subtotal:** | **$2,318,375** |
| Sale | 7/6/21 | 1,000 | $120.80 | $120,800 |
| Sale | 7/6/21 | 3,850 | $121.82 | $469,007 |
| Sale | 7/6/21 | 2,832 | $122.59 | $347,175 |
| Sale | 7/6/21 | 2,734 | $123.61 | $337,950 |
| Sale | 7/28/21 | 6,575 | $121.47 | $798,665 |
| Sale | 7/28/21 | 2,100 | $122.08 | $256,368 |
| Sale | 7/28/21 | 700 | $123.12 | $86,184 |
| | **Subtotal:** | **19,791** | **Subtotal:** | **$2,416,149** |
| Sale | 8/3/21 | 3,676 | $118.80 | $436,709 |
| Sale | 8/3/21 | 5,140 | $119.56 | $614,538 |
| Sale | 8/3/21 | 900 | $120.78 | $108,702 |
| Sale | 8/3/21 | 700 | $122.17 | $85,519 |
| Sale | 8/15/21 | 1,854 | $110.92 | $205,646 |
| Sale | 8/17/21 | 1,749 | $110.00 | $192,390 |
| Sale | 8/31/21 | 4,443 | $102.05 | $453,408 |
| | **Subtotal:** | **18,462** | **Subtotal:** | **$2,096,912** |
| Sale | 9/3/21 | 3,364 | $97.97 | $329,571 |
| Sale | 9/3/21 | 11,861 | $98.77 | $1,171,511 |
| Sale | 9/3/21 | 2,706 | $99.78 | $270,005 |
| Sale | 9/3/21 | 3,993 | $100.81 | $402,534 |
| Sale | 9/28/21 | 3,947 | $87.90 | $346,941 |
| Sale | 9/28/21 | 4,528 | $88.87 | $402,403 |
| Sale | 9/28/21 | 800 | $89.70 | $71,760 |
| Sale | 9/28/21 | 100 | $90.65 | $9,065 |
| | **Subtotal:** | **31,299** | **Subtotal:** | **$3,003,791** |
| Sale | 10/4/21 | 8,417 | $81.47 | $685,733 |
| Sale | 10/4/21 | 1,300 | $83.04 | $107,952 |
| Sale | 10/4/21 | 400 | $84.06 | $33,624 |
| Sale | 10/4/21 | 300 | $85.42 | $25,626 |
| Sale | 10/28/21 | 6,463 | $89.14 | $576,112 |
| Sale | 10/28/21 | 2,912 | $90.18 | $262,604 |

| | | | | |
|---|---|---|---|---|
| | **Subtotal:** | **19,792** | **Subtotal:** | **$1,691,651** |
| Sale | 11/3/21 | 5,936 | $89.54 | $531,509 |
| Sale | 11/3/21 | 4,064 | $90.20 | $366,573 |
| Sale | 11/3/21 | 416 | $91.16 | $37,923 |
| | **Subtotal:** | **10,416** | **Subtotal:** | **$936,005** |
| | **Total Shares:** | **270,419** | **Total Proceeds:** | **$29,084,978** |
| Conversion | 3/22/21 | 29,392 | $14.59 | $428,829 |
| Conversion | 3/22/21 | 32,551 | $26.69 | $868,786 |
| Conversion | 3/23/21 | 18,521 | $14.59 | $270,221 |
| Conversion | 3/23/21 | 14,320 | $26.69 | $382,201 |
| Conversion | 3/31/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 4/5/21 | 10,416 | $14.59 | $151,969 |
| Conversion | 5/26/21 | 10,416 | $14.59 | $151,969 |
| Conversion | 5/26/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 5/28/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 6/7/21 | 10,416 | $14.59 | $151,969 |
| Conversion | 6/28/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 7/6/21 | 10,416 | $14.59 | $151,969 |
| Conversion | 7/28/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 8/3/21 | 10,416 | $14.59 | $151,969 |
| Conversion | 9/3/21 | 10,416 | $14.59 | $151,969 |
| Conversion | 9/3/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 9/28/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 10/4/21 | 10,417 | $14.59 | $151,984 |
| Conversion | 10/28/21 | 9,375 | $26.69 | $250,219 |
| Conversion | 11/3/21 | 10,416 | $14.59 | $151,969 |
| | | 253,113 | **Total Conversion Costs:** | **$5,167,558** |
| | | | **CLASS PERIOD PROFIT:** | **$23,917,420** |

