**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL CONSUMER TRENDS and CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM individually and on behalf of all others similarly situated, <br><br>       Plaintiff, <br><br>   -v- <br><br> PELOTON INTERACTIVE, INC., JOHN FOLEY, WILLIAM LYNCH, JILL WOODWORTH, THOMAS CORTESE, MARIANA GARAVAGLIA, and HISAO KUSHI, <br><br>       Defendants. | 21-CV-09582 (ALC) (OTW) <br><br> The Honorable Andrew L. Carter <br><br> The Honorable Ona T. Wang <br><br> <u>CLASS ACTION</u> <br><br> **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
<u>**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**</u>

TABLE OF CONTENTS

Page

Table of Authorities ....................................................................................................... i

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   FACTS ........................................................................................................... 3

III.  ARGUMENT ................................................................................................. 5

      A.    The SAC Alleges Actionable False Statements and Omissions............................ 5

            1.    Defendants Falsely Stated That Demand for Peloton's Products Had Not
                  Declined When COVID Restrictions Eased ...................................................... 5

            2.    Defendants Falsely Stated That Inventory Levels Were Healthy And Not
                  Excessive............................................................................................................ 8

            3.    Defendants' Risk Disclosures Regarding Excess Inventory Were Misleading
                  by Omission ..................................................................................................... 11

            4.    Defendants' Remaining Arguments Fail ......................................................... 12

      B.    The SAC Adequately Alleges Scienter ................................................................ 15

            1.    Defendants Had Actual Knowledge That Sales Were Declining, Quotas Were
                  Missed, and Inventory Was Building................................................................ 16

            2.    Defendants Ignore Accounts of CWs Who Confirm the Management
                  Defendants' Knowledge of Declining Demand and Excess Inventory .......... 18

            3.    The Management Defendants' Insider Trades................................................... 20

            4.    Foley's and Lynch's Stock Pledges Evidence Scienter ................................... 24

      C.    The SAC Alleges a Section 20A Claim ................................................................ 24

IV.   CONCLUSION............................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)......................................................................................25

*In re Am. Bus. Computers Corp. Sec. Litig.*,
MDL No. 913, 1994 WL 848690 (S.D.N.Y. 1994) ................................................................25

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................................................................................18

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)....................................................................................15

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................................20

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)....................................................................................14

*In re BioMarin Pharm. Inc. Sec. Litig.*,
No. 3:20-CV-06719-WHO, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022)................................22

*Bd. of Tr. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011) ...................................................................................20

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)....................................................................................11

*In re Chicago Bridge & Iron Company N.V. Sec. Litig.*,
No. 17 Civ 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018)................................12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)....................................................................................20

*City of Potomac Gen. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................................25

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)......................................................................................15

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)..............................................................................18, 21

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
  No. CV H-14-3428, 2017 WL 2608243 (S.D. Tex. June 15, 2017) ........................................25

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................................20

*In re Deutsche Bank AG Sec. Litig.*,
  No. 09-CV-1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016) ..................................5

*Emps.' Ret. Sys. of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ......................................................................................10, 13, 21

*In re Facebook, Inc., IPO Secs. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .....................................................................................14

*In re Finisar Corp. Sec. Litig.*,
  646 F. App'x 506 (9th Cir. 2016) ............................................................................................10

*Frankfurt-Tr Inv. Luxemborg Ag v. United Techs. Corp.*,
  336 F. Supp 3d. 196 (S.D.N.Y 2018) ........................................................................................7

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .....................................................................................23

*George v. China Auto. Sys., Inc.*,
  No. 11 CIV. 7533 KBF, 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ...................................22

*Glazer Cap. Mgmt., L,P, v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) .............................................................................................15, 16

*Gormley v. Magicjack Vocaltec Ltd.*,
  220 F. Supp. 3d 510 (S.D.N.Y. 2016) .....................................................................................14

*Gray v. Wesco Aircraft Holdings, Inc.*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021) .......................13

*Gruber v. Gilbertson*,
  No. 16CV9727, 2019 WL 4458956 (S.D.N.Y. Sept. 17, 2019) .............................................25

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) .....................................................................................24

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022) .....................................................................................15

*Kasilingam v. Tilray, Inc.*,
  No. 20-CV-03459 (PAC), 2022 WL 4537846 (S.D.N.Y. Sept. 28, 2022) .............................22

*Local No. 38 International Brotherhood of Electrical Workers v. American Express Co.*,
 724 F. Supp. 2d 447 (S.D.N.Y. 2010).......................................................19

*Long Miao v. Fanhua, Inc.*,
 442 F. Supp. 3d 774 (S.D.N.Y. 2020).......................................................18

*Meyer v. Concordia Int'l Corp.*,
 No. 16 CIV. 6467 (RMB), 2017 WL 4083603 (S.D.N.Y. July 28, 2017)...............................24

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................21

*Middlesex Ret. Sys. v. Quest Software Inc.*,
 527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................25

*Moshell v. Sasol Ltd.*,
 481 F. Supp. 3d 280 (S.D.N.Y. 2020).................................................16, 17

*In re Mylan N.V. Sec. Litig.*,
 No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)................................20

*N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*,
 929 F. Supp. 2d 740 (M.D. Tenn. 2013).....................................................24

*Nguyen v. New Link Genetics Corp.*,
 297 F. Supp. 3d 472 (S.D.N.Y. 2018)......................................................23

*In re Nielsen Holdings PLC Sec. Litig.*,
 510 F. Supp. 3d 217 (S.D.N.Y. 2021).......................................................14

*Noto v. 22nd Century Grp., Inc.*,
 No. 19-CV-1285 (JLS), 2023 WL 122305 (W.D.N.Y. Jan. 6, 2023)....................................17

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)...........................................................15, 16

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ............................................................21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015).....................................................................12

*In re Oxford Health Plans, Inc.*,
 187 F.R.D. 133 (S.D.N.Y 1999) .......................................................21, 25

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)...................................................14

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................................15

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)....................................5

*Plumbers & Pipefitters Nat'l. Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)...............................................................................17, 18

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
No. 17-CV-5753, 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ...............................................12

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)..................................................................................19

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
548 F. App'x 16 (2d Cir. 2013) ...........................................................................................13

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................................... *passim*

*Rosi v. Aclaris Therapeutics, Inc.*,
No. 19-CV-7118 (LJL), 2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021)....................................7

*S.E.C. v. McCaskey*,
No. 98 CIV 6153 (SWK) (AJP), 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002) ......................25

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)......................................................................................14, 20, 21

*In re Secure Computing Corp. Sec. Litig.*,
184 F. Supp. 2d 980 (N.D. Cal. 2001) ................................................................................21

*Simon v. Am. Power Conversion Corp.*,
945 F. Supp. 416 (D.R.I. 1996)..........................................................................................10

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)....................................................................................................5

*Sinnathurai v. Novavax, Inc.*,
No. CV TDC-21-2910, 2022 WL 17585715 (D. Md. Dec. 12, 2022)....................................22

