# EXHIBIT A

2024 WL 1898512
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SAN ANTONIO FIRE AND POLICE
PENSION FUND et al., Plaintiffs,
v.
DENTSPLY SIRONA INC. et al., Defendants.

22-cv-6339 (AS)
|
Signed May 1, 2024

**Attorneys and Law Firms**

John L. Chaney, Chaney & Drexel, LLC, Columbus, OH, Nancy A. Kulesa, Fairfield, CT, Ross Mitchell Shikowitz, White Plains, NY, Javier Bleichmar, Bleichmar Fonti & Auld LLP, New York, NY, for Plaintiffs.

Alycia N. Broz, Vorys Sayer Seymour & Pease LLP, Columbus, OH, Roger Allen Cooper, Cleary Gottlieb, New York, NY, Andrew W. Stern, James Ormerod Heyworth, V, Peter J. Mardian, Sidley Austin LLP, New York, NY, Katherine Rosemary Lynch, Mark Edward McDonald, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for Defendant Dentsply Sirona Inc.

Bryce Leigh Friedman, Craig Scott Waldman, Meredith Dawn Karp, Simpson Thacher & Bartlett LLP, New York, NY, for Defendant Donald M. Casey, Jr.

Seth L. Levine, Allison Samantha Markowitz, Chad Albert, Levine Lee LLP, New York, NY, John Jay O'Donnell, Jr., Herbert Smith Freehills New York LLP, New York, NY, Kelechi Emem Okengwu, Baker & McKenzie LLP, New York, NY, for Defendant Jorge Gomez.

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

**\*1** Defendant Dentsply Sirona is "the world's largest manufacturer of professional dental products and technologies." Am. Compl. ¶ 30, Dkt. 72. When the COVID-19 pandemic hit, many dentists' offices shut down, and demand for professional dental products fell. ¶ 3. The industry also faced supply-chain issues. *Id.* But certain Dentsply executives (also Defendants here) told investors that the company was doing just fine. *Id.* And for a while, that was true—or so it seemed. Plaintiffs say Defendants were artificially inflating sales by forcing distributors to take on more inventory, also known as channel stuffing. Later, the company reported disappointing earnings for several quarters in a row, replaced nearly all its top executives, conducted an internal investigation, and restated its financials. Plaintiffs say they were misled; they allege that Defendants knew all along that something was rotten with the state of Dentsply.

**BACKGROUND**

**I. The company**

Dentsply was (and is) a multibillion-dollar company. Its products can be split into two categories: (1) technologies and equipment ("T&E") and (2) consumables. ¶ 37. T&E includes high-tech imaging, orthodontics, and so on. Consumables includes single-use products, such as drills. During the class period, T&E constituted about 60% of the business; consumables constituted about 40%. *Id.* One segment of the T&E business was "computer-aided design and computer-aided manufacturing," or "CAD/CAM." One of Dentsply's main products in this segment was "Primemill." As its name suggests, Primemill "mills" blocks of ceramic and other materials to create crowns, bridges, and the like. ¶ 38. It was sold both individually and as part of a larger CAD/CAM bundle. *Id.* In the imaging segment, two of Dentsply's main products were "Axeos" and "Orthophos," high-tech x-ray machines. These CAD/CAM and imaging devices were "generally high-margin products for the company." *Id.*

Dentsply did not typically sell directly to its end users (usually dentists' offices). Instead, it sold to distributors. ¶ 39. But, of course, distributors would buy only as much as they could sell to end users. The potential for disconnect between these two points of sale can cause problems. For example, in 2016, Dentsply allegedly pushed distributors to buy far more inventory than they needed. ¶ 42. By getting distributors to buy more, Dentsply was able to inflate its sales numbers at that moment, but it came at the expense of future sales because distributors wouldn't need to buy more for a long time. *Id.* This practice is known as "channel stuffing," and it led to a civil fine and cease-and-desist order from the SEC. *Id.*

Around the same time, company leadership changed. ¶ 43. Defendant Donald Casey was made CEO in February 2018. ¶ 31. Defendant Jorge Gomez was made CFO in August 2019.

¶ 32. And Defendant Ranjit Chadha was made CAO (chief accounting officer) in August 2020. ¶ 33.

## II. The decay

Plaintiffs allege that during the class period (June 9, 2021, to November 13, 2022), Dentsply faced three major problems: a sharp drop in end-user demand, supply-chain constraints, and defective products. The demand and supply-chain issues were symptoms of COVID. The pandemic "shut down dental offices worldwide and crippled end-user demand for new product." ¶ 45. And there was an electronic-component shortage, which severely delayed delivery of imaging products. ¶ 53. The supply-chain issue got worse over the course of 2021. *Id.* While Dentsply normally had a six-to-eight-week lead time for its machines, by the fourth quarter of 2021, "distributors were waiting up to nine months for backordered imaging equipment." *Id.*

 **\*2**  Plus, at least half of all Primemills were reported defective, leading to repair costs, returns, and angry customers. ¶¶ 48, 50. The defects also hurt Primemill's popularity, which had a knock-on effect for the products with which it was bundled. ¶ 48. Axeos and Orthophos also had high failure rates. ¶ 51. And the defect problem exacerbated the supply-chain problem: when the company needed to repair or replace machines, those demands added to the backlog. ¶ 53. The company regularly held meetings to discuss the defects, which Casey "occasionally attended." ¶ 52. Many customers would also call Casey directly. *Id.* In April 2021, the company created a "full-time product quality group Vice President role to manage and resolve quality issues." ¶ 49. The Primemill issue, in particular, became so severe that a Primemill could be returned only if Casey or Gomez personally authorized it. ¶ 50. And some time in the first half of 2021, Casey showed up "unannounced" at a dinner to confront a distributor's vice president "about the U.S. market purportedly making too much of the ongoing quality issues ... and [the distributor's] unwillingness to purchase greater quantities of Primemill." *Id.*

