**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ROBECO CAPITAL GROWTH FUNDS
SICAV – ROBECO GLOBAL CONSUMER
TRENDS and CITY OF HIALEAH
EMPLOYEES' RETIREMENT SYSTEM,**
*individually and behalf of all others similarly
situated*,

                                  **Plaintiffs,**

                  -against-

**PELOTON INTERACTIVE, INC., JOHN
FOLEY, WILLIAM LYNCH, JILL
WOODWORTH, THOMAS CORTESE,
MARIANA GARAVAGLIA, and HISAO
KUSHI,**

                                  **Defendants.**

---

**21-cv-9582 (ALC)(OTW)**


**OPINION AND ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends

("Robeco") along with City of Hialeah Employees' Retirement System ("City of Hialeah"),

together ("Plaintiffs") bring this securities class action against Peloton Interactive, Inc. ("Peloton"

or "the Company"), John Foley ("Foley"), William Lynch ("Lynch"), Jill Woodworth

("Woodworth"), Thomas Cortese ("Cortese"), Mariana Garavaglia ("Garavaglia"), and Hisao

Kushi ("Kushi") (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder

on behalf of itself and a class of all persons who purchased Peloton common stock between

February 5, 2021 and November 4, 2021 (the "Class Period").

Currently pending before the Court is Defendants' motion to dismiss the Second Amended

Complaint. (ECF No. 93). Drawing all reasonable inferences in Plaintiffs' favor, the Court finds

that Plaintiffs have not articulated sufficient factual allegations to carry their assertions beyond the speculative level: many of Defendants' alleged misstatements are statements of non-actionable corporate optimism or are protected by the PSLRA safe harbor, and Plaintiffs have not asserted sufficient facts demonstrating Defendants' statements were materially false when made.  For these reasons, Defendants' motion is **GRANTED**.

## **BACKGROUND**

### I.    **Factual Background[1]**

#### A.  **The Parties**

Lead Plaintiff Robeco Capital Growth Funds SICAV is an "open-ended investment company based in Rotterdam, Netherlands" that purchased common stock at allegedly artificially inflated prices during the Class Period.  (SAC, ECF No. 92 ¶ 13).

Plaintiff City of Hialeah Employees' Retirement System is a "benefit pension plan based in Hialeah, Florida" that "provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah." (*Id.* at ¶ 14).

Defendant Peloton Interactive, Inc. ("Peloton") is a fitness company that manufactures and produces stationary bikes and treadmills (referred to as "Connected Fitness products").  (*Id.* ¶ 15.) The Company sells a monthly subscription service that allows users to participate in remote fitness classes using the Company's online fitness platform.  (*Id.*)

The "Management Defendants" consist of high-ranking members of Peloton's executive leadership.  Defendant Foley is the Executive Chair and co-founder of Peloton.  (*Id.* ¶ 16.)  He also served as Peloton's Chief Executive Officer and as a member of the Board of Directors.  (*Id.*)

---

[1] The following facts are drawn from the Second Amended Complaint ("SAC"), Defendants' Memorandum in Support of their Motion to Dismiss, Plaintiffs' Opposition Brief, and documents relied upon therein.

Defendant Lynch is another co-founder of Peloton and served as the President and a member of the Company's Board of Directors.  (*Id.* ¶ 17.)  Defendant Woodworth was Peloton's former Chief Financial Officer.  (*Id.* ¶ 18.)  Plaintiffs allege that the Management Defendants made misleading statements to investors while in possession of material, non-public adverse information about Peloton.  (*Id.* ¶¶ 16-18.)

The "Insider Trading Defendants" are alleged to have traded Peloton common stock on the basis of material, nonpublic information.  (*Id.* ¶¶ 20–23.)  Defendant Kushi is Peloton's Chief Legal Officer and another co-founder.  (*Id.* ¶ 20.)  Defendant Garavaglia was Peloton's Chief People Officer and Chief Business Officer.  (*Id.* ¶ 21.)  Defendant Cortese is another of Peloton's co-founders and its Chief Operations Officer until August 2021.  (*Id.* ¶ 22.)  He was subsequently named as the Company's Chief Product Officer.  (*Id.*)

**B.  Allegations of Declining Demand for Peloton's Products**

In the wake of the business closures enacted in the face of the COVID-19 pandemic, demand for Peloton's products increased exponentially.  (*Id.* ¶ 110.)  Peloton began to experience supply chain logistic issues and substantial backlogs in delivering its Connected Fitness products to its customers.  (*Id.* ¶¶ 27-32.)  In response, Plaintiffs allege that Peloton significantly ramped up its production capacity and told investors that it would be making investments into its supply chain in order to keep up with the soaring demand.  (*Id.* ¶ 115.)  By early 2021, however, Plaintiffs allege that this surge in demand had begun to wane as COVID-19 vaccines became more widely accessible and brick and mortar gyms began reopening.  (*Id.* ¶ 204.)  Plaintiffs allege that Defendants hid the true nature of the declining demand to investors and publicly stressed that its investment into its supply chain was necessary and appropriate given the sustained demand for its products.  (*Id.* ¶ 248.)

