# MANDATE

1:21-cv-09582-ALC

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 18 2025

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of August, two thousand twenty-five.

Before:      Jon O. Newman,
             Denny Chin,
             Steven J. Menashi,
                  *Circuit Judges.*

_____

| | |
|---|---|
| City of Hialeah Employees' Retirement System, Individually and on behalf of all others similarly situated, Robeco Capital Growth Funds SICAV - Robeco Global Consumer Trends, | **JUDGMENT** |
| Plaintiffs - Appellants, | Docket No. 24-2803 |
| v. | |
| Peloton Interactive, Inc., Thomas Cortese, John Foley, William Lynch, Jill Woodworth, Mariana Garavaglia, Hisao Kushi, | |
| Defendants - Appellees. | |

_____

The appeal in the above captioned case from an order of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED in part and AFFIRMED in part and the matter is REMANDED for further proceedings consistent with this Court's opinion.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 09/18/2025**

24-2803
*City of Hialeah Employees' Retirement System v. Peloton Interactive, Inc.*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

––––––––––––

AUGUST TERM 2024
No. 24-2803

CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL
CONSUMER TRENDS,
*Plaintiffs-Appellants*,

v.

PELOTON INTERACTIVE, INC., THOMAS CORTESE,
JOHN FOLEY, WILLIAM LYNCH, JILL WOODWORTH,
MARIANA GARAVAGLIA, HISAO KUSHI,
*Defendants-Appellees*.[*]

––––––––––––

On Appeal from the United States District Court
for the Southern District of New York

––––––––––––

ARGUED: APRIL 11, 2025
DECIDED: AUGUST 27, 2025

––––––––––––

––––––––––––

[*] The Clerk of Court is directed to amend the caption as set forth above.

Before: NEWMAN, CHIN, and MENASHI, *Circuit Judges*.

Plaintiffs-Appellants City of Hialeah Employees' Retirement System and Robeco Capital Growth Funds SICAV brought this putative class action on behalf of investors who purchased common stock of Peloton Interactive, Inc., between February 5, 2021, and January 19, 2022. The plaintiffs alleged that Peloton and its executives violated the federal securities laws by making false and misleading statements about demand for the company's fitness products and inventory levels following the COVID-19 pandemic. The district court dismissed the complaint on the ground that the plaintiffs failed to allege any actionable material misstatement or omission of fact. We conclude that the complaint plausibly alleged an actionable material misstatement. We affirm in part, vacate in part, and remand to the district court for further proceedings consistent with this opinion.

Judge Newman concurs in part and dissents in part in a separate opinion.

---

KARIN E. FISCH (Daniel E. Berger, Cecilia E. Stein, Mica A. Cocco, *on the brief*), Grant & Eisenhofer P.A., New York, NY, *for Plaintiff-Appellant Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends*.

Hannah G. Ross (Avi Josefson, Jonathan D. Uslaner, Caitlin C. Bozman, *on the brief*), Bernstein Litowitz Berger & Grossmann LLP, New York, NY, *for Plaintiff-Appellant City of Hialeah Employees' Retirement System*.

MELISSA ARBUS SHERRY, Latham & Watkins LLP, Washington, DC (Andrew B. Clubok, Latham & Watkins LLP, Washington, DC, Michele D. Johnson, Latham &

Watkins LLP, Costa Mesa, CA, *on the brief*), *for Defendants-Appellees*.

MENASHI, *Circuit Judge*:

Plaintiffs-Appellants City of Hialeah Employees' Retirement System and Robeco Capital Growth Funds SICAV brought this putative class action on behalf of investors who purchased common stock of Peloton Interactive, Inc., between February 5, 2021, and January 19, 2022. The plaintiffs alleged that Peloton and its executives made false and misleading statements about consumer demand for the company's fitness products and inventory levels following the COVID-19 pandemic. The district court dismissed the complaint on the ground that the plaintiffs failed to allege any actionable material misstatements or omissions.

We agree with the district court that most of the alleged misstatements were not actionable. But we conclude that the plaintiffs plausibly alleged actionable misstatements or omissions based on three statements. We vacate the judgment of the district court insofar as it dismissed the claims based on those statements, and we otherwise affirm. We remand for further proceedings consistent with this opinion.

## BACKGROUND

"We review a district court's grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021) (internal quotation marks omitted). We rely on the facts alleged in the second amended complaint ("SAC") in deciding this appeal.

# I

Peloton is a fitness company that manufactures and produces stationary bikes and treadmills. It sells a monthly subscription service that allows users to participate in remote fitness classes using the company's online fitness platform. During the COVID-19 pandemic in 2020, demand for Peloton's products surged as gyms closed and consumers sought at-home fitness alternatives. Because of the increase in demand, Peloton began to experience supply-chain logistics issues and substantial backlogs in delivering its products to customers. In response, Peloton expanded its manufacturing capacity and told investors that it would invest in its supply chain to keep up with demand for its products.

By early 2021, the plaintiffs alleged, the surge in demand had waned as vaccines became accessible and gyms reopened. The plaintiffs alleged that Peloton and its executives concealed the declining demand from investors and publicly stressed that the company's investment in its supply chain was necessary given the sustained strong demand for its products.

The plaintiffs' allegations are supported by statements from thirty-one confidential witnesses, primarily former Peloton employees who worked in different departments and geographic locations. The confidential witnesses reported that (1) demand for Peloton's products began to decline significantly by early 2021; (2) sales personnel repeatedly missed their quotas, even after those quotas were reduced; (3) Peloton's internal systems tracked sales data in real-time, showing declining demand and sales; (4) inventory levels at warehouses increased dramatically, with facilities struggling to store excess inventory; and (5) by August 2021, Peloton had three months of excess inventory at shipping ports.

On November 4, 2021, Peloton disclosed that 91 percent of its inventory was unsold, and it reduced its earnings guidance by more than $1 billion. The next day, Peloton's stock price dropped by 35 percent. On January 20, 2022, additional news reports revealed that Peloton had halted production of its bikes to manage excess inventory. Peloton's stock price dropped an additional 24 percent following these reports.

## II

City of Hialeah Employees' Retirement System ("City of Hialeah") is a benefit pension plan based in Hialeah, Florida, that provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah. Robeco Capital Growth Funds SICAV ("Robeco") is an open-ended investment company based in Rotterdam, Netherlands. Both City of Hialeah and Robeco purchased Peloton common stock at allegedly artificially inflated prices during the period from February 5, 2021, to January 19, 2022.

In November 2021, City of Hialeah, on behalf of itself and similarly situated plaintiffs, filed a putative class action complaint against Peloton, Thomas Cortese, John Foley, William Lynch, Jill Woodworth, Mariana Garavaglia, and Hisao Kushi, alleging violations of § 10(b), § 20(a), and § 20A of the Securities Exchange Act of 1934 and of Rule 10b-5 promulgated thereunder. Robeco was appointed lead plaintiff in May 2022.

On June 25, 2022, Robeco filed an amended complaint, alleging that the defendants made eighteen statements about Peloton's demand and inventory that were knowingly false or misleading. The defendants filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), which the district court granted on March 30, 2023. The district court held that (1) eight of the

challenged statements were forward-looking statements protected by the statutory safe harbor of the Private Securities Litigation Reform Act of 1995 because those statements included "extensive" and "meaningful cautionary language"; (2) five of the challenged statements were non-actionable puffery, lacking "specific metric[s] on which the investing public would reasonably rely"; and (3) none of the challenged statements were materially false or misleading when made. *Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 538-42 (S.D.N.Y. 2023). The district court granted the plaintiffs leave to amend the complaint.

On May 6, 2023, Robeco filed the SAC, which contained additional facts from another twenty-four confidential witnesses and included additional alleged misstatements. The defendants again moved to dismiss. On September 30, 2024, the district court dismissed the SAC on the ground that the plaintiffs still failed to plead any actionable misstatements or omissions. *Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, No. 21-CV-9582, 2024 WL 4362747, at *9 (S.D.N.Y. Sept. 30, 2024). The district court decided that Peloton's statements were "entirely consistent with Peloton's actual financial results" and that the allegations based on confidential witness accounts were "anecdotal" and did not reflect Peloton's performance "as a whole." *Id.* at *11 (internal quotation marks omitted). Having concluded that the plaintiffs failed to plausibly allege a claim under § 10(b) and Rule 10b-5, the district court dismissed the remaining claims under § 20(a) and § 20A.

## DISCUSSION

"We review the district court's dismissal of a complaint *de novo.*" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 149 (2d

6

Cir. 2021). The SAC contained four counts. Counts I and III alleged that the defendants are liable for false or misleading statements in violation of § 10(b) of the Exchange Act and SEC Rule 10b-5. Count II alleged that Foley, Lynch, and Woodworth violated § 20(a) of the Exchange Act as controlling persons of Peloton when Peloton violated § 10(b). Count IV alleged that Cortese, Foley, Lynch, Woodworth, Garavaglia, and Kushi traded Peloton securities while in possession of inside information in violation of § 20A of the Exchange Act. The district court dismissed the SAC in its entirety. We address each count in turn.

<strong>I</strong>

Section 10(b) of the Exchange Act provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, … any manipulative or deceptive device." 15 U.S.C. § 78j(b). Rule 10b-5 implements the statute by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, … in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. The plaintiffs alleged that the defendants' statements about demand and inventory violated these provisions.

"To state a claim for relief under § 10(b) and Rule 10b-5, 'a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'" *Altimeo*, 19 F.4th at 149-50 (quoting *Setzer v. Omega Healthcare Invs.*,

7

*Inc.*, 968 F.3d 204, 212 (2d Cir. 2020)). "In addition, because such a claim sounds in fraud, the plaintiff 'must state with particularity the circumstances constituting fraud.'" *Id.* at 150 (quoting Fed. R. Civ. P. 9(b)). Under this heightened pleading standard, "plaintiffs must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Whether a statement is false or misleading is "evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (internal quotation marks omitted). "The test for whether a statement is materially misleading under Section 10(b) … is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Rombach*, 355 F.3d at 172 n.7 (quoting *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). "Similarly, for an alleged statement to be 'material' under Section 10(b), we have held that it 'must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome.'" *Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23-1112, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024) (alteration omitted) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)). "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174.

In this case, the district court held that the plaintiffs failed to plausibly allege any material misrepresentation or omission by the defendants. We agree with the district court that the following alleged misstatements are not actionable: (1) Woodworth's and Foley's statements during an earnings call on February 4, 2021, that demand was "strong," "robust," and "not … softening," App'x 680, 683;

(2) Peloton's statement in its Form 10-Q filed on May 7, 2021, about an "increase in inventory levels" to meet "current increased demand," *id.* at 549; (3) Woodworth's statement during an analyst conference on May 25, 2021, that—as compared to May 2019—there was still a "ton of demand," *id.* at 836; (4) Woodworth's and Foley's statements during an earnings call on August 26, 2021, that the company was entering fiscal year 2022 with a "normalized backlog" and had an "expectation of continued strong" and "robust" demand, *id.* at 734, 738; (5) Foley's statement during an earnings call on November 4, 2021, that the company's "inventories are healthy" for the upcoming holiday season, *id.* at 787; and (6) Peloton's risk disclosure in its Form 10-Q filed on May 7, 2021, which warned of potential financial consequences in the event of "excess inventory levels," *id.* at 564.

We reach a different conclusion as to the following alleged misstatements: (1) Foley's statement during an earnings call on August 26, 2021, describing the company's decision to reduce the price of its bike by $400 as an "absolutely offensive" business strategy, *id.* at 738; and (2) Peloton's warning of hypothetical risks regarding "excess inventory levels" in its Form 10-K and Form 10-Q filed on August 26 and November 4, 2021, *id.* at 424; *see also id.* at 250-51 (¶ 214).[1]

---

[1] These statements are included in those the district court numbered Statements 14 and 20. *See Robeco*, 2024 WL 4362747, at *5.

## A

We first address the statements that are not actionable as a matter of law.

## 1

During an earnings call on February 4, 2021, Foley stated: "*We are not seeing a softening of demand*. That is absolutely not what's happening here. *We are seeing incredibly strong organic demand*." App'x 680 (emphasis added). Woodworth added: "that's reflected in the revised revenue guidance that we've given for Q3 and Q4. … *[W]e're still seeing very strong organic demand* across all geographies across all products." *Id.* (emphasis added). Later in the call, Foley reiterated: "*We haven't seen any softening of demand*." *Id.* at 683 (emphasis added).

The plaintiffs argue that these statements were false or misleading because demand was not strong but declining. But the plaintiffs failed to plead with particularity that demand had softened by February 2021 when these statements were made. The SAC relied primarily on confidential witness accounts, but these accounts were inconsistent regarding when demand began to decline. Only one confidential witness consistently reported decreased demand *before* February 2021,[2] while most placed the beginning of any decline in demand in February, March, or later in 2021, after the statements were made.[3]

---

[2] *See* App'x 185 (¶ 34).

[3] *See* App'x 183 (¶ 28) (CW1 stating that "at the end of February 2021 or in March 2021, internal reports showed a significant softening of demand"); *id.* at 186 (¶ 37) (CW3 stating that a "downturn in sales" started "by April 2021"); *id.* at 195 (¶ 70) (CW12 stating that sales "slowed down by June 2021"); *id.* at 197 (¶ 81) (CW16 stating that "deliveries slowed in February or March of 2021"); *id.* at 198 (¶ 83) ("CW18 estimated that sales dropped

Moreover, Woodworth explicitly tied her statement about demand to Peloton's revenue guidance, which predicted $1.1 billion in quarterly revenue, representing 110 percent year-over-year growth. The company not only met but exceeded this guidance, achieving 141 percent year-over-year growth in the third quarter of fiscal year 2021. Woodworth's and Foley's statements about "strong" and "robust" demand were consistent with Peloton's then-current expectations of further growth, both quarter-over-quarter and year-over-year. "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

We agree with the district court that Woodworth's and Foley's statements during the earnings call on February 4, 2021, were neither false nor misleading when made.

**2**

In its Form 10-Q filed on May 7, 2021, Peloton reported "a $363.7 million increase in inventory levels as we ramped up supply to meet the *current increased demand*." App'x 549 (emphasis added).

The plaintiffs argue that this statement was false or misleading because it represented that Peloton had expanded its inventory to respond to increased demand when in fact "inventory accumulated

---

off significantly beginning in February 2021."); *id.* at 198-99 (¶ 84) (CW19 stating that "deliveries slowed" in "July 2021"); *id.* at 201 (¶ 90) (CW23 recalling that "business slowed down significantly" in "February of 2021"); *id.* at 202 (¶ 94) (CW24 stating that "orders were slowing" in "August or September 2021"); *see also id.* at 213 (¶ 132) (CW28 stating that "in December 2020, Peloton was still pretty busy"); *id.* at 203 (¶ 100) (CW27 describing consistent sales from January to June 2021).

because demand had declined." Appellants' Br. 27. The plaintiffs, however, read the statement out of context. The inventory increase described in the Form 10-Q referred to a specific year-over-year comparison between the first three quarters of fiscal year 2021 and the first three quarters of fiscal year 2020. Peloton explained that it had ramped up its inventory "to meet the current increased demand" compared to pre-pandemic levels—not compared to COVID peak levels. Demand in the first three quarters of fiscal year 2021 was indeed substantially higher than pre-COVID levels. Even if demand declined sequentially from the COVID peak, as the plaintiffs alleged, it remained above the pre-COVID baseline that formed the basis of the comparison.

We agree with the district court that Peloton's statement in the May 2021 Form 10-Q regarding "current increased demand" was not false or misleading about the period to which it referred.

**3**

During an analyst conference on May 25, 2021, in response to a question from an analyst about "where bike demand is heading into warmer weather and into strong reopening," Woodworth stated: "we all know that COVID was a little bit of an anomaly last year in terms of sales." App'x 836. She explained that the fourth quarter of fiscal year 2021 was therefore not the "relevant" comparator; what mattered was "Q4 of '19." *Id.* Comparing "where we were in Q4 of '19 [to] where we expect to be in terms of bike in Q4 of this year … bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, *we still see a ton of demand.*" *Id.* (emphasis added).

This statement was not false or misleading because Woodworth expressly acknowledged that COVID was an "anomaly" and framed

12

her comparison against pre-COVID levels from 2019, not COVID peak levels. The statement that demand was "still over 3x where it was a couple of years ago" was factually true and consistent with Peloton's financial results. Likewise, it was factually true that, as compared to May 2019, there was a "ton of demand" in May 2021.

The plaintiffs contend that Woodworth's statement was misleading because demand had significantly declined by May 2021, as evidenced by nationwide failures to meet sales quotas. The plaintiffs suggest that Woodworth's use of the word "still" implied a continuity of strong demand. Woodworth's statement was expressly comparative, however, because she focused on the "3x" growth over a two-year period and the "CAGR over a 2-year period." A reasonable investor would have understood Woodworth's statement to address long-term growth trends rather than sequential quarter-over-quarter changes. *Cf. Hassan v. Bos. Beer Co.*, No. 23-8, 2023 WL 8110940, at *2-3 (2d Cir. Nov. 22, 2023) (holding that a statement that the hard seltzer industry will "now start to reaccelerate" was not misleading and rejecting the argument that "now" meant "immediate reacceleration" because the statement was in response to a question about "*full year* growth").

Moreover, during the May 6, 2021, earnings call that prompted the analyst's question, Woodworth disclosed that "sales have been tapering from COVID highs, and we're expecting a gradual return to historical seasonal sales trends." App'x 706. She reiterated that the business was now "going to be seasonal," *id.* at 836, and Peloton announced a fourth quarter forecast *less* than its actual third quarter revenue, acknowledging that demand would not increase quarterly and would instead reflect seasonality, with lower sales in warmer months. Woodworth's statement during the analyst conference on May 25, 2021, was consistent with this guidance.

13

We agree with the district court that Woodworth's statement was not misleading because it used a pre-COVID comparator and made no representations about sequential growth.

**4**

During an earnings call on August 26, 2021, Woodworth stated: "For fiscal [year] 2022, we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR. Given our significant manufacturing capacity and logistics investments during the past year, we are entering fiscal [year] 2022 with a *normalized backlog* for our Bike portfolio and guidance reflects our *expectation of continued strong demand*." *Id.* at 734 (emphasis added).

Woodworth's statement regarding an "expectation of continued strong demand" was not false or misleading because she tied the statement to Peloton's revenue guidance, which projected $800 million for the first quarter of fiscal year 2022 and $5.4 billion for the full fiscal year 2022. While the first quarter revenue guidance represented a sequential decrease from the previous quarter's results of $937 million, it was consistent with Peloton's disclosed expectations of a return to seasonal patterns, with lower demand during summer months. The first quarter and full-year guidance still reflected year-over-year growth of 6 percent and 34 percent, respectively. And Peloton ultimately met its first quarter guidance with revenue of $805 million.

As for the "normalized backlog" portion of the statement, Woodworth had announced earlier in the call that the company had "made significant progress on product wait times with … order to delivery windows at pre-pandemic levels." *Id.* at 731. Read in context, her statement referred to the improvement in order-to-delivery times, not inventory levels. The statement was not misleading because it

accurately reflected the company's resolution of delivery delays that had previously overwhelmed its operations.

We agree with the district court that Woodworth's statement regarding an "expectation of continued strong demand" was not misleading in context because it was tied to guidance that Peloton subsequently met, and the "normalized backlog" statement accurately reflected the company's improvement in delivery times.

**5**

During an earnings call on November 4, 2021, Foley stated: "Looking ahead, we're about to enter our busiest time of the year. Our *inventories are healthy* and our logistics teams are well equipped for the seasonally strong sales period." *Id.* at 787 (emphasis added).

The plaintiffs argue that this statement was false or misleading because Peloton's inventories were not "healthy." Instead, the company "was buried in almost eighteen months' worth of inventory and had decided to halt production of its Bike and Bike+ to reduce inventory levels." Appellants' Br. 15. Yet the plaintiffs ignore the context of the statement. Foley's reference to "healthy" inventories was about Peloton's readiness for the upcoming holiday season; Foley said that Peloton had sufficient inventory to meet the anticipated holiday demand without the delivery delays that the company experienced during the prior holiday season. Supply-chain issues in December 2020 had "forced [Peloton] to reschedule many deliveries." App'x 673. The November 2021 statement was not a representation about overall inventory levels.

Foley explained that having "healthy" inventory and being "well equipped" meant having "low expected [order-to-delivery times] across our portfolio" because "delivery is greatly appreciated during the holiday and New Year's resolution periods." *Id.* at 787.

15

Peloton's guidance for the second quarter of fiscal year 2022 predicted $1.1-1.2 billion in revenue, and the company met this guidance with actual revenue of $1.13 billion, demonstrating that its inventory levels were appropriately aligned with projected holiday demand. A reasonable investor would have understood Foley's statement about "healthy" inventory to refer to having sufficient stock to meet the demands of the holiday season without delays, not as a representation about the overall sustainability of Peloton's inventory levels beyond that season.

In addition, a reasonable investor would not have been misled because the characterization of the inventories as "healthy" was the type of expression of corporate optimism that we consider non-actionable puffery. *Cf. Teladoc*, 2024 WL 4274362, at *3 ("These 'vague positive statements' regarding the integration—including phrases like 'going really great,' 'continues to progress,' 'well on the way,' and 'on track'—are 'too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable.'") (alterations omitted) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021)); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (explaining that a word such as "encouraging" reflects inactionable puffery and optimism).

We agree with the district court that Foley's statement regarding "healthy" inventories was not false or misleading in context.

**B**

We now turn to the statements that are plausibly actionable.

**1**

During the earnings call on August 26, 2021, in response to an analyst's question about whether the bike price reduction was "offensive or defensive," Foley stated: "we feel like the *demand for Bike+ and Bike is robust* and we feel good about the entire year's forecast. The price drop with B1 was *absolutely offensive*. As we think about the competitive landscape, we think about democratizing access to great fitness, which is, as you know, always been in our playbook." App'x 737-38 (emphasis added).

While Foley's assertion about "robust" demand was tied to guidance that Peloton ultimately met, his characterization of the price reduction as "absolutely offensive" rather than defensive was plausibly false or misleading. The SAC alleged that the former senior director of operations and supply-chain management stated that "the August 2021 price reduction on the original Bike was an attempt to increase sales because Peloton had so much excess inventory." *Id.* at 184 (¶ 31). The SAC also alleged numerous statements from other confidential witnesses who reported details about the company's inventory build-up. *See, e.g., id.* at 238-40 (¶ 189). According to the SAC, by August 2021, Peloton had three months of excess inventory sitting at shipping ports. *See id.* at 238 (¶ 189). These allegations "present inconsistencies with [Foley's] definitive statement[]" that the price reduction was an offensive move to expand market share rather than a defensive attempt to mitigate the losses from the excess inventory. *Teladoc*, 2024 WL 4274362, at *4. We have explained that such inconsistencies "cannot be resolved at this stage of the litigation, when we must accept all factual claims in the complaint as true and

17

draw all reasonable inferences in the plaintiff's favor." *Id.* (internal quotation marks omitted); *see also IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 147 (2d Cir. 2021) (holding that the district court erred in dismissing claims based on the allegedly misleading statements about a company's progress in reducing inventory when allegations from "a cadre of confidential informants" contradicted the statements).[4]

We conclude that the district court erred by holding that the SAC did not plausibly allege that Foley's characterization of the price reduction as "absolutely offensive" was false or misleading.

**2**

In its SEC filings of May 7, August 26, and November 4, 2021, Peloton warned: "If we fail to accurately forecast consumer demand, we *may experience excess inventory levels* or a shortage of products available for sale. Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of excess

---

[4] The dissent concludes that Foley's statement was neither false nor misleading because the price reduction could have been both offensive and defensive and "Foley did not say that the price … reduction was not defensive." *Post* at 3. We do not disagree that a strategy could be both offensive and defensive. In this case, however, the analyst specifically asked whether the price reduction was "offensive or defensive." App'x 737. Foley responded that it was "absolutely offensive," which a reasonable investor would understand as rejecting the suggestion that the reduction was defensive. The dissent suggests that the analyst's question "posed a false choice." *Post* at 4. Perhaps, but Foley did not say so. Because we are deciding this appeal on a motion to dismiss, we must make inferences in favor of the complaint, which alleged that confidential witnesses described the price reduction as a direct response to excess inventory. The allegations establish the plausible inference that Foley characterized the price reduction as purely offensive and that the characterization was misleading.

inventory at discounted prices, which would cause our gross margins to suffer." App'x 424 (emphasis added); *id.* at 564; *see also id.* at 250-51 (¶ 214).

We agree with the district court that the risk disclosure in the Form 10-Q of May 2021 was not actionable. But the risk disclosures in the Form 10-K and the Form 10-Q of August and November 2021 were plausibly false or misleading. The SAC plausibly alleged that by August 26, 2021, the specific financial consequences described in these disclosures were not merely hypothetical "but had already materialized and resulted in significant disruption to [Peloton's] business." *Teladoc*, 2024 WL 4274362, at *5. The SAC alleged that following the earnings call on August 26, 2021, Peloton reduced the price of the original Bike by $400. *See* App'x 237 (¶ 187). According to CW1, this reduced price was a direct response to Peloton's "excess inventory." *Id.* at 184 (¶ 31). Moreover, on November 4, 2021, Peloton disclosed that 91 percent of its inventory was unsold and reduced its earnings guidance by approximately $1 billion. *See id.* at 178 (¶ 7); *id.* at 252-53 (¶¶ 219-23). In other words, Peloton was already engaging in "the sale of excess inventory at discounted prices." *Id.* at 424.

Accepting the allegations as true, the presentation of the risk of inventory write-downs and discounted sales as merely hypothetical in the August Form 10-K and in the November Form 10-Q was potentially misleading. We have previously explained that warnings that hedging activity "could" or "may" impact the prices of notes might have "possibly sufficed" when the notes were first issued, but when the warnings remained unchanged after "market volatility put[] to rest any uncertainty as to the price-impact," those warnings became actionable misstatements. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 86 (2d Cir. 2021). The same logic applies here.

We conclude that the district court erred by holding that the SAC did not plausibly allege that the risks had already materialized by the time of the August and November 2021 filings and rendered the statements misleading.

## C

The defendants argue in the alternative that the § 10(b) claims should be dismissed because the SAC lacks factual allegations providing a strong inference of scienter. The district court did not consider this argument because it held that the SAC failed to plausibly allege a material misstatement or omission. "'Mindful that we are a court of review, not of first view,' we decline to consider those arguments for the first time on appeal." *Hunter v. McMahon*, 75 F.4th 62, 73 n.15 (2d Cir. 2023) (alteration omitted) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)); *see Eric M. Berman, P.C. v. City of New York*, 796 F.3d 171, 175 (2d Cir. 2015) ("[I]t is this Court's usual practice to allow the district court to address arguments in the first instance.") (quoting *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003)); *see also Teladoc*, 2024 WL 4274362, at *5 (declining to address the issue of scienter in the first instance). On remand, the district court may consider whether the plaintiffs have plausibly alleged scienter with respect to Foley's statement that "[t]he price drop with B1 was absolutely offensive" on August 26, 2021, App'x 738, and Peloton's risk warnings in the Form 10-K and Form 10-Q filed on August 26 and November 4, 2021.

## D

In sum, we conclude that the plaintiffs have plausibly alleged actionable misstatements or omissions based on Foley's statement that "[t]he price drop with B1 was absolutely offensive" on August 26, 2021, and Peloton's risk warnings in the Form 10-K and Form 10-Q

filed on August 26 and November 4, 2021. We vacate the judgment of the district court insofar as it dismissed the plaintiffs' claims under § 10(b) and Rule 10b-5 based on these statements.

## II

The plaintiffs also alleged control person liability under § 20(a) of the Exchange Act. The district court dismissed the § 20(a) claims because it decided that the plaintiffs had not plausibly alleged the underlying claims under § 10(b) and Rule 10b-5.

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (alteration omitted) (quoting 15 U.S.C. § 78t(a)). "Actions under [§ 20(a)] require an independent violation of the Exchange Act." *Altimeo*, 19 F.4th at 152.

Because we conclude that the district court erred by dismissing the claims under § 10(b) and Rule 10b-5 with respect to the three plausibly actionable statements, we vacate the judgment of the district court insofar as it dismissed the corresponding § 20(a) claims with respect to those statements as well.[5]

## CONCLUSION

We vacate the judgment of the district court insofar as it dismissed the plaintiffs' claims under § 10(b), Rule 10b-5, and § 20(a)

---

[5] The SAC additionally asserted insider trading claims under § 20A of the Exchange Act. On appeal, the plaintiffs do not raise any arguments challenging the dismissal of those claims, which therefore "are waived." *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

with respect to the three plausibly actionable statements. We affirm the judgment insofar as the district court dismissed the plaintiffs' claims with respect to the other challenged statements. We remand for further proceedings consistent with this opinion.

Jon O. Newman, Circuit Judge, concurring in part and dissenting in part:

In this securities fraud class action brought by Plaintiffs-Appellants City of Hialeah Employees' Retirements System, *et al.* ("Hialeah") against Peloton Interactive, Inc., *et al.* ("Peloton"), the majority affirms the District Court's dismissal of Hialeah's claims concerning six statements made by Peloton, but remands for further consideration the claims concerning two statements. I agree with affirmance of the dismissal of the claims concerning the six statements, but disagree that the claims concerning the two remanded statements require any further consideration. Those two statements, assessed in the context of the "total mix," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), of all the information publicly disclosed by Peloton, could not be considered false or misleading by reasonable investors. I therefore concur in part and respectfully dissent in part.

The two statements to be remanded for further consideration are the following:

*Statement 14 (as numbered in the second amended complaint* ("SAC")). Paragraph 187 of the SAC alleges that during an August 26, 2021, earnings call, Peloton announced that the price of the Peloton Bike would be reduced by $400.

1

John Foley, a Peloton employee, was asked, regarding the relationship of the price drop to demand: "[I]s the Bike price gotten [*sic*] offensive or defensive?"[1] (I am willing to assume that "gotten" is a mistranscription for the word "reduction," although Hialeah's briefs in this Court provide no clarification.) Foley replied, "The price drop . . . was absolutely offensive."[2] The majority says that Foley's "characterization of the price reduction as 'absolutely offensive' rather than defensive was plausibly false and misleading." Ct. Op. 17.

*Statement 20.* Paragraph 214 of the SAC alleges that in Peloton's Forms 10-Q or 10-K, in a section titled "Risks Related to Our Business," Defendants stated, "*If we fail to accurately forecast consumer demand, we may experience excess inventory levels . . .*"[3] Paragraph 218 alleges that "Defendants misrepresented verifiable facts—namely, they *already had already had* [*sic*] excess inventory by [the dates of the 10-K]."[4] The majority says that "the risk disclosures in the Form 10-K and the Form 10-Q of August and November 2021 were plausibly false or misleading," Ct. Op. 18, because "when the warnings remained unchanged after 'market volatility put[] to rest any uncertainty as to price-impact,' those warnings

---

[1] Joint Appendix ("JA") 237.

[2] *Id.*

[3] *Id.* 76 (emphases in original).

[4] *Id.*

became actionable misstatements." Ct. Op. 19 (quoting *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 86 (2d Cir. 2021)."[5]

Statement 14 is neither false nor misleading. The price reduction *was* "offensive," as Foley said. It was offensive in the obvious sense that it was made to increase sales. The majority does not deny the offensive nature of the price reduction. Instead, the majority takes Foley's response as a denial that the reduction was defensive and a false denial at that.

First, Foley did not say that the price was reduction was not defensive. He simply asserted that the statement was offensive, which it was. Furthermore, the majority's concern with Foley's response ignores the obvious fact that a price reduction inevitably serves both an offensive and a defensive purpose, unless

---

[5] The majority's quotation from *Set Capital* is accurate, but the facts of that case are so different from the pending case as to make it weak support for any of Hialeah's claims. *Set Capital* involved traders at Credit Suisse who were secretly engaged in manipulative hedging that they knew would earn them profit at the investors' expense. *Set Capital LLC*, 996 F.3d at 86. Offering documents stating that Credit Suisse's hedging activity "could" or "may" impact the prices of certain notes was misleading because the traders were secretly hedging in a way that they intended to create the warned-of impact. *Id.* In the pending case, the Form 10-Qs warned that excess inventory may result in discounted sale prices and write downs. Then the Defendants announced that 91% of inventory remained unsold resulting in a $1 billion decrease in earnings projections. While Peloton did not update its Form 10-Q language, it did explicitly tell investors that the warned-of risk had materialized, unlike the Credit Suisse traders in *Set Capital* who kept hidden their plans to intentionally impact the price.

production of new product is increased, which no one claims occurred in this case as of August 2021.

When a price reduction succeeds in increasing sales (the offensive purpose), it also reduces inventory (the defensive purpose).

In the circumstances of this case, the offensive and defensive purposes are virtually two sides of the same coin. The question put to Foley posed a false choice. Any reasonable investor, hearing that the price reduction was offensive would understand that the reduction would also be defensive because Peloton would reduce inventory (where else would the bikes come from?). That reasonable investor would not regard Foley's statement as false or misleading.

"[T]aken together and in context" with the publicly available numbers, which is how statements are to be assessed, *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004), the "absolutely offensive" statement could not have misled a reasonable investor. *See Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 189-90 (2015) (investors are expected to filter an opinion statement through "all its surrounding text, including hedges, disclaimers, and apparently conflicting information," and thus executives' opinions are protected as long as they "fairly align with the information in the[ir]

4

possession at the time").The plaintiffs do not dispute that the inventory numbers were disclosed in SEC filings and readily available.

Statement 20 is neither false nor misleading. The majority says that statement 20 "became" false and misleading because the risks warned against had already occurred. Ct. Op. 18-19. As the majority amplifies, "The SAC plausibly alleged that by August 26, 2021, the specific financial consequences described in these disclosures were not merely hypothetical 'but had already materialized and resulted in significant disruption to [Peloton's] business.'" Ct. Op. 18.

The appellees make a substantial response to the claim with respect to statement 20. First, Peloton explains that although it "did not warn of 'excess' inventory in the abstract – it warned of the specific potential financial *consequences* of 'excess' inventory: write-downs, write-offs, sale at discounted margins, and a decrease in gross margins." (Br. for Appellees at 31) (emphasis added). And as Peloton points out, "Plaintiffs do not allege . . . that any of *those* consequences [the "might"-or-"could"-happen consequences] materialized during the Class Period." *Id.* at 31-32.

Plaintiffs' only reply is that at the time of the risk warnings, Peloton already had excess inventory levels that resulted in inventory payments and storage costs.

(Reply Br. at 17). Yet those are not the consequences of which Peloton's Form 10-Q and 10-K warned. Neither Plaintiffs nor the majority respond to Peloton's legitimate assertion that the SAC lacks particularized allegations about the write-downs, write-offs, sale at discounted prices, or a decrease in gross margins during the class period.

Second, they point out that "Peloton disclosed its precise inventory in dollar amounts, as well as Peloton's precise financial condition. *E.g.*, JA335 ($244.5 million in net inventory in June 2020; $552.8 million in December 2020); JA517 ($614.2 million in net inventory in March 2021). Br. for Appellees at 32.

Of even greater significance, despite the November Form 10-Q in which a statement was made that the majority asserts "became" misleading because the potential risks had already occurred, Peloton disclosed in the Nov. 4, 2021, earnings call that 91 percent of its inventory was unsold and the devastating news that it had reduced its earnings guidance by $1 billion. No reasonable investor could have regarded Form 10-Q as misleading when simultaneously apprised of this $1 billion reduction. As the Supreme Court pointed out in *Matrixx*, the question is "whether a *reasonable* investor would have viewed the nondisclosed

information as having *significantly* altered the 'total mix' of information made available."[6]

District Judge Denise Cote recently dismissed claims alleging misleading risk disclosure statements that were couched in hypothetical language because in light of "robust disclosures, the risk factors identified in the prospectus were not misleading." *In re UiPath, Inc. Securities Litigation*, 755 F. Supp. 3d 498, 514 (S.D.N.Y. 2024).

A $1 billion reduction in projected earnings is certainly a robust disclosure for a company of Peloton's size.

In addition to the foregoing specific analysis of statements 14 and 20, Peloton's "revenue guidance" precluded the statements complained of in the SAC, including statements 14 and 20, from misleading investors. Peloton regularly disclosed "revenue guidance" (estimates of anticipated revenue) for time periods that included the dates of statement 14 (August 26, 2021) and statement 20 (August and November 2021). It is undisputed that Peloton's actual revenues exceeded its

---

[6] *Matrixx*, 563 U.S. at 44 (emphases in original) (internal quotation from *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

estimates for the third and fourth quarters of 2021 and the first and second quarters of 2022. *See* Br. for Appellees at 21.

As Peloton contends, the revenue guidance was a proxy for expected demand, and reasonable investors would not have been misled about demand when the guidance disclosed that demand would decline to pre-Covid seasonal trends, predictions that proved to be correct. Br. for Appellees at 19. Furthermore, when announcing the decline in revenue guidance, Peloton explained that the revision was necessary because of "reduction[s]" to Peloton's "demand forecast." JA 790-91. Not only was the relationship between revenue guidance and demand explained to investors, that relationship was understood. For example, when Peloton issued the July-September 2021 revenue guidance, which was lower than the previous quarter's revenue, an analyst commented that the educed revenue guidance "obviously . . . implies sequential decline" in the "trend in *demand*." JA 745 (emphasis added).

The revenue guidance figures, which Peloton expected to be, and were, understood as a proxy for demand, and which must be assessed in the total mix of information disclosed, preclude any reasonable inference that Peloton's statements about demand were grounds for a securities fraud lawsuit.

8

\* \* \* \* \*

Fortunately, the Court does not remand statements 14 and 20 for trial or consideration of a motion for summary judgment, but only for consideration of issues not yet considered by the District Court, notably scienter. In my view, it is highly unlikely that the plaintiffs' pleading of scienter can survive the defendants' motion to dismiss. So, although I dissent from the Court's ruling that statements 14 and 20 were adequately pled to survive the motion to dismiss, I have a high degree of confidence that the complaint will ultimately be dismissed for lack of an adequate pleading of scienter and that the heavy pressure often felt to settle a class action securities fraud case will not yield a monetary recovery for the class in this case.[7]

---

[7] The Supreme Court has observed that the PSLRA  was enacted to curb the "extraction of extortionate settlements of frivolous claims" by imposing heightened pleading requirements and caps on attorneys' fees to curb use of strike suits by plaintiffs' lawyers. *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 475-76 (2013) (citation omitted). Our colleague, Judge Richard C. Wesley, "has noted  the pressures upon corporate defendants to settle securities fraud 'strike suits' when those settlements are driven, not by the merits of plaintiffs' claims, but by defendants' fears of potentially astronomical attorneys' fees arising from lengthy discovery." *Bondi v. Capital & Finance Asset Management S.A.*, 535 F.3d 87, 97 (2d Cir. 2008) (Wesley, J., dissenting) (citations omitted).

One commentator reports that adjudication of securities class actions has been "zealously avoided" in favor of settlements that "do not reflect the merits." Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 STAN. L. REV. 497, 596-97 (1991); *see also* Joseph A. Grundfest, *Disimplying Private Rights of Action Under the Federal Securities Laws: The Commission's Authority*, 107 HARV. L. REV. 961, 972 n.38 (1994). Another commentator has decried the problem in securities class actions whereby "[p]laintiffs' attorneys are able to generate attorneys' fees by initiating or maintaining strike suits." Elliot J. Weiss & John S. Beckerman, *Let the Money do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 YALE L. J. 2053, 2084-88 (1995).