**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL CONSUMER TRENDS and CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　*Plaintiffs*,<br><br>　　　v.<br><br>PELOTON INTERACTIVE, INC., JOHN FOLEY, WILLIAM LYNCH, and JILL WOODWORTH,<br><br>　　　　　　　　　*Defendants*. | 21-CV-09582 (ALC) (OTW)<br><br>The Honorable Andrew L. Carter<br>The Honorable Ona T. Wang<br>**ORAL ARGUMENT REQUESTED** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND.................................................................................................................... 3

    I.      March 2020 to December 2020: Peloton Begins Issuing Detailed Pandemic-Related Risk Disclosures Long Before the Narrowed Class Period........................... 4

    II.     February to May 2021: Leading up to the Narrowed Class Period, Peloton Discloses its Intent to Increase Inventory................................................................. 5

    III.    August 2021: Peloton Issues the Price Statement and the August 2021 Risk Disclosure as it Continues to Accurately Disclose Demand and Inventory ............... 6

    IV.    November 2021 Disclosures ..................................................................................... 8

    V.     January and February 2022 Disclosures................................................................... 10

    VI.    Post-Class Period, February through May 2022: Peloton Discusses Pandemic-Related Difficulties Projecting Demand....................................................... 10

    VII.   None of the CWs Claims Knowledge that the Individual Defendants Thought Inventory was Excessive or Justified a Price Reduction........................................... 11

    VIII.  Most of the Individual Defendants' Alleged Stock Sales Took Place Before the Narrowed Class Period................................................................................... 12

    IX.    Procedural History.................................................................................................. 13

ARGUMENT....................................................................................................................... 14

    I.      Plaintiffs Fail to Allege a Strong Inference of Scienter.......................................... 14

           A.     Plaintiffs Do Not Allege Motive and Opportunity to Commit Fraud............ 15

           B.     Plaintiffs Do Not Allege Strong Circumstantial Evidence of Fraud.............. 17

           C.     Innocent Intent is the More Plausible Inference .......................................... 22

    II.     Plaintiffs Fail to Allege Loss Causation................................................................. 23

    III.    Lead Plaintiff Lacks Standing................................................................................ 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Battery Techs., Inc.*,
  781 F.3d 638 (2d Cir. 2015) ........................................................................................... 17

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ............................................................................................ 15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .............................................................................................. 25

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013) ............................................................................. 18

*Bazzelle v. Novocure Ltd.*,
  2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) .................................................................... 16

*In re Bristol-Myers Squibb Co. CVS Sec. Litig.*,
  658 F. Supp. 3d 220 (S.D.N.Y. 2023) ............................................................................. 23

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Morg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ....................................................................................... 24

*In re Checkpoint Therapeutics Sec. Litig.*,
  2025 WL 1434400 (S.D.N.Y. May 19, 2025) .................................................................. 20

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 277 (S.D.N.Y. 2013) .................................................................................. 21

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen.
  Holdings, Corp.*,
  2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .................................................................... 17

*Cox v. Blackberry Ltd.*,
  660 F. App'x 23 (2d Cir. 2016) ....................................................................................... 21

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2022) .................................................................. 16

*Damri v. LivePerson, Inc.*,
  772 F. Supp. 3d 430 (S.D.N.Y. 2025) ............................................................................. 15

*Davison v. Ventrus Biosciences, Inc.*,
  2014 WL 1805242 (S.D.N.Y. May 5, 2014) .................................................................... 25

*Diabat v. Credit Suisse Group AG,*
  2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)...................................................................24

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005)...........................................................................................................23

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
  553 F.3d 187 (2d Cir. 2009)......................................................................................... 15, 17

*In re FBR Inc. Sec. Litig.,*
  544 F. Supp. 2d 346 (S.D.N.Y. 2008).............................................................................20

*In re Flag Telecomm. Holdings, Ltd. Sec. Litig.,*
  308 F. Supp. 2d 249 (S.D.N.Y. 2004).............................................................................22

*Gabelli Asset Fund v. Garret Mot. Inc.,*
  2024 WL 1653451 (2d Cir. Apr. 17, 2024)....................................................................17

*Gagnon v. Alkermes PLC,*
  368 F. Supp. 3d 750 (S.D.N.Y. 2019).............................................................................22

*Glaser v. The9, Ltd.,*
  772 F. Supp. 2d 573 (S.D.N.Y. 2011).............................................................................17

*Gurary v. Winehouse,*
  235 F.3d 792 (2d Cir. 2000)............................................................................................25

*In re Hardinge, Inc. Sec. Litig.,*
  696 F. Supp. 2d 309 (W.D.N.Y. 2010)...................................................................... 19, 20

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.,*
  445 F. App'x 368 (2d Cir. 2011).....................................................................................19

*In re IPO Sec. Litig.,*
  399 F. Supp. 2d 261 (S.D.N.Y. 2005).............................................................................24

*Janbay v. Canadian Solar, Inc.,*
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012).................................................................24

*Jones v. Perez,*
  550 F. App'x 24 (2d Cir. 2013).......................................................................................20

*Kasilingam v. Tilray, Inc.,*
  2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021).................................................................23

*Koplyay v. Cirrus Logic, Inc.,*
  2013 WL 6233908 (S.D.N.Y. Dec. 2, 2013)............................................................... 15, 16

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012)..................................................................18, 20

*In re Liberty Tax, Inc. Sec. Litig.*,
435 F. Supp. 3d 457 (E.D.N.Y. 2020)..........................................................................25

*Livingston v. Cablevision Sys. Corp.*,
966 F. Supp. 2d 208 (E.D.N.Y. 2013)..........................................................................16

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010).........................................................................21

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014).............................................................................25

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021)..........................................................................21

*Marquez v. Bright Health Grp., Inc.*,
755 F. Supp. 3d 266 (E.D.N.Y. 2024)..........................................................................20

*New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
122 F.4th 28 (2d Cir. 2023).................................................................................14, 15

*Optimum Strategies Fund I, LP v. U.S. Oil Fund, LP*,
2023 WL 2526394 (D. Conn. Mar. 15, 2023)..............................................................22

*In re Plug Power, Inc., Sec. Litig.*,
2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)........................................................15, 16

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010).........................................................................23

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994).................................................................................19, 20

*Sun v. TAL Educ. Grp.*,
2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023) (Carter, J.)..........................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................3, 14

*Tian v. Peloton Interactive, Inc.*,
2025 WL 510043 (E.D.N.Y. Feb. 14, 2025)................................................................16

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..............................................................18

*Wallace v. IntraLinks*,
2013 WL 1907685 (S.D.N.Y. May 8, 2013)......................................................................... 24

*Wilson v. Dalene*,
699 F. Supp. 2d 534 (E.D.N.Y. 2010).............................................................................. 25

*Wyche v. Advanced Drainage Sys., Inc.*,
2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ..................................................................... 21

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
379 F. Supp. 3d 164 (E.D.N.Y. 2019).............................................................................. 24

**Statutes**

PSLRA ................................................................................................................*passim*

v

# GLOSSARY

The following terms are used in this memorandum:

| Term | Definition |
|---|---|
| 2COA Op. or Appellate Decision: | Second Circuit's August 27, 2025 Opinion, on appeal of SAC dismissal with prejudice, Dkt. 110. |
| 2COA Conc.: | Second Circuit Judge Jon O. Newman's August 27, 2025 partial concurrence and partial dissent of Appellate Decision, Dkt. 110-1. |
| 4Q20, 1Q21, 2Q21, 3Q21, 4Q21, 1Q22, or 2Q22: | Quarterly periods, starting with the fourth quarter of FY20 through the second quarter of FY22.<br><br>Peloton's fiscal year begins on July 1 of the prior calendar year (e.g., the 2Q21 10-Q was filed in February 2021, covering the period September through December 2020). |
| AC: | Amended Consolidated Class Action Complaint for Violations of the Federal Securities Law, filed June 25, 2022, Dkt. 51. |
| Appendix A or App. A: | Appendix A hereto, listing in tabular form the remaining Challenged Statements, previously numbered 14 and 20 in the Court's Order and Opinion dismissing the SAC, dated March 30, 2023, Dkt. 88. |
| Bike: | The original Peloton Bike, SAC ¶ 31. |
| CEO: | Chief Executive Officer |
| CFO: | Chief Financial Officer |
| Challenged Statements: | Statements Plaintiffs allege are false or misleading, SAC ¶¶ 187, 213–18. |
| Class Period: | August 27, 2021 through and including January 19, 2022, narrowed from February 5, 2021 through and including January 19, 2022, as a result of the Appellate Decision. |
| Connected Fitness Products: | Peloton's technology-enabled fitness equipment, including the Bike and Bike+ stationary bikes, and the Tread and Tread+ Treadmills. |
| CW(s): | Confidential Witness(es), as identified in the SAC. |
| Defendants: | Peloton and Individual Defendants |
| Exchange Act: | The Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* |
| Ex(s). Or Exhibit(s): | Exhibits attached to the Declaration of Stephen L. Ascher, filed concurrently, which are public filings and statements and are incorporated into the SAC and/or subject to judicial notice. |

| **Term** | **Definition** |
|---|---|
| FY20, FY21, or FY22: | Fiscal years, starting with fiscal year 2020 through fiscal year 2022. Peloton's fiscal year begins on July 1 of the prior calendar year (e.g. FY20 is July 1, 2019 – June 30, 2020). |
| Individual Defendants: | John Foley (Peloton CEO during the Class Period), William Lynch (Peloton President during the Class Period), Jill Woodworth (Peloton CFO during the Class Period) |
| Inside Sales Team: | Team of sales staff, account associates, or account executives who offer one-on-one consultations with customers via phone, email, or online chat on Peloton's website. |
| Ord. or Second MTD Order: | Court's Order and Opinion dismissing the SAC, dated September 30, 2024, Dkt. 108. |
| OTD: | Order-to-delivery window, which represents the time between a customer ordering a Peloton product and receiving that product. |
| Peloton or Company: | Peloton Interactive, Inc. |
| Plaintiffs: | Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends (individually, "Robeco") and Additional Plaintiff City of Hialeah Employees' Retirement System (individually, "Hialeah") |
| PSLRA: | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| Q1, Q2, Q3, Q4: | Quarterly periods, starting with the first quarter of a fiscal year through the fourth quarter of the fiscal year. Peloton's fiscal year begins on July 1 of the prior calendar year. |
| QoQ: | Quarter-over-quarter |
| RSUs: | Restricted stock units |
| SAC or Complaint: | Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Law, filed May 6, 2023, Dkt. No. 92 |
| YoY: | Year-over-year |

Pursuant to the Appellate Decision's remand, Peloton and the remaining[1] Individual Defendants bring this motion to dismiss all remaining claims with prejudice.

**PRELIMINARY STATEMENT**

This Court should dismiss the little that is left of Plaintiffs' case. Peloton, like many others, navigated unprecedented challenges during the pandemic. Early on, Peloton did not have enough inventory to meet surging demand, so it deliberately increased its inventory levels as part of its disclosed plan to stabilize supply, deliver to customers faster, expand its competitive landscape, and capitalize on growth. But inventory planning during the pandemic was notoriously difficult worldwide. Throughout this uncertainty, Peloton accurately disclosed the risks posed by the pandemic, the demand for its products, and precise quantitative information concerning its inventory levels before and during the entire Class Period, which is uncontested. At most, Plaintiffs challenge Peloton's business decision to increase its inventory. Such fraud by hindsight allegations do not meet the PSLRA's demanding pleading standard. This Court should dismiss the case once and for all.

Because the Second Circuit affirmed the majority of this Court's dismissal of the SAC—holding that Defendants waived all insider trading claims and that Defendants' statements about demand for Peloton products throughout the Class Period "were neither false nor misleading[,]" *see* 2COA Op. at 3, 11, 21 n.5—only three Challenged Statements remain on remand. All three remaining Challenged Statements are predicated on Plaintiffs' unfounded allegation that Peloton knew it already had excess inventory in August 2021 and reduced the Bike's price as a result.

The Challenged Statements should again be dismissed, this time for failure to allege

---

[1] Former defendants Thomas Cortese, Mariana Garavaglia, and Hisao Kushi were dismissed with prejudice because Plaintiffs waived insider trading claims against them. *See* Dkt. 114.

1

scienter. While this Court has not yet considered scienter, a member of the Second Circuit panel instructively volunteered that:

> In my view, it is highly unlikely that the plaintiffs' pleading of scienter can survive the defendants' motion to dismiss. So, . . . . I have a high degree of confidence that the complaint will ultimately be dismissed for lack of an adequate pleading of scienter . . . . 2COA Conc. at 9.

Indeed, the PSLRA's uniquely demanding standard requires Plaintiffs to plead an inference of fraudulent intent that is at least as "cogent and compelling" as any non-fraudulent inference, but the SAC fails because it alleges neither that Defendants had "motive and opportunity" to commit fraud, nor that Defendants engaged in "conscious misbehavior or recklessness."

The narrowed Class Period negates any inference of "motive and opportunity" to defraud because the vast majority of the SAC's allegedly suspicious stock sales occurred well ***before*** the Class Period—making most of Plaintiffs' motive allegations categorically irrelevant. And the few remaining sales were pursuant to pre-existing 10b5-1 plans, which also undermines motive.

Without "motive and opportunity," Plaintiffs must allege "strong circumstantial evidence of conscious misbehavior or recklessness." Plaintiffs cannot meet that high bar because Peloton's truthful disclosures and consistent strategy leading up to and during the Class Period contradict Plaintiffs' allegation that Peloton knew it had excess inventory in August 2021. Throughout 2021, Peloton repeatedly disclosed that it was deliberately increasing its inventory levels to prevent supply problems, to enhance Peloton's ability to meet expected demand, and to increase its share of the market. The Second Circuit carefully analyzed these statements and held that none was false or misleading. 2COA Op. at 10–16.

Moreover, as Plaintiffs themselves allege and as was disclosed in precise dollar amounts in Peloton's SEC filings, Peloton continued building inventory through the Class Period, SAC ¶¶ 29–31—which undermines any inference that Peloton believed it had excess inventory at the

2

beginning of the Class Period. Peloton also repeatedly warned investors that COVID's uncharted territory made projecting inventory needs and revenue more challenging. And although Plaintiffs rely heavily on purported CW allegations, not a single CW accuses the Individual Defendants of holding views contrary to their public statements. Taking all these disclosures together, the more plausible inference is that Peloton genuinely believed that building inventory was important to enable it to meet increased demand and make its products more accessible to the public. Any alleged deficiencies in the Challenged Statements were the inadvertent result of the difficulty projecting future supply and demand, not a result of fraudulent intent.

The SAC should also be dismissed for failure to allege loss causation because Plaintiffs cannot connect their claimed loss to the Challenged Statements. The Company's stock price ultimately dropped because Peloton reduced its future financial forecasts, not because of allegedly corrective disclosures concerning inventory levels.

Finally, the SAC should be dismissed because Lead Plaintiff Robeco lacks standing. Robeco last purchased Peloton shares months before the narrowed Class Period—and therefore could not have suffered any losses.

Any one of these flaws is fatal to Plaintiffs' case. This Court should dismiss the SAC with prejudice again.

## BACKGROUND[2]

Peloton is a leading global fitness and wellness company. Peloton sells, among other things, connected fitness products—including stationary bikes and treadmills—with touch screens that provide access to live and on-demand fitness content through paid monthly subscriptions. Ex.

---

[2] Defendants assume the truth of well-pleaded facts, "documents incorporated into the [SAC] by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

3

1 at 12; SAC ¶¶ 15, 109. An initial sale of a connected fitness product, like the Bike, has additional benefits, including future subscription revenue potentially for many years thereafter. Ex. 1 at 12. Peloton's business also experiences "seasonality," generating a higher proportion of connected fitness sales during the period from November through February due in large part to holiday demand, New Year's resolutions, and cold weather. *Id.* at 47. From the outset, Peloton sought to make its products and content more accessible to a wider customer base, including by introducing 0% financing options and no risk trials. Ex. 11 at 3.

## I.    March 2020 to December 2020: Peloton Begins Issuing Detailed Pandemic-Related Risk Disclosures Long Before the Narrowed Class Period

In March 2020, COVID-19 was declared a pandemic. Amid lockdown orders and gym closures, demand for Peloton's fitness products surged. SAC ¶¶ 1, 110; Ex. 2 at 16. But like most businesses, Peloton faced pandemic-related challenges. Supply-chain issues made it difficult for Peloton to import products. Ex. 3 at 11; SAC ¶¶ 5, 165. By Fall 2020, the Company's order-to-delivery times increased from two weeks before the pandemic to more than ten weeks. SAC ¶¶ 64, 165. Beginning in May 2020, Peloton made extensive quarterly disclosures concerning these issues. Ex. 1 at 3. Peloton's "extensive warnings," Ord. at 17, Dkt. 88 at 19, included:

- "We are unable to accurately predict the full impact that COVID-19 will have on our revenues, profitability, and financial position" given "the uncertainty as to the severity and duration of the pandemic, actions that may be taken by government authorities, the impact to our customers and business partners, and other factors . . . ." Ex. 1 at 26.

- "[P]rolonged delivery timelines," "inventory shortages," "reduced demand" for products, and a "change in consumer spending preferences or buying trends" could all have a "negative impact" on the Company. *Id.* at 43.

- Failure to accurately forecast demand may result in "excess inventory levels or a shortage of products available for sale," which may result in the sale of excess inventory at discounted prices and reduced gross margins. *Id.* at 51.

- Peloton's "limited operating history makes it difficult to forecast future results," which could be impacted by "errors in our forecasting of the demand of our products and

4

services," "seasonal fluctuations in subscriptions," and "changes in business or macroeconomic conditions, including the impact of the current COVID-19 outbreak." *Id.* at 49–50.

- Peloton "operate[s] in a highly competitive market and . . . may be unable to compete successfully against existing and future competitors" with "more aggressive pricing policies." *Id.* at 43–44.

- The price of the Company's stock could change in response to "changes" in Peloton's "financial projections" or Peloton's "failure to meet these projections." *Id.* at 61.

By November 2020, Peloton announced that it was "operating under supply constraints for the foreseeable future" because of "continued high global demand" for Peloton's products and a delivery backlog driven by the pandemic. Ex. 3 at 11.

## II.  February to May 2021: Leading up to the Narrowed Class Period, Peloton Discloses its Intent to Increase Inventory

Having faced prolonged delivery timelines and supply shortages, Peloton prioritized inventory investments. SAC ¶¶ 4, 30–31, 64, 165. Quarter after quarter, Peloton accurately disclosed strong demand for its products and the Company's strategy to deliberately grow inventory. SAC ¶¶ 154–55, 168; Ex. 4 at 15; Ex. 5 at 16; 2COA Op. 10–15.

In February 2021, then-CEO Foley announced that Peloton had made "extensive supply chain investments" and engaged in a "herculean effort" to make more Bikes given "incredibly strong organic demand." Ex. 6 at 3, 7; *see also* SAC ¶ 154. As this Court and the Second Circuit have both held, this statement was "consistent with Peloton's then-current expectations of further growth." 2COA Op. at 11. Then-CFO Woodworth agreed: Peloton was "seeing very strong organic demand[.]" Ex. 6 at 7; 2COA Op. at 10–11 (statement not false). She added that Peloton's "manufacturing capacity exceed[ed] demand" so that Peloton could reduce the "order[-]to[-] delivery" time going forward. Ex. 6 at 5, 13; SAC ¶ 155. Peloton similarly announced "substantial additional investments" in its supply chain to reduce order-to-delivery times. Ex. 7 at 3.

5

Consistent with this goal, Peloton disclosed its plan to continue investing in inventory and that its net inventory had more than doubled from the quarter ending June 2020 to the quarter ending December 2020. Ex. 4 at 5, 15. As in prior quarters, Peloton issued extensive risk disclosures with respect to the pandemic, including with respect to inventory. *Id.* at 39–64.[3]

In May 2021, Peloton accurately disclosed that it had "ramped up supply to meet the current increased demand." SAC ¶ 168; Ex. 5 at 37; 2COA Op. at 11–12 (statement not false). Peloton once again disclosed growth in inventory. Ex. 5 at 16. Peloton again issued extensive risk disclosures. *Id.* at 41–70.

### III.    August 2021: Peloton Issues the Price Statement and the August 2021 Risk Disclosure as it Continues to Accurately Disclose Demand and Inventory

On August 26 and 27, 2021, Peloton made two of the three remaining Challenged Statements, along with numerous indisputably accurate disclosures.[4]

***The Price Statement.*** Peloton announced that it was lowering the price of the Bike by $400, to $1495. When asked whether the price cut was "offensive or defensive," Foley responded: "The price drop with [the Bike] was absolutely offensive," *id.* at 8 (the "**Price Statement**"); *see also* App'x A. Foley also explained that this was the latest step to "broaden the accessibility" of Peloton's products and the competitive landscape, a longtime goal. Ex. 8 at 3, 6. Although the question posed by the analyst did not refer to inventory, Plaintiffs contend that the Price Statement was false or misleading because the price cut allegedly had the "defensive" purpose of reducing excess inventory. 2COA Op. at 17–18; *see also* SAC ¶ 189.

***The August 2021 Risk Disclosure.*** As in prior quarters, Peloton made extensive risk

---

[3] *E.g.* Ex. 4 at 41 (inventory needs are "difficult to predict with accuracy" given pandemic), at 42 ("full extent" of pandemic's impact on business "will depend largely on future developments"), at 45 (business affected by "seasonality").

[4] Peloton met or exceeded its guidance during the entire Class Period. 2COA Op. at 11, 13–16.

disclosures. Ex. 2 at 14–42. One of the risks Peloton again disclosed was the "**August 2021 Risk Disclosure**" (*see* App'x A for full text):

> **Our operating results could be adversely affected if we are unable to accurately forecast consumer demand for our products and services and adequately manage our inventory.**
>
> To ensure adequate inventory supply, we must forecast inventory needs and expenses and place orders sufficiently in advance with our suppliers and contract manufacturers, based on our estimates of future demand for particular products and services. Failure to accurately forecast our needs may result in manufacturing delays or increased costs. Our ability to accurately forecast demand could be affected by many factors, including changes in consumer demand for our products and services, changes in demand for the products and services of our competitors, unanticipated changes in general market conditions, and the weakening of economic conditions or consumer confidence in future economic conditions, such as those caused by the COVID-19 pandemic. This risk will be exacerbated by the fact that we may not carry a significant amount of inventory and may not be able to satisfy short-term demand increases. . . . If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale.
>
> Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer and could impair the strength and premium nature of our brand. . . . Ex. 2 at 24.

Plaintiffs contend that the August 2021 Risk Disclosure was false or misleading because the risk of selling excess inventory at discounted prices had already materialized. 2COA Op. at 19; *see also* SAC ¶¶ 215–16.

***Simultaneous Truthful Disclosures***. At the same time as it made these two Challenged Statements, Peloton made numerous other disclosures that both this Court and the Second Circuit have determined were neither false nor misleading. Foley accurately stated that Peloton considered demand for the Bike "robust." 2COA Op. at 17. Woodworth similarly stated expectations of "continued strong demand." Ex. 8 at 6; 2COA Op. at 14 (statement not false). Foley also stated that Peloton "invested aggressively in supply chain and logistics[.]" Ex. 8 at 3.

Peloton also disclosed inventory data, which again reflected substantial further growth in

inventory. Ex. 5 at 16; Ex. 2 at 82. Indeed, Peloton disclosed inventory amounts in precise dollar amounts throughout the entire Class Period, and Plaintiffs do not allege that any of Peloton's publicly disclosed inventory data was false. Thus, the market was fully aware of Peloton's increasing inventory following its disclosures that it was intentionally building inventory that outpaced demand, undermining Plaintiffs' theory that Defendants tried to hide inventory from investors. Analysts also noted that "the inventory numbers [were] up pretty dramatically quarter-to-quarter on the balance sheet." Ex. 8 at 13.

Notably, Plaintiffs allege that Peloton's staff was instructed to build *more* inventory during this time period. SAC ¶¶ 29–31. This allegation contradicts Plaintiffs' theory that Peloton believed it had excess inventory. Peloton was "staging for what will be our biggest holiday ever"—expecting to generate "60%" of Peloton's revenue in the wintertime. Ex. 8 at 6, 13. Analysts recognized Peloton's higher inventory needs "through the holiday season." *Id*. at 13.

Finally, management also discussed Peloton's next forecast, which was replete with specific warnings about the uncertainties posed by the pandemic. Foley recognized that there was "great debate about the growth prospects of our industry post COVID," and that Peloton's FY21 results "benefited significantly from lockdown orders, work from home mandates and gym closures." *Id*. at 3–4. Woodworth similarly noted that FY21 was a "very unusual year[,]" making "predicting our year-over-year performance more challenging than normal." *Id*. at 5. For that reason, Woodworth explained several necessarily uncertain "assumptions" underlying 1Q22 and FY22 guidance, including "seasonal weather as well as holiday and New Year's resolutions purchases." *Id*. at 6; SAC ¶¶ 186–187; Ex. 8 at 8 (analyst confirming, "we know there's seasonality."); Ex. 2 at 20 (seasonality risk).

## IV.    November 2021 Disclosures

***The November 2021 Risk Disclosure.*** In its next quarterly disclosure on November 4,

2021, Peloton again issued extensive risk disclosures, including the **November 2021 Risk Disclosure** (the last of the three Challenged Statements) which was identical to the August 2021 Risk Disclosure discussed above. Ex. 9 at 48–49. As with the August 2021 Risk Disclosure, Plaintiffs contend that the November 2021 Risk Disclosure was misleading because it failed to disclose that Peloton was already discounting excess inventory through the previously disclosed price reduction. Yet as it did in August 2021, Peloton simultaneously disclosed significantly growing inventory—giving investors complete inventory information to draw their own conclusions. Ex. 2 at 82; Ex. 9 at 14.

*The November 2021 "Corrective Disclosures."* Plaintiffs contend that at the same time Peloton was making supposed misrepresentations about its inventory, investors "began to learn the truth" about the same topic, SAC ¶ 219, because Peloton reduced its forward-looking FY22 guidance to levels lower than the guidance announced a quarter earlier. Ex. 10 at 5. Peloton announced that it was reducing its FY22 guidance because, over the past two months, it had observed "a greater-than anticipated taper of [its] website traffic" and "slower-than-expected pickup in retail showroom traffic, both of which are important inputs into [its] forward-looking demand model." *Id.* at 3. Peloton thus candidly adjusted its guidance "a few weeks ahead" of its "busiest sales season." *Id.* at 5. Foley noted that predicting "consumer behavior" "coming out of COVID" (among other factors) further contributed to uncertainty that justified reducing Peloton's projections. *Id.* at 3, 7. Foley also truthfully stated that Peloton's inventories were "healthy" thanks to Peloton "mov[ing] mountains" to ensure "ample inventory across our portfolio ahead of the holiday season." *Id.* at 4; 2COA Op. at 15–16 (statement true). Moreover, Foley confirmed that the Bike's price cut had its intended effect by "broad[ening] [Peloton's] demographic mix and expanding [its] market opportunity." *Id.* at 3.

9

Plaintiffs claim that Peloton's disclosures revealed that 91% of its inventory was "unsold." SAC ¶ 223. But Peloton's November 2021 10-Q does not say that. *See* Ex. 9 at 14. It lists the components of Peloton's net inventory in dollars, including "finished products." The SAC also omits that this percentage of supposedly "unsold" inventory was consistent with Peloton's disclosures in previous quarters. *See* Ex. 2 at 82 (87%); Ex. 1 at 16 (90%); Ex. 4 at 5, 15 (90%).

According to Plaintiffs, Peloton's stock dropped by 35% as a result of these November 2021 inventory disclosures. SAC ¶ 225.

## V.    January and February 2022 Disclosures

The SAC alleges additional corrective disclosures on January 20, 2022—the day after the Class Period—when the press reported that Peloton planned to pause Bike production. SAC ¶¶ 229–31; Ex. 11; Ex. 12. Analysts reported Peloton's decline in consumer demand, rise in inventory levels, and plans to slow production. SAC ¶ 233. According to Plaintiffs, Peloton's stock price dropped by 24% as a result of these disclosures. *Id.* ¶ 235. A few days later, *Business Insider* reported that Peloton planned to pause certain manufacturing given rising inventory. *Id.* ¶ 234. In February 2022, Peloton reduced its FY22 revenue outlook going forward. Ex. 13 at 5. Consistent with its most recent forecast, Peloton met its 2Q22 revenue guidance. SAC ¶ 232; Ex. 14 at 1.

## VI.    Post-Class Period, February through May 2022: Peloton Discusses Pandemic-Related Difficulties Projecting Demand

According to Plaintiffs, Peloton purportedly made various post-Class Period "admissions" that it "suffered from excess supply and lackluster demand." SAC ¶¶ 236–42:

- The announcement during Peloton's February 8, 2022 earnings call that Peloton had "slowed production to better match [its] current demand outlook"; "assessing demand coming out of COVID ha[d] been a significant challenge." Ex. 13 at 6, 12.

- Peloton's May 20, 2022 letter to shareholders stating that it had too much inventory for its "current" run rate. SAC ¶ 241; Ex. 15 at 1.

- Former-CEO Barry McCarthy's May 2022 statement that Peloton's cash burn was "bad news," but that the "very good news" is that "inventory has a long life"—once Peloton sells the inventory, it becomes a "tailwind" for the Company.  Ex. 16 at 6.

- McCarthy's statement in September 2022 that—"in . . . March [2022]" Peloton was "drowning in inventory."  SAC ¶ 240; Ex. 17 at 9.

Although Plaintiffs characterize these statements as "admissions," none of them related to the August or November 2021 Challenged Statements—they all concerned Peloton's inventory several months later, in 2022.

### VII. None of the CWs Claims Knowledge that the Individual Defendants Thought Inventory was Excessive or Justified a Price Reduction.

Although the SAC emphasizes the number of CWs, their alleged reports are irrelevant or "inconsistent," 2COA Op. at 10, and undermine any inference of fraud.  No CWs contend that the *Individual Defendants* believed Peloton had excess inventory in August 2021 or believed Peloton reduced the Bike's price to shed inventory.[5]  *Cf.* SAC ¶¶ 25–32, 50, 59–64, 98.  Nor did the CWs allegedly have responsibility for companywide inventory, pricing, or market strategy.

Instead, Plaintiffs merely allege that one CW (CW1) *thought* the Bike's price reduction was "an attempt to increase sales" due to excess inventory and therefore "pushed back" on directives to increase inventory capacity.  *Id.* ¶¶ 30–31.  CW1, who worked remotely, also noted that Peloton *continued building inventory* through November 2021.  *Id.* ¶¶ 29–31.  CW1's allegations thus undermine Plaintiffs' argument that *Peloton* believed inventory was excessive in August 2021.  CW1 also is not alleged to have been involved in pricing strategy.  *Id.* ¶¶ 25–32.

CW7 never spoke to the Individual Defendants, did not have any input on pricing strategy,

---

[5] Only three purported CWs claimed to have ever communicated with the Individual Defendants *on any topic* (CW1, CW10, and CW 26)  and only two (CW1 and CW7) purported to have any knowledge about the Bike's price reduction, though never discussed that topic with the Individual Defendants.  SAC ¶¶ 25–32, 47–51, 59–64, 98.  Seven purported CWs stopped working at Peloton before the narrowed Class Period.  *Id.* ¶¶ 36, 70–71, 77, 85, 88–89 (CWs 3, 12, 13, 15, 20, 22, 23).

and worked in one of Peloton's warehouses in one region. *Id.* ¶¶ 48–51. CW7 states only that the Bike price change happened "around the time" CW7 believed there were inventory issues, but says nothing about whether CW7 had any basis to believe management shared these views. *Id.*

Other allegations similarly fail to advance Plaintiffs' arguments. CW10, who worked in Inside Sales,[6] speculated that Peloton was "buying more inventory than it could sell" in 2021 because another employee said so. *Id.* ¶ 64. CW26 accused Woodworth of being "aware" of "inventory reporting discrepancies" several months before the Class Period in May 2021—but did not identify any of these supposed discrepancies. *Id.* ¶ 98.

The remaining CWs did not have a role in the Company's overall inventory or pricing strategy, and did not interact with the Individual Defendants or comment on the Bike's price cut. These CWs vaguely alleged that management may have had access to "reports" or "data" that supposedly reflected reduced demand or missed sales quotas, but do not identify any specifics, including dates or contents. *Id.* ¶¶ 34, 38, 42, 45–46, 68–69, 86, 94 (CWs 2, 3, 5, 6, 11, 20, 24). These CWs at most opined that *they themselves* had questions about Peloton's inventory strategy based on their limited regional observations or considered Peloton's inventory levels too high, whereas management *disagreed*. *Id.* ¶¶ 53, 103, 138 (CWs 8, 11, 29).

## VIII.    Most of the Individual Defendants' Alleged Stock Sales Took Place Before the Narrowed Class Period

The SAC repeatedly claims that the Individual Defendants were motivated to misrepresent facts about Peloton to protect their personal investments in Peloton stock. *Id.* ¶¶ 282–301. But now that the Second Circuit has limited the Challenged Statements, the vast majority of the Individual Defendants' alleged stock sales took place ***before*** the narrowed Class Period—and thus could not have incentivized fraud to inflate Peloton's stock price.

---

[6] Peloton had *three sales* channels; Inside Sales comprised a minority. Ex. 2 at 24.

Of Foley's 700,486 alleged stock sales, all but 486 shares (more than 99%) were sold before the Class Period. SAC App'x B. Those minimal sales—for proceeds of $48,765—were all to cover tax liabilities. *Id.*; Ex. 18 at 12. Foley retained his remaining 200,000 shares during the period when Peloton's stock price fell. Ex. 18 at 12.

Lynch exercised options on a total of 786,668 shares of stock and promptly sold those shares, but as with Foley, almost all those sales (96%) predated the Class Period. SAC App'x D. Lynch sold only 28,333 Peloton shares for proceeds of $3,134,841 during the Class Period pursuant to a pre-arranged 10b5-1 plan. SAC App'x D; Ex. 19 at 18. Plaintiffs allege that Lynch supposedly "halted" trading on September 14, 2021 (SAC ¶ 298)—he too retained his remaining shares while Peloton's stock price fell.

As for Woodworth, she exercised options on a total of 150,000 shares of stock and promptly sold those shares for proceeds of $5,277,292. SAC App'x C; Ex. 20 at 8. But again, two-thirds of those conversions and sales occurred before the Class Period. *Id.* Woodworth's sales during the Class Period were made pursuant to a pre-arranged 10b5-1 plan. Ex. 20 at 8.

## IX. Procedural History

Robeco was appointed lead plaintiff on May 5, 2022, and filed its AC on June 25, 2022. Dkt. 51. This Court dismissed the AC in full without prejudice. Dkt. 88. Robeco, together with additional plaintiff Hialeah, then filed the SAC. Dkt. 92. The Court dismissed the SAC with prejudice for failure to allege any false or misleading statements. Dkt. 108. The Second Circuit largely affirmed, concluding that the majority of the alleged misstatements—regarding demand and inventory—were not actionably false, including the statements described *supra* 5–10. 2COA Op. The Second Circuit also affirmed dismissal of all of Plaintiffs' insider trading claims. *Id.* at 21 n.5. It vacated and remanded with respect to only three Challenged Statements: the Price Statement, the August 2021 Risk Disclosure, and the November 2021 Risk Disclosure. *Id.* at 9.

13

Judge Newman dissented from the majority's reinstatement of the Challenged Statements and noted that it was "highly unlikely that the plaintiffs' pleading of scienter can survive the defendants' motion to dismiss." 2COA Conc. at 9. He also highlighted that Peloton's robust disclosures regarding its "precise inventory in dollar amounts" and "precise financial condition" undermined Plaintiffs' case. *Id.* at 6–7.

## ARGUMENT

Plaintiffs fail to allege three independent requirements for a Section 10(b) claim based on alleged misstatements: (1) scienter, (2) loss causation, and (3) standing. Ord. at 14.

### I.    Plaintiffs Fail to Allege a Strong Inference of Scienter

Under the PSLRA, Plaintiffs bear the burden of alleging a "strong inference" of scienter—*i.e.*, an "intent to deceive, manipulate, or defraud." *Tellabs, Inc*, 551 U.S. at 319. The PSLRA replaces the usual presumptions in favor of the plaintiff on a motion to dismiss; Plaintiffs must allege an inference of fraudulent intent that is *at least* as cogent and compelling as an inference of non-fraudulent intent. *Id.* at 324. Thus, rather than construe the allegations in the light most favorable to Plaintiffs, the Court "must engage in a comparative evaluation" by also considering "competing inferences rationally drawn from the facts alleged." *Id.* at 314. Plaintiffs must also allege particularized facts as to each Defendant showing, in a "holistic" analysis, (1) "motive and opportunity to commit fraud"; and/or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 48 (2d Cir. 2023).

Far from alleging a strong inference of fraud, the SAC does the opposite: It validates the more compelling inference that Defendants made extensive truthful disclosures while openly grappling with the extraordinary challenges posed by the pandemic, and that any imperfections in those disclosures were at worst innocent mistakes in light of those uncertainties.

14

### A.    Plaintiffs Do Not Allege Motive and Opportunity to Commit Fraud

Plaintiffs contend that the Individual Defendants were motivated to defraud investors because they wanted to inflate the value of their personal holdings in Peloton stock. *Supra* 12–13. But if scienter were alleged based on a motive to increase executive compensation, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009). To support a finding of scienter, therefore, Plaintiffs must allege that the Individual Defendants' personal financial transactions were "unusual." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). None of the alleged transactions here was unusual or shows motive.

*Stock Sales.* Stock sales that occur before the Class Period are categorically irrelevant because they cannot demonstrate motive to maintain or inflate the price of the stock during the Class Period. *In re Plug Power, Inc., Sec. Litig.*, 2022 WL 4631892, at *14 (S.D.N.Y. Sept. 29, 2022) (collecting cases); *see also New Eng. Carpenters*, 122 F.4th at 49 (no scienter where sales began "several months before" class period). Here, the vast majority of the Individual Defendants' sales took place *before* the Class Period (*supra* 13), and are thus irrelevant.

The few sales during the Class Period also do not suggest fraudulent intent. First, they were all made pursuant to pre-arranged 10b5-1 plans or to cover tax liabilities, which by definition "could not be timed suspiciously" and are not "unusual." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355; *see also Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 468 (S.D.N.Y. 2025) ("automatic" stock sales to cover "tax liabilities" not indicative of fraud). In addition, the sales during the Class Period comprise under 5% of the total sales during the SAC's original class period and were thus relatively inconsequential in amount. *See Koplyay v. Cirrus Logic, Inc.*, 2013 WL 6233908, at *6 (S.D.N.Y. Dec. 2, 2013) (no motive where sales by executives "totaled less than $10 million").

15

Finally, those sales took place more than ***six weeks before*** the first supposed corrective disclosure in November 2021. *Supra* 13.  Sales that take place "more than a month prior" to purported corrective disclosures are not "inherently suspicious," *Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at \*29 (S.D.N.Y. Sept. 29, 2023) (Carter, J.) (collecting cases), because the Individual Defendants did not "rush[] to cash out before the [purported] fraud was revealed and stock prices plummeted"—conduct that weighs "*against* a finding of scienter." *Koplyay*, 2013 WL 6233908, at \*5.  Instead, Foley and Lynch[7] *stopped* selling under their 10b-5 plans before the alleged fraud unraveled, and thus held stock that declined in value. *Supra* 13.[8]

Apparently recognizing the weakness of their motive allegations, Plaintiffs "waived" their insider trading claims against all Defendants on appeal (2COA Op. at 21 n.5), confirming that the SAC's motive allegations are unfixable. *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 222 (E.D.N.Y. 2013).

***Stock Option Exercises.*** The SAC's bare assertions that Woodworth and Lynch exercised stock options, *supra* 13, also do not suggest scienter. *See In re Plug Power, Inc.*, 2022 WL 4631892, at \*15 (exercise of options "in advance of their expiration" not suspicious).

***Pledging Shares.*** Plaintiffs also allege that Foley and Lynch were motivated to commit fraud because they pledged Peloton shares as collateral. SAC ¶¶ 282–84.  But loans secured with stock "are analogous to stock ownership"—which does not allege motive. *Tian v. Peloton Interactive, Inc.*, 2025 WL 510043, at \*16 (E.D.N.Y. Feb. 14, 2025).

---

[7] Plaintiffs also assert that Woodworth "abruptly" terminated her 10b-5 trading plan, but do not even allege when she supposedly did so, let alone what was unusual about this.  SAC ¶ 164.
[8] Terminating trading plans well before allegedly "significant drop[s]" in a company's share price also does not demonstrate scienter. *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at \*25 (S.D.N.Y. May 10, 2022) ("unusual" termination of plan insufficient).  Labeling Defendants' conduct "abrupt" or "sudden" is conclusory. *See Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at \*22 (S.D.N.Y. Mar. 18, 2025) ("conclusory" allegations regarding amended plan insufficient).

**B.      Plaintiffs Do Not Allege Strong Circumstantial Evidence of Fraud**

Without a motive to defraud, the strength of any circumstantial allegations "must be correspondingly greater." *ECA*, 553 F.3d at 199.  Plaintiffs' "uphill battle to plead a strong inference of scienter" on this basis becomes "that much steeper." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings, Corp.*, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021).  Plaintiffs must allege with particularity, at minimum, that Defendants' conduct was "highly unreasonable" and represented "an extreme departure from the standards of ordinary care." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015).

***Plaintiffs' Theory Disregards Peloton's Accurate Disclosures and Contemporaneous Actions.***  Plaintiffs cannot show that the alleged inaccuracies in the three remaining Challenged Statements represented highly unreasonable misconduct given Peloton's contemporaneous, accurate, and detailed inventory and price disclosures, including its deliberate and ongoing inventory investment strategy.  Scienter is "not plausible" when investors "could easily evaluate" a defendant's assertions about its business "in light of the financial information in its public filings," especially when the defendant "acknowledged" relevant risks "many times." *Gabelli Asset Fund v. Garret Mot. Inc.*, 2024 WL 1653451, at *3 (2d Cir. Apr. 17, 2024) ("unlikely" defendants could deceive given public financial information and risk disclosures).  Nor is fraud conceivable when Defendants' "corporate activities"—like building inventory—are consistent with their public statements. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589, 598 (S.D.N.Y. 2011) (no scienter because defendants spent significant time negotiating supposedly doomed contract).

Yet that is exactly what the challenged disclosures show—as confirmed by the Second Circuit.  From the beginning of the pandemic, Defendants quickly began reporting a long list of "negative impact[s]" on Peloton, including unpredictable demand for its products, forecasting challenges, and difficulties anticipating inventory needs. *Supra* 4–5.  Peloton also accurately

17

disclosed inventory in precise dollar amounts, which consistently grew before and during the Class Period. *Supra* 8. Plaintiffs do not challenge these figures. Foley and Woodworth explained to investors exactly what Peloton was doing: building inventory at a pace "exceed[ing] demand" so that Peloton could improve order-to-delivery times, particularly leading into the busy holidays. *Supra* 5–6, 8.[9] As this Court and the Second Circuit have held, Defendants' expectations of strong demand were "consistent with Peloton's then-current expectations of further growth." 2COA Op. at 11. In sum, Peloton "disclosed its precise inventory in dollar amounts, as well as Peloton's precise financial condition." 2COA Conc. at 6.

It "defies logic" to conclude that Defendants were hiding allegedly excess inventory from investors when Defendants made these "fulsome disclosures"—and openly discussed Peloton's deliberate inventory investments with analysts. *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) (no scienter because company made truthful disclosures "covering everything from detailed credit characteristics to extensive risk assessments," refuting theory that company sought to mislead about its exposure to subprime loans and capital adequacy). If Defendants really sought to prevent investors from "learning the truth" about Peloton's purported real reason for cutting the Bike's price, "[Peloton] needed to be measurably more opaque." *Id.*; *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 587 (S.D.N.Y. 2013) (no scienter given defendant's "aggregate disclosure" on same topic in SEC filings); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *15 (S.D.N.Y. Sept. 28, 2012) (no scienter given related and unchallenged disclosures on same topic).

---

[9] Plaintiffs suggest that management was aware of excess inventory because Peloton "reduced the import of equipment," SAC ¶ 5, but that interpretation of Peloton's import data is inconsistent with the SAC's allegation that Peloton was intentionally building inventory through November 2021, *id.* ¶¶ 29, 31. And Peloton's import data was, in any event, public. *Id.* ¶¶ 147–51.

And the little information that Defendants allegedly hid—that the price reduction was supposedly motivated by excess inventory—was obviously less important than the bigger picture information which Peloton accurately disclosed concerning demand, precise inventory levels, and the uncertainties posed by the pandemic—information that together allowed investors to draw their own conclusions. This further undermines scienter. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n*, 2016 WL 5794774, at *22 ("immaterial" concealment supported conclusion that fraud was "implausibl[e]" under holistic scienter inquiry); *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 326, 332 (W.D.N.Y. 2010) (failure to disclose "[un]important" facts regarding "inventory levels" undermined scienter). [10]

Nor would it make sense for Peloton to misrepresent the state of its inventory on August 26, 2021, if Defendants knew that the Company would be releasing purportedly conflicting inventory and revenue data mere months later in periodic filings. "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning," especially where "the ordinary course of . . . business" would lead to review of the purportedly hidden information—"as it did." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1126, 1130 (2d Cir. 1994) (no scienter where defendants allegedly made misstatements subject to public review "[t]wo months later"); *see also Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (no scienter given statements made shortly before the company "would inevitably be required to report its quarterly earnings to the market").

The timing of Defendants' purported scheme is particularly nonsensical for the November 2021 Risk Disclosure, which was issued *the same day* that the "truth" about Peloton's inventory was supposedly "revealed to investors." SAC ¶ 2. According to Plaintiffs' own version of events,

---

[10] The Challenged Statements are—for this and related reasons—immaterial.

Peloton "explicitly t[old] investors that the warned-of risk had materialized." 2COA Conc. at 3 n.5. Plaintiffs cannot have it both ways. Indeed, "cautionary statements of potential risk" like the August and November 2021 Risk Disclosures have "only rarely been found to be actionable by themselves." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360–61 (S.D.N.Y. 2008).

At most, Defendants "took a more optimistic view" of Peloton's prospects—but others "viewing the same publicly available information" could reach different conclusions, negating any circumstantial evidence of fraud. *Jones v. Perez*, 550 F. App'x 24, 26 (2d Cir. 2013) (no scienter where plaintiffs did "not challenge the accuracy of [company's] financial disclosures" and company eventually faced liquidity challenges); *supra* 6–9. "[M]isguided optimism is not a cause of action, and does not support an inference of fraud." *Jones*, 550 F. App'x at 26; *see also Shields*, 25 F.3d at 1129 (that management should have been "more skeptical" does not allege fraudulent intent); *In re Hardinge, Inc.*, 696 F. Supp. 2d at 331–32 (no scienter because management "need not present an overly gloomy or cautious picture" regarding inventory levels). Peloton's repeated disclosures "that the COVID-19 pandemic might impose risks" on its ability to accurately project inventory needs further refutes any inference of fraud. *Marquez v. Bright Health Grp., Inc.*, 755 F. Supp. 3d 266, 285 (E.D.N.Y. 2024) (warnings about pandemic risks undermined scienter). In sum, the "bevy of truthful disclosures" Defendants made about inventory, demand, and revenue forecasts forecloses any plausible inference of scienter. *Kuriakose*, 897 F. Supp. 2d at 185.

***CW Allegations.*** The CW allegations do not establish scienter because the CWs do not individually or collectively support the inference that any Individual Defendants believed Peloton had excess inventory in August 2021 or reduced the Bike's price for that reason. The majority of the CWs never "communicated" with the Individual Defendants or were "privy to" their knowledge. *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *26 (S.D.N.Y. May

20

19, 2025). The few CWs who do purport to have some relevant knowledge—CW1, CW10, and CW26—do not assert that *Defendants* deemed Peloton's inventory levels excessive in August 2021 or that Peloton cut the Bike's price to shed inventory. *Supra* 11–12. At most, *CW1* held that view—and was frustrated that others *disagreed*. Courts do not leap from disagreement to fraud. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 277, 299 (S.D.N.Y. 2013); *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) (defendants and CWs merely "disagreed" about adequacy of company's accounting). Similarly, CW7 (who worked in a single warehouse and did not have any input on pricing strategy) supposedly observed that Peloton cut the Bike's price "around the time" Peloton faced "inventory issues"—but did not purport to know why the Bike's price was cut. *Supra* 12. Such vague "speculation" by employees uninvolved in Peloton's decision-making comes nowhere close to alleging fraud. *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (CWs' "anecdotes" and "conclusory statements of belief" could not allege scienter).

Plaintiffs also emphasize CWs who thought Defendants had access to unspecified "reports" or "data" reflecting reduced demand or missed sales quotas. *Supra* 12. But vaguely alleging that executives "regularly assessed company inventory" and that (according to CWs who worked remotely or at discrete warehouses) inventory numbers were excessive is "too vague to support an inference of scienter"; Plaintiffs cannot identify specific information showing Defendants' awareness that the Challenged Statements were false. *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *see also Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (that defendants "monitored the sales and returns" insufficient to establish that "defendants actually possessed information contradicting" public statements). And "the mere

21

fact" that CWs supposedly considered this data problematic "does not establish that [Defendants]" agreed. *In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004) (that certain employees "anticipated" delay did not show defendants held same view).

In sum, not a single CW accuses the Individual Defendants of holding views different from their public statements. [11] To the contrary, the CWs assert that Lynch and other employees internally *defended* Peloton's public views. *Supra* 12. That too negates fraudulent intent.[12] And as the Second Circuit confirmed, the CWs' accounts are "inconsistent." 2COA Op. at 10.

### C.  Innocent Intent is the More Plausible Inference

Considering all these facts holistically, the more plausible explanation for the Challenged Statements is that, in hindsight, Defendants mistakenly forecast Peloton's inventory needs leading into the busy holiday season. Peloton accumulated inventory to prepare for "our biggest holiday ever." *Supra* 8. When Defendants realized that online and in-store traffic—key inputs for Peloton's demand model—were lower than expected, Peloton promptly and preemptively reduced its projections. And it explained why: As Peloton had warned investors for months, "in the face of an unprecedented global pandemic, Defendants were making disclosures in uncharted waters." *Optimum Strategies Fund I, LP v. U.S. Oil Fund, LP*, 2023 WL 2526394, at *13 (D. Conn. Mar. 15, 2023) (no scienter). Peloton's many other candid disclosures underscore its good faith. Rather than fraud, the "more compelling inference to be drawn" is that Defendants experienced "setbacks" in connection with "an unprecedented pandemic" and that Peloton pre-emptively adjusted

---

[11] Nor could they; Plaintiffs have not alleged what made Peloton's inventory levels "excessive."
[12] Lacking any cogent theory of scienter, Plaintiffs resort to invoking the Individual Defendants' high-ranking positions and personal connections. SAC ¶¶ 276–81; *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 775 (S.D.N.Y. 2019) (collecting cases for "overwhelming consensus" that core operations allegations are insufficient to establish scienter). But the disfavored core operations theory has no application here, where the issue is not that Peloton lacked knowledge of inventory levels, but that it lacked a belief that those levels were excessive.

22

projections in early November once it began discerning less robust holiday traffic than expected. *In re Bristol-Myers Squibb Co. CVS Sec. Litig.*, 658 F. Supp. 3d 220, 234 (S.D.N.Y. 2023).

The post-Class Period 2022 statements Plaintiffs label as "admissions" are entirely consistent with Peloton's good faith. Far from admitting that Peloton misled investors in August and November 2021, Peloton's executives explained that Peloton was slowing production *months later* after adjusting its forecasts. As Peloton announced, "assessing demand coming out of COVID ha[d] been a significant challenge." *Supra* 10.

McCarthy similarly announced that although Peloton had more inventory than expected *in February or March 2022*, he remained optimistic that the Company could turn the inventory into a "tailwind" for Peloton because Peloton's inventory (unlike, say, fruit or lipstick) "has a long life." *Supra* 11. That is entirely consistent with a lack of fraudulent intent. *See In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) (allegation that exposure "took [defendant] by surprise" after class period undermined scienter).

Finally, because Plaintiffs fail to "plead scienter with respect to any" Individual Defendant and "assert no specific corporate scienter allegations," scienter allegations against Peloton (Count I) also fail. *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *13 (S.D.N.Y. Sept. 27, 2021).

## II.    Plaintiffs Fail to Allege Loss Causation

Plaintiffs also cannot satisfy their burden to plead that the Challenged Statements "proximately caused the plaintiff's economic loss"—in other words, that the "relevant truth" they supposedly concealed was ever disclosed. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 346 (2005). Plaintiffs purport to have pled loss causation via corrective disclosure. SAC ¶ 315. But loss causation with respect to the November 2021 Risk Disclosure can be quickly rejected; Peloton *simultaneously* disclosed the projected revenue and inventory figures Plaintiffs deem revelatory. *Supra* 8–9. Plaintiffs cannot "have it both ways" by alleging that Defendants simultaneously made

23

a misstatement and revealed the truth it supposedly obscured.  *Diabat v. Credit Suisse Group AG*, 2024 WL 4252502, at *149–50 (S.D.N.Y. Sept. 19, 2024) (no loss causation).

Nor does the SAC allege loss causation for the Price Statement and the August 2021 Risk Disclosure.  Peloton's stock price declined because, as Plaintiffs acknowledge, Peloton repeatedly reduced its revenue guidance. *Supra* 9.  That is not a corrective disclosure with respect to the Challenged Statements, which concern whether Peloton had excess inventory in August 2021.  If "downward revisions of forecasts" were categorically enough to constitute corrective disclosures, the securities laws would effectively become "an insurance policy for investors." *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 267 (S.D.N.Y. 2005); *see also Wallace v. IntraLinks,* 2013 WL 1907685, at *10 (S.D.N.Y. May 8, 2013) (no loss causation where "revised . . . earnings projections" did not correct alleged misstatements regarding defendant's accounting practices); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (no loss causation where plaintiffs only alleged disclosures of revised *future* projections).

Plaintiffs also point to disclosure of Peloton's inventory levels in November 2021 as purportedly corrective—but that disclosure did not correct any purported misstatements.  To the contrary, additional inventory was consistent with Peloton's disclosures back in August 2021 that the Company was continuing to invest in inventory.  *Supra* 7–8, 10.  Because "all relevant information" regarding Peloton's inventory and business strategy "was already available to investors," the purported disclosures were "not 'corrective.'" *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Morg. Corp.*, 543 F. App'x 72, 77 (2d Cir. 2013) (no loss causation where investors could assess defendant's capitalization based on publicly available data).  No "new information" regarding the Bike's August 2021 price cut or Peloton's 2021 inventory levels ever emerged. *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164,

178 (E.D.N.Y. 2019). Moreover, Plaintiffs' theory that Peloton's proportion of "finished products" somehow revealed "unsold" inventory defies the face of Peloton's disclosure, which says no such thing. *Supra* 10; *Davison v. Ventrus Biosciences, Inc.*, 2014 WL 1805242, at *10 (S.D.N.Y. May 5, 2014) (when complaint defies SEC filing, filing "control[s]"). In any event, it ignores that this proportion was roughly the same as in prior quarters. *Supra* 10.

Reports that Peloton paused production in January 2022—after the holiday season—also do not amount to a corrective disclosure. The SAC does not allege why Peloton's decision to reduce inventory investments almost five months *after* it cut the Bike's price could contradict Peloton's statements about the price cut and inventory "in the past." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 471 (E.D.N.Y. 2020) (purported corrective disclosure inadequate because it did not reveal company's "past" performance); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014) (no revelation that "earlier earnings statements" were false).

In sum, Plaintiffs have not alleged, and cannot prove, that investors suffered losses because of the Challenged Statements, as opposed to a change in Peloton's forward-looking forecasts made while publicly navigating the complexity of the pandemic.

## III.    Lead Plaintiff Lacks Standing

Lead Plaintiff Robeco's latest share purchase was on March 5, 2021—before the narrowed Class Period. *See* Dkt. 16-1, at 3. It thus now lacks standing to sue. *See Gurary v. Winehouse*, 235 F.3d 792, 799 (2d Cir. 2000); *Wilson v. Dalene*, 699 F. Supp. 2d 534, 543 (E.D.N.Y. 2010).

\*\*\*

Plaintiffs fail to state a predicate Exchange Act violation, so their Section 20(a) and 20A claims also fail. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## CONCLUSION

For all of those reasons, the Court should dismiss the SAC in full with prejudice.

25

Dated: October 15, 2025                    Respectfully submitted,
       New York, New York

                                        */s/  Stephen L. Ascher*

                                        Stephen L. Ascher
                                        Joanna Wright
                                        Anna M. Windemuth
                                        Jenner & Block LLP
                                        1155 Avenue of the Americas
                                        New York, NY 10036-2711
                                        Telephone: (212) 891-1600
                                        sascher@jenner.com
                                        jwright@jenner.com
                                        awindemuth@jenner.com

                                        *Counsel for Defendants Peloton Interactive, Inc.,*
                                        *John Foley, William Lynch, and Jill Woodworth*

26