**APPENDIX G:**
CORTESE'S CLASS PERIOD TRADES

| Transaction | Date | Shares | Price | Amount |
|---|---|---|---|---|
| Sale | 2/12/21 | 1,474 | $145.66 | $214,707 |
| Sale | 2/12/21 | 1,486 | $146.34 | $217,461 |
| Sale | 2/12/21 | 2,800 | $147.80 | $413,840 |
| Sale | 2/12/21 | 9,771 | $148.65 | $1,452,459 |
| Sale | 2/12/21 | 2,309 | $149.42 | $345,011 |
| Sale | 2/12/21 | 600 | $150.68 | $90,408 |
| Sale | 2/12/21 | 3,048 | $152.18 | $463,845 |
| Sale | 2/12/21 | 3,200 | $152.86 | $489,152 |
| Sale | 2/12/21 | 13,997 | $153.99 | $2,155,398 |
| Sale | 2/12/21 | 1,315 | $154.53 | $203,207 |
| | **Subtotal:** | **40,000** | **Subtotal:** | **$6,045,488** |
| Sale | 3/12/21 | 9,192 | $109.95 | $1,010,660 |
| Sale | 3/12/21 | 16,948 | $110.80 | $1,877,838 |
| Sale | 3/12/21 | 7,520 | $111.67 | $839,758 |
| Sale | 3/12/21 | 4,685 | $112.84 | $528,655 |
| Sale | 3/12/21 | 1,655 | $114.48 | $189,464 |
| | **Subtotal:** | **40,000** | **Subtotal:** | **$4,446,377** |
| Sale | 4/12/21 | 5,088 | $115.84 | $589,394 |
| Sale | 4/12/21 | 8,626 | $116.80 | $1,007,517 |
| Sale | 4/12/21 | 7,589 | $118.03 | $895,730 |
| Sale | 4/12/21 | 18,697 | $118.87 | $2,222,512 |
| | **Subtotal:** | **40,000** | **Subtotal:** | **$4,715,153** |
| Sale | 5/20/21 | 40,000 | $100.02 | $4,000,800 |
| | **Subtotal:** | **40,000** | **Subtotal:** | **$4,000,800** |
| Sale | 6/21/21 | 3,701 | $104.86 | $388,087 |
| Sale | 6/21/21 | 5,339 | $105.82 | $564,973 |
| Sale | 6/21/21 | 7,129 | $106.80 | $761,377 |
| Sale | 6/21/21 | 18,704 | $107.96 | $2,019,284 |
| Sale | 6/21/21 | 5,127 | $108.85 | $558,074 |
| Sale | 6/24/21 | 95,618 | $124.05 | $11,861,413 |
| Sale | 6/28/21 | 154,382 | $124.26 | $19,183,507 |
| | **Subtotal:** | **290,000** | **Subtotal:** | **$35,336,715** |
| Sale | 7/12/21 | 7,655 | $115.17 | $881,626 |
| Sale | 7/12/21 | 2,448 | $116.29 | $284,678 |
| Sale | 7/12/21 | 9,399 | $117.30 | $1,102,503 |
| Sale | 7/12/21 | 7,345 | $118.28 | $868,767 |
| Sale | 7/12/21 | 2,517 | $119.52 | $300,832 |
| Sale | 7/12/21 | 10,636 | $120.29 | $1,279,404 |
| | **Subtotal:** | **40,000** | **Subtotal:** | **$4,717,810** |
| Sale | 8/12/21 | 16,388 | $112.56 | $1,844,633 |
| Sale | 8/12/21 | 19,412 | $113.38 | $2,200,933 |
| Sale | 8/12/21 | 4,200 | $114.09 | $479,178 |
| Sale | 9/13/21 | 3,100 | $110.68 | $343,108 |
| Sale | 9/13/21 | 15,914 | $111.70 | $1,777,594 |
| Sale | 9/13/21 | 8,676 | $112.74 | $978,132 |
| Sale | 9/13/21 | 11,510 | $113.72 | $1,308,917 |
| Sale | 9/13/21 | 800 | $114.39 | $91,512 |
| | **Subtotal:** | **40,000** | **Subtotal:** | **$4,499,263** |
| | **Total Shares:** | **60,657** | **Total Proceeds:** | **$6,994,523** |
| Conversion | 2/12/21 | 40,000 | $0.75 | $30,000 |
| Conversion | 3/12/21 | 40,000 | $0.75 | $30,000 |
| Conversion | 4/12/21 | 40,000 | $0.75 | $30,000 |

| | | | | |
|---|---|---|---|---|
| Conversion | 5/20/21 | 40,000 | $0.75 | $30,000 |
| Conversion | 6/21/21 | 40,000 | $0.75 | $30,000 |
| Conversion | 6/24/21 | 95,618 | $2.89 | $276,336 |
| Conversion | 6/28/21 | 154,382 | $2.89 | $446,164 |
| Conversion | 7/12/21 | 40,000 | $0.75 | $30,000 |
| Conversion | 8/12/21 | 40,000 | $0.75 | $30,000 |
| Conversion | 9/13/21 | 40,000 | $0.75 | $30,000 |
| | | **570,000** | **Total Conversion Costs:** | **$962,500** |
| | | | **CLASS PERIOD PROFIT:** | **$67,323,850** |