*Sjunde AP-Fonden v. Gen. Electric Co.*,
417 F. Supp. 3d 379 (S.D.N.Y. 2019)..................................................................................17

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010)..................................................................................14

*Smilovits v. First Solar, Inc.*,
   No. CV12-0555-PHX-DGC, 2019 WL 7282026 (D. Ariz. Dec. 27, 2019) .............................23

*Speakes v. Taro Pharm. Indus., Ltd.*,
   No. 16-CV-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)...............................19

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A.,* Inc.,
   412 F. Supp. 3d 353 (S.D.N.Y. 2019) ..............................................................................13, 15

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................................25

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................................................15, 16

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
   2022 WL 596861 (S.D.N.Y. 2022).........................................................................................7

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)....................................................................................13

*Wang v. Cloopen Grp. Holding Ltd.*,
   No. 21-CV-10610 (JGK), 2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ...............................12

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020).....................................................................................21

*In re Wells Fargo & Co. Sec. Litig.*,
   No. 1:20-CV-04494 (GHW), 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) .........................13

*Weston v. DocuSign, Inc.*,
   No. 22-CV-00824-WHO, 2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ...................... *passim*

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir.. 2021) ............................................................................................19

*Woolgar v. Kingstone Cos., Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)....................................................................................18

**Statutes**

15 U.S.C. § 78u-4 ...........................................................................................................................25

15 U.S.C. § 78j...........................................................................................................................13, 14

**Other Authorities**

Fed. R. Civ. P. 9(b) ...........................................................................................................................5

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the SAC.[1]

## I.    PRELIMINARY STATEMENT

During the height of the COVID pandemic in 2020, Peloton experienced enormous growth in demand for its Connected Fitness products. However, starting in December 2020, demand began to decline rapidly. Peloton's equipment sales plummeted and inventory levels became so bloated that warehouses turned away shipments of equipment, and incurred massive storage costs – trends that worsened through 2021. Nevertheless, Defendants insisted that they were "absolutely not" seeing "a softening of demand," and explained that the "increase in inventory levels" was necessary "to meet the current increased demand." Further, Defendants told investors that there was a "risk" that Peloton could "experience excess inventory levels" – but when Defendants said this, the "risk" had already materialized. ¶¶154, 168, 214. Thus, Defendants' statements were false—and they knew it—because they had personally reviewed Peloton's internal databases, which contained data tracking demand for Peloton's products, equipment sales, and inventory levels and attended meetings at which this inventory crisis was discussed.

By November 2021, the inventory glut and evaporated demand could no longer be concealed; Defendants admitted that demand was not, in fact, what had been represented and accordingly reduced their guidance. One analyst noted that Peloton was "stuck with dying demand, bloated inventory, bloated cost structure." ¶222. By January 2022, Peloton fully disclosed that it had huge quantities of unsold inventory, without corresponding demand, despite having stated that its inventories had been built to accommodate continuing demand. Production was halted. These revelations caused Peloton's stock price to drop by over 59%, and wiped out over $12.5 billion in

---

[1] Abbreviations are those listed in the Glossary at p. vii in Defendants' Memorandum of Law.

shareholder value. Foley and his fellow top executives were fired, but only after having realized huge insider trading profits of $383 million. Barry McCarthy replaced Foley as CEO and admitted that, when he arrived at Peloton in March 2022, "**we were drowning in inventory**."

The SAC directly addresses the issues raised by this Court's March 30, 2023 Opinion and Order (ECF 88). First, the SAC no longer asserts claims based on ten statements that the Court dismissed. Second, regarding the remaining ten false statements, the SAC contains **new** facts gathered from **24 new** confidential witnesses supporting their falsity and Defendants' scienter. These 24 former Peloton employees worked across Peloton's sales and supply chain organizations and their testimony corroborates that, contrary to what Defendants were telling investors, demand for Peloton's primary product had plummeted and inventory had become unsustainably bloated. Third, the SAC includes new data regarding specific amounts of Bikes and Treads that Peloton imported into the United States, which also demonstrates that it had excessive inventory that it could not possibly sell. ¶¶148-52.

To avoid dealing with this new, overwhelming evidence, Defendants point to Peloton meeting its quarterly sales guidance during the CP. This is a red herring: Plaintiffs do not challenge Peloton's sales guidance; Plaintiffs challenge Defendants' public statements about demand and inventory—e.g., demand was so "robust" that Peloton had to "ramp[] up supply to meet the **current** increased demand" (¶168) and "our inventories are healthy" (¶ 205)—materially false and misleading statements that are not forward-looking, corporate optimism, or opinion statements. The SAC alleges further that Defendants had actual knowledge that Peloton's inventory levels had spiraled out of control as a result of the precipitous decline in demand for, and sales of, Peloton's equipment. Knowing that, Defendants reaped more than **$383 million** in profits from insider trading. Profits of this magnitude, stemming from manipulation of 10b5-1 trading plans, illustrate

2

motive and support a claim for insider trading. Taken together, the SAC's allegations of the Management Defendants' actual knowledge of facts that directly contradicted their public statements, along with more than $383 million in insider trading profits, create a strong inference of scienter.

## II.     FACTS

The SAC contains new factual allegations evidencing that, in early 2021, Defendants knew that demand for Peloton's bikes had begun to decline dramatically and that supply was so inflated that boxes of exercise equipment occupied warehouse yards, contrary to their public statements.

*First*, at least 11 additional CWs confirm that demand had cratered in early 2021. ¶132. These new CWs verify that Defendants regularly received reports generated by sophisticated sales software that tracked sales metrics and analytics in real time. ¶¶45, 60-61, 86, 117-22. These reports revealed that sales were declining throughout 2021. ¶¶33-35, 45-46, 60-62, 130-32. According to one CW, the former Senior Director of Operations and Supply Chain Program Management, Defendants were warned that inventory levels far outpaced demand. ¶¶27-32.

*Second*, new CWs confirm that sales personnel regularly missed their quotas, even when lowered, information that was tracked by and reported to Defendants. ¶¶87-88, 102, 130, 134-35. The new CWs state that quotas were missed because the demand for products wasn't there.

*Third*, Peloton's inventory levels rose rapidly as sales declined. ¶¶98-105. The CWs stated that the Management Defendants received software generated reports that tracked company-wide inventory and sales data in real time, which showed that "less inventory was moving." ¶¶36-38, 47-51, 52-55, 124-29, 132-33, 140-43. Shipments of bikes from Peloton's largest warehouses across the country had declined by almost 50% by April of 2021. ¶¶37-38, 81, 132. As a result, warehouses struggled to find space to store inventory, and Peloton left inventory sitting outside in warehouse yards and paid hefty demurrage fees to let containers of equipment sit at international

and domestic ports for months on end.[2] ¶¶31, 52-58, 108, 141.

*Fourth*, product import data shows that Defendants knew that Peloton's inventory levels did not correspond with current demand levels (and also exceeded any backlogged orders that resulted from the demand surge in 2020). ¶¶147-51. Specifically, Peloton imported 278,255 units of equipment during the Class Period ("CP"), the bulk of which was imported prior to July 2021, at which point shipments sharply dropped off. ¶¶149-51. After August 2021, Peloton had effectively ceased importing exercise equipment, reflecting that Defendants had stopped placing orders months prior. *Id*.

*Fifth*, according to internal company documents published by *Business Insider* in January 2022, Peloton had 500 days of Bike+ inventory by the end of 2021 – **ten times** its target of only 50 days. ¶¶145-46. Peloton's inventory had almost tripled from $500 million in January 2021 to over $1.3 billion in October 2021, representing over a year's worth of inventory. ¶¶32, 223.

On November 4, 2021, Peloton disclosed that **91%** of its current inventory was unsold and that it was slashing its earnings guidance by more than $1 billion. ¶¶7, 219-23. When announcing the guidance revision, to assuage investors, CEO Foley said: "**Our inventories are healthy** . . .". ¶205. That statement was a lie: Foley knew that Peloton had almost 18 months of inventory on hand and Peloton was planning to halt production of its Bike+ just one month later to try to reduce inventory levels. ¶8. That Foley's statement was untrue was revealed when, on January 20, 2022, Peloton announced that it would incur a net loss of $423-$481 million for Q2 of FY 2022 (¶232), and the stock dropped by 24% (¶235). On February 8, 2022, Peloton announced that Foley would resign as CEO and Lynch would resign as president. Barry McCarthy, who replaced Foley as CEO in March 2022, commented that, when he arrived, Peloton was "drowning in inventory" which

---

[2] According to CW26, 80% of Peloton's equipment was shipped from abroad. ¶98.

"posed an existential threat to the business."[3] ¶240.

## III.    ARGUMENT

### A.    THE SAC ALLEGES ACTIONABLE FALSE STATEMENTS AND OMISSIONS

To comply with Fed. R. Civ. P. 9(b), a plaintiff need only: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Deutsche Bank AG Sec. Litig.*, No. 09-CV-1714 (DAB), 2016 WL 4083429, at *20 (S.D.N.Y. July 25, 2016). Whether a statement is actionable should be "evaluated not only by the 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

### 1.    Defendants Falsely Stated That Demand for Peloton's Products Had Not Declined When COVID Restrictions Eased

During the CP, Defendants falsely touted continued high product demand after COVID restrictions had been relaxed:

| | |
|---|---|
| **Statement 1[4]** | On February 4, 2021, answering an analyst question about "change in demand," Foley stated, "**We are not seeing a softening in demand.  That is absolutely not what's happening here. . . [W]e're seeing robust demand**." ¶154. |
| **Statement 2** | During the same call, Woodworth told investors: "Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products**." ¶155. |
| **Statement 9** | Peloton reported that an increase in net operating assets and liabilities was "partially  offset  by  a  **$363.7 million increase in inventory levels as we** |

[3] Defendants try to downplay McCarthy's statements because they were made after the CP. But Defendants ignore that McCarthy described the mess that existed at Peloton at the time he took over as CEO and that the inventory mess didn't happen overnight. Further, Defendants also argue that Foley's November 4 statements that inventories were healthy were not false because Defendants believed that Peloton's massive inventory was necessitated by current demand. However, the fact that Peloton completely halted bike production to reduce inventory levels just **one month** later, creates a strong inference that Foley's statements were false. *See Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (falsity sufficiently alleged where company's false representations were corrected months after issuance).

[4] The statement numbers correspond to those labeled by the Court in its March 30, 2023 Opinion and Order (ECF 88).

| | |
|---|---|
| | ramped up supply to meet the current increased demand." ¶168. |
| **Statement 11** | In an August 26, 2021 earnings call, Woodworth told investors: "We are entering fiscal 2022 with **a normalized backlog for our Bike portfolio** and guidance reflects our **expectation of continued strong demand**." ¶185. |
| **Statement 13** | During the same call, an analyst noted: "we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet." Lynch responded, "we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.  We're very excited both in terms of the Bike growth…which we expect to be very large over time." ¶186. |
| **Statement 14** | Foley stated on August 26, 2021 that a $400 price drop was "absolutely offensive" and designed to "democratiz[e] the access to great fitness" thus denying that demand for the product had declined. ¶187. |

These were not vague statements, nor were they forward-looking. Rather, they were Management's representations about then-current facts, i.e., the **current** state of demand for Peloton's products at the time each statement was made. ¶¶159, 171, 180, 190, 208, 322-24. The statements that the demand for Peloton products remained high in 2021 were designed to assure a market skeptical that the COVID-level demand for Bikes and Treads had continued. ¶¶159, 171, 180, 190, 208, 322-24. And the statements were false: The SAC's new CW accounts confirm that demand for Peloton's products started to plummet as early as December 2020:

- CW20 reported that monthly sales reports, which showed a drastic slowdown in sales beginning in early 2021, came from senior management, as further confirmed by CWs 18, 21, 22, 28, and 30. ¶¶ 83, 86-88, 101-02, 105.

- CW10 and CW22 stated that Peloton's "Looker" database (which was updated daily incorporating data from Salesforce), showed that sales quotas were not being met. ¶¶60-61, 130. Quotas were then lowered, but most of the sales staff was still unable to achieve them. ¶¶60, 130, 135.

- After record equipment shipments between September 2020 and June 2021, shipments largely ceased at the end June 2021. In November 2021, Peloton shipped 81% less inventory than it had in August 2021. ¶¶149-51.

- According to CWs 14, 15, and 25, the decline in demand led to fewer deliveries, Peloton laid off a significant number of warehouse employees, and instituted a hiring freeze across the whole company. ¶¶78, 95-97, 136.

6

These facts, known to Defendants, show that once COVID restrictions eased, demand for Peloton's bikes declined substantially, resulting in an overwhelming build-up of inventory. *See also* ¶¶ 30, 34-35, 50, 37, 43-46, 131-36, 145.

Defendants' principal defense to Plaintiffs' allegations of falsity—that Peloton was meeting or exceeding its sales guidance each quarter during the CP—misconstrues the SAC's allegations. MTD at 8-9. Plaintiffs do not allege that Peloton's guidance forecasts were false, but rather that Defendants' statements (i) regarding demand for Peloton's products, and (ii) their assurances that rising inventory levels were healthy and a result of sustained post-COVID demand were false. ¶¶1, 158, 170, 179, 189, 197, 207. Meeting prior-provided sales guidance is a red herring because Peloton's reported quarterly revenues came from sales made during the height of COVID in 2020 that filled demand for that time period, and thus did not reflect current demand.

Defendants also argue that reduced sales quotas and reduced number of deliveries are not evidence that their statements regarding demand were false because (i) the CW statements are "anecdotal," and (ii) do not reflect Peloton's performance as a whole. MTD at 9-10.[5] Defendants are wrong. The SAC contains mutually corroborating accounts from numerous former Inside and Outside sales employees, many of whom had personal knowledge of and access to Salesforce

---

[5] In *Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 1177505, at *11 (S.D.N.Y. Mar. 29, 2021), cited by Defendants, the plaintiff provided purely anecdotal accounts from only three out of 50 sales representatives. 2021 WL 1177505, at *12. Similarly, in *Frankfurt-Tr Inv. Luxemborg Ag v. United Techs. Corp.*, 336 F. Supp 3d. 196, 223 (S.D.N.Y 2018), the CWs had little insight into the company as a whole. 336 F. Supp. 3d at 23. In contrast, the SAC includes accounts from **11** former sales representatives who worked in both of Peloton's primary sales channels (¶¶33, 41, 43, 59, 82-83) and **16** former supply chain employees (¶¶25, 36, 39-40, 47, 52, 56, 65, 71). These CWs confirmed that Defendants had access to and utilized internal data about sales performance and inventory across the entire company. ¶¶124-29. *See In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *8 (S.D.N.Y. 2022) (crediting allegations about company's sales cycle from "confidential witnesses [who] worked in Tufin's sales divisions" despite no allegations suggesting that their observations were "specific to [their] respective regional areas" or "isolated to a certain time period").

reports which reflected sales performance across the Company in real-time.[6] ¶¶34-35, 44-45, 62-63, 121. The SAC also includes the accounts of 16 former employees who worked at Peloton's distribution facilities and in supply chain management. These witnesses stated that Defendants had access to and tracked data reflecting the number of deliveries across the country using NetSuite, Manhattan Scale, and Tableau. ¶¶124-26. The CWs cited in the SAC also speak to their personal knowledge of the data and trends in demand conveyed in the Looker Reports, and monthly delivery summaries. ¶¶34, 37-38, 40, 113-14, 121, 124. The sheer number of CWs reporting the same facts and events supports the credibility of the CW accounts. And the standard for alleging a false statement is not so high that Plaintiffs must allege every conceivable fact demonstrating falsity; rather, Plaintiffs need only allege sufficient facts to draw an inference as to falsity. *See Weston v. DocuSign, Inc.*, No. 22-CV-00824-WHO, 2023 WL 3000583, at *21 (N.D. Cal. Apr. 18, 2023) (statements regarding post-COVID demand actionable where "multiple confidential witnesses ... who spoke to executives' ability to access Salesforce" showed that membership renewals had decreased).

### 2.    Defendants Falsely Stated That Inventory Levels Were Healthy And Not Excessive

In addition to misrepresenting demand, Defendants also misled investors about Peloton's inventory. Specifically, Defendants made the following materially false and misleading statements:

| **Statement 9** | Peloton reported in its 10-Q for the third quarter ("3Q") of FY 2021, filed on May 7, 2021 that an increase in net operating assets and liabilities was "partially offset by a ***$363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand***." ¶168. |
| --- | --- |

---

[6] Defendants argue that the SAC does not allege that the new CW accounts show that Defendants' statements were false. MTD at 10 n.3. This is incorrect. *See, e.g.,* ¶¶158, 170, 179, 207 (citing the accounts of former sales representatives as evidence of the falsity of Defendants' statements).

| Statement 11 | In an August 26, 2021 earnings call, Woodworth told investors: "We are entering fiscal 2022 with **a normalized backlog for our Bike portfolio** and guidance reflects our expectation of continued strong demand." ¶185. |
|---|---|
| Statement 13 | During the August 26, 2021 call, an analyst noted: "we can see the **inventory numbers up pretty dramatically quarter to quarter on the balance sheet**." Lynch responded, "we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that **we're staging for what will be our biggest holiday ever**. We're very excited both in terms of the Bike growth . . . which we expect to be very large over time." ¶186. |
| Statement 14 | Foley stated on August 26, 2021 that a $400 price drop was "absolutely offensive" and designed to "democratiz[e] the access to great fitness" thus denying that demand for the product had declined. ¶187. |
| November 4, 2021 Statement | Foley stated: "Looking ahead, we're about to enter our busiest time of the year. **Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period**." ¶205. |
| Peloton's Quarterly SEC Filings | In Peloton's quarterly SEC filings in 2021, Defendants misleadingly disclosed as a "risk" that "**If** we fail to accurately forecast consumer demand, we **may** experience excess inventory levels or a shortage of products available for sale . . . ." ¶214. |

The above statements directly contradicted facts that Defendants knew, including that inventories were unhealthy due to declining demand. Indeed, Peloton's internal reporting and databases, which Defendants acknowledged in internal emails and at meetings that they reviewed in real-time, contained detailed information about demand for Peloton's products, equipment sales, and inventory levels. ¶¶30, 40, 68, 124-28. This data demonstrated that as demand for Peloton's products declined, equipment sales plummeted resulting in a significant buildup of excess inventory in Peloton's warehouses across the country. The SAC includes new facts from import data which shows that shipments of Peloton equipment into the United States ceased shortly after August 2021. ¶¶149-51. Further:

- CW13 noticed excessive inventory at the Houston warehouse around Christmastime in 2020. CW13 stated that the Houston warehouse was getting eight to ten trucks a day (each truck contained a couple hundred bikes), and that there was not enough inventory going out to account for what was coming in. ¶71.

- CW11 stated that, as early as April or May of 2021, the Perris, CA Warehouse (one of Peloton's largest distribution facilities) was overwhelmed with inbound inventory—so much so that the facility began storing containers of equipment in

9

the yard (¶¶65-67) and Peloton opened an additional site in San Bernardino just to store excess product. ¶66.

- CW8, who managed operations in Peloton's largest warehouse on the east coast, also described a significant mismatch between inventory and demand, and stated that beginning in June of 2021, finding places for excess inventory became their sole focus. ¶¶139, 52-55. By August 2021, Peloton had three months of excess inventory at shipping ports. ¶189.

Defendants argue that Peloton truthfully disclosed its inventory issues to investors when it stated it would invest in its manufacturing capacity to decrease OTD times. MTD at 12-13. Not so: by falsely attributing increased inventories to **increased** demand and the effort to reduce OTD times, Defendants misled investors about the true reason for the ballooning inventory: declining demand. Also, many of Defendants' false statements regarding inventory (Statements 9, 11, 13, and 14; ¶¶205; 214) were made **after** Foley told investors, during Peloton's 3Q2021 earnings call on May 6, 2021, that Peloton's OTD already had been significantly reduced. MTD, Ex. 8 at 9.[7]

When the full truth about Peloton's inventory levels was disclosed on January 20, 2022, the market understood for the first time what the increasing inventories meant for Peloton's business.  Comparable facts have supported a finding of falsity of statements regarding demand. *See, e.g.*, *Emps.' Ret. Sys. of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (excess inventory due to declining demand demonstrated falsity of statements regarding growing demand); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (statements denying knowledge of building inventory in excess of demand actionable where defendants previously had learned of inventory build-up); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 429 (D.R.I. 1996) (statements that high demand caused increased inventories actionable where the "true cause for rising inventory levels was a production slowdown needed to remedy a defective component.").

---

[7] In addition, CW10 stated that delivery times had declined dramatically between April and August of 2021, from 8-10 weeks to just 1-2 days. ¶64.

### 3.    Defendants' Risk Disclosures Regarding Excess Inventory Were Misleading by Omission

In Peloton's SEC filings made on May 6, 2021; August 26, 2021 and November 4, 2021 (¶214), Defendants stated: "**If** we fail to accurately forecast consumer demand, we **may experience** excess inventory levels or a shortage of products available for sale." This risk disclosure was materially false and misleading because the purported "risk" already had materialized. Indeed, Peloton's inventory problems had begun as early as December 2020. ¶¶149-51. By May 6, and certainly by August 26, Peloton "had experienced" excessive inventory (e.g., overflowing warehouses and enormous storage fees for Bikes and Treads stuck in containers in ports). *See* ¶¶137-143. By November 4, 2021, Peloton's excess inventory had spiraled so far out of control that it was forced to stop its imports, such that in November 2021, Peloton shipped **81%** less inventory that month than it had in August of 2021. *Id.* As McCarthy said, Peloton was "drowning in inventory."

Defendants assert that inventory was not "excessive" because Peloton had purposefully increased inventory to reduce OTD times. MTD at 17. But the issue of whether inventory was excessive cannot be resolved at the pleadings stage. *See, e.g.*, *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) ("delicate, fact-intensive assessments . . . are more properly left to the jury"). And the facts alleged in the SAC contradict Defendants' explanation: as noted above, by the time Peloton filed its 10-Q on May 7, 2021, OTD times already had normalized. Plaintiffs have also alleged facts showing that Defendants knew, for months, that Peloton's inventory levels far exceeded demand. ¶¶32, 138-43. Indeed, Defendants' assertion is contradicted by statements from Peloton's own CEO who later explained that this excess "inventory has consumed an enormous amount of cash," which was a "primary driver of [Peloton's] underperformance." ¶241.

11

By warning that Peloton **may** experience excess inventory levels, Peloton led investors to believe that Peloton was not **already** experiencing excess inventory levels due to declining demand. This Court has found that it is misleading for a company to fail to disclose that a known risk has already materialized. *See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17-CV-5753, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (defendants' disclosure that revenue may decline was misleading because the risks had come to fruition at the time the 10-K was issued). *See also Wang v. Cloopen Grp. Holding Ltd.*, No. 21-CV-10610 (JGK), 2023 WL 2534599, at *10 (S.D.N.Y. Mar. 16, 2023) (liability for risk disclosure adequately pled where disclosure omitted that the risk had transpired).

### 4.    Defendants' Remaining Arguments Fail

Defendants also assert that the alleged false statements are non-actionable statements of opinion, forward-looking statements, and/or puffery. MTD at 13-16. These arguments fail.

***The Statements Are Actionable Under Omnicare***: The challenged statements are not opinions because the statements about Peloton's inventory and demand were verifiable facts existing at the time Defendants made the statements. *See In re Chicago Bridge & Iron Company N.V. Sec. Litig.*, No. 17 Civ 1580 (LGS), 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018) (explaining difference between fact and opinion). Thus, statements such as: "We are not seeing any softening in demand" (Statement 1); "current increased demand" (Statement 9); and "continued strong demand" (Statement 11) are not opinions, but clear, unequivocal representations of existing fact. Moreover, even if any of Defendants' statements were construed as opinions, they remain actionable under *Omnicare*, which holds that opinion statements are actionable where, as here, the speaker either: (i) "did not hold the belief [] professed;" or (ii) omitted information that made the statement misleading. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Contrary to Defendants' assertions (MTD at 16), qualifiers such

as "we think" and "we believe" do not "operate as a magic shield against liability," particularly since the challenged opinion did not "fairly align[] with the information in the issuer's possession at the time." *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-CV-04494 (GHW), 2021 WL 4482102, at *13-14 (S.D.N.Y. Sept. 30, 2021) (statements actionable where omitted facts conflicted with statements); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) (opinion statements actionable where they "contradict facts that are known to a defendant"); *Blanford*, 794 F.3d at 306 (same).

Here, the SAC alleges that Defendants knew facts demonstrating that demand had declined substantially by February 2021 and that inventory had swelled so much so by the summer of 2021 that imports of Peloton product had starkly declined, which contradicted any "opinion" that demand remained strong or that "inventories were healthy" and necessary to meet a "current increase in demand". *See* III.A.2. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (finding actionable false statements regarding company's sales pipeline where CWs stated that defendants "had access to and used reports documenting in real time the decline in sales").

***The Statements Are Not Protected by the PSLRA Safe Harbor***: This case is not about statements of **future** demand or **future** supply; it is about whether Defendants misled the market about the declining current demand for Peloton's products in 2021 and the cause of its ballooning inventory levels.[8] Defendants' misstatements are not forward looking; they were statements of then-existing facts. *See supra* III.A. But even if they do contain a forward-looking component,

---

[8] The cases Defendants cite are inapposite. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021) (statement regarding the speculative value of a future merger to be forward looking); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A.,* Inc., 412 F. Supp. 3d 353, 362 (S.D.N.Y. 2019) (generalized statement that growth would continue into the next year was forward looking); *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc*., 548 F. App'x 16, 18 (2d Cir. 2013) (financial projection statements were "plainly forward looking").

13

none are protected by the PSLRA's safe harbor for two reasons discussed below. *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) ("[W]hen an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply.")

*First*, Defendants incorrectly contend that their statements were accompanied by "meaningful cautionary language." However, the language they cite did not specifically address "the allegedly undisclosed risk," as required. *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 515 (S.D.N.Y. 2016) (internal citation omitted). Further, hypothetical warnings of future adverse events are meaningless when the events warned of have **already materialized**. Purported warnings about the generic effect COVID might have on Peloton's future do not negate statements of present fact known to be false due to an already-materialized decline in demand and excess inventory levels. Defendants' purported cautionary language does not "insulate from liability the failure to disclose that the risk ha[d] transpired." *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *see also Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020) (warnings are insufficient if "framed as mere hypotheticals" which "imply that the risk" is "theoretical," when it "has already materialized").

*Second*, Defendants had actual knowledge that their statements were false. *See* III.B.1. *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 374-75 (S.D.N.Y. 2018); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 71 (2d Cir. 2001) (holding that defendants were regularly updated about declining sales and thus knew their statements regarding growing sales were false). The gap between what Defendants said and what they observed alone removes the statements from safe harbor protection. *See In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y. 2021) (finding that assurances of a regulation's minor impact on the company suggested that the

14

defendants knew or had access to information that contradicted their statements).

***The Statements Are Not Puffery***: Defendants' argument that their false statements are nonactionable statements of mere "corporate optimism" is wrong. MTD at 16-17. Defendants made their statements to alleviate investor concerns about Peloton's rising inventory levels. "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 392 (S.D.N.Y. 2022) (reasonable investor could rely on statements made repeatedly to reassure investors about the Company's integrity); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements about inventory were not puffery); *Glazer Cap. Mgmt., L,P, v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023)(defendants' statements that sales were healthy went beyond mere optimism by "provid[ing] a concrete description of the past and present sales pipeline."); *Quality Sys.*, 865 F.3d at 1143 (defendants' statements regarding sales pipeline were not puffery because they addressed "specific aspects of company's operation that defendants knew to be performing poorly.").[9]

### B.    THE SAC ADEQUATELY ALLEGES SCIENTER

The SAC's allegations create a strong inference of scienter. *See Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences;'" instead, the inquiry is: "When the allegations are accepted as true and taken collectively, would a

---

[9] Defendants' reliance on *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 524 (S.D.N.Y. 2020) is misplaced because there, the statements held to be puffery were not responsive to specific analyst concerns. *See also Skechers*, 412 F. Supp. 3d at 365 (same). Defendants' reference to *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022) also fails because there, the challenged statements "conveyed no meaningful information to a reasonable investor."

reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id*. at 326; *Salix Pharms.*, 2016 WL 1629341, at \*13 (a tie "goes to the plaintiff"). A strong inference may be established through factual allegations showing either (a) "strong circumstantial evidence of conscious misbehavior or recklessness" or (b) "motive and opportunity to commit fraud." *Novak*, 216 F.3d at 307. Both are present here.

### 1.    Defendants Had Actual Knowledge That Sales Were Declining, Quotas Were Missed, and Inventory Was Building

As detailed above, Defendants knew, through internal reporting software that displayed sales metrics and inventory movement in real-time, that sales targets were missed repeatedly; that actual sales had declined and were continuing to decline; and that inventory levels were ballooning. These facts create a strong inference that Defendants knew their statements about demand for Peloton's products and explanations for increasing inventory were false. *See Quality Sys.*, 865 F.3d at 1145 (CW statements that management had access to sales forecasts generated through Salesforce supported an inference of scienter); *Docusign*, 2023 WL 3000583, at \*21 (CW statements that Defendants had access to and utilized salesforce data to track demand supported an inference of scienter); *Forescout*, 63 F.4th at 768 (allegations that management had access to the status of deals through internal reports supported inference of scienter).

The specific facts supporting these allegations come from **31** former Peloton employees, whose accounts confirm downward trends in demand, overflowing inventory in warehouses and at ports, and management's regular access to and knowledge of this information. The CW's statements "describe with sufficient particularity" facts "to support the probability that a person in the position occupied by the source[s] would possess the information alleged." *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020) (citation omitted) (CW accounts supported a strong inference of scienter where each CW, by virtue of her job position, was provided with "direct,

contemporaneous information" about the fraudulent activity). Confidential witness testimony must be "taken collectively" with other alleged evidence of scienter. *Id.* at 290.

Defendants' counter-arguments fail. MTD at 20-21. They claim that information provided by CW1—who attended monthly meetings with Woodworth and Lynch "to discuss capacity and demand" (¶27) as well as "the buildup of excess inventory" (¶137)—was too "vague." Not so. CW1 explained that beginning in February 2021, Woodworth and Lynch: (i) were informed that demand was expected to decline and did in fact decline in March of 2021 (¶27); (ii) attended monthly supply chain meetings where internal presentations showed that demand continued to decline between February and November of 2021 (¶¶27-29); and (iii) were copied on emails after each supply chain meeting which contained action items (¶29). CW1 told Lynch directly that they were concerned about the growing inventory levels and that current levels of demand did not warrant increased production. ¶¶30-31. Similar allegations have been found to support an inference of scienter. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1145 (CW's personal knowledge of defendants' real-time access to Salesforce reports forecasting quarterly sales supported an inference of scienter); *Docusign*, 2023 WL 3000583, at *17 (same); *Sjunde AP-Fonden v. Gen. Electric Co.*, 417 F. Supp. 3d 379, 408-09 (S.D.N.Y. 2019) (CW statements that facts underlying the fraud were recorded in regular reports for the company's leadership supported an inference of scienter).[10] Defendants' contention that CW1's account does not indicate that Defendants accepted the view that demand was declining is unsupported by the facts.[11] Defendants were presented with company

---

[10] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) (CW statements that defendants knew of the company's practice of discounting bulk sales as a means of artificially inflating revenue raised inference of scienter).

[11] Defendants' beliefs regarding the data are not appropriate to litigate at the motion to dismiss stage. *See Noto v. 22nd Century Grp., Inc.*, No. 19-CV-1285 (JLS), 2023 WL 122305, at *11 (W.D.N.Y. Jan. 6, 2023) ("The Court cannot weigh" the defendants' belief "against Plaintiffs' allegations of fraudulent intent at the motion to dismiss stage.").

17

data that contradicted their public statements. *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 269 (S.D.N.Y. 2010) (plaintiff raised inference of scienter by identifying reports through which defendants were made aware of facts that allegedly contradicted his public statements).

Defendants argue that statements of additional CWs should be discredited because they did not have direct contact with Defendants. MTD at 22. But that is not the standard. The facts alleged "'support the probability that a person in the position occupied by the source would possess the information alleged.'" *Orthofix*, 89 F. Supp. 3d at 615-16. (internal quotation omitted); *see also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (crediting CW statements based on indirect knowledge).[12]

### 2. Defendants Ignore Accounts of CWs Who Confirm the Management Defendants' Knowledge of Declining Demand and Excess Inventory

Plaintiffs' allegations regarding Defendants' knowledge of the falsity of their statements do not rest on the account of CW1 alone. The accounts of new CWs confirm Defendants' knowledge of and access to data regarding declining demand and excess inventory:

- CWs 8 and 9 said that Defendants would have been made aware by August 2021 that Peloton was paying $275 per day for shipping containers to sit at ports of entry, because warehouses were at capacity. ¶¶55, 58.

- CW10 stated that Foley and Lynch were on an email distribution list for the Looker Reports which showed real-time sales results daily. ¶¶62, 121. CW10 further explained that Foley sent internal emails when sales milestones were attained, and would discuss sales figures during company-wide meetings. ¶¶61, 133.

- CW11 confirmed that Peloton's corporate offices had access to the software that Peloton used to track inventory movement. ¶¶124-25.

Defendants also claim that the facts the CWs recount are too vague because they do not

---

[12] *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020) and *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 779 (S.D.N.Y. 2020) are distinguishable, because here, the CWs—managers in Peloton's sales organization who reported to the Global Chief Sales Officer––possessed information probative of Defendants' mental state with regards to their view of demand.

include actual figures from sales and inventory reports[13] MTD at 20-21. Yet, in addition to the specific figures noted above, these CWs stated that Defendants knew that actual sales were well below sales forecasts. ¶¶131-32. According to CWs 1, 3, 7, 11, and 12, by August 2021, Peloton had three months of excess inventory on hand (¶189); had incurred substantial demurrage fees (¶¶55, 58); and had opened additional warehouse facilities to store excess inventory (¶66.). CW10 stated further that Foley and Lynch attended weekly meetings with Peloton's Chief Sales Officer wherein the decline of sales, sales forecasts, and sales quotas were discussed. ¶¶60-64.[14] No more specificity is required at the pleading stage.

Plaintiffs' allegations regarding demand and inventory also concern the "core operations" of Peloton, which Defendants argue, taken alone, do not establish scienter. MTD at 22. But these allegations must be considered holistically with other evidence of scienter. *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017) ("[T]he doctrine can provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently."). Further, it is inconceivable that Defendants, co-founders and high-level executives, were not aware of demand levels for Peloton's fitness equipment which accounted for 72% of the Company's annual

---

[13] Defendants citation to *Local No. 38 International Brotherhood of Electrical Workers v. American Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) is misplaced. There, the plaintiffs' allegations relied on **only one** CW who had contact with defendants but did not provide specific information suggesting that data had been presented to management at the time of the allegedly misleading statements. *Id.* at 461. Such is not the case here. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) is also inapposite because there, the "views" that defendant had not been alleged to accept were opinions about the company's ability to reach certain goals, not, as here, incontrovertible facts about the Company's declining demand.

[14] This Court has previously credited CW statements attesting to defendants' attendance at meetings involving the subject of their false statements (i.e., regular meetings regarding sales, manufacturing capacity, and inventory) and held that such statements support scienter. *See Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at *8 (S.D.N.Y. Sept. 24, 2018) (CW statements that defendants regularly attended meetings to discuss drug pricing decisions supported an inference of scienter).

revenue. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (scienter was well-pled in the absence of facts alleging *actual* knowledge of the fraud, because a high-level officer has a "duty to familiarize himself with the facts relevant to the core operations of the company…"); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (outsized importance of the EpiPen to Mylan's bottom line bolstered inference of scienter). Further, the SAC cites internal company documents published in *Business Insider* and U.S. import data, which both corroborate the CWs' statements that management knew that Peloton's inventory levels were excessive due to declining demand. ¶¶144-52. That the CWs' accounts are corroborated by internal documents and public data further strengthens the inference of scienter. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (internal company documents corroborated by former employees' accounts established a strong inference of scienter.).

### 3.    The Management Defendants' Insider Trades

The Management Defendants realized tremendous profits on sales of their Peloton stock during the CP: $80.1 million (Foley); $16.8 million (Woodworth); and $103.5 million (Lynch). ¶244. "[I]nsider trading represents a classic example of a 'concrete and personal' benefit that suffices to plead motive to commit securities fraud." *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) (citation omitted). For stock sales to evidence scienter, they must be unusual in timing or amount, so as to "suggest[] that the seller is maximizing personal benefit from inside information." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020).

When determining whether insider trading activity is unusual, courts consider: (i) the amount of profit realized from the sales; (ii) the percentage of stockholdings sold; and (iii) the number of insiders selling. *Scholastic*, 252 F.3d at 74-75. Here, the Management Defendants

realized profits of approximately **$200 million** from their CP stock sales. ¶¶296-97, 299.[15] Insiders' trades have been found to be suspicious where the profits were far less.[16] Foley sold over 700,000 shares of Peloton common stock (SAC App. B); Lynch 786,668 shares (SAC App. D); and Woodworth 150,000 shares (SAC App. C), accounting for 77.84%, 99.62%, and 37.81% of their respective Class A stockholdings. ¶294. These percentages support an inference of scienter.[17,18] That six of the Company's top insiders were selling Peloton stock at a sizeable profit during the CP is further indicative of scienter.

The timing of sales was suspicious, in many cases following spikes in Peloton's stock price after false statements were disseminated. *See In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001) (insider sales suspicious where they occurred shortly after false statement); *World Wrestling*, 477 F. Supp. 3d at 137 (insider sales that occur "at the time of the alleged withholding" of negative news may permit an inference of bad faith and scienter.") (internal quotation marks and citation omitted). Just four days after the Company's February 4, 2021 earnings call, Lynch sold **500,000 shares** (¶268) for proceeds of $72.48 million and Kushi sold **160,000 shares** for proceeds of $23.2 million (*see* SAC App. E). On February 16, 2021, while

---

[15] Outsized profits are probative of scienter. ¶287. *Scholastic*, 252 F.3d at 74 (unusually high profits support scienter). Profits were calculated by subtracting the cost of converting options from proceeds of the sales. *See generally* SAC, App. B-G.

[16] *See, e.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y 1999) ($78 million in combined profit was "massive by any measure"); *Blanford*, 794 F.3d at 302-03 ($49 million in combined profit supported scienter).

[17] *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sale of 2.1% and 7% of stockholdings supported scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 654 (E.D. Va. 2000) (sale of 2.2% of stockholdings supported scienter).

[18] In the FAC, Plaintiffs included unvested options held by insiders when calculating percentage of holdings sold. Conversely, in the SAC, Plaintiffs only included fully vested options, i.e., those that the insider **could have sold**. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 257 (S.D.N.Y. 2020) ("While the Second Circuit has yet to opine directly on this issue, most courts have expressed an inclination to include exercisable stock options."). This is why Garavaglia's 202,089 Class B stock options were omitted from her percentage of holdings sold.

Peloton's stock was trading at $155.50, up about 4.7% from the February 4 earnings call, Foley sold 100,000 shares; Lynch 116,670 shares; and Woodworth 150,000 shares. ¶¶296-98.

Defendants point to their 10b5-1 trading plans for protection. MTD at 18-19. But a trading plan provides no defense under the circumstances presented here. ¶¶246-58. "[W]here a 10b5-1 trading plan is entered into—or strategically amended—to take advantage of an inflated stock price or insider information" the trading plan is not a "cognizable defense to scienter allegations on a motion to dismiss." *George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533 KBF, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012); *Kasilingam v. Tilray, Inc.*, No. 20-CV-03459 (PAC), 2022 WL 4537846, at *9 (S.D.N.Y. Sept. 28, 2022) ("[T]he mere presence of a 10b5-1 plan is not a complete defense to scienter."). Further, simply because an insider trades pursuant to a trading plan does not render those stock sales "non-discretionary" as Defendants assert. *See* MTD at 18 n.6. *See DocuSign*, 2023 WL 300583, at *22 (stock sales transacted under 10b5-1 plans allowed defendants to "conceal[] the negative information before the sale" and "set[] the sales for certain dates" which "were discretionary choices" sufficient to support an inference of scienter at the pleading stage) (internal quotation marks omitted).[19]

Here, Foley established his trading plan in September 2020 (¶285), when Peloton's stock was still trading high on investor expectations that demand would continue unabated. The plan was established to last for two years, but Foley terminated it on August 30, 2021, more than a year

---

[19] Even if this Court found Defendants' stock sales to be "non-discretionary," such does not preclude a finding of scienter. *See, e.g.*, *In re BioMarin Pharm. Inc. Sec. Litig.*, No. 3:20-CV-06719-WHO, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022) (noting that "concealing the negative information before the sale and setting the sale …*were* discretionary choices, so it is sufficient at the pleadings stage to contribute to the plausibility of the scienter allegations"); *Sinnathurai v. Novavax, Inc.*, No. CV TDC-21-2910, 2022 WL 17585715, at *23 (D. Md. Dec. 12, 2022) ("the alleged nondiscretionary trading plans" do not "negate the inference of scienter" because at the pleading stage, there was no evidence of the "specific terms of the plans").

ahead of schedule (¶281), when he knew of the rising inventory levels and declining demand. Thus, his trading plan is no defense to insider trading. A "valid plan" must "prevent the insider from exerting any subsequent influence over how, when, or whether to effect purchases or sales." *Smilovits v. First Solar, Inc.*, No. CV12-0555-PHX-DGC, 2019 WL 7282026, at *3 (D. Ariz. Dec. 27, 2019). Defendants argue that Foley's premature cancellation of his trading plan "suggests he honestly believed that [Peloton] was going to continue to grow." MTD at 19. This is backward: had Foley genuinely held this belief, he would have wanted to **continue** to sell 100,000 shares of stock as his trading plan required to take advantage of the Company's climbing stock price.[20] But by terminating his plan 14 months early, Foley avoided selling his Peloton stock at significantly lower prices – creating a plausible inference that he knew his public statements did not reflect Peloton's true internal state of affairs.[21] *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018) (scienter pled as to defendant who avoided a 25% stock price drop by abruptly halting trading under his 10b5-1 plan immediately before company released negative results). Similarly, Woodworth abruptly ceased trading pursuant to her trading plan in September 2021, after selling 150,000 shares during the CP. (¶164) and Lynch also abruptly ceased trading under his 10b5-1 plan in September 2021. ¶298. It is no coincidence that the three most senior Peloton officers each terminated their trading plans in the early fall of 2021, at the very time demand for Peloton's products had evaporated and inventory had become insurmountably high.

---

[20] The competing inference offered by Defendants—that Foley was preserving his shares—ignores that Foley continued to receive thousands, if not millions, of options as part of his compensation package. According to Peloton's FY 2021 Proxy Statement, Foley received 16,800,028 option awards as part of his annual salary package for 2021. This negates any inference that Foley ended his trading plan because he believed "that [Peloton] was going to continue to grow."

[21] Defendants continue to insist that paying taxes upon the sale of RSUs negates an inference of scienter. MTD at 18-19 n.5. But courts have held otherwise. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (stock sales "to cover the exercise price and taxes for options," acquired at no cost, "do[] not demonstrate lack of scienter").

#### 4.    Foley's and Lynch's Stock Pledges Evidence Scienter

"Where a corporate officer pledges shares of his common stock as collateral for loans, this pledge provides the officer with a financial incentive to conceal problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit." *Meyer v. Concordia Int'l Corp.*, No. 16 CIV. 6467 (RMB), 2017 WL 4083603, at *7 (S.D.N.Y. July 28, 2017) (cleaned up). Here, Foley and Lynch pledged 65% and 41%, respectively, of their economic interest in Peloton, the value of which was contingent on the price of Peloton's stock remaining high. ¶¶241-45. Foley and Lynch were motivated to keep Peloton's stock price inflated so as to avoid a margin call or decrease in credit. *See Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008).

Defendants assert that the SAC's allegation that Foley and Lynch pledged shares of Peloton to collateralize loans "contradicts the [] allegations that Defendants sought to 'cash out' during the Class Period." MTD at 20. Foley and Lynch could, and did, do both. They wanted Peloton's stock price to be as high as possible to: (a) maximize profits from their stock sales; and (b) avoid a margin call on their loans. *See Hall*, 580 F. Supp. 2d at 233. Courts have found that plaintiffs adequately pled scienter where, as here, they allege both stock pledges to secure loans **and** insider trading. *See, e.g.*, *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 765-66 (M.D. Tenn. 2013) (denying defendants' motion to dismiss and crediting plaintiff's allegations of suspicious insider stock sales and substantial stock pledges as motive to commit fraud).

#### C.    THE SAC ALLEGES A SECTION 20A CLAIM

To state a claim for insider trading under §20A, a plaintiff must demonstrate: (i) a predicate violation of the Exchange Act; and (ii) facts demonstrating that the defendant traded the security at issue contemporaneously with the plaintiff. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.

24

2d 247, 309 (S.D.N.Y. 2008). "[T]he standard for contemporaneity is a reasonable period," *Oxford Health*, 187 F.R.D. at 144, which can extend throughout "the entire period while relevant material non-public information remained undisclosed." *In re Am. Bus. Computers Corp. Sec. Litig.*, MDL No. 913, 1994 WL 848690, at *4 (S.D.N.Y. 1994). Here, the trading gap ranges from one to 11 days (¶¶251-65, App. A), which satisfies §20A's contemporaneous standard.[22] *In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 176 (S.D.N.Y. 2021). Further, "a plaintiff may state a §20A claim without pleading a §10(b) claim, so long as there are factual allegations supporting a reasonable inference of a §10(b) violation." *See Gruber v. Gilbertson*, No. 16CV9727, 2019 WL 4458956, at *3 (S.D.N.Y. 2019). The SAC alleges that the Insider Trading Defendants traded while in the possession of MNPI, namely, the widening gap between Peloton's demand and supply, and that they possessed this MNPI by, *inter alia*, virtue of their executive level positions. ¶¶348-50. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012) (An "inference arises that high-level officers and directors had knowledge" of MNPI "by virtue of their positions with the company.").[23]

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

---

[22] *See, e.g.*, *S.E.C. v. McCaskey*, No. 98 CIV 6153 (SWK) (AJP), 2002 WL 850001, at *11 n.15 (S.D.N.Y. Mar. 26, 2002) (one week); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (eight days); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. CV H-14-3428, 2017 WL 2608243, at *3 (S.D. Tex. June 15, 2017) ("Different courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month…").

[23] The SAC also adequately alleges that the Management Defendants were "culpable participants" in the fraud, and thus control persons under Section 20(a). *Aegean*, 529 F. Supp. 3d at 149-50.

DATED:  July 21, 2023

/s/   Daniel L. Berger

Daniel L. Berger
Karin E. Fisch
Cecilia E. Stein
Mica A. Cocco
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
dberger@gelaw.com
kfisch@gelaw.com
cstein@gelaw.com
mcocco@gelaw.com

*Counsel for Lead Plaintiff Robeco
Capital Growth Funds SICAV –
Robeco Global Consumer Trends*

Hannah Ross
Avi Josefson
Jonathan D. Uslaner
Caitlin C. Bozman
**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: hannah@blbglaw.com
Email: avi@blbglaw.com
Email: jonathanU@blbglaw.com
Email: caitlin.bozman@blbglaw.com

*Counsel for Additional Plaintiff City
of Hialeah Employees' Retirement
System*

26