Faced with these challenges, Plaintiffs claim that Dentsply returned to its channel-stuffing ways. And the complaint alleges that Casey and Gomez orchestrated it. They set "unrealistic sales targets" and then "bullied" those below them to hit the targets by any means possible. ¶ 229. Eric Bruno allegedly executed this scheme. Bruno was the senior vice president in charge of Dentsply's North American operations, and he reported directly to Casey. ¶ 39. "[U]nder extreme pressure from Casey and Gomez to achieve ... sales

targets," Bruno told the sales team "exactly how many units of a particular product they were to convince each distributor to take," and told them "they 'had to do it.' " ¶ 55. The sales team understood "that their jobs were on the line" and that Bruno's directions were coming from Casey. ¶ 59. And the pressure Casey put on Bruno was filtering down. When one member of the sales team "voiced disapproval," Bruno "lost it" and humiliated him, effectively stamping out dissent. *Id.*

To get distributors to buy more, the sales team initially tried to convince them that end-user demand would soon rise dramatically. ¶ 60. These projections flunked the "red face test," and distributors declined. *Id.* Once that attempt failed, Bruno stepped in. He negotiated with the distributors directly. ¶¶ 61–62. He offered generous incentive packages, including millions of dollars in cash back. *Id.* While Bruno was Casey's direct report and the head of North American operations, he still didn't have the authority to execute these incentives. ¶ 62. Instead, he got approval from Ivan Zeljkovic. *Id.* Zeljkovic was Dentsply's vice president of commercial finance and reported directly to Gomez. *Id.* The incentives were approved, and Dentsply successfully made tens of millions in extra sales. ¶ 63.

But this incentive-based channel stuffing works only if the incentives are hidden. Typically, a company would account for rebates and other incentives by discounting present earnings. Dentsply did not do that, instead "largely or entirely" failing to account for the incentives. *Id.* This failure enabled Dentsply to report positive financial results. For the third quarter of 2021, it beat market expectations across several metrics. ¶ 64.

Dentsply repeated this pattern in the fourth quarter: Casey established sales targets and applied pressure, Bruno negotiated incentives worth millions, the distributors bought tens of millions of dollars' worth of extra equipment, and Dentsply didn't fully account for the incentives. ¶¶ 67–71. But this time, Dentsply still didn't quite reach its financial targets. ¶ 72. According to Plaintiffs, though, it would have been much worse if not for T&E sales that nearly met expectations. *Id.*

## III. The fallout

Eventually, the company's performance began to falter. On February 28, 2022, Dentsply announced the disappointing earnings for the fourth quarter of 2021, mentioned above. ¶ 72. Dentsply's stock fell 7.7% that day. ¶ 75. On April 19, Dentsply reported more disappointing financial results and

that Casey had been fired. ¶ 80. Dentsply's share price fell 13%. *Id.* On May 10, Dentsply announced that it had begun an investigation in March "regarding certain financial reporting matters," particularly Dentsply's "use of incentives ... in the third and fourth quarters of 2021." ¶ 82.

**\*3**  On November 1, Dentsply released the investigation's findings. ¶ 87. Dentsply said it would "restate" (meaning "correct") several of its financial statements from 2021. *Id.* It noted that the company offered incentives "to attempt to meet certain internal sales targets," and those incentives were connected to over $100 million in sales over the last two quarters of 2021. ¶ 90. It concluded that the incentives "contributed to the Company's ability to meet external financial analyst expectations in the third quarter of 2021," but there were "potential omissions in public disclosures ... regarding the use of these incentives or their potential future impacts." *Id.* Relatedly, the investigation also found that Dentsply had used "incorrect accounting and assumptions ... related to its sales returns provisions, warranty reserve provisions and variable consideration." ¶ 91. In other words, Dentsply also didn't properly account for returns and repairs, which hid another $27 million in expenses. *Id.* The investigation faulted senior leadership, though it found no "intentional wrongdoing." *Compare* ¶ 89, *with* Dkt. 96 at 11. In the two days following the report, Dentsply's share price fell another 13%. ¶ 96.

Finally, on November 14, 2022, Dentsply announced another round of disappointing financial results. ¶ 97. The share price fell 5%. *Id.* And by the end of 2022, many of the top executives were gone: As mentioned, Casey was fired in April. Gomez also resigned that month, and Bruno was replaced in March. ¶¶ 231–232. Chadha and Dentsply "mutually agreed" to his departure in August. ¶ 235. The company's CCO (chief commercial officer) left in September, and its head of Chinese operations left in November. ¶¶ 236–237.

Throughout the second half of 2021 and beginning of 2022, Defendants made dozens of statements about inventory, the supply chain, product quality, and the company's overall health that Plaintiffs say were misleading and thus violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 as well as SEC Rule 10b-5.

**LEGAL STANDARDS**

## I. Pleading standards

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b). *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). "As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant made misleading statements and omissions of a material fact, and acted with the required state of mind." *Id.* at 305 (cleaned up). And though the Court accepts Plaintiffs' allegations as true, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), Plaintiffs must plead these elements with particularity.

For the misleading-statement element, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305; *see also* 15 U.S.C. § 78u-4(b)(1)–(2). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," the complaint must plausibly allege that the statements were misleading. *Blanford*, 794 F.3d at 304, 307.

On the scienter element, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23, 127 S.Ct. 2499. A "complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324, 127 S.Ct. 2499.

## II. Permitted materials

On a motion to dismiss, the Court may "consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (cleaned up). Any of these judicially noticed documents can be considered for the fact that certain statements were made, but not for the truth of

those statements. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022).

**\*4** On the subject of judicial notice, the parties here dispute whether Plaintiffs can rely on certain parts of the internal investigation's findings while rejecting others. At this stage, the Court cannot accept *any* part of the internal investigation for its truth. The Court may consider the full report simply for the fact that certain statements were made. *Roth v. Jennings*, 489 F.3d 499, 509–12 (2d Cir. 2007). The Court accepts as true only the complaint's well-pleaded allegations.

**DISCUSSION**

"To state a claim under Section 10(b) and Rule 10b-5[(b)], a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps.*, 28 F.4th at 351–52. Defendants say Plaintiffs have failed to allege elements one, two, and six.

Plaintiffs also alleged "scheme liability" under Rule 10b-5(a), (c). Am. Compl. ¶¶ 296–297. Across three briefs (for which they requested and received twice the normal page limit), the parties wrote three paragraphs squarely addressing this branch of Plaintiffs' case. *See* Dkt. 97 at 10–11; Dkt. 99 at 15. The only argument relevant to this claim in Defendants' opening brief is that the complaint fails to raise a strong inference of scienter. *See* Dkt. 96 at 18–21; *see Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (requiring scienter for scheme-liability claims); 15 U.S.C. § 78u-4(b)(2)(A). The Court addresses scienter in Part II. But Defendants forfeited (for this motion) the argument that Plaintiffs' scheme-liability claim "amounts to nothing more than Plaintiffs' inadequate 10b-5(b) claim" by failing to raise it until their reply brief. Dkt. 99 at 15; *Kurtz v. Hansell*, 2021 WL 1143619, at \*8 n.9 (S.D.N.Y. Mar. 24, 2021) ("It is well established, of course, that arguments first raised in reply briefs are forfeited or waived.... The Court thus will not consider these arguments on the present motion to dismiss." (internal quotation marks omitted)).

**I. Misleading statements**

Plaintiffs identify dozens of allegedly misleading statements. Defendants say that "many of the alleged misstatements"

are not materially false or misleading. Dkt. 96 at 29 (capitalization removed). Their brief cites only about thirty specific paragraphs. *Id.* at 29–34. Rather than combing through the 143-page complaint to apply Defendants' arguments to each statement, the Court will consider only those paragraphs cited in their brief. Similarly, although some of the statements might be protected as forward-looking, Defendants did not make that argument.

**A. Opinion and puffery**

Defendants' main argument is that many statements were merely nonactionable opinions or puffery. *See* Dkt. 96 at 30–34 (citing Am. Compl. ¶¶ 100–102, 105, 111–114, 120–122, 129, 132, 137–144, 147–148). The Court agrees in part.

"Opinions are not actionable unless ... (i) the speaker did not subjectively believe the opinion; (ii) the opinion contained one or more embedded factual statements that was false; or (iii) the statement failed to provide critical context, meaning that the speaker implied he or she had a reasonable basis for the opinion but in fact did not." *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at \*6 (S.D.N.Y. Feb. 5, 2024) (cleaned up). "[T]he appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). "In assessing what a reasonable investor would expect, the Supreme Court [has] stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[ ], of the kind that an individual might communicate in daily life.' " *Id.* (second alteration in original) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015)).

**\*5** Start with the statements that are not actionable. Some statements (or parts of statements) express only a subjective state of mind or feeling, which is classic opinion. *See Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016); Am. Compl. ¶¶ 105 ("As we go into the fourth quarter, we're optimistic that things [will] get closer and closer to normal."), 111 ("I think we're seeing [a] great recovery[.]"), 114 (describing those at the company as "happy" that they've expanded beyond "full chairside" and "introduce[d] things like [Prime]mill"), 120 ("[W]e've been super happy with our dealer partners[.]"), 143 ("[W]e're pretty optimistic that our growth prospects are good[.]").

Some other statements (and some of the above) are not actionable because a reasonable investor would interpret them as puffery or simply not conveying any specific message. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (no misleading statements where they were "too general to cause a reasonable investor to rely upon them"); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) ("General declarations about the importance of acting lawfully and with integrity are inactionable puffery, especially when expressed in aspirational terms." (cleaned up)); Am. Compl. ¶¶ 100 (saying the supply-chain team has "done a great job of managing" and "handl[ing]" risks, and Dentsply "financially ... ha[s] been able to manage the challenges really well"), 147 ("[A]cross the company, across the globe, all of our employees are embracing ESG.... [O]ne of the key aspects of ESG is managing risks. And it ties perfectly into our enterprise risk management process, which ... is extremely important."), 148 (listing "[t]hink and act with positive intent and the highest integrity" as one of the company's "five key operating principles").

Other statements are plausibly not puffery. For example, Casey said, "We feel very good that we have adequate supply." ¶ 102. Although "adequate" is a somewhat flimsy word, a reasonable investor plausibly could interpret "adequate supply" to mean the supply necessary to meet demand. That statement is definite and verifiable. And though it is preceded by "we feel," it could reasonably be read to communicate a reasonable basis for that feeling. A similar analysis applies to statements like "we've been able to make everything we need to make," ¶ 105, and "we're very comfortable that we're going to be able to deliver what our customers need," ¶ 101.

Another set of statements discusses the strength and sustainability of the company's earnings in general and demand for CAD/CAM and imaging products in particular. *See* ¶¶ 111–113, 129, 132, 137–144. These statements survive. It would be misleading if (as alleged) the company was having trouble getting the materials to make the products, many of the products it did make didn't work, and much of its sales were due to channel stuffing. *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 285–86 (E.D.N.Y. 2023); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019).

Finally, there are two statements in which Gomez said the company didn't expect inventory levels to rise. ¶¶ 121–122. Those statements would also be misleading if, in fact, Defendants were planning on or had already begun channel stuffing.

### B. Falsity at the time of the statements

Defendants next argue that the complaint has failed to plead that some statements were false or misleading at the time they were made. Dkt. 96 at 29–30 (citing ¶¶ 52, 99–110, 130, 145). Some of these statements have already been knocked out as opinion or puffery. And some other paragraphs are not attempting to identify a statement. *See* ¶¶ 52, 99, 109–110, 130, 145. So just a handful of statements remain in this category.

**\*6** Defendants focus on a series of statements about supply-chain disruptions. The timeline here is tricky because, as both sides acknowledge, the supply-chain issues got worse over time. Plaintiffs allege that by the third quarter of 2021, Dentsply's sales team was having inventory calls every week, and the "supply constraints caused Dentsply employees to worry about the Company's ability to manufacture orders." ¶ 53. By the fourth quarter, "distributors were waiting up to nine months for backordered imaging equipment," the sales team had "shouting matches," and, "ultimately, some ... orders were not shipped because of the supply constraints." *Id.*

Given these allegations, statements downplaying supply-chain issues in the second half of 2021 are plausibly misleading. In September, Casey said that "we're very comfortable that we're going to be able to deliver what our customers need," and that "[w]e feel very good that we have adequate supply." ¶¶ 101–102. And in November and December, Casey and Gomez made several statements downplaying supply-chain problems. ¶¶ 103–107. If the company was already facing severe supply-chain issues, these statements could be misleading.

One other statement isn't actionable because it's entirely consistent with Plaintiffs' allegations. In February 2022, Gomez said, "Up until the third quarter, the majority of our supply chain challenges were cost related .... In the fourth quarter, we started to face significant component short-ages[.]" ¶ 108. Plaintiffs allege that employees were "worr[ied]" about shortages in the third quarter, but they do not allege meaningful shortages until the fourth quarter. So Gomez's statement is not plausibly misleading, even on Plaintiffs' account.

### C. Item 303

Finally, Defendants challenge Plaintiffs' Item 303 argument. The Supreme Court recently addressed Item 303 claims, holding that pure omissions aren't actionable and that Item 303 claims must still plead particular "statements made" that are rendered misleading by the alleged violation. *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, —— U.S. ——, 144 S. Ct. 885, 892, —— L.Ed.2d —— (2024). Here, Plaintiffs refer generally to some of Dentsply's 10-Qs, but they fail to plead a particular statement rendered misleading. *See* Am. Compl. ¶¶ 181–183. So this theory fails, though Plaintiffs will have an opportunity to amend.

## II. Scienter

To establish a strong inference of scienter, Plaintiffs "must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Ark. Pub. Emps.*, 28 F.4th at 355 (cleaned up). That extreme departure "approximat[es] actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106 (citation omitted). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) (citation omitted). Plaintiffs focus on recklessness but also make a motive argument.

### A. Motive

Plaintiffs seem to acknowledge that, on their own, the complaint's motive allegations would be insufficient to establish scienter. And Defendants quote a Second Circuit case "declin[ing] to accept" a plaintiff's argument (for which he "offer[ed] no support") that "combin[ing] inadequate allegations of motive with inadequate allegations of recklessness" could establish scienter. *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001). But as mentioned, "[i]f *no* motive ... is shown, the circumstantial evidence ... must be correspondingly greater." *Ark. Pub. Emps.*, 28 F.4th at 355 (emphasis added). In light of that sliding-scale standard, the Second Circuit has more recently held that it is "error" *not*

to "to assess the total weight of the circumstantial allegations together with the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021). So the Court will weigh the motive allegations together with the circumstantial evidence. (There is no dispute that Defendants had the opportunity to defraud. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) ("The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer.").)

**\*7** Here, Plaintiffs argue that Defendants' fraud translated into millions in performance-based pay. Typically, "bonuses based on corporate earnings and higher stock prices do[ ] not strengthen the inference of fraudulent intent." *ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009). But if a plaintiff shows a "direct link between the compensation package and the fraudulent statements because of the magnitude of the compensation and the defendants' motive to sweep problems under the rug," then bonuses can be probative. *Id.*

The complaint draws a direct link. The magnitude was substantial. Based on the alleged scope of the fraud, Plaintiffs calculate that Casey and Gomez inflated their 2021 earnings by several million dollars. *See* Am. Compl. ¶¶ 211–225. And the alleged fraud was critical—the company just barely hit the thresholds necessary for bonuses. ¶¶ 221, 224. Plus, Casey and Gomez would've gotten away with more, too, if it weren't for the meddling board. As issues began to emerge, Dentsply's board reduced cash and stock bonuses, costing Casey $4.9 million and Gomez $2.5 million. ¶ 213; *see Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (courts should not "confuse[ ] expected with realized benefits" (citation omitted)). And Defendants might have been motivated to sweep issues under the rug to maintain growth under "Casey's flagship three-year Restructuring Plan" and to secure the specific bonuses under that plan. ¶¶ 219–225, 239. So the motive allegations here weigh in favor of scienter, and the circumstantial evidence need not be extraordinary, though it must still be strong.

### B. Actual knowledge

Plaintiffs also allege that Defendants had actual knowledge of information contradicting their statements. Some of Defendants' statements themselves support this inference. Start with statements about inventory: In August 2021, an analyst asked Casey about "what you're hearing from your dealers as you think about inventory levels ... going back up."

¶ 245. Casey responded, "[W]e've been super happy with our dealer partners.... And we're working with them every day to make sure that they're getting adequate inventory .... And that's an ongoing process." *Id.* Similarly, in November 2021, an analyst asked Gomez, "Do you feel like inventory levels ... have changed at all with your distribution partners?" ¶ 246. And Gomez responded, "We don't think so. We track that closely and we manage our inventory levels in a disciplined way." *Id.* On the same call, an analyst asked, "Do you expect your inventory level to increase in the coming quarters?" ¶ 247. And again, Gomez responded, "No, we watch inventory very closely, our internal inventory, inventory in the channel." ¶ 243.

But Plaintiffs allege that "dealer inventory for ... CAD/CAM products [on] September 30, 2021 [was] higher than at the start of the year by approximately $80 million." ¶ 130(b). And by the end of 2021, there was "$50 million in excess product sitting in the channel." ¶ 275 (internal quotation marks omitted). Plus, of course, Plaintiffs allege that Casey and Gomez orchestrated the channel-stuffing scheme, which would give them actual knowledge of the inventory issues. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764–65 (S.D.N.Y. 2017).

Next consider statements about Dentsply's supply chain: On the November earnings call, Gomez analyzed the company's supply chain in a way that reflected detailed knowledge:

**\*8** So far, ... we have not been impacted in terms of our ability to manufacture products or to supply our distributors[, which] is something that we are monitoring very closely.... Any changes really [are not] of material significance at this point.... [O]ur financials ... have not been impacted by the supply chain issues in a material way other than some elevated costs that we have been able to offset or in some cases, for example, we did a price increase.

¶ 251. On the same call, he reiterated that "so far, [supply-chain issues] have not impacted our ability to manufacture products." ¶ 252. Ten days later, Casey was asked, "Can you provide an update on what you're seeing in terms of any supply chain issues at this point or freight costs? Are you having trouble getting a hold of anything? Are you seeing any kind of shipping delays or anything at this point?" And Casey said, "Yes.... We're not seeing huge delays.... [W]hat we're learning is we can get stuff." ¶ 254. Yet Gomez admitted later that "[i]n the fourth quarter [of 2021], we started to face significant component shortages impacting the production of imaging equipment." ¶ 108.

Casey's alleged confrontation with a distributor's executive over product defects is similar. There, he allegedly said that the defects were overblown and that distributors should buy more product. Defendants try to spin this statement as showing that Casey really believed that the product worked. Even so, Casey's statement reveals that he was highly attuned to defect complaints. That conclusion is bolstered by other allegations: Casey attended meetings where the defects were discussed, Casey got calls from complaining customers, and either Casey or Gomez had to personally approve every return. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) (conversations and attendance at meetings show "access to and actual knowledge of facts"); *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at \*6 (S.D.N.Y. June 12, 2018) (knowledge of "actual return history" supported scienter).

Defendants' detailed statements about inventory, the supply chain, and product defects support the inference of scienter. Courts have found that "[t]he specificity of [the defendants'] statements ... is strong circumstantial evidence that [they] were receiving some form of specific information on [these topics]." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012); *see also Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269–70 (3d Cir. 2009); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at \*5 (S.D.N.Y. Feb. 5, 2024). If, on the other hand, Casey and Gomez didn't monitor these topics but made definitive statements as if they did, they still might have been reckless. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[T]he pleading standard was met where ... the defendant ... consistently reassured the plaintiff ... but never actually investigated ... to determine whether there was a basis for the defendant's assertions." (cleaned up)); *see also Inst'l Invs. Grp.*, 564 F.3d at 269–70; *Stadium Cap.*, 2024 WL 456745, at \*5; *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552–53 (S.D.N.Y. 2017).

On top of these statements, Plaintiffs also appeal to the so-called core-operations doctrine and the magnitude of the restatement. They allege that CAD/CAM and imaging products were key to the company's profits and digitally driven restructuring plan, so Casey and Gomez would've monitored them closely. *See* ¶¶ 239–240. And they note that the company "adjusted nearly every financial account" by 3% to 24%. ¶ 162. These allegations support the inference of scienter. *See Okla. Firefighters*, 367 F. Supp. 3d at 37–38 ("primary profit engine"); *Stadium Cap.*, 2024 WL

456745, at *5 (the core-operations doctrine "simply reflects the commonsense assumption that executives are likely to know more about things central to their business"); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (magnitude of restatement); *comScore*, 268 F. Supp. 3d at 553 (same).

**\*9** Plaintiffs also point out that Casey and Gomez signed Dentsply's Sarbanes-Oxley certifications. ¶ 228. In these certifications, they "attest[ed] that they had personally supervised and participated in the evaluation of Dentsply's financial controls and procedures, and that the Company's financial reports fairly and accurately presented its financial condition." *Id.*; *see also* ¶ 230. While signing boilerplate certifications is not especially probative, it at least adds to the total mix of information. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017).

Defendants make three counterarguments, and one has merit. First, the scienter inference is weak for product-defect statements made before the fourth quarter of 2021. Plaintiffs allege merely that certain Dentsply employees were "worr[ied]" about the supply chain at that point. ¶ 53. But neither Plaintiffs' allegations nor Defendants' statements suggest that the supply-chain issues were anything more than cost problems before the fourth quarter. Even though Defendants' overconfident statements were plausibly misleading, the inference that the Defendants made those statements recklessly is not strong. *See* ¶¶ 100–102.

Second, Defendants point out that some of the statements supporting scienter were made after the class period. But those statements can still "support the plaintiffs' belief that serious inventory [and other] problems existed during the Class Period itself." *Novak*, 216 F.3d at 313.

Third, Defendants argue that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Dkt. 96 at 15 (quoting *Novak*, 216 F.3d at 309). But here, Defendants' own statements suggest that they had access to—and reviewed—such information. Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to. *See Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre[.]"). Instead, Defendants said they reviewed internal information about inventory, the supply chain, and product defects. And Plaintiffs allege (with support) that, at the

time of Defendants' review, that information would have contradicted their statements. That combination is enough. To the extent that Plaintiffs also use some reports to bolster their scienter allegations, they have sufficiently identified them. *See, e.g.*, ¶ 57 (alleging that distributors sent Dentsply detailed quarterly spreadsheets describing inventory and end-user orders).

### C. Executive behavior

The complaint next alleges that Casey and Gomez "maintained an inappropriate tone at the top," including a culture of fear and poor internal controls. ¶ 146. Plaintiffs say Casey and Gomez suppressed dissent, heaped "extreme pressure" on the sales team, and made employees fear that they'd be fired if they spoke up or fell short. ¶¶ 44, 201, 229. (On this point, Defendants object that the "former employees" on which the complaint relies are insufficiently identified. But because the claim—"tone at the top," or company culture—is a general one, merely identifying "former employees" is likely enough to "support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. In any event, there are sufficient facts to support these beliefs even without the former employees. *See id.* at 313–14.)

**\*10** Courts in this district have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020); *comScore*, 268 F. Supp. 3d at 551–52; *In re Insys*, 2018 WL 2943746, at *6; *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 244 (S.D.N.Y. 2012); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) (collecting cases); *In re Eletrobras*, 245 F. Supp. 3d at 468 (collecting cases).

These allegations also shed light on the company's sales targets. Defendants rightly argue that even aggressive sales targets do not necessarily suggest wrongdoing. *See, e.g., Gross v. AT&T Inc.*, 2021 WL 9803956, at *9 (S.D.N.Y. Sept. 27, 2021) ("Pushing representatives to sell does not, on its own and without more, suggest that [an executive] was encouraging or was aware of widespread fraud."), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

But scienter must be evaluated as a whole. Here, the complaint supports the inference of scienter by alleging that Casey set outlandish sales targets, silenced critics, muddied internal controls, and "bull[ied]" Bruno and others "into meeting

targets." *Varljen v. H.J. Meyers, Inc.*, 1998 WL 395266, at *6 (S.D.N.Y. July 14, 1998). Defendants' briefs don't talk about Bruno, but he allegedly negotiated the distributor incentives, reported directly to Casey, and got final approval from Gomez's direct report, suggesting that Casey and Gomez pushed for or at least knew of the incentives. *See Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *18–19 (S.D.N.Y. June 17, 2020); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 243–44 (S.D.N.Y. 2022); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018).

Zooming out, the complaint also alleges a pattern of wrongdoing by the company as well as Casey and Gomez. In December 2020, the SEC sent a cease-and-desist letter alleging a channel-stuffing scheme similar to that alleged here. ¶¶ 258–259. Although the letter described conduct from before Casey and Gomez were in charge, they were CEO and CFO when Dentsply received the letter. *Id.* Similarly, in December 2021, the SEC sent a comment letter to Dentsply, reminding it to "account[ ] for returns, rebates and discounts." ¶ 256. Gomez replied, acknowledging the letter and promising to "revise future filings to include additional disclosures." ¶ 257. Plus, Casey and Gomez were named defendants in a 2019 securities-fraud case claiming misrepresentations relating to "unaccounted for inventory." ¶ 260. That complaint survived a motion to dismiss before the case settled. *Id.* Past accusations do not guarantee future fraud, but these allegations bolster the inference that Casey and Gomez would have been attuned to these issues. And if they failed to monitor them despite all these "red flags," that failure might well have been reckless. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d at 468–69.

### D. Executive departures

Plaintiffs also point to several firings and resignations during the class period. Defendants say departures alone are not enough. But here, there are "factual allegations linking the executives' resignation[s] to the alleged fraud." *See Africa v. Jianpu Tech. Inc.*, 2023 WL 5432282, at *8 (S.D.N.Y. Aug. 23, 2023) (citation omitted).

**\*11**  First, the timeline itself is suggestive: The internal investigation began in March 2022. Bruno was replaced that month, Gomez resigned in April, and Casey was fired in April. ¶¶ 231–238; *see In re Pareteum*, 2021 WL 3540779, at *17 (collecting cases for the idea that the "timing of terminations and resignations ... can [support] a strong inference of scienter"). And Plaintiffs allege that the

departures were part of the company's "remediation plan" to address the failure to "design and maintain effective controls associated with approving, communicating, and accounting for incentive arrangements." ¶¶ 203, 205, 238; *see also* ¶¶ 206–207.

Second, events following Gomez's and Casey's departures suggest wrongdoing. After Gomez resigned, he took a job as CFO of another public company. The day after he started, Dentsply announced the internal investigation, and he was fired from his new post. ¶ 32. As for Casey, he would've been entitled to $11 million in termination payments if he'd been fired without cause. ¶ 234. As of April 2023, the company still hadn't taken a position on whether Casey was entitled to those payments (unlike at least one other executive). *Id.* & n.24.

Third, there were too many departures to say that they were coincidental with a straight face. Not only did Bruno, Casey, and Gomez leave in rapid succession, but three other executives were also gone before the year was out. ¶¶ 231–238. "Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls. These circumstances, combined with the announcement of the impending restatement establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question." *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).

### E. The inference of scienter is strong for Casey and Gomez

The complaint raises a strong inference of scienter with respect to Casey and Gomez. (And Dentsply doesn't contest that Casey's scienter and Gomez's scienter can be imputed to the corporation, so there is also a strong inference for Dentsply. *See* Dkt. 96 at 17.) Although there is no smoking gun, the competing inference—that Casey and Gomez were blissfully unaware—is neither cogent nor compelling. The allegations that they knew about the product defects and fourth-quarter supply-chain issues are straightforward. The inventory and channel-stuffing allegations are somewhat less direct, but still sufficient. One cogent and compelling inference is that Casey and Gomez orchestrated or knew about and approved the incentive plan. After all, their direct reports executed the scheme.

Another cogent and compelling inference is that they set unrealistic sales targets, applied pressure, suppressed dissent,

and then watched as sales remained steady but distributor inventory rose. And they knew what that meant given Dentsply's and their own histories of (alleged) channel stuffing. Either scenario would support the claim that their statements were knowingly or recklessly false or misleading.

And even if they simply turned a blind eye to all the red flags, willful blindness is also enough. *SEC v. Roor*, 2004 WL 1933578, at *4 (S.D.N.Y. Aug. 30, 2004); *SEC v. Obus*, 693 F.3d 276, 287 (2d Cir. 2012) (holding that § 10(b)'s scienter standard "appl[ies] broadly to civil securities fraud liability, including ... tipper/tippee liability," and that "conscious avoidance can be sufficient to establish tipper scienter"); *SEC v. Frank*, 388 F.2d 486, 489 (2d Cir. 1968) (noting that a defendant in a § 10(b) case could not "escape liability for fraud by closing his eyes to what he saw and could readily understand") (Friendly, J.).

### F. The inference of scienter is not strong for Chadha

**\*12** Few of the indicators of scienter discussed above apply to Chadha. The sum total of the allegations against him are (1) he was the chief accounting officer when there was accounting fraud, (2) he resigned in August 2022, (3) he signed the company's 10-Ks, and (4) he stood to gain some bonus, but Plaintiffs don't know how much. Am. Compl. ¶¶ 17, 20, 33, 63, 212 n.22, 214, 235. These allegations raise an inference of scienter, but a weak one. Recall, to start, that without some sense of Chadha's motive, Plaintiffs' circumstantial evidence of his recklessness must be "correspondingly greater."

But there are no specific allegations linking him to any fraud. As noted, signing boilerplate financial statements is weak evidence. And though he resigned, he did so months after Casey and Gomez did and months after the internal investigation began. The strongest evidence is simply that Chadha was "the executive most responsible for the Company's accounting." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221–22 (S.D.N.Y. 2004). But even then, courts have required some specific allegation suggesting that the executive was made aware of the issue underlying the fraud. *See, e.g.*, *id.*; *see also Lipow v. Net1 UEPS Techs.*, Inc., 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("Courts in this circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." (citation omitted)).

For Chadha, the inference of scienter is not as strong the inference that he was kept in the dark. Casey's and Gomez's direct reports executed the incentive scheme and might have kept that information from the accounting department. That story is especially plausible in light of the company's culture, which didn't exactly encourage free-flowing discussion. And Chadha's later resignation suggests that he might have been ousted because the entire prior regime was tainted with fraud, not necessarily because he participated in it. So the complaint does not raise a strong inference of scienter with respect to Chadha.

### III. Loss causation

Finally, Defendants challenge loss causation. "To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (internal quotation marks omitted). "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (cleaned up). But the causal link must still be sufficiently direct. "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (internal quotation marks omitted).

Ultimately, loss causation can be pleaded by alleging that either (1) "the market reacted negatively to a corrective disclosure of the fraud," or (2) "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund*, 750 F.3d at 232–33.

Plaintiffs say the five loss-causing events here fit the materialization category. First, on February 28, 2022, Dentsply announced disappointing sales from the end of 2021 and issued guidance below expectations for 2022. ¶¶ 265–267. Second, on April 19, Dentsply announced disappointing financials and weak sales for the first quarter. ¶ 270. It also announced that Casey had been fired. *Id.* Third, on May 10, Dentsply announced more disappointing sales. ¶ 273. It also said it wouldn't be able to file its Form 10-Q on time for the first quarter of 2022 due to the (up to this point undisclosed) "ongoing internal investigation." ¶ 272. Fourth, on November 1, Dentsply released the investigation's findings and restated financials. ¶ 277. (Defendants don't challenge that Plaintiffs

sufficiently plead loss causation as to this disclosure.) Fifth, on November 14, Dentsply again announced disappointing sales and guidance below expectations. ¶ 279. On each of these five dates in 2022, the value of Dentsply's stock dropped at least 5%. ¶¶ 268, 270, 276, 278, 281.

### A. Earnings reports

**\*13** Defendants' main argument is that a disappointing earnings announcement can never be a loss-causing event. To their credit, there are many district-court cases that seem to say as much. But a closer reading of those cases and a broader consideration of the doctrine shows that Defendants' categorical approach is misguided. Defendants' cases say that "the mere failure to meet earnings forecasts is insufficient to establish loss causation." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678–79 (S.D.N.Y. 2007); *see also id.* (collecting cases). That platitude has to be right—there must be a connection between the fraud and the loss.

But it can't be right that earnings reports are simply exempt. Consider this hypothetical: Acme makes widgets. It has one widget factory. In June, Acme tells investors that widget production is just dandy. Acme's stock price soars on the good news. But, in reality, Acme's one widget factory has burned to the ground, and the company is not producing any widgets. In July, Acme reports earnings and inventory of zero. The stock price plummets to zero. Then, in August, Acme discloses that the widget factory burned down in May. Because the stock price is already at zero, investors don't lose anything based on the disclosure.

According to Defendants, only the August disclosure could establish loss causation. But it's really just a question of proof. Because earnings reports reflect all sorts of variables, it will often be difficult for a plaintiff to prove that disappointing earnings were "caused by the materialization of the risk concealed by the fraudulent statement." But so long as the plaintiff's theory of causation is plausible, that difficulty doesn't justify dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (internal quotation marks omitted)); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (describing loss causation as a "fact-based inquiry," and noting when it is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion").

Some courts have recognized this principle, permitting earnings reports to serve as loss-causing events at the pleading stage. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 854–55 (S.D.N.Y. 2019) (Nathan, J.); *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at \*8–9 (D. Conn. Mar. 31, 2018).

Here, Plaintiffs have plausibly linked each disappointing earnings report to the risks concealed by the fraud. Plaintiffs' whole story is that the company faced a three-headed threat of supply-chain constraints, product defects, and declining end-user demand that Defendants papered over with channel stuffing, mortgaging the company's future. The complaint has specifically alleged a connection between that scheme and each wave of disappointing earnings. *See* ¶¶ 73–76 (February); ¶¶ 90, 267 (April); ¶¶ 83, 273 (May); ¶¶ 280–282 (November 14).

The November 14 announcement presents an added wrinkle. Defendants argue that the November 1 release of the internal investigation's findings fully disclosed the fraud. If that were true, then Plaintiffs could not claim that any further loss was attributable to any further disclosure or materialization of a "concealed" risk. Yet this issue presents largely the same proof question. It might be even harder for Plaintiffs to prove loss causation for this event. But Plaintiffs have plausibly alleged that the November 1 disclosure didn't fully reveal the fraud's scope or continuing effects. ¶¶ 280–282. That allegation is made more plausible by the market's strong reaction on November 14, even after the November 1 bombshell. *Id.*

### B. Casey's firing and the disclosure of the investigation

**\*14** The announcement of Casey's firing on April 19 and of the internal investigation on May 10 are somewhat more traditional loss-causation events. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140 (D. Conn. 2021) (internal investigation, delayed 10-Q, and executive departures support loss causation); *In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d 277, 288–89 (S.D.N.Y. 2012) (internal investigation and executive departures); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 174 (D. Conn. 2019) (same); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) ("[C]ourts within this District have concluded that the disclosure of an investigation into a particular business practice can be sufficient to allege loss causation with respect to alleged

misstatements regarding that practice." (internal quotation marks omitted)).

Again, the question is simply one of proof—whether Casey's firing and the internal investigation were materializations of the risk concealed by the fraud. At this stage, Plaintiffs have plausibly pleaded that connection. *See* ¶¶ 80, 89, 205, 234, 270–271 (Casey's firing); ¶¶ 82, 272–273 (investigation announcement and 10-Q filing delay).

### IV. The § 20(a) claim

Finally, Defendants challenge the § 20(a) claim, also known as "control-person liability." Their only argument is that Plaintiffs failed to plead a primary violation of § 10(b). *See* Dkt. 96 at 39–40; Dkt. 99 at 15. That argument rises and falls with the analysis above, so the § 20(a) claim will survive with respect to Casey and Gomez. As for Chadha, Plaintiffs might argue (though they don't) that he still controlled Dentsply under § 20(a) even if the § 10(b) claim against him fails. Yet the scienter requirements are similar, and the complaint fails to allege the state of mind required for § 20(a) too. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (control-person liability requires that "the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud"); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437–39 (S.D.N.Y. 2014) (describing "culpable participation" as requiring "that the controlling person knew or should have known that the primary violator ... was engaging in fraudulent conduct" (citation omitted)); 15 U.S.C. § 78u-4(b)(2)(A).

### CONCLUSION

For these reasons, the motion to dismiss is GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to all claims against Defendant Ranjit Chadha; paragraphs 100–102, 108, 114, 120, 147–148, and 181–183 of the amended complaint; and those portions of paragraphs 105, 111, 114, 120, and 143 of the amended complaint identified as nonactionable in this opinion. The motion is denied in all other respects. The Clerk of Court is directed to terminate Dkt. 94 and Defendant Chadha.

Plaintiffs will have the opportunity to amend only for the Item 303 argument. By May 7, 2024, Plaintiffs may file an amended complaint, adding allegations only with respect to the statement or statements rendered misleading by Defendants' alleged Item 303 violations. If Plaintiffs would prefer to get this show on the road in discovery, rather than amend, then they should let the Court know by May 7, in which case Defendants' answer to the current complaint will be due by May 21, 2024, and the Court will promptly schedule an initial pretrial conference. If Plaintiffs do amend, then Defendants may file a motion to dismiss only those additional paragraphs added by way of amendment by May 21, 2024.

 **\*15**  SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2024 WL 1898512

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.