As analysts and investors began to question whether Peloton's explosive success could be maintained after the peak of the COVID-19 pandemic, Defendants allegedly continued to assure the public that demand for Peloton's products remained strong. (*Id.* ¶¶ 165, 167, 185, 190, 202, 205, 268.) However, Plaintiffs allege that by early 2021, Peloton and its management knew that the demand for its products had begun to decline. Specifically, Plaintiffs allege that Defendants received regular reports from sales management software such as Looker, Salesforce, Slack, and Callidus, showing that sales had declined. (*Id.* ¶ 117.) Plaintiffs allege that sales personnel were regularly missing their sales quotas (even after they had been reduced), which was reported to Defendants. (*Id.* ¶¶ 34, 135, 183). Plaintiffs also cite Peloton's rising inventory levels as indication that demand for its products was decreasing. (*Id.* ¶¶ 191. 193, 233-244.) Plaintiffs also note that Peloton was forced to reduce the price of its bikes in order to increase sales. (*Id.* ¶¶ 31, 189, 192-93, 199, 201.)

Plaintiffs substantiate these allegations by relying on the statements of several confidential witnesses ("CWs"), consisting of 32 former Peloton employees. (*Id.* ¶¶ 25–108.)

In the SAC, Plaintiffs allege the following:[2]

First, at least 11 additional CWs confirm that demand had cratered in early 2021. (*Id.* ¶ 132.) These new CWs verify that Defendants regularly received reports generated by sophisticated sales software that tracked sales metrics and analytics in real time. (*Id.* ¶¶45, 60-61, 86, 117-22.) These reports revealed that sales were declining throughout 2021. (*Id.* ¶¶33-35, 45-46, 60-62, 130-32.) According to one CW, the former Senior Director of Operations and Supply Chain Program Management, Defendants were warned that inventory levels far outpaced demand. (*Id.* ¶¶ 27-32.) Second, new CWs confirm that sales personnel regularly missed their quotas, even when lowered,

---

[2] *See* Pl. Opp. at 3-4 (ECF No. 98).

information that was tracked by and reported to Defendants. (*Id.* ¶¶87-88, 102, 130, 134-35.) The new CWs state that quotas were missed because the demand for products wasn't there. Third, Peloton's inventory levels rose rapidly as sales declined. (*Id.* ¶¶ 98-105.) The CWs stated that the Management Defendants received software generated reports that tracked company-wide inventory and sales data in real time, which showed that "less inventory was moving." (*Id.* ¶¶36-38, 47-51, 52-55, 124-29, 132-33, 140-43.) Shipments of bikes from Peloton's largest warehouses across the country had declined by almost 50% by April of 2021. (*Id.* ¶¶37-38, 81, 132.) As a result, warehouses struggled to find space to store inventory, and Peloton left inventory sitting outside in warehouse yards and paid hefty demurrage fees to let containers of equipment sit at international 4 and domestic ports for months on end. (*Id.* ¶¶31, 52-58, 108, 141).

**The Alleged Misstatements[3]**

Plaintiffs allege that Defendants made the following materially false and misleading statements from February 5, 2021 until November 4, 2021 during the Class Period:

- **Feb. 4, 2021 2Q21 Earnings Call[4]**

    Analyst: "Jill, you mentioned that manufacturing capacity exceeds demand. I just want to clarify that strictly because you ramped capacity, **or are you seeing any change to demand due to extended order to delivery times**? [...]

    Foley: "Thanks Doug. We're going to do a switcher I'm going to take the first one, and then I think William and I can talk about Precor. **We are not seeing a softening in demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand even in the phase of light marketing.** As you know, the successes that we're seeing in getting the order to delivery down and getting our backlog down are 100% based on incredible upgrades, and our manufacturing capacity up to over six times -- 6x increase in just the last 12 months in our capacity of them know - - we're now making more Bikes on a monthly basis than we did in all of fiscal 2018. So it's a Herculean effort based on our in-house manufacturing teams and our third-party partners.

---

[3] The statement numbers correspond to those designated by the Court in its March 30, 2023 Opinion and Order with respect to the First Amended Complaint (ECF No. 88). Plaintiffs no longer challenge ten of the Statements from that Complaint, i.e., those that the Court labeled Statements 4, 5, 6, 7, 8, 12, 15, 16, 17, and 18. (See ECF No. 88, pp. 5-11.)

[4] All italicized and bolded texts are as filed in the Amended Complaint.

And so yeah, I hope that answers your question. **But it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand."** (*Id.* ¶ 154 ("Statement 1").)

- **Feb. 4, 2021 2Q21 Earnings Call**

  Woodworth: "And I would just highlight obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products.**" (*Id.* ¶ 155 ("Statement 2").)

- **Feb. 4, 2021 2Q21 Earnings Call**

  Analyst: "[J]ust thinking about the opening next year, some of the e-commerce companies had a showdown in September and October, and then reaccelerated due to lockdown. Did you see anything in the fall and how are you thinking about that."

  Foley: "When the vaccine was announced in the fall, you saw a reaction to the stock, we did not see any reaction to our sales or demand. We still have not seen any softening since that vaccine was announced and since the vaccine has been rolling out. So other than investors getting nervous, the consumers are still feeling like they want to work out at home The experience to William's point is the best in the world and it's getting better as we launch more software features, more content types, more access on more different platforms. And I think what you're seeing is everyone's starting to realize that working out at home is a better place. It's a better value. And so, we're very bullish on our sales opportunities on the other side of the opening to your point. So we remain very, very bullish on our opportunity. And like Jill did say, we're excited to get on the offensive and start marketing because the story is incredible, the products and the experiences are incredible, and they're getting better by the month. So we've remained very, very bullish on our opportunity. **We haven't seen any softening of demand.**" (*Id.* ¶ 156 ("Statement 3").)

- **May 7, 2021 Form 10-Q**

  Peloton: "The increase in net operating assets and liabilities was primarily due to a $442 million increase in accounts payable and **accrued expenses related to increased inventory** and other expenditures to promote general business growth, as well as the timing of payments, partially offset by a **363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**" (*Id.* ¶ 168 ("Statement 9").)

- **May 25, 2021 Analyst Conference**

  Analyst: "how do you get people comfortable with where Bike demand is heading into warmer weather and into strong reopening[?]"

6

Woodworth: "Well, first, I would say, and I think we said this after the launch of Bike+ is that truly the technology and the innovation that we've brought with the Bike+ has been incredibly well received. And so I think we continue to see Bike+ exceeding our expectations on mix. And so with that said, the comments that I made around bike demand in Q4 is that we all know that COVID was a little bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, and everybody -- I mean, I was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this juncture, it's not relevant. So what I was trying to do was, okay, well, let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand.** And what's so interesting about our company today, versus 2 years ago, is that we now have the portfolio of products, right? We have the lower price bike at $49 a month. We have Bike+ which I've said is doing very well. We also are back marketing, again, which is something we haven't done and we were purely organic for so many months because we didn't want to exacerbate the OTD situation." (*Id.* ¶ 177 ("Statement 10").)

- **Aug. 26, 2021 4Q21 Earnings Call**

  Woodworth: "For fiscal [year] 2022 we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR."

  "**We are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of continued strong demand.**" (*Id.* ¶ 174 ("Statement 11").)

- **Aug. 26, 2021 4Q21 Earnings Call**

  Analyst: "…**And the second question on the supply chain, we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet**. Outside of the cost headwinds that you talked about for supply chain, are you worried at all about actually getting product to the consumer over the next -- basically through the holiday season?"

  Lynch: "Well, I can take the second question first. This is William. In terms of the guidance that Jill provided, we feel like we've built -- and the investments that John and Jill talked about, we built the infrastructure to support our holiday plans. As Jill noted, we feel like fiscal year '22 is going to be a return to more **seasonality. So a large part of our business is in Q2, Q3. And certainly, that's true of deliveries. And so everything in the supply chain from inventory that you're noting, the accumulation up on the balance sheet to warehousing and how we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.** We're very excited both in terms of the Bike growth that Jill noted and then the launch of Tread, which we expect to be very large over time. And

so there's -- a lot of companies aren't in that position or reading in automotive, some of the shortages on chips and semis. So we're very proud of our team. We think our partners, TI, others who have helped us get in that position. So inventory is up. We are building inventory. As you know, the lead times with ocean freight and freight, in general, have extended. And so we've been diligent about learning from the past and feel like we're in a really good position to execute this plan this year."  (*Id.* ¶ 186 ("Statement 13").)

- **Aug. 26, 2021 4Q21 Earnings Call**

Analyst: "One for John and one for Jill. John, we know there's seasonality. But just given the light 1Q guide, is the price -- is the Bike price gotten offensive or defensive? And how do you think about demand for Bike+ currently? And then, Jill, hoping you can walk through a little bit more detail around the Tread gross margin structure perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you."

Foley: "**Thank you, Doug. So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness, which has, as you know, always been in our playbook.** This is actually the first year since we founded the company that we had the opportunity to do this, and we're super excited that the investments we've made in our supply chain certainly over the last few years, but definitely in the last 12 months, are bearing enough fruit that we have the capacity to make what will become -- what will look like close to 2 million fitness units of hardware this year, which is just incredible considering, when we founded the company, we approached the biggest contract manufacturer we could find, and they said that they were confident that they could make up to 10,000 Bikes a year. That was only eight years ago. So the scale of which we've seen and put in place and invested in across our entire supply chain with Bikes. And now, obviously, it includes Treads. And the lower priced Tread as well allowed us to consider lowering the price of B1, and we think it's the right thing for our business, obviously, solving for net new sub adds, which was kind of our True North of getting more people into the tent and thinking about the LTV of those users, not just, Doug -- interestingly, not just as a subscriber for the $39 for a new Bike sub, which has always been kind of our True North and the golden goose of our business model, but think about selling those same people, the same households, future Treads, and future products, apparel and all the other stuff that becomes a much broader LTV picture over time."  (*Id.* ¶ 187 ("Statement 14").)

- **Nov. 4, 2021 1Q22 Earnings Call**
  Foley: "Looking ahead, we're about to enter our busiest time of the year. **Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period.**" (*Id.* ¶ 205 ("Statement 19").)

- **May 6, 2021 Form 10-Q' August 26, 2021 Form 10-K; November 4, 2021 Form 10-Q**

"*If* we fail to accurately forecast consumer demand, we *may* experience excess inventory levels or a shortage of products available for sale . . ." ((*Id.* ¶ 214 ("Statement 20").)

### C. Peloton Reveals Decline in Demand to the Public

In Peloton's annual report for the fourth quarter of fiscal year 2021, the Company informed the market about a "material weakness" in the Company's internal controls related to inventory reporting. (*Id.* ¶ 286.)

Subsequently, on November 4, 2021, Peloton announced its financial result for the fiscal year 2022 and disclosed that it had revised its full-year revenue guidance to a range of $4.4 billion to $4.8 billion, down from $5.4 billion. (*Id.* ¶ 219.) The Company also announced that 91% of its inventory on hand remained unsold. (*Id.* ¶ 223.) Plaintiffs allege that this decline in demand was because Peloton's customers "were increasingly free to exercise outside the home." (*Id.*)

In the 1Q22 Earnings Call, Foley explained to the public:

> "As you all well know, stay-at-home and work-from home orders, coupled with commercial gym closures drove massive awareness gains for Connected Fitness, accelerating an adoption curve that was already well underway. Given the unprecedented circumstances presented by the global pandemic, we said last quarter that modelling the exit from COVID and the massive growth we saw in fiscal 2021 would be a challenging task, and that has certainly proven to be true.
>
> We reduced backlogs, our visibility into our future performance has become more limited. From forecasting consumer demand to accurately predicting logistics costs, our teams have never seen a more complex operating environment in which to guide our expected results this year.
>
> As noted in our shareholder letter, we are reducing our guidance for fiscal year 2022. We have returned to presenting ranges given the uncertainty. The swift timing of these changes since giving our initial guidance in August is not lost on us.
>
> As we prepared our previous guidance, we had to make assumptions about consumer behavior coming out of COVID, the impact of our

original Bike price reduction and the cost structure within our Connected Fitness segment, all against the backdrop of a global supply chain crisis [….]

While we continue to see a nearly 100% two-year growth CAGR in both traffic and unit sales in Q1 and into Q2, we've seen a greater-than-anticipated taper of our website traffic levels over the past two months and a slower-than-expected pickup in retail showroom traffic, both of which are important inputs into our forward-looking demand model.  This reduction in traffic has added increased near-term uncertainty into our forecast.

As expected, our original Bike price reduction created a step shift in demand, helping to broaden our demographic mix and expand our market opportunity. The price move did significantly improve our e-commerce conversion rate, in fact, greater than we expected, but not enough to offset the year-over-year declines we have seen in overall traffic.

We saw a positive and sustained reception to the price moves in our international markets. This was anticipated as our international consumers have proven to be more price sensitive. To maintain a premium end-to-end member experience, we made significant investments over the past year to scale manufacturing, logistics and operations. Overall, we believe we met the challenge, but there's no doubt that in some cases, we overcorrected. That combined with the reduction to our demand picture and higher than expected costs across product, transportation and delivery are causing a near-term compression of our hardware margins.

[…]

We track our estimated market share closely. And while sales are currently not meeting our previous forecast, third-party data suggests that we continue to build on our leading share of the Connected Fitness market. We firmly believe at-home fitness customers will want one subscription for a comprehensive home fitness platform and we are determined to be that one subscription."

(Engel Decl., Ex. 11, ECF No. 68 at 3–5.)

Plaintiffs allege that this disclosure directly contradicted Defendants' representations from the prior few months and that this information shocked the market.  (*Id.* ¶¶ 223-27.)  Peloton's stock price dropped by 35%, declining from a price of $86.06 per share to a closing price of $55.64

per share.  (*Id.* ¶ 225) On a February 8, 2022 earnings call, Peloton announced that Foley would be stepping down as CEO and instead serve as executive chair of the Company's board of directors. (*Id.* ¶ 237.)  The Company also announced that Lynch would be stepping down from the board of directors.  (*Id.*)  As of September 12, 2022, Foley had resigned from the board of directors.  (Pl.'s Mem., ECF No. 69 at 7 n.3.)

### D.  Scienter Allegations

Plaintiffs allege that when Defendants learned that demand for their products was declining, the Management Defendants and Insider Trading Defendants sold their shares of Peloton stock at inflated prices.  (*Id.* ¶¶ 245-45.)   In particular, Plaintiffs allege that the Management Defendants and Insider Trading Defendants either suspiciously deviated from their 10b5-1 trading plans or engaged in "highly erratic and irregular trading behavior", suggesting that they had sold Peloton shares during the class period on the basis of material nonpublic information before the truth emerged that demand for Peloton's products was declining.  (*Id.* ¶ 291.)  Plaintiffs also allege that because the Management and Insider Trading Defendants had pledged a "substantial percentage" of their shares during the Class Period, they were motivated to keep Peloton's stock price artificially high.  (*Id.* ¶¶ 282.)

### II.  Procedural Background

The Complaint was filed on November 18, 2021.  (ECF No. 1.)  On May 2, 2021, Robeco was appointed as Lead Plaintiff and this action was consolidated with 21-cv-10266 (ALC)(OTW) *Deulina v. Peloton Interactive, Inc. et al.*  (ECF No. 42.)  Thereafter Plaintiff filed an Amended Complaint on June 25, 2022.  (FAC, ECF No. 51.) Defendants filed a motion to dismiss on August 22, 2022, ECF No. 66), which the Court granted on March 30, 2023 (ECF No. 88, "Ord."). Plaintiff Plaintiff Robeco, together with a new Plaintiff City of Hialeah, filed their Second Amended

Complaint on May 6, 2023 (ECF No. 92), and Defendants filed their Motion to Dismiss the Second Amended Complaint on June 16, 2023. Plaintiffs filed their Opposition on July 21, 2023 (ECF No. 98). Defendants filed their Reply on August 18, 2023. This Motion is fully briefed. Oral argument was denied on April 2, 2024. (ECF No. 103).

## LEGAL STANDARDS

### I.    Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

## II.    Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Importantly, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 397 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, issuers have a duty of

disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

### III.    Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### DISCUSSION

### I.    Plaintiffs Have Failed to Cure Deficiencies and Have Not Pleaded an Actionable Misstatement or Omission

### A.  Safe Harbor for Forward-Looking Statements

Plaintiffs' second amended complaint has still failed to cure the deficiencies the Court has specified in its dismissal of the first amended complaint, namely that the challenged statements are non-actionable, forward-looking statements that fall within the PSLRA's statutory safe harbor.

A "forward-looking statement" is (1) "a statement containing a projection of revenues, income. . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(A)-(C); *see also In re Vivendi*, 838 F.3d at 246.  These statements are subject to the PSLRA's safe harbor which provides, in relevant part, that: "[A] defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *Id.* at 245–46 (citation omitted).  To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague."  *Id.* at 247 (citation omitted).  However, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful."  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton v. American Exp. Co.*, 604 F.3d 758, 768–69 (2d Cir. 2010)).

In its previous order, the Court found that Statements 1, 11, and 13 were forward-looking. Plaintiffs have not put forth any additional facts or evidence for the Court to determine otherwise. Defendants also identify five other statements allegedly protected by the PSLRA safe harbor:

Statements 2-3, 10, 14, and 19. They argue that these Statements related to Defendants' projections regarding the future. Statements 2 and 10 explained that "robust" demand was reflected in Peloton's sales guidance. SAC ¶ 155 (demand is "reflected in the revised revenue guidance that we've given"); id. ¶ 177 (discussing "where we expect to be in terms of bike in Q4 of this year"). And Statements 3, 14, and 19 all refer to Peloton's future opportunities and plans. Id. ¶ 187 (in response to question about "1Q guide," explaining supply-chain had "capacity to make what will become—what will look like close to 2 million fitness units"); id. ¶ 156 ("we're very bullish on our sales opportunities on the other side of the opening"); id. ¶ 205 ("Looking ahead, we're about to enter our busiest time of the year. Our inventories are healthy and our logistics teams are well-equipped"). Statement 20 is also arguably forward-looking and cautionary. ("*If* we fail to accurately forecast consumer demand, we *may* experience excess inventory levels or a shortage of products available for sale . . ." id. ¶ 214. Plaintiffs assert that these Statements are not in fact forward-looking, but statements of then-existing fact. This argument fails. These statements clearly describe future economic performance and are "paradigmatic forward-looking statements protected by the safe harbor." *Gray v. Wesco Aircraft Holdings, Inc*., 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *23-25 (S.D.N.Y. Sept. 2, 2022).

Moreover, these forward-looking statements are accompanied by meaningful cautionary language. Statements 1-3, 10-11, 13-14, 19-20 were accompanied by extensive company-specific warnings that actual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated. While it is true that "cautionary words about future risk cannot insulate from liability an insurer's failure to disclose the risk that has, in fact, materialized in the past and is virtually certain to materialize again," *Set*

*Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021), such is not the case here. As this Court has already determined, Peloton warned of the very risks alleged to have later occurred, including "a change in consumer spending preferences" due to "the COVID-19 pandemic," and the "uncertain[ty of] how the COVID-19 pandemic will impact Subscriber renewal rates in the long-term." Ord. at 20 (citing Ex. 1 at 40, 50).[5] Peloton also warned that "our revenue growth rate is likely to slow down as our business matures," particularly if "the market for our products . . . does not continue to grow" or "grows more slowly than we expect," and cautioned that "past financial results may not be indicative of our future performance" due to its "limited operating history." *Id*. 19-20 (citing Ex. 1 at 40-41). These extensive warnings about the risk and uncertainty of future subscriber growth were specified in Peloton's Form 10-q, issued on February 4, 2021, the same day of the 2Q21 Earnings Call (where Statements 1-3 took place). Moreover, the 2Q21 Earnings Call began with cautionary language. Peter Stabler, Head of Investor Relations, beginning 2Q21 Earnings Call noting:

> Our comments and responses to your questions reflect management's views as of today only and will include statements related to our business that are forward-looking statements under federal securities law. Actual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated with our business. For a discussion of the material risks and other important factors that could impact our actual results, please refer to our SEC filings and today's shareholder letter, both of which can be found on our Investor Relations website. (*See* Ex. 7., ECF No. 96-7).

And, these very detailed warnings were substantively repeated in Peloton's SEC filings throughout the Class Period. (*See, e.g.*, *id.*, Ex. 2, ECF No. 68-2 at 17 ("The full extent of the impact of COVID-19 on our business and financial results will depend largely on future developments, including upon the removal of lockdowns may cause, consumers to go back to

---

[5] The Court "may take judicial notice of the full contents of the SEC's filings relating to this enforcement action because plaintiffs rely upon portions of them in their pleadings." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 354-55 n.5 (2d Cir. 2010).

their pre-COVID routines…"); *id.* Ex. 3, ECF No. 68-3 at 45 (same)) Peloton's "substantive company-specific warnings" are the precise type of "extensive and specific" factors that courts find meaningfully cautionary. *See, e.g.*, *Gray*, 454 F. Supp. 3d at 392 (dismissing where company had specific risk warnings).

The Court finds that this language is sufficiently specific to shield Defendants from liability for their forward-looking statements. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 534 (S.D.N.Y. 2021); *See Rombach*, 355 F.3d at 173-74 (affirming dismissal of claims based on "[c]autionary words about future risk" where plaintiffs' "allegations do not support an inference that the company was in trouble" and are "consistent with unremarkable circumstances short of financial peril or instability"); *see, e.g.*, *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y., 2014) (FDA approval statements made on conference calls and in press releases not actionable under PSLRA safe harbor because of publicly filed docs that contradicted plaintiff's allegations).

## B. Falsity

Once again, Plaintiffs have failed to adequately plead falsity as to any of the Challenged Statements, including the newly Challenged Statements 19-20, because none of the Challenged Statements was false.

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996). A statement believed to be true when made, but later shown to be false, is insufficient. *Id.* (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future

performance"); *see also Novak v. Kasaks*, 216 F.3d at 309 ("refus[ing] to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (internal citations omitted), *cert. denied*, 531 U.S. 1012 (2000).

As the Second Circuit has recently specified in *Leadersel Innotech ESG v. Teladoc Health, Inc.*, "[a] material misrepresentation or omission must be both (1) false or misleading, and (2) material. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019). Whether a statement is false or misleading is 'evaluated not only by literal truth, but by context and manner of presentation.' *Id.* at 63 (internal quotation marks and citation omitted). For a statement to be misleading, a plaintiff must plead that the speaker omitted facts whose omission makes the statement misleading to a reasonable investor. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187-89, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015). 'An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.' *Singh*, 918 F.3d at 63 (internal quotation marks and citation omitted). Similarly, for an alleged statement to be "material" under Section 10(b), we have held that it 'must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome[.]' *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) *Leadersel Innotech ESG v. Teladoc Health, Inc.*, 2024 U.S. App. LEXIS 24196, *4-5 (2d. Cir., Sept. 24, 2024). Plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174. "The key question in considering the misleading nature of a statement is 'whether defendants' representations, taken

together and in context, would have misle[d] a reasonable investor[.]'" *In re Skechers USA, Inc.*

*Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (internal citations omitted).

This Court has already recognized, "Peloton's performance exceeded its sales guidance throughout the Class Period," meaning the "challenged statements were entirely consistent with Peloton's actual financial results." Ord. at 23. Throughout the Class Period (1) Peloton explained that demand expectations were "reflected in" its "revenue guidance," see SAC ¶¶ 155, 185; (2) Peloton achieved that guidance each quarter; and (3) those results reflected YoY growth. Exs. 1-3, 6-11, 13; Ord. 23-24. Rather than promising that the unprecedented demand that Peloton had seen during COVID closures would remain at the same level," Defendants told investors "that the rapid increase in demand for Peloton's products could not be sustained at COVID levels". Ord. at 24-25 (emphasis added); see also SAC ¶ 177 (COVID was "an anomaly last year in terms of sales").

First, Plaintiffs challenge a statement from November 4, 2021 (Statement 19), where Foley said that "[l]ooking ahead" Peloton had "healthy" inventories and was "well-equipped for the seasonally strong sales period" in 2Q22. SAC ¶ 205; App. A at 19. Plaintiffs claim the statement was misleading because "sales were declining," and there was "no sign of sales rebounding at any time through November 2021." See SAC ¶ 207. But, Peloton achieved its 2Q22 sales guidance, which reflected year over year growth (2Q22 revenue guidance listing $1.1-1.2 billion, actual revenue achieved $1.134). See Exs. 1-3, 6-13. Moreover, Plaintiffs claim that nearly every Challenged Statement was false and misleading because according to CWs some Inside Sales staff missed their sales quotas. See SAC ¶¶ 158, 170, 179, 189 (discussing allegations by CW2, CW6, and CW10). Plaintiffs allege only that some employees in one channel (Inside Sales, which comprised a minority of total sales) missed quotas, although Peloton had three sales channels. See

Ex. 2 at 24. Because Plaintiffs' anecdotal allegations thus say nothing about Peloton's performance "as a whole, they do not support an inference of falsity. *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018); *see also Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *12 (S.D.N.Y Mar. 29, 2021) (no falsity where no dispute defendants reported "results accurately").

Second, Plaintiffs claim that Statement 20 is materially false and misleading because the purported "risk" had already materialized. In Peloton's SEC filings made on May 6, 2021; August 26, 2021 and November 4, 2021 (SAC ¶ 214), Defendants stated: "If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale." But Peloton's inventory growth does not prove falsity. The SAC claims, based on allegations from low-level CWs, that the Challenged Statements were false because there was not "strong" demand for Peloton products, as evidenced by "excessive" inventories. See SAC ¶¶ 170, 179, 189, 207. But the CW allegations conflict with Plaintiffs' own allegations. See Ord. at 24. Several CWs allege there was "excess inventory" at "Christmastime in 2020" or "early 2021," SAC ¶¶ 38, 48, 71—when even Plaintiffs admit Peloton experienced "unprecedented" demand and was "supply constrained." Id. ¶¶ 1, 165; Ord. at 24 (CW allegations "need not be credited" where inconsistent with "totality of the facts"). Peloton has sufficiently alleged that its Class Period inventory was not "excessive"—Peloton purposefully built inventory to improve delivery times and Peloton warned not of "excessive" inventory generally, but that excessive inventory "may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices," which would negatively impact Peloton's financials. Ex. 3 at 52. *See Hou Liu v. Intercept Pharms.*, Inc., 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) ("no [] allegations" that risk materialized); *see also Williams*, 869 F.3d at 243 ("adverse effects at issue" had not yet been

realized. To avoid a repeat of long order to delivery times during the busy holiday season in 2020, Defendants built "ample inventory" to ensure quick delivery "during the holiday and New Year's resolution periods." Ex. 11 at 6; SAC ¶ 170. Peloton was "abundantly transparent" about its inventory plan, and Plaintiffs ignore that Peloton "met its guidance" throughout the Class Period. *See Insperity, Inc*., 2022 WL 784017, at *8.

In balance, no reasonable investor could have been misled by these purportedly false statements, because they were in fact, true. Peloton told investors what it expected demand to be through its quarterly sales guidance, how it planned to build inventory to meet demand, and then met or exceeded that guidance throughout the Class Period. In *Teladoc*, the Second Circuit found that certain statements made from multiple former employees responsible for integrating the two companies' sales forces were directly contradicted by confidential witnesses and supporting documents. Following an $18.5 billion merger between two large telehealth companies, the *Teladoc* defendants told investors that the companies had "fully integrated" their "commercial organization" and "sales team[s]" although the companies were not fully integrated when defendants made these statements. 2024 WL 4274362, at *1, 4-5. This is not the case here. Plaintiffs' SAC alleges no specific facts contradicting any of Defendants' statements, and none of the confidential witnesses here had any involvement in or responsibility for assessing Peloton's overall demand or the preparation of Peloton's sales guidance.

And as this Court notes again, the "challenged statements were entirely consistent with Peloton's actual financial results." Ord. at 23. Plaintiffs have failed to adequately plead that any of the Challenged Statements were false or materially misleading.

### C. Statements of Corporate Optimism

"[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable."). As the Second Circuuit has explained, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."). *See Leadersel Innotech ESG v. Teladoc Health, Inc*., 2024 U.S. App. LEXIS 24196, *5-6 (setting forth corporate optimism standards).

The Court has already found that Statement 9 constitutes inactionable corporate puffery. Ord. at 22. Certainly, Foley's Statement during the November 9, 2021 1Q22 Earnings Call (SAC ¶ 205), "Looking ahead, we're about to enter our busiest time of the year. Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period" is precisely the type of vague expressions of optimism that courts in this district have dismissed. *See, e.g.*, *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018); *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398-99 (S.D.N.Y. 2018) (statements about the company's "competitive advantage" were mere puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (statements suggesting "Xerox's confidence in its competitiveness" and "vaguely and

enthusiastically describ[ing] Xerox's performance, [and] expectations of business success" were non-actionable puffery); *compare, e.g.*, *Teladoc*, 2024 WL 4274362, at *3 (integration is "going really great," "continues to progress," "well on [the] way," and "on track") with SAC ¶¶ 177, 185-186, App. A at 10-11, 13 (Peloton expects "continued strong demand"; "Bike+ exceeding our expectations"; "we're in a really good position" and are "staging for what will be our biggest holiday ever").

Accordingly, the Court finds that the above-listed statements are inactionable as a matter of law.

### D.  Non-actionable Opinion Statements

Although Statement 20 is arguably forward-looking, the Court certainly finds that it is a non-actionable opinion statement. Statements of opinions are actionable "if either 'the speaker did not hold the belief [he] professed' or 'the supporting facts [he] supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc.*, 575 U.S. at 186); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) ("Subjective statements can be actionable only if the defendant's opinions were both false and not honestly believed when they were made." (internal quotation marks and citation omitted). Plaintiffs argue that Statement 20 is a misleading statement by omission. But the cautionary ("if") and qualifying ("may") language accompanying the Statement is strikingly similar to the kinds of "evaluative assessments" dismissed as nonactionable statements of opinion. *Xerox*, 300 F. Supp. 3d at 575.

### II.    Scienter

Because Plaintiffs have failed to plead any actionable misstatement or omission, the Court need not reach the question of whether Plaintiffs have adequately pleaded scienter.  *See Singh v.*

*Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *see also Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020).

### III.    Section 20(a) and Section 20A Claims

As Plaintiffs have failed to adequately allege their § 10(b) claim, the claims under § 20(a) also fail as a matter of law.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).  Likewise, Plaintiffs' insider trading allegations necessarily fail because they has failed to plead an adequate predicate § 10(b) claim.  *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364 (S.D.N.Y. 2005).

### IV.    Denial of Leave to Amend

A district court is not required to grant leave to amend when it grants a motion to dismiss based on pleading deficiencies. *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 Fed. Appx. 289, 296 (2d. Cir. 2021) (internal citation omitted). And Plaintiffs had ample opportunity to amend their complaint to cure deficiencies. It is thus "unlikely that the deficiencies . . . were unforeseen." *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 188. Given that Plaintiffs have yet to cure these deficiencies, even when the Court granted leave to file a 133-page Second Amended Complaint, the Court denies leave to amend the SAC. Further amendment will not cure these deficiencies given Plaintiffs' failure to show falsity in light of the cautionary language accompanying non-actionable forward-looking statements.

25

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) is **GRANTED**. Accordingly, this case is dismissed with prejudice. The Clerk of Court is respectfully requested to terminate the pending motion at ECF Nos. 93 and to close this case.

Dated:  September 30, 2024
     New York, New York

_____
       **ANDREW L. CARTER, JR.**
       **United States District Judge**