# EXHIBIT 4 (Part 2)

distributed, hypothecated or otherwise disposed of without registration under the Securities Act, except pursuant to an exemption from such registration available under the Securities Act, and in compliance with any other federal, state, foreign or local securities Law, in each case, to the extent applicable.

Section 5.9     Independent Investigation. Purchaser has conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, technology, management and prospects of the Transferred Entities and the Business, which investigation, review and analysis was done by Purchaser and its Representatives. In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of any of Parent, the Sellers, the Transferred Entities, their respective Affiliates or any of their respective Representatives (except the representations and warranties of Parent expressly set forth in Article IV). Purchaser hereby acknowledges and agrees that none of Parent, the Sellers, the Transferred Entities, their respective Affiliates or any of their respective Representatives or any other Person will have or be subject to any Liability to Purchaser, its Affiliates or any of their respective Representatives or shareholders or any other Person resulting from the distribution to Purchaser, its Affiliates or their respective Representatives of, or Purchaser's, its Affiliates' or their respective Representatives' use of, any information relating to Parent, the Sellers, the Transferred Entities or the Business, including any information, documents or material made available to Purchaser, its Affiliates or their respective Representatives, whether orally or in writing, in any data room, any management presentations (formal or informal), functional "break-out" discussions, responses to questions submitted on behalf of Purchaser or its Affiliates or in any other form in connection with the Transactions. Purchaser further acknowledges that no representative of Parent, the Sellers, the Transferred Entities or their respective Affiliates has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided. Purchaser acknowledges that, should the Closing occur, Purchaser shall acquire the Transferred Entities and the Business without any representation or warranty as to merchantability or fitness thereof for any particular purpose, in an "as is" condition and on a "where is" basis, except as otherwise expressly set forth in this Agreement.

Section 5.10    No Other Representations or Warranties; No Reliance. Purchaser acknowledges and agrees that, except for the representations and warranties of Parent contained in Article IV, none of Parent or any Affiliate thereof, or any other Person or entity on behalf of Parent or any Affiliate thereof, has made or makes, and Purchaser and its Affiliates have not relied upon, any representation or warranty, whether express or implied, with respect to the Business, Parent, the Transferred Entities or any Affiliate thereof, or their respective businesses, affairs, assets, liabilities, financial condition, results of operations, future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects) or with respect to the accuracy or completeness of any other information provided or made available to Purchaser or its Affiliates any of their respective Representatives by or on behalf of Parent or any Affiliate or representative thereof. Purchaser acknowledges and agrees that none of Parent or any Affiliate thereof, or any other Person or entity on behalf of Parent or any Affiliate thereof, has made or makes, and Purchaser has not relied upon, any representation or warranty, whether express or implied, with respect to any projections, forecasts, estimates or budgets made available to

-49-

Purchaser or any of its Representatives of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of any of Parent, the Transferred Entities or any Affiliates thereof or the Business.

## ARTICLE VI

## COVENANTS OF THE PARTIES

Section 6.1    Access to Books and Records.

(a)    From the date of this Agreement through the earlier of the Closing or the termination of this Agreement, and subject to the requirements of applicable Laws, Parent shall, and shall cause the Sellers and Transferred Entities to, afford to Representatives of Purchaser reasonable access to the books and records of the Business, under the supervision of the personnel of Parent or its Subsidiaries, during normal business hours consistent with applicable Law and in accordance with the procedures established by Parent, in each case, as is reasonably requested by Purchaser or its Representatives for purposes of integration planning following the consummation of the Transactions; provided that (i) such access shall not unreasonably interfere with the conduct of the business of the Parent or its Subsidiaries; (ii) such access shall occur in such a manner as Parent reasonably determines to be appropriate to protect the confidentiality of the Transactions; (iii) such access may be modified in light of applicable COVID-19 Measures; (iv) Purchaser shall not be permitted to conduct any environmental sampling, investigation or testing (including any commonly known as a Phase II assessment) at any of Parent's or its Subsidiaries' properties or facilities without Parent's consent (which shall not be unreasonably withheld, conditioned or delayed); and (v) nothing herein shall require Parent and its Subsidiaries to provide access to, or to disclose any information to, Purchaser if such access or disclosure would be reasonably likely to (x) waive any legal privilege or (y) be in violation of applicable Law or the provisions of any agreement entered into prior to the date of this Agreement and to which Parent of any of its Subsidiaries is a party.  All information and documents provided pursuant to this Section 6.1(a) will be subject to the Confidentiality Agreement, and Purchaser acknowledges and agrees that it has and will continue to abide by, and will cause its Representatives to continue to abide by, the terms of such Confidentiality Agreement.

(b)    Purchaser agrees that any access granted under Section 6.1(a) shall not interfere unreasonably with the operation of the Business or any other business of Parent or its Subsidiaries.  Purchaser and its Affiliates and its and their respective Representatives shall not communicate with any of the employees customers, suppliers, financing sources, lenders and other business relations of Parent or its Subsidiaries without the prior written consent of Parent, which shall not be unreasonably withheld, delayed or conditioned.

(c)    Except as otherwise provided in Section 8.2(a), from and after the Closing, Purchaser shall, and shall cause its Subsidiaries to, afford Parent and its Representatives, during normal business hours, upon reasonable notice, access to the books, records, properties and employees of each Transferred Entity and the Business to the extent that such access may be reasonably requested in connection with financial statements, Taxes, any Action or investigation by or before a Governmental Entity related to the Business and Governmental Entity reporting

obligations; provided that nothing in this Agreement shall limit any rights of discovery of Parent or its Affiliates.

(d)    Except for Tax Returns and other documents governed by Section 8.2(b), Purchaser agrees to hold, and to cause the applicable Transferred Entities to hold, all the books and records of each Transferred Entity or the Business existing on the Closing Date and not to destroy or dispose of any thereof for a period of seven (7) years from the Closing Date or such longer time as may be required by Law, and thereafter, if any of them desires to destroy or dispose of such books and records, to offer first in writing at least sixty (60) days prior to such destruction or disposition to surrender them to Parent.

Section 6.2    Confidentiality.

(a)    The parties hereto expressly agree that, notwithstanding any provision of the Confidentiality Agreement to the contrary, the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect until the Closing.    The parties hereto expressly agree that, notwithstanding any provision of the Confidentiality Agreement to the contrary, including with respect to termination thereof, if, for any reason, the Sale is not consummated, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

(b)    For a period of twenty-four (24) months from the Closing Date, Parent shall, and shall cause its Affiliates to, hold in confidence any nonpublic information that is proprietary or competitively sensitive ("Sensitive Business Information") to the extent exclusively relating to the Business; provided that the foregoing restriction shall not apply to information (i) that becomes available on a non-confidential basis to Parent or any of its Affiliates from and after the Closing from a third-party source that is not known by Parent or its applicable Affiliates to be under any obligations of confidentiality with respect to such information, (ii) that is in the public domain or enters into the public domain through no fault of Parent or any of its Affiliates, (iii) to the extent used by Parent or any of its Affiliates to comply with the terms of this Agreement or any of the Ancillary Agreements or any other Contract between Parent or any of its Affiliates, on the one hand, and Purchaser or any of its Affiliates, on the other hand, (iv) that is, following the Closing, independently derived by Parent or any of its Affiliates without use of such Sensitive Business Information or (v) subject to the immediately following sentence, that Parent or any of its Affiliates is required by Law or the rules of any stock exchange or required or requested pursuant to legal or regulatory process to disclose.    In the event that Parent or any of its Affiliates is required by Law or the rules of any stock exchange or required or requested pursuant to legal or regulatory process to disclose such information, Parent shall reasonably promptly notify Purchaser in writing unless not permitted by Law or such legal or regulatory process to so notify, which notification shall include the nature of such legal or regulatory requirement or request, as applicable, and the extent of the required or requested disclosure, and will use commercially reasonable efforts to cooperate with Purchaser, at Parent's expense, to preserve to the extent reasonably practicable the confidentiality of such information.    For the avoidance of doubt, nothing contained in this Agreement shall limit, restrict, require prior notice with respect to, or in any other way affect any party's or its Representatives' communications with any Governmental Entity, or communications with any official or staff person of a Governmental Entity, concerning matters relevant to such Governmental Entity.    For the avoidance of doubt, nothing in this Section 6.2(b) shall prohibit

Parent or any of its Affiliates from making disclosures regarding the Transactions to its equityholders, investors or prospective investors.

(c)    From and after the Closing, Purchaser shall, and shall cause its Subsidiaries (including the Transferred Entities) to, hold in confidence and not use for any purpose any Sensitive Business Information to the extent exclusively relating to the Retained Businesses; provided that the foregoing restriction shall not apply to information (i) that becomes available on a non-confidential basis to Purchaser or any of its Affiliates from and after the Closing from a third-party source that is not known by Purchaser or its applicable Affiliates to be under any obligations of confidentiality with respect to such information, (ii) that is in the public domain or enters into the public domain through no fault of Purchaser or any of its Affiliates, (iii) to the extent used by Purchaser or any of its Affiliates to comply with the terms of this Agreement or any of the Ancillary Agreements or any other Contract between Purchaser or any of its Affiliates, on the one hand, and Parent or any of its Affiliates, on the other hand, (iv) that is, following the Closing, independently derived by Purchaser or any of its Affiliates without use of such Sensitive Business Information or (v) subject to the immediately following sentence, that Purchaser or any of its Affiliates is required by Law or required or requested pursuant to legal or regulatory process to disclose.  In the event that Purchaser or any of its Affiliates is required by Law or required or requested pursuant to legal or regulatory process to disclose such information, Purchaser shall reasonably promptly notify Parent in writing unless not permitted by Law or such legal or regulatory process to so notify, which notification shall include the nature of such legal or regulatory requirement or request, as applicable, and the extent of the required or requested disclosure, and will use commercially reasonable efforts to cooperate with Parent, at Parent's expense, to preserve to the extent reasonably practicable the confidentiality of such information. For the avoidance of doubt, nothing contained in this Agreement shall limit, restrict, require prior notice with respect to, or in any other way affect a party's or its Representatives' communications with any Governmental Entity, or communications with any official or staff person of a Governmental Entity, concerning matters relevant to such Governmental Entity.

Section 6.3    Required Actions.

(a)    Purchaser and Parent shall use their reasonable best efforts to take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under any applicable Laws to consummate and make effective in an expeditious manner the Transactions, including (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions, (ii) taking all actions necessary to obtain (and cooperating with each other in obtaining) any consent, clearance, expiration or termination of a waiting period, authorization, Order or approval of, or any exemption by, any Governmental Entity (which actions shall include furnishing all information required under any Antitrust Laws) required to be obtained or made by Purchaser or Parent or any of their respective Subsidiaries in connection with the Transactions, and (iii) the execution and delivery of any additional instruments necessary to consummate the Transactions and to fully carry out the purposes of this Agreement. Additionally, each of Parent and Purchaser shall take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under any applicable Laws to fulfill all conditions precedent to this Agreement.

(b)     Prior to the Closing, to the extent not prohibited by applicable Law, Purchaser and Parent shall each keep the other apprised of the status of matters relating to the completion of the Transactions and work cooperatively in connection with obtaining all required consents, clearances, expirations or terminations of waiting periods, authorizations, Orders or approvals of, or any exemptions by, any Governmental Entity.  In that regard, prior to the Closing, subject to the Confidentiality Agreement and Section 6.2, to the extent not prohibited by applicable Law, each of Parent and Purchaser shall promptly consult with the other party to provide any necessary information with respect to (and, in the case of correspondence, provide the other party (or their counsel) copies of) all filings made by such party with any Governmental Entity or any other information supplied by such party to, or correspondence with, a Governmental Entity in connection with this Agreement, the Transactions.  Subject to the Confidentiality Agreement and Section 6.2, to the extent not prohibited by applicable Law, each party to this Agreement shall promptly inform the other party to this Agreement, and if in writing, furnish the other party with copies of (or, in the case of oral communications, advise the other party of) any communication from any Governmental Entity or other such Person regarding the Transactions, and permit the other party to review and discuss in advance, and consider in good faith the views of the other party in connection with, any proposed written or oral communication or submission with or to any such Governmental Entity or other such Person.  If any party to this Agreement or any representative of such party receives a request for additional information or documentary material from any Governmental Entity with respect to the Transactions, then such party will make, or cause to be made, promptly and after consultation with the other party to this Agreement, an appropriate response in compliance with such request.  Purchaser, on one hand, and Parent, on the other hand, shall not participate in any meeting with any Governmental Entity in connection with this Agreement or the Sale, or with any other Person in connection with any Action by a private party relating to any Antitrust Laws in connection with this Agreement or the Sale, or make oral submissions at meetings or in telephone or other conversations, unless it consults with the other party in advance and, to the extent not prohibited by such Governmental Entity, gives the other party the opportunity to attend and participate thereat.  Purchaser and Parent may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other party under this Agreement as "outside counsel/in-house counsel only."  Such designated materials and any materials provided by Purchaser to Parent or by Parent to Purchaser pursuant to this Section 6.3, and the information contained therein, shall be given only to the outside legal counsel and in-house counsel of the recipient and shall not be disclosed by such outside counsel and in-house counsel to employees (other than in-house counsel), officers or directors of the recipient unless express permission is obtained in advance from the source of the materials (Purchaser or Parent, as the case may be) or its legal counsel; it being understood that materials provided pursuant to this Agreement may be redacted (i) to remove references concerning the valuation of the Business, (ii) as necessary to comply with contractual arrangements and (iii) as necessary to address reasonable privilege concerns.

(c)     Purchaser and Parent shall file or cause to be filed, as promptly as practicable, but in any event no later than ten (10) Business Days after the date of this Agreement, notifications under the HSR Act.  During the term of this Agreement, Purchaser shall not withdraw its filing under the HSR Act or take any other action which is reasonably expected to materially delay the consummation of the Transactions, without prior written consent of the Seller (such consent not to be unreasonably withheld, conditioned or delayed).

(d)    Purchaser shall use its reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the Transactions under any Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or lessening of competition through merger or acquisition or restraint of trade.

(e)    For the avoidance of doubt, Purchaser shall use its reasonable best efforts to avoid or eliminate each and every impediment under any Antitrust Laws so as to enable the Closing to occur as promptly as practicable (and in any event no later than the Outside Date), including (i) proposing, negotiating, agreeing to, committing to and effecting, by consent decree, hold separate Order, or otherwise, the sale, divestiture or disposition of any businesses, product lines or assets of the Transferred Entities, Purchaser, and their respective Subsidiaries, and (ii) otherwise taking or committing to take actions that after the Closing would limit Purchaser's, the Transferred Entities' or their respective Subsidiaries' freedom of action with respect to, or its or their ability to retain, any businesses, product lines or assets of the Transferred Entities, Purchaser, and their respective Subsidiaries.  Notwithstanding the foregoing or any other provision of this Agreement to the contrary, in no event shall Purchaser be obligated to take any actions pursuant to this Section 6.3 that would or would reasonably be expected to materially adversely impact the business or operations of the Purchaser and its Subsidiaries, taken as a whole, or materially reduce Purchaser's contemplated benefits from the Transactions.

(f)    Whether or not the Sale is consummated, Purchaser shall be responsible for all fees and payments (including filing fees and legal, economist and other professional fees) to any third party or any Governmental Entity to obtain any consent, clearance, expiration or termination of a waiting period, authorization, Order or approval pursuant to this Section 6.3, other than the fees of and payments to Parent's legal and professional advisors; provided that Parent shall pay one-half of the filing fees required in connection with notification under the HSR Act.

(g)    Purchaser covenants and agrees that, from the date of this Agreement through the earlier of the Closing or the termination of this Agreement, Purchaser shall not, and shall cause its Subsidiaries not to, directly or indirectly, acquire or agree to acquire, by merger, consolidation, stock or asset purchase or otherwise, any business or Person or other business organization or division thereof, or dissolve, merge or consolidate with any other Person, if such transaction would reasonably be expected to prevent, delay or impede the consummation of the Transactions.

Section 6.4    Conduct of Business.

(a)    From the date of this Agreement through the earlier of the Closing or the termination of this Agreement, except (i) as otherwise expressly required or contemplated by this Agreement (including any actions, elections or transactions undertaken pursuant to Section 6.8 or Section 6.9), (ii) as required by or to comply with Law or a Business Material Contract, (iii) to the extent solely relating to any Retained Businesses, (iv) as disclosed in Section 6.4(a) of the Parent Disclosure Schedule or (v) as otherwise consented to by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Parent shall cause the Transferred Entities (and the Sellers to the extent related to the Business) to:

(i)      conduct the Business in the Ordinary Course of Business in all material respects, including how the Business has been operated since the beginning of the COVID-19 Pandemic; provided that, except for actions required to comply with Law or any COVID-19 Measure (for which no consent is required), if Parent or the Transferred Entities determine that the Transferred Entities are reasonably required to take any action in response to the COVID-19 Pandemic that is not consistent with the Ordinary Course of Business (including how the Business has been operated since the beginning of the COVID-19 Pandemic), Parent shall notify Purchaser thereof in writing seeking Purchaser's consent thereto, and Purchaser shall promptly review such proposal and respond in writing (email being sufficient) to Parent's request for consent within forty-eight (48) hours of receipt of such notice (which consent will not be unreasonably withheld, conditioned or delayed);

(ii)      not (1) amend their Organizational Documents, (2) split, combine or reclassify their outstanding Equity Interests, or (3) declare, set aside or pay any dividend or distribution to any Person other than a Transferred Entity (except as may be required to facilitate the elimination of intercompany accounts contemplated by Section 6.8 or Section 6.9);

(iii)      other than to a Transferred Entity or in connection with the Pre-Closing Restructuring, not issue, sell, pledge or dispose of, or agree to issue, sell, pledge or dispose of, any Equity Interests (other than pledges existing on the date hereof to be released at Closing);

(iv)      not (1) incur in excess of $250,000 aggregate principal amount of Indebtedness outstanding at any time (other than intercompany indebtedness owing by one Transferred Entity to another Transferred Entity, or any borrowings under revolving credit facilities or Indebtedness in the Ordinary Course of Business that may be prepaid at or prior to Closing or pursuant to agreements existing as of the date hereof), (2) make any material acquisition of any assets or businesses in excess of $100,000 other than acquisitions of inventory or other materials in the Ordinary Course of Business or as set forth in the capital budget of the Transferred Entities made available to Purchaser prior to the date hereof, (3) sell or dispose of any material assets other than in the Ordinary Course of Business or (4) incur, create or assume any Lien, other than Permitted Liens or Liens that will be discharged at or prior to the Closing;

(v)      except (1) solely in the case of clause (i) and (ii) of this Section 6.4(a)(v) as may be required pursuant to any (x) Seller Benefit Plan or (y) Transferred Entity Benefit Plan, (2) in the case of any Seller Benefit Plan, in connection with any action that applies uniformly to Transferred Entity Employees and other similarly situated employees of the Parent Group and the effect of which does not materially increase Purchaser's obligations under Article VII with respect to any Transferred Business Employees, (3) for changes in connection with ordinary course annual renewals or immaterial annual increases of a Transferred Entity Benefit Plan, or (4) for any grant for which the Parent Group shall be solely obligated to pay, not (i) grant to any Business Employee any material increase in compensation or benefits, including severance or termination pay, (ii) pay or award, or commit to pay or award, any bonuses, retention or

-55-

incentive compensation to any Business Employee, (iii) take any action to amend or waive any performance or vesting criteria or accelerate vesting or funding under any Transferred Entity Benefit Plan, or (iv) adopt, enter into or materially amend any Transferred Entity Benefit Plan;

(vi)    not make any material change to its methods of financial accounting in effect at December 31, 2019, except as required by a change in, or to comply with, IFRS (or any interpretation thereof);

(vii)    except as set forth in the capital budget of the Transferred Entities made available to Purchaser prior to the date hereof, not commit or authorize any commitment to make any capital expenditures in excess of $500,000 in the aggregate;

(viii)    not dissolve, merge or consolidate with any other Person (except with respect to entities that are dormant as of the date hereof);

(ix)    (A) not (1) change any annual accounting period, (2) adopt or change any material method of accounting for Tax purposes (3) settle any claim or assessment in respect of Taxes or surrender any right to a Tax refund, (4) make or change any material Tax election or (5) enter into any written agreement with a Taxing authority relating to Taxes, in each case with respect to a Transferred Entity, and (B) continue to pay or cause to be paid the Transferred Entities' Taxes as they become due and payable in the Ordinary Course of Business in a manner consistent with Parent's past practice;

(x)    not (1) materially amend, terminate (other than expiration in accordance with its terms) or cancel any Business Material Contract, (2) enter into any Contract providing for any Lease Recourse Liabilities or any Contract that would have been required to be listed on Section 6.10(a) of the Parent Disclosure Schedule (Guarantees) if entered into prior to the date of this Agreement with a value in excess of $350,000 individually or $6,000,000 in the aggregate or (3) enter into any other Contract that if in effect on the date hereof would be a Business Material Contract, other than, in the case of clause (3), in the Ordinary Course of Business or (4) renew the Business Material Contract as set forth in Section 4.10(c) of the Parent Disclosure Schedule;

(xi)    not settle or compromise any Action, or enter into any consent decree or settlement agreement with any Governmental Entity, against or affecting the Business, in each case, other than settlements or compromises of any Action where the amount paid in settlement or compromise does not exceed $100,000 individually or $250,000 in the aggregate (excluding any proceeds paid solely under any insurance policy) (it being agreed and understood that this clause (xi) shall not apply with respect to Tax matters, which shall be governed by Section 6.4(a)(ix));

(xii)    not accept non-cancelable purchase orders from customers containing any minimum volume or purchase or sale commitments that would result in manufacturing commitments as of the Closing that materially exceed the manufacturing commitments of the Business incurred in the Ordinary Course of Business;

(xiii)    not establish, adopt, enter into, amend or terminate any Collective Bargaining Agreement that covers any Business Employee;

(xiv)    not cancel, amend (other than in connection with the addition of customers and suppliers to such insurance policies from time to time in the Ordinary Course of Business) or fail to renew (on substantially similar terms) any material insurance policy held by or for the benefit of the Business;

(xv)    not change in any material respects its practices and procedures in respect of Working Capital, other than in the Ordinary Course of Business;

(xvi)    not (1) hire any Business Employee (other than to fill or replace any vacant position so long as the annual base salary of such newly hired Business Employee does not exceed an amount equal to 115% of the base salary of the Person so replaced), (2) terminate the employment of any Business Employee (except for cause) or (3) transfer the employment of any employee or Business Employee into or out of a Transferred Entity, in each case, other than as contemplated by the Pre-Closing Restructuring; or

(xvii)    not agree or commit to do any of the foregoing.

(b)    Nothing contained in this Agreement shall give Purchaser, directly or indirectly, the right to control or direct Parent's or any of its Affiliates' (including the Transferred Entities') businesses or operations. Nothing contained in this Agreement shall give Parent, directly or indirectly, the right to control or direct Purchaser's or any of its Affiliates' businesses or operations.

Section 6.5    Consents. Parent and Purchaser shall, and shall cause their respective Subsidiaries to use reasonable best efforts (i) to obtain any consents required from third parties in connection with the consummation of the Transactions under Business Material Contracts and (ii) transfer any Permits required to be transferred to or from a Transferred Entity in connection with the consummation of the Transactions, in each case as set forth in Section 6.5 of the Parent Disclosure Schedule; provided, that neither Parent nor any of its Affiliates shall have any obligation to make any payments or incur any Liability to obtain any consents of third parties or effect the transfers or arrangements contemplated by this Section 6.5, and, without limiting the obligations of Parent and its Subsidiaries under this Section 6.5, the failure to receive any such consents or to effect any such transfers or arrangements shall not, in and of itself, result in the failure of any condition to the Closing set forth in Article IX to have been satisfied.

Section 6.6    Intellectual Property Assignment. At or prior to the Closing, Parent shall, and shall cause the Sellers to, use reasonable best efforts to deliver to Purchaser executed confirmatory assignments of Intellectual Property from the individuals set forth on Section 6.6 of the Parent Disclosure Schedule involved in the development of the Owned Intellectual Property, in each case, in a form that is reasonably acceptable to Purchaser; provided, that the failure to receive or effect any such assignment shall not, in and of itself, result in the failure of any condition to the Closing set forth in Article IX to have been satisfied. For the avoidance of doubt, the individuals set forth on Section 6.6 of the Parent Disclosure Schedule are all currently employed

by, or providing services to, the Parent Group or the Transferred Entities, as applicable, and who have materially contributed to Owned Intellectual Property.

Section 6.7    Public Announcements.  No party to this Agreement nor any Representative of such party shall issue or cause the publication of any press release or public announcement in respect of this Agreement or the Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), except (a) as may be required by Law or stock exchange rules, or (b) to the extent the contents of such release or announcement have previously been released publicly by a party hereto or are consistent in all material respects with materials or disclosures that have previously been released publicly without violation of this Section 6.7.  The parties hereto agree that the initial press release to be issued with respect to the execution of this Agreement shall be in the form heretofore agreed to by Parent and Purchaser.

Section 6.8    Intercompany Accounts; Cash.    At or prior to the Closing, (a) all intercompany accounts (a true, correct and complete list of which as of the date of this Agreement are set forth on Section 6.8 of the Parent Disclosure Schedule), between any member of the Parent Group, on the one hand, and any Transferred Entity, on the other hand, shall be settled or otherwise eliminated, it being understood that, from and after the Closing, Purchaser and the Transferred Entities shall have no obligation or liability with respect to the intercompany accounts set forth on Section 6.8 of the Parent Disclosure Schedule (or that arise after the date of this Agreement, but are of the type that would be required to be set forth thereon if outstanding as of the date of this Agreement), and (b) any and all Cash of the Transferred Entities may be extracted from the Transferred Entities by the Sellers or other Affiliates of Parent (including, for the avoidance of doubt, through cash sweeps, dividend payments, distributions, share redemptions, recapitalizations, and the settling of intercompany loans accounts), in the case of each of clause (a) and (b), in such a manner as Parent shall reasonably determine in its sole discretion.  For the avoidance of doubt, (i) intercompany accounts between and among any of the Transferred Entities shall not be required to have been eliminated at the Closing and (ii) trade accounts payable and receivable between any Transferred Entity, on the one hand, and any member of the Parent Group (other than the Transferred Entities), on the other hand, created in the Ordinary Course of Business, shall not be required to have been eliminated, at the Closing.

Section 6.9    Termination of Intercompany Arrangements.  Effective at the Closing, all arrangements, understandings or Contracts, including all obligations to provide goods, services or other benefits, by any member of the Parent Group (other than the Transferred Entities), on the one hand, and any Transferred Entity on the other hand, that are not otherwise covered under Section 6.8, shall be terminated without any party having any continuing obligations or Liability to the other, except for (a) this Agreement and the Ancillary Agreements and (b) the other arrangements, understandings or Contracts listed in Section 6.9 of the Parent Disclosure Schedule.

Section 6.10    Guarantees; Commitments.

(a)    From and after the Closing, the Transferred Entities, jointly and severally, shall indemnify and hold harmless Parent and any of its Affiliates against any Liabilities that Parent or any of its Affiliates suffer, incur or are liable for by reason of or arising out of or in consequence of (i) Parent or any of its Affiliates issuing, making payment under, being required to pay or

reimburse the issuer of, or being a party to, any guarantee, indemnity, co-signature, surety bond, letter of credit, letter of comfort, commitment or other similar obligation relating to the Business or the Transferred Entities listed on Section 6.10(a) of the Parent Disclosure Schedule (collectively, the "Guarantees"), (ii) any claim or demand for payment made on Parent or any of its Affiliates with respect to any of the Guarantees or (iii) any Action by any Person who is or claims to be entitled to the benefit of or claims to be entitled to payment, reimbursement or indemnity with respect to any Guarantees.  For the avoidance of doubt, and not in limitation of the foregoing, upon and after the Closing, Parent and its Affiliates may terminate all Guarantees.

(b)    Without limiting Section 6.10(a) in any respect, Purchaser shall use reasonable best efforts, at its sole expense, to cause itself or its Affiliates to be substituted in all respects for Parent and any of its Affiliates, and for Parent and its Affiliates to be released, effective as of the Closing, in respect of, or otherwise terminate (and cause Parent and its Affiliates to be released in respect of), all obligations of Parent and its Affiliates under each Guarantee (including, in each case, by delivering at Closing (i) executed agreements to assume reimbursement obligations for such Guarantees, (ii) executed instruments of guaranty, letters of credit or other documents requested by any banks, customers or other counterparties with respect to any Guarantees, and (iii) any other documents requested by Parent in connection with its obligations under this Section 6.10), and Parent shall and shall cause its Affiliates to reasonably cooperate in relation thereto and use its and their reasonable best efforts to effectuate the foregoing.  In furtherance and not in limitation of the foregoing, at the request of Parent or its Affiliates, Purchaser shall and shall cause its Affiliates to assign or cause to be assigned any Contract or lease underlying such Guarantee to a Subsidiary of Purchaser meeting the applicable net worth and other requirements in such Contract or lease to give effect to the provisions of the preceding sentence. For any Guarantees for which Purchaser or any Transferred Entity is not substituted in all respects for Parent and any of its Affiliates (or for which Parent and any of its Affiliates is not released) effective as of the Closing and that cannot otherwise be terminated effective as of the Closing (with Parent and any of its Affiliates to be released in respect thereof), each of Parent and Purchaser shall continue to use its reasonable best efforts and shall cause its Affiliates to use their reasonable best efforts to effect such substitution or termination and release as soon as practicable after the Closing.  Without limiting the foregoing, neither Purchaser nor any of its Subsidiaries shall, or shall permit any of its Affiliates to, extend or renew any Contract containing or underlying a Guarantee unless, prior to or concurrently with such extension or renewal, Purchaser or the Transferred Entities are substituted in all respects for Parent and any of its Affiliates, and Parent and any of its Affiliates are released, in respect of all obligations of Parent and any of its Affiliates under such Guarantee.

Section 6.11    Insurance; Director and Officers Indemnification and Insurance.

(a)    Insurance.

(i)    From and after the Closing, the Transferred Entities shall cease to be insured by the Parent Group's current and historical insurance policies or programs or by any of its current and historical self-insured or retention programs with respect to pre-Closing claims or occurrences under "claims made" or "occurrence based" insurance policies, and none of the Transferred Entities, Purchaser or its other Affiliates shall have any access, right, title or interest to or in any such insurance policies, programs or self-

insured programs (including to all claims and rights to make claims and all rights to proceeds) to cover any assets of the Transferred Entities or any Liability of the Transferred Entities or of or arising from the operation of the Business, in each case including with respect to all known and incurred but not reported claims or occurrences. The members of the Parent Group may, to be effective at the Closing, amend any insurance policies and ancillary arrangements in the manner they deem appropriate to give effect to this Section 6.11(a).

(ii) Notwithstanding the foregoing, during the term of the Transition Services Agreement, with respect to claims for events or Losses related to the Business Products with respect to pre-Closing occurrences that are covered by the Parent Group's occurrence-based third-party liability insurance policies (the "Available Insurance Policies") subject in all cases to the terms and limitations of such policies (such claims, the "Valid Pre-Closing Claims"), (x) Purchaser may promptly notify Parent in writing of any matter that is reasonably expected to give rise to a Valid Pre-Closing Claim under any such Available Insurance Policy (provided that the failure to promptly notify Parent shall not relieve Parent from its obligations under clause (y)), and (y) Parent shall, and shall cause its Affiliates to, (A) make Valid Pre-Closing Claims and pursue and seek to recover on such claims under the terms of the Transition Services Agreement, and (B) promptly deliver to Purchaser any insurance proceeds received with respect thereto (calculated net of reasonable expenses incurred in procuring such recovery and any increase in premiums or retroactive premium adjustments or chargebacks paid by or on behalf of the Parent Group to the extent as a result of such claims, and taking into account the available coverage under each Available Insurance Policy, it being understood that such coverage shall first be available to satisfy other claims of the Parent Group that are pending under such policy at the time the claim for the benefit of Purchaser is made); provided that, unless otherwise deducted from the proceeds received by the Purchaser, the Purchaser shall pay (or reimburse the Parent Group for), without duplication, any deductibles, retentions, loss-sensitive, self-insurance amounts or other costs, in each case, to the extent resulting from any Valid Pre-Closing Claim made by Parent or its Affiliates on behalf of any of Purchaser or the Transferred Entities under such policies for Valid Pre-Closing Claims. For the avoidance of doubt, Purchaser shall be liable for all uninsured, uncovered, unavailable or uncollectible Losses associated with any such Valid Pre-Closing Claim. Following the Closing, if permitted under the applicable Available Insurance Policy, Parent hereby authorizes Purchaser and its Subsidiaries to notify, make and pursue Valid Pre-Closing Claims as contemplated by this Section 6.11(a)(ii) under the Available Insurance Policies, subject to the payment and reimbursement provisions set forth in the prior sentence. Notwithstanding anything to the contrary herein, no member of the Parent Group shall have any Liability to bring any Actions to obtain any insurance coverage for any Valid Pre-Closing Claim.

(iii) In connection with the pursuit of any Valid Pre-Closing Claim, Purchaser shall, and shall cause the Transferred Entities to, fully cooperate with the Parent Group in pursuing coverage for any Valid Pre-Closing Claim. If Purchaser or any of its Affiliates breach, or cause any member of the Parent Group to breach, any terms or conditions of any Available Insurance Policies with respect to any Valid Pre-Closing Claim, Purchaser shall be solely responsible for, and shall bear the risk of any Loss of

-60-

coverage cause by such breach (and, in all events, the Purchaser shall bear the risk of any lack of coverage under the Available Insurance Policies). Purchaser shall, and shall cause the Transferred Entities to, use commercially reasonable efforts to pursue rights of recovery against third parties with respect to claims, Liabilities, occurrences, accidents, events, matters, Actions or Losses for which the Transferred Entities have the ability to mitigate via contract or tort and shall cooperate with Parent with respect to the pursuit of such rights.

(b)     Director and Officers Indemnification and Insurance.

(i)     Purchaser and Parent agree that all rights to indemnification, advancement of expenses and exculpation from liability for or in connection with acts or omissions occurring at any time prior to or on the Closing Date (including in connection with this Agreement and the Transactions), that now exist in favor of any Person who prior to or on the Closing Date is or was a current or former director, manager, officer or employee of a Transferred Entity, or who at the request of Parent or any of its Affiliates served prior to or on the Closing Date as a director, officer, member, manager, employee, trustee or fiduciary of any other entity of any type (each a "D&O Indemnified Person"), including as provided in the Organizational Documents of a Transferred Entity, or in the Contracts between a D&O Indemnified Person and a Transferred Entity set forth in on Section 6.11(b) of the Parent Disclosure Schedule (an "Indemnity Agreement"), will survive the Closing and will continue in full force and effect for the six (6) year period following the Closing Date. In furtherance (and not in limitation of) the foregoing, for the six (6) year period following the Closing Date, Purchaser will cause the Transferred Entities to, and the Transferred Entities will (i) maintain in the Organizational Documents of each of the Transferred Entities provisions with respect to indemnification, advancement of expenses and exculpation from liability that in each such respect are at least as favorable to each D&O Indemnified Person as those contained in each Transferred Entity's respective Organizational Documents, as applicable, as in effect on the date hereof, which provisions will not be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of any D&O Indemnified Person and (ii) continue in existence each Indemnity Agreement without termination, revocation, amendment or other modification that would adversely affect the rights thereunder of any D&O Indemnified Person.

(ii)     On or before the Closing Date, Parent, at its sole expense, will obtain for the Transferred Entities for a six (6) year period following the Closing Date, and Purchaser will cause the Transferred Entities to maintain in effect, with no lapse in coverage, one or more "tail" or "runoff" directors' and officers' liability and employment practices liability insurance policies covering actual or claimed acts or omissions of any D&O Indemnified Person occurring on or before the Closing Date (including in connection with this Agreement and the Transactions), in each case on terms with respect to coverage, retentions, amounts and other material terms at least as favorable to such D&O Indemnified Persons as those of such policies in effect on the date hereof.

(iii)     If Purchaser or any Transferred Entity (or any of its successors or assigns) (a) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, or (b) transfers all or

-61-

substantially all of its properties and assets to any other Person (including by dissolution, liquidation, assignment for the benefit of creditors or similar action), then, and in each such case, proper provision will be made so that such other Person fully assumes the obligations set forth in this Section 6.11(b).

(iv)    The provisions of this Section 6.11(b) will survive the Closing. This Section 6.11(b) will be for the irrevocable benefit of, and will be enforceable by, each D&O Indemnified Person and his or her respective heirs, executors, administrators, estates, successors and assigns, and each such Person will be an express intended third party beneficiary of this Agreement for such purposes. Purchaser will pay, or will cause the Transferred Entities to pay, as and when incurred by any Person referred to in the immediately preceding sentence, all fees, costs, charges and expenses (including attorneys' fees and expenses) incurred by such Person in enforcing such Person's rights under this Section 6.11(b) upon receipt of an undertaking by or on behalf of such Person to repay such amount if it shall ultimately be determined that such Person is not entitled to be indemnified by Purchaser or such Transferred Entity. Notwithstanding anything in this Agreement to the contrary, the obligations under this Section 6.11(b) will not be terminated, revoked, modified or amended in any way so as to adversely affect any Person referred to in the second sentence of this Section 6.11(b)(iv) without the written consent of such Person. With respect to any right to indemnification or advancement for actual or claimed acts or omissions occurring prior to or on the Closing Date (including in connection with this Agreement and the Transactions), each Transferred Entity, as applicable, will be the indemnitor of first resort, responsible for all such indemnification and advancement that any D&O Indemnified Person may otherwise have from any direct or indirect stockholder or equity holder of any of the Transferred Entities (or any Affiliate of such stockholder or equity holder) and without right to seek or obtain subrogation, indemnity or contribution. Each of the Transferred Entities and Purchaser further agrees that no advance or prepayment by any Person other than the applicable Transferred Entity or Transferred Entities as the primary indemnitor on behalf of any D&O Indemnified Person with respect to any claim for which such D&O Indemnified Person has sought indemnification or advancement from any of the Transferred Entities will affect the foregoing and that any such secondary indemnitor will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all the rights of recovery of the D&O Indemnified Person against the Transferred Entities and Purchaser, and the Parent shall cause the Transferred Entities to hereby irrevocably release any such secondary indemnitor from, and irrevocably waive and relinquish any right to assert against any such secondary indemnitor, any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof, effective as of the Closing. Each of the Transferred Entities, Purchaser and the D&O Indemnified Persons agree that the secondary indemnitors are express third party beneficiaries of this Section 6.11(b)(iv).

Section 6.12    Litigation Support. Until the fifth (5th) anniversary of the Closing Date, Parent and its Affiliates on the one hand, and Purchaser and its Subsidiaries, on the other, shall reasonably cooperate with each other (at the requesting party's cost and expense with respect to reasonable out-of-pocket costs and expenses of the other party and its Subsidiaries or Affiliates) in respect of any Action, investigation, charge, claim, or demand by or against a third party (other than an Action brought against or by the other party hereto or any Affiliate of such party) with (a)

the Transactions or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction relating to, in connection with or arising from the Business or the Transferred Entities (including, for the avoidance of doubt, any Retained Businesses that were historically part of a Transferred Entity), including making available its personnel, participating in meetings, providing such testimony and access to their books and records and taking such other actions as shall be reasonably necessary in connection with such prosecution, contest or defense (provided that such party and its Subsidiaries or Affiliates, as applicable, shall enter into such customary joint defense agreements or other arrangements, as appropriate, so as to allow for such disclosure in a manner that does not result in the loss of such privilege or protection).

Section 6.13    Misallocated Assets and Misdirected Payments.

(a)    If, following the Closing, any right, property or asset that is part of the Retained Businesses is found to have been transferred to Purchaser, the Transferred Entities or their Affiliates in error, Purchaser shall use reasonable best efforts to transfer, or cause its applicable Affiliate to transfer such right, property or asset to the applicable member of the Parent Group as soon as practicable. If, following the Closing, any right, property or asset that was primarily related to the Business immediately prior to the Closing is found to have been transferred to or retained by a member of the Parent Group in error, either directly or indirectly, Parent shall use reasonable best efforts to transfer, or cause the applicable member of the Parent Group to transfer, such right, property or asset to Purchaser or its applicable Affiliate as soon as practicable. Until such time that Parent or its applicable Affiliate transfers any such right or asset that constitutes Owned Intellectual Property in accordance with this Section 6.13(a), Parent, on behalf of itself and its Affiliates, hereby grants to Purchaser, the Transferred Entities and their Affiliates a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, sub-licensable and transferable right and license (or sub-license, as the case may be) to fully use, practice and otherwise exploit such Intellectual Property, as applicable, effective as of the Closing Date. If, following the Closing, any right, property or asset that otherwise constituted Retained Intellectual Property is found to have been transferred to or retained by Purchaser or the Transferred Entities in error, either directly or indirectly, Purchaser shall use reasonable best efforts to transfer, or cause the applicable Transferred Entities to transfer, such right, property or asset to the applicable member of the Parent Group as soon as practicable.

(b)    Except as otherwise provided in this Agreement or any Ancillary Agreement, following the Closing, (i) if any payments due with respect to the Business are paid in error to any member of the Parent Group, Parent shall, or shall cause the applicable member of the Parent Group to, promptly remit by wire or draft such payment to an account designated in writing by Purchaser and (ii) if any payments due with respect to the Retained Business are paid in error to Purchaser, the Transferred Entities or their Affiliates, Purchaser shall, or cause its Affiliates to, promptly remit by wire or draft such payment to an account designated in writing by Parent. Until such time that Parent transfers any such right or asset that constitutes Intellectual Property in accordance with this Section 6.13, Parent, on behalf of itself and other members of the Parent Group, hereby grants to Purchaser and its Affiliates a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, sub-licensable and transferrable right and license (or sub-license, as the case may be) to fully use, practice and otherwise exploit such Intellectual Property, as applicable, effective as of the Closing Date.

Section 6.14    Parent  Names.    Notwithstanding  anything  contained  herein,  neither Purchaser nor any of its Affiliates shall use, or have or acquire the right to use or any other rights in, any Marks of Parent or any of its Affiliates, including Parent's logo, the word "Amer" or any variations or derivatives thereof or any Marks of Parent or any of its Affiliates, or any name, trademark, service Mark or logo that, in the reasonable judgment of Parent, is similar to any of the foregoing (the "Parent Names").  Within ten (10) Business Days after the Closing Date, Purchaser shall, and shall cause the Transferred Entities to, (i) cause its board of directors to adopt any necessary resolutions to change its name to a name not containing a Parent Name, (ii) file with the applicable Governmental Entity and take all other necessary action to complete such name changes to a name not containing any Parent Name, and (iii) cease and discontinue all use of all Parent Names.

Section 6.15    Non-Solicitation.

(a)    Each of member of the Parent Group shall not, and shall not permit, cause or encourage any of its respective Affiliates to, at any time prior to twenty-four (24) months from the Closing Date, directly or indirectly, (i) solicit the employment or services (whether as an employee, consultant, independent contractor or otherwise) of any Transferred Business Employee or independent contractor of the Transferred Entities as of Closing or any Person who has been an employee or an independent contractor of the Transferred Entities within the twelve (12) month period immediately preceding the Closing Date, without Purchaser's prior written consent, or (ii) hire in any capacity (whether as an employee, consultant, independent contractor or otherwise) any Transferred Business Employee with the title of Vice President or any more senior title as of the Closing, unless such Person has been terminated by Purchaser or any of its Affiliates subsequent to the Closing and who has not been employed or engaged by any Transferred Entity for a period of at least twelve (12) months prior to the date of such hire, without Purchaser's prior written consent.    For purposes of this Section 6.15(a), the terms "solicit the employment or services" shall not be deemed to include generalized searches for employees through media advertisements of general circulation, employment search firms, open job fairs or otherwise.

(b)    Purchaser and its Subsidiaries shall not, and shall not permit, cause or encourage any of their respective Affiliates to, at any time prior to twenty-four (24) months from the Closing Date, directly or indirectly, (i) solicit the employment or services (whether as an employee, consultant, independent contractor or otherwise) of any Parent Group employee or independent contractor of any member of the Parent Group as of Closing or any Person who has been an employee or an independent contractor of any member of the Parent Group within the twelve (12) month period immediately preceding the Closing Date, without Parent's prior written consent, or (ii) hire in any capacity (whether as an employee, consultant, independent contractor or otherwise) any Person listed on Section 6.15(b) of the Parent Disclosure Schedule, unless such Person has been terminated by Parent or any of its Affiliates subsequent to the Closing and who has not been employed or engaged by any member of the Parent Group for a period of at least twelve (12) months prior to the date of such hire, without Parent's prior written consent.  For purposes of this Section 6.15(b), the terms "solicit the employment or services" shall not be deemed to include generalized searches for employees through media advertisements of general circulation, employment search firms, open job fairs or otherwise.

-64-

(c)    Notwithstanding the foregoing, (1) this Section 6.15 shall not restrain or prohibit any activities, actions or conduct of any Person that is not directly or indirectly controlled by a party, including any joint ventures, partnerships or co-investment vehicles that neither such party nor any of its direct or indirect Subsidiaries controls, (2) Section 6.15(b) shall not apply to any Wrong Pocket Employee and (3) Section 6.15(b) shall not apply to any Business Employee described in the last sentence of Section 7.3.

Section 6.16    Resignations.    Parent shall deliver any resignations (effective as of the Closing) of the directors, managers, and officers of the Transferred Entities that are requested by Purchaser in writing no less than ten (10) Business Days prior to the Closing Date.

Section 6.17    Pre-Closing Restructuring.

(a)    The parties hereto acknowledge and agree that (a) nothing in this Agreement shall prohibit or restrict the transfer (by distribution or otherwise) of any cash or cash equivalents prior to the Closing, and (b) prior to the Closing, Parent and its Subsidiaries will take all actions and steps necessary (subject to the limitations set forth in Section 6.7) to effectuate the transactions in Section 6.17 of the Parent Disclosure Schedule (all such actions as set forth on Section 6.17 of the Parent Disclosure Schedule, the "Pre-Closing Restructuring").

(b)    From the date of this Agreement through the earlier of the Closing or the valid termination of this Agreement, the parties hereto shall cooperate with each other and negotiate, acting reasonably and in good faith, to amend, modify, supplement, or take any other actions reasonably required to finalize each Business Transfer Agreement and Transfer Instrument (each, as defined in Section 6.17 of the Parent Disclosure Schedule), as applicable, including any of the exhibits, annexes or schedules attached thereto.

(c)    Without Purchaser's prior written consent (not to be unreasonably withheld, conditioned or delayed), Parent shall not, and shall procure that no Seller shall, effect any element of the Pre-Closing Restructuring other than pursuant to a Business Transfer Agreement or Transfer Instrument, in each case, in a form reasonably satisfactory to Purchaser.

Section 6.18    Release of Liens; Other Actions.    Parent shall take such actions as may be reasonably necessary to (a) secure the release of all Liens listed on Section 6.18(a) of the Parent Disclosure Schedule and (b) upon Purchaser's written request, take the actions described in Section 6.18(b) of the Parent Disclosure Schedule prior to the Closing.

Section 6.19    Transition Services Agreement.    From the date of this Agreement through the earlier of the Closing or the valid termination of this Agreement, the parties hereto shall cooperate with each other and negotiate, acting reasonably and in good faith, to amend, modify, supplement, or take any other actions reasonably required to finalize the Transition Services Agreement, including any of the exhibits, annexes or schedules attached thereto.

Section 6.20    R&W Insurance Policy.    In the event Purchaser or any of its Affiliates elects to obtain a representations and warranties insurance policy in respect of the representations and warranties contained in this Agreement or in any certificate or other instrument contemplated by or delivered in connection with this Agreement (such policy, a "R&W Insurance Policy") (a) all premiums, underwriting fees, brokers' commissions and other costs and expenses related to such

R&W Insurance Policy shall be borne solely by Purchaser or such Affiliate and (b) Purchaser shall provide Parent a reasonable opportunity to review the R&W Insurance Policy and provide reasonable comments in advance of binding coverage; provided, that (i) the bound R&W Insurance Policy shall be in the form reviewed by Parent and (ii) none of Purchaser or any of its Affiliates shall amend, waive, modify or otherwise revise the R&W Insurance Policy in any manner adverse to any member of the Parent Group without the prior written consent of Parent (not be unreasonably withheld, conditioned or delayed).

## ARTICLE VII

## EMPLOYEE MATTERS COVENANTS

Section 7.1    Business Employee List.  From and after the date hereof until the Closing Date, Sellers shall deliver to Purchaser on a periodic basis as reasonably requested by Purchaser, but not more frequently than once per calendar month, an updated Business Employee List including the information described in Section 4.12(f), with the final Business Employee List to be delivered to Purchaser no later than ten (10) Business Days prior to the Closing Date, in each case reflecting any resignations from employment and employees who are hired or terminated or transferred into the Business solely to the extent permitted by Section 6.4.

Section 7.2    Continuation of Employment.  On the Closing Date, the Sellers shall cause each of the Transferred Entities to employ on the Closing Date its respective Business Employees. The parties hereto will cooperate in good faith to provide that, on the Closing Date, each Business Employee will be, and the Sellers will have obtained all necessary visas, permits, passes and other approvals in order for each Business Employee to be, authorized and permitted under applicable Law to be employed by his or her respective Transferred Entity; provided, that, subject to Section 6.17, the failure to obtain any such visa, permit, pass or other approval shall not, in and of itself, result in the failure of any condition to the Closing set forth in Article IX to have been satisfied. Each such Transferred Entity Employee whose employment continues with a Transferred Entity shall be referred to herein as a "Transferred Business Employee".

Section 7.3    Wrong Pocket Employees.  In the event of any Transfer Claim, (i) the party to this Agreement that discovers such claim shall promptly notify the other party in writing of such claim and (ii) upon Purchaser's written request, the Sellers shall make (or procure that another member of the Parent Group makes) a written offer off employment to the individual making such Transfer Claim (each, a "Wrong Pocket Employee") on terms and conditions of employment that are no less favorable than those provided to such Wrong Pocket Employee as of immediately prior to the Closing (including, where required by applicable Law, granting such Wrong Pocket Employee full recognition of his or her service with the Parent Group), within ten (10) Business Days following the Sellers' receipt of such written request. In the event that any Business Employee is not an employee of a Transferred Entity as of immediately prior to the Closing or does not otherwise become a Transferred Business Employee, the Sellers shall promptly notify Purchaser in writing and the Purchaser or its designated Affiliate shall be permitted (but not required) to make a written offer of employment to such individual on terms and conditions determined in Purchaser's sole discretion.

Section 7.4    Terms and Conditions of Employment.  With respect to each Transferred Business Employee in the United States, Purchaser and its Affiliates shall take all action necessary to provide or cause to be provided, for the period commencing on the Closing Date and ending on the first anniversary of the Closing Date, (a) the same wage rate or cash salary level in effect for such Transferred Business Employee immediately prior to the Closing Date and (b) incentive compensation opportunities and employee benefits that are substantially comparable, in the aggregate, as those in effect for such Transferred Business Employee immediately prior to the Closing Date (other than equity-based incentives, long-term cash incentive plan incentives and nonqualified deferred compensation plan arrangements).    Notwithstanding the foregoing, Purchaser shall not be prohibited by this Section 7.4 from terminating the employment of any Transferred Business Employee following the Closing Date.  Purchaser and its Affiliates shall, in addition to meeting the applicable requirements of Article VII, comply with any additional obligations or standards arising under applicable Laws or contracts governing the terms and conditions of employment or termination of employment of the Transferred Business Employees, as such Contracts maybe amended from time to time.

Section 7.5    Service Credit.  As of and after the Closing, Purchaser shall, and shall cause its Affiliates (including, following the Closing, the Transferred Entities) to, give each Transferred Business Employee full credit for all purposes under (a) any Transferred Entity Benefit Plans, (b) each other benefit or compensation plan, program, policy or arrangement, and (c) any other service-based or seniority-based entitlement, in each case maintained or made available for the benefit of Transferred Business Employees as of or after the Closing by Purchaser or any of its Affiliates (including, following the Closing, the Transferred Entities) (such plans referenced in (b) and (c), the "Purchaser Benefit Plans"), for such Transferred Business Employee's service prior to the Closing with Parent and its applicable Affiliates (including the Transferred Entities) and their respective predecessors; provided that such credit shall not be given (i) to the extent that it would result in a duplication of benefits for the same period of service, or (ii) in respect of any Purchaser Benefit Plan that is grandfathered or frozen with respect to level or benefits or participation.

Section 7.6    Health Coverages.  As of and after the Closing, Purchaser and its Affiliates (including, following the Closing, the Transferred Entities) shall cause each Transferred Business Employee (and his or her eligible dependents) to be covered by a group health plan or plans, effective as of the Closing Date, that (a) comply with the provisions of Section 7.4, (b) do not limit or exclude coverage on the basis of any pre-existing condition of such Transferred Business Employee or dependent (other than any limitation already in effect under the corresponding group health Seller Benefit Plan or Transferred Entity Benefit Plan) or on the basis of any other exclusion or waiting period not in effect under the applicable group health Seller Benefit Plan or Transferred Entity Benefit Plan, and (c) to the extent that such Purchaser Benefit Plans in which such Transferred Business Employee becomes eligible to participate for the first time following the Closing, provide such Transferred Business Employee full credit, for the first year of eligibility, for any deductible, co-payment or out-of-pocket expenses already incurred by the Transferred Business Employee under the applicable group health Seller Benefit Plan or Transferred Entity Benefit Plan during such year for purposes of any deductible, co-payment or maximum out-of-pocket expense provisions, as applicable, of such Purchaser Benefit Plan.

Section 7.7    Accrued Vacation, Sick Leave and Personal Time.  Purchaser and its Affiliates will recognize and assume all Liabilities with respect to accrued but unused vacation,

sick pay, personal time and other paid time off for all Transferred Business Employees accrued as of the Closing Date, other than to the extent any such Liabilities are paid to Transferred Business Employees in connection with any transfer of employment to a Transferred Entity (the "Accrued PTO"). Purchaser and its Affiliates shall allow Transferred Business Employees to use the vacation, sick pay, personal time and other paid time off recognized or assumed in accordance with the first sentence of this Section 7.7 in accordance with the terms of Purchaser's programs as in effect from time to time, other than to the extent such Accrued PTO is paid to the applicable Transferred Business Employee by Purchaser or its affiliates following the Closing Date. At or as soon as practicable following the Closing, the Sellers shall deliver to Purchaser a schedule setting forth the Accrued PTO for each Transferred Business Employee.

Section 7.8    Collective Bargaining Agreements.    Purchaser agrees that as of and following the Closing Date, Purchaser and its Affiliates shall recognize the unions and works councils set forth on Section 7.8 of the Purchaser Disclosure Schedule that are signatories to the collective bargaining or other labor Contracts covering Transferred Business Employees as the Representatives of the Transferred Business Employees of the bargaining units described therein. The Sellers and Purchaser shall, and shall cause their respective Affiliates to, cooperate to take all steps, on a timely basis, as are required under applicable Law or any Collective Bargaining Agreement to notify, consult with or negotiate the effect, impact, terms or timing of the Sale with each works council, union, labor board, employee group or Governmental Entity where so required under applicable Law.

Section 7.9    Precor Cash Plan.    Prior to the Closing, the Sellers shall take all actions necessary to terminate the Business Employees' participation in the Precor Cash Plan as of the Closing.

Section 7.10    Seller Benefit Plans; Transferred Entity Benefit Plans.    As of the Closing, except as otherwise expressly provided in the Transition Services Agreement, the Transferred Entities shall cease to be participating employers in the Seller Benefit Plans and the Transferred Business Employees shall cease to be active participants in the Seller Benefit Plans. Except as otherwise expressly provided in this Article VII, Purchaser shall not assume any obligations under, or Liabilities with respect to, or receive any right or interest in any trusts relating to, any assets of or any insurance, administration or other contracts, or related obligations pertaining to, any Seller Benefit Plan. For the avoidance of doubt, as of the Closing, Purchaser and its Affiliates shall assume, or shall cause the Transferred Entities to assume or retain, as the case may be, sponsorship of, and all Liabilities and other obligations with respect to, the Transferred Entity Benefit Plans. Purchaser and its Affiliates shall assume and retain all obligations under Section 4980B of the Code for all Transferred Business Employees and their beneficiaries who are "M&A qualified beneficiaries" (as such term is defined in Treasury Regulation Section 54.4980B-9).

Section 7.11    No Third-Party Beneficiaries.    Without limiting the generality of Section 11.5, nothing in this Agreement is intended to or shall (a) be treated as an amendment to, or be construed as amending, any Seller Benefit Plan, Transferred Entity Benefit Plan or other benefit plan, program or agreement sponsored, maintained or contributed to by any Seller, any Transferred Entity, Purchaser or any of their respective Affiliates, (b) prevent Purchaser or its Affiliates, on or after the Closing Date, from terminating the employment of any Transferred Entity Employee, or (c) confer any rights or remedies (including third-party beneficiary rights) on any current or

former director, employee, consultant or independent contractor of any Seller, any Transferred Entity, Purchaser or any of their respective Affiliates or any beneficiary or dependent thereof or any other Person other than the parties to this Agreement.

## ARTICLE VIII

## TAX MATTERS

Section 8.1    Purchase Price Allocation.

(a)    No later than twenty (20) Business Days prior to the Closing, Parent shall deliver to Purchaser a proposed preliminary allocation of the relevant portion of the purchase price and any other items that are treated as additional consideration for Tax purposes (including, for the avoidance of doubt, any liabilities that, for Tax purposes, are treated as assumed by the Purchaser (or its relevant Subsidiaries)) among, on the one hand, each applicable member of the Parent Group that sells, transfers or assigns and, on the other hand, each of Purchaser and its Subsidiaries that purchases, the Transferred Entities or the Transferred Intellectual Property, determined in a manner consistent with the fair market value of the Transferred Entities and Transferred Intellectual Property (the "Preliminary Allocation"). The Preliminary Allocation shall be subject to Purchaser's review and comment. If Purchaser disagrees with any Preliminary Allocation, Purchaser may, within ten (10) days after delivery of such Preliminary Allocation, deliver a notice to Parent to such effect, specifying those items as to which Purchaser disagrees and setting forth Purchaser's proposed allocation. In the event of any disagreement as to the Preliminary Allocation, Parent and Purchaser shall cooperate in good faith to resolve such dispute prior to the Closing.

(b)    As soon as practicable after the Closing, but in no event later than thirty (30) days after the finalization of the Final Closing Statement pursuant to Section 2.6, Parent shall deliver to Purchaser a proposed allocation of the Final Purchase Price and any other items that are treated as additional consideration for Tax purposes among the Shares and the Transferred Intellectual Property and, to the extent applicable, further allocate the portion of the Final Purchase Price and any other amounts treated as consideration for such tax purposes that is allocated to the Shares among (i) the assets of the Transferred Entities that are treated for U.S. federal income Tax purposes as entities disregarded from the applicable Seller or as selling their assets pursuant to an election made under Section 338(g) of the Code, and (ii) the assets of Precor Incorporated treated for U.S. federal income Tax purposes as being sold pursuant to the 338(h)(10) Election (if applicable), in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Parent's Allocation"). If Purchaser disagrees with the Parent's Allocation, Purchaser may, within thirty (30) days after delivery of the Parent's Allocation, deliver a notice ("Purchaser's Allocation Notice") to Parent to such effect, specifying those items as to which Purchaser disagrees and setting forth Purchaser's proposed allocation. If Purchaser's Allocation Notice is duly and timely delivered, Parent and Purchaser shall, during the twenty (20) days following such delivery, use commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine the allocation of the Final Purchase Price (and other relevant amounts). If Parent and Purchaser are unable to reach such agreement, they shall promptly thereafter cause the Independent Accounting Firm to resolve any remaining disputes. Any allocation of the Final Purchase Price (and other relevant amounts) determined pursuant to

the decision of the Independent Accounting Firm shall incorporate, reflect and be consistent with the Purchase Price Allocation Schedule and the terms of this Agreement.  Any costs and expenses of the Independent Accounting Firm incurred pursuant to this Section 8.1(b) shall be borne equally by Parent, on the one hand, and the Purchaser, on the other hand.  The allocation, as prepared by Parent if no Purchaser's Allocation Notice has been timely given, as adjusted pursuant to any agreement between Purchaser and Parent or as determined by the Independent Accounting Firm pursuant to this Section 8.1(b) (the "Allocation"), shall be conclusive and binding on the Parties.  The Allocation shall be adjusted, as necessary, to reflect any subsequent payments treated as adjustments to the Final Purchase Price pursuant to Section 8.6.  Any such adjustment shall be allocated, consistent with this Section 8.1(b), to the Equity Interests and/or asset or assets of the Transferred Entities to which such adjustment is attributable.   In the event that the Allocation to the shares of any Transferred Entity or to any Transferred Intellectual Property differs from the amount set forth in the Preliminary Allocation, both Parent and Purchaser and their respective Affiliates agree to treat such difference as a purchase adjustment for Tax purposes, to the maximum extent permitted by applicable Tax Law.

(c)    Parent and the Purchaser shall (and shall cause their respective Affiliates to not take any position inconsistent therewith on any Tax Return, in connection with any Tax Proceeding or otherwise, in each case, except to the extent otherwise required pursuant to a "determination" (within the meaning of Section 1313(a) of the Code or any similar provision of state, local or foreign Law).  In the event that the Allocation is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify the other party in writing of such notice and resolution of the dispute. The provisions of Section 8.3 governing Pre-Closing Tax Audits will apply, mutatis mutandis, to any audit, investigation, or other action by a Governmental Entity with respect to the Allocation.

Section 8.2    Cooperation and Exchange of Information.

(a)    Not more than thirty (30) days after the receipt of a request from Parent, Purchaser shall, and shall cause its Affiliates to, provide to Parent a package of Tax information materials, including schedules and work papers, requested by Parent to enable Parent to prepare and file all Tax Returns required to be prepared and filed by it with respect to the Transferred Entities.  Purchaser shall prepare such package completely and accurately, in good faith and in a manner consistent with Parent's past practice.

(b)    Each party to this Agreement shall, and shall cause its Affiliates to, provide to the other party to this Agreement such cooperation, documentation and information as either of them reasonably may request in (i) filing any Tax Return, amended Tax Return or claim for refund, (ii) determining a Liability for Taxes or a right to refund of Taxes or (iii) conducting any Tax Proceeding. Such cooperation and information shall include providing copies of all relevant portions of relevant Tax Returns, together with all relevant portions of relevant accompanying schedules and relevant work papers, relevant documents relating to rulings or other determinations by taxing authorities and relevant records concerning the ownership and Tax basis of property and other information, which any such party may possess. Each party shall make its employees reasonably available on a mutually convenient basis at its cost to provide an explanation of any documents or information so provided. Notwithstanding anything to the contrary in this Agreement, neither Parent nor any of the Sellers shall be required to provide any Person with any

-70-

Tax Return or copy of any Tax Return of (i) Parent or a member of the Parent Group or (ii) a consolidated, combined, affiliated or unitary group that includes any member of the Parent Group.

(c)      Each party shall retain all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters, of the relevant entities for their respective Tax periods ending on or prior to the Closing Date until the expiration of the statute of limitations for the Tax periods to which the Tax Returns and other documents relate. Thereafter, the party holding such Tax Returns or other documents may dispose of them after offering the other party reasonable notice and opportunity to take possession of such Tax Returns and other documents at such other party's own expense (provided that any such notice must in any event be made in writing at least sixty (60) days prior to such disposition; provided, further, for the avoidance of doubt, that Parent shall have no obligation to offer Purchaser any Tax Returns or other documents not required to be provided under Section 8.2(b)).

Section 8.3      Preparation and Filing of Returns.  Purchaser shall prepare and file all Tax Returns of the Transferred Entities that are required to be filed after the Closing Date for any Pre-Closing Tax Period or Straddle Period (excluding, for clarity, any Tax Return of a Transferred Entity filed as part of a consolidated, combined or other similar Group that includes Parent or any of its Affiliates (other than any such group comprised solely of Transferred Entities)).  Not later than thirty (30) days prior to the due date for filing any such Tax Return, Purchaser shall provide Parent with a copy of each such income or other material Tax Return for its review and consent (not to be unreasonably withheld, conditioned or delayed), to the extent that such Tax Return would reasonably be expected to increase the Taxes of Parent or any of its Affiliates (excluding, for clarity, the Transferred Entities).  If Purchaser, any of its Affiliates or any of the Transferred Entities receives notice of any audit, investigation, or other action by a Governmental Entity in respect of any Tax Return of the Transferred Entities for a Pre-Closing Tax Period (a "Pre-Closing Tax Audit"), then such party will promptly (and in any event within fifteen (15) days) give written notice to Parent.  Purchaser will have the right, at its own expense, to control the defense of the Pre-Closing Tax Audit and shall keep the Parent reasonably informed of all material matters that come to its attention in respect of the Pre-Closing Tax Audit.  The Parent will be entitled to participate in the defense of any Pre-Closing Tax Audit, at its own expense, and Purchaser shall not settle or compromise such Pre-Closing Tax Audit without the consent of Parent (not to be unreasonably withheld, conditioned or delayed) to the extent that such settlement or compromise could reasonably be expected to increase the Taxes or decrease the Tax attributes of Parent or any of its Affiliates (excluding, for clarity, the Transferred Entities).

Section 8.4      Straddle Period.  To the extent necessary to determine the allocation of Taxes in respect of a Straddle Period, Taxes of the Transferred Entities based on or measured by income, gross or net sales, payroll, payments or receipts shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period based on an interim closing of the books as of the close of business on the Closing Date and any other Taxes shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis.

Section 8.5      Closing of Tax Period.  With respect to the preparation of any income Tax return for any Straddle Period, the Parties agree that: (i) all Transaction Tax Deductions shall be taken into account in the Pre-Closing Tax Period (and allocated solely to Sellers with respect to the Pre-Closing Tax Period) to the maximum extent allowable by applicable Law, determined as

if the Tax year ended on and included the Closing Date; (ii) any financing or refinancing arrangements entered into at any time by or at the direction of Purchaser or its Affiliates or any other transactions entered into by or at the direction of Purchaser or its Affiliates in connection with the Transactions shall not be taken into account in the Pre-Closing Tax Period; and (iii) any items of income, gain, loss and deduction attributable to transactions undertaken by or at the direction of Purchaser or its Affiliates (including the Transferred Entities following the Closing) outside the Ordinary Course of Business on the Closing Date after the time of the Closing shall not be taken into account in the Pre-Closing Tax Period.

Section 8.6     Tax Treatment of Payments.    Except to the extent otherwise required pursuant to a "determination" (within the meaning of Section 1313(a) of the Code or any similar provision of state, local or foreign Law), Parent, Purchaser, the Transferred Entities and their respective Affiliates shall treat any and all payments under Section 2.7, Section 7.7 and Section 8.9 as an adjustment to the purchase price for Tax purposes.

Section 8.7     Post-Closing Tax Covenant.    Purchaser shall not, and shall not cause its Affiliates (including the Transferred Entities) to (i) make any Tax election with respect to any Transferred Entity, which election would be effective on or prior to the Closing Date, (ii) take any action on the Closing Date after the Closing that is outside the Ordinary Course of Business with respect to the Transferred Entities or the Business, (iii) amend any Tax Return or election made in connection with such Tax Return with respect to any of the Transferred Entities for any Tax period ending on or before the Closing Date, (iv) initiate or enter into any voluntary disclosure agreement or program with any taxing authority with respect to any Tax period ending on or before the Closing Date prior to the finalization of the Final Closing Statement, or (v) change any method of accounting for Tax purposes or Tax accounting period with respect to any Tax period or portion thereof ending on or before the Closing Date, in each case, that would reasonably be expected to increase the liability of any of the Sellers or their respective Affiliates (other than the Transferred Entities) for Taxes (including pursuant to this Agreement); provided, that nothing in this Section 8.7 or otherwise in this Agreement shall be construed to limit Purchaser's ability to make an election under Section 338(g) of the Code (or any corresponding or similar provision of state or local Tax Law) with respect to the Sale of Shares of any non-U.S. Transferred Entity.

Section 8.8     Transfer Taxes.    Notwithstanding anything to the contrary in this Agreement, Purchaser and Parent shall each pay 50% of, when due, and be responsible for, any sales, use, transfer, real property transfer, registration, documentary, conveyance, franchise, goods and services, stamp, value added or similar Taxes and related fees and costs imposed on or payable in connection with the Transactions, ("Transfer Taxes"). The party required to do so by applicable Tax Law shall prepare and file any Tax Return required to be filed with respect to any such Transfer Taxes and promptly provide a copy of such Tax Return to the other party. For the avoidance of doubt, the Closing Purchase Price set forth in this Agreement is exclusive of Transfer Taxes. Parent shall be solely responsible for any Transfer Taxes arising as a result of the Pre-Closing Restructuring.

Section 8.9     Refunds.    Except as otherwise provided by Section 8.5, Parent shall be entitled to retain, or receive immediate payment from Purchaser of, any Tax refund or credit to which any Transferred Entity becomes entitled with respect to any Pre-Closing Tax Period, except

to the extent that such Tax refund is attributable to a net operating loss or other Tax attribute of a Transferred Entity arising after the Closing Date.

Section 8.10    338(h)(10) Election and Tax Adjustment.

(a)    Upon the timely written request of Purchaser (the "Purchaser Request"), the parties shall join in making an election under Section 338(h)(10) of the Code with respect to the purchase of the Shares representing the stock of Precor Incorporated (the "338(h)(10) Election"), provided that, if the parties make the 338(h)(10) Election, then as an addition to the Final Purchase Price, Purchaser shall pay or cause to be paid to such Seller, in cash, the amounts (such amounts, collectively the "Tax Adjustment") necessary to cause such Seller's and its Affiliates' after-Tax net proceeds from the sale of the stock of Precor Incorporated pursuant to this Agreement, to be equal to the after-Tax net proceeds that such Seller and its Affiliates would have received had the transaction instead been structured as a sale of the stock of Precor Incorporated without the 338(h)(10) Election being made, taking into account all appropriate federal, state, or local Tax implications arising from the transactions contemplated by this Agreement, including any Taxes imposed on the Tax Adjustment; provided, however, that the Tax Adjustment shall in no event be a negative number (that is, in no event shall such Seller be required to make a Tax Adjustment payment to Purchaser or the Transferred Entities).

(b)    In calculating the Tax Adjustment: (i) only the items of income, gain, deduction, loss, expense and credit or recapture of any of the foregoing items arising out of the transactions contemplated by this Agreement shall be considered (including without limitation any recognition of income, gain, deduction or loss or change in character thereof as a result of the transactions contemplated by this Agreement), (ii) in making such calculations, the actual federal, state and local Tax income rates applicable to such Seller (as determined by Seller in its reasonable discretion) shall be used, and (iii) notwithstanding any actual receipt thereof after the taxable year when Closing occurs, such Seller shall be deemed to have received during the taxable year when Closing occurs both the Tax Adjustment and the Final Purchase Price.

(c)    Within thirty (30) days after the later of (i) the final determination of Final Closing Statement pursuant to Section 2.6 or (ii) the receipt of the Purchaser Request, Parent shall provide to Purchaser a schedule, with supporting work papers, setting forth a calculation of the Tax Adjustment (the "Tax Adjustment Schedule"). During the twenty (20) days following the receipt by Purchaser of the Tax Adjustment Schedule, Purchaser and Parent shall meet and confer and attempt in good faith to agree upon and finalize the Tax Adjustment Schedule. Within thirty (30) days after receipt of such Tax Adjustment Schedule, Purchaser shall notify Parent whether Purchaser concurs or disagrees with such Tax Adjustment Schedule and, if applicable, the disagreements. If such disagreements cannot be resolved between Purchaser and Parent within ten (10) days after delivery of notice by Purchaser to Parent, the disagreements shall then be referred to the Independent Accounting Firm, which shall be selected in accordance with the procedures set forth in Section 2.6; provided, however, that the Independent Accounting Firm's determination shall be limited to choosing the position either of Purchaser or Parent. The determination of the Independent Accounting Firm shall be final and binding. The fees of the Independent Accounting Firm shall be borne by Parent, on the one hand, and Purchaser, on the other hand, in inverse proportion as they may prevail on the matters resolved by the Independent Accounting Firm, which proportionate allocation shall be calculated on an aggregate basis based on the relative dollar

-73-

values of the amounts in dispute and shall be determined by the Independent Accounting Firm at the time the determination of such firm is rendered on the merits of the matters submitted.    For clarity, Purchaser shall not be obligated to make a 338(h)(10) Election by virtue of having requested Parent to provide the Tax Adjustment Schedule or having participated in the review and negotiation of the Tax Adjustment Schedule under this Section 8.10(c); provided, that, if Purchaser does not elect to make a 338(h)(10) election after having requested that Parent provide the Tax Adjustment Schedule, Purchaser shall, upon Parent's request, promptly reimburse Parent for its reasonable out-of-pocket costs and expenses incurred in connection with the preparation, review and negotiation of the Tax Adjustment Schedule.

(d)    If Purchaser has determined that the 338(h)(10) Election should be made on or before the date that is thirty (30) days after Purchaser's receipt of the Tax Adjustment Schedule (as provided for in Section 8.10(c) above), Purchaser shall pay the Tax Adjustment as calculated as of such time; provided that no payments of the Tax Adjustment shall be due prior to Parent having delivered to Purchaser properly executed copies of IRS Form 8023 (together with any comparable state or local Tax forms) to effect the 338(h)(10) Election. If a disagreement regarding the amount of the Tax Adjustment is pending at that time, Purchaser shall pay the undisputed portion thereof on or before such date and shall pay any remaining portion of the Tax Adjustment within five (5) days of the final determination of the Independent Accounting Firm.

(e)    The obligations of Purchaser to pay the Tax Adjustment shall survive until the expiration of all statutes of limitation with respect to Tax Returns of Parent, the Sellers, the Transferred Entities, and their Affiliates for the taxable years ending on or including the Closing Date and the Tax Adjustment shall be increased if required due to any final determination within the meaning of Section 1313(a) of the Code or corresponding provision of state, local or foreign income Tax law, relating to a Tax Return filed by Parent, the Sellers, the Transferred Entities, or any of their Affiliates. The amount of any such increase shall be determined by the preparation of a revised Tax Adjustment Schedule that takes into account such final determination, pursuant to the procedures set forth in this Section 8.10 (commencing with the date of notice of such final determination in lieu of the date described in Section 8.10(c)), and Purchaser shall pay any such increase in the Tax Adjustment within five (5) days after the amount of any such increase is determined in accordance with such procedures. Purchaser, Parent and the Sellers shall promptly provide written notice to each other of any audit or other investigation or that may affect the amount of the Tax Adjustment.  The provisions of Section 8.3 governing Pre-Closing Tax Audits shall apply, mutatis mutandis, to any audit, investigation, or other action by a Governmental Entity of a Tax Return of Seller (or its Affiliates) to the extent such audit, investigation, or other audit would give rise to an increase in the Tax Adjustment Amount under this Section 8.10(e).

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS TO CLOSE

Section 9.1    Conditions to Obligation of Each Party to Close.  The respective obligations of each party to effect the Sale shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    HSR Clearance.  The expiration or early termination of the applicable waiting period under the HSR Act.

(b)    No Injunctions.  No Governmental Entity of competent authority shall have issued an Order or enacted a Law that remains in effect and makes illegal or prohibits the consummation of the Sale (collectively, the "Legal Restraints").

Section 9.2    Conditions to Purchaser's Obligation to Close.  Purchaser's obligation to effect the Sale shall be subject to the satisfaction or waiver at or prior to the Closing of all of the following conditions:

(a)    Representations and Warranties.  (i) The representations and warranties of Parent set forth in Article III, Section 4.1 (Organization), Section 4.2 (Due Authorization), Section 4.3(b) (No Conflict – Organizational Documents), Section 4.5 (Capitalization) and Section 4.26 (*Brokers' Fees*) shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date, except any such representations and warranties that are made as of a specific date shall be true and correct only on and as of such date; and (ii) each of the other representations and warranties of Parent set forth in Article III and Article IV shall be true and correct as of the Closing Date as if made on and as of the Closing Date (except to the extent that any representation and warranty is expressly made as of a specific date, in which case such representation and warranty need only be true and correct only on and as of such date), except in each case under this clause (ii) where the failure of any such representations and warranties to be so true and correct does not result in a Business Material Adverse Effect, provided that, solely for purposes of clause (ii), qualifications as to "materiality" and "Business Material Adverse Effect" contained in such representations and warranties shall be disregarded (except with respect to Section 4.6 (Financial Statements) and any such qualification to the extent it qualifies an affirmative requirement to list specified items on a section of the Disclosure Schedules).

(b)    Covenants and Agreements.  The covenants and agreements of Parent to be performed on or before the Closing Date in accordance with this Agreement shall have been performed in all material respects.  The Pre-Closing Restructuring shall have been completed in accordance with Section 6.17.

(c)    *Officer's Certificate*.  Purchaser shall have received a certificate, dated as of the Closing Date and signed on behalf of Parent by an executive officer of Parent, stating that the conditions specified in Section 9.2(a), Section 9.2(b), and Section 9.2(d) have been satisfied.

(d)    No Material Adverse Effect.  Since the date hereof, there shall not have occurred a Business Material Adverse Effect.

Section 9.3    Conditions to Parent's Obligation to Close.  The obligations of Parent to effect the Sale shall be subject to the satisfaction or waiver at or prior to the Closing of all of the following conditions:

(a)    Representations and Warranties.  (i) The representations and warranties of Purchaser set forth in the first sentence Section 5.1 and Section 5.2 shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date, except any such representations and warranties that are made as of a specific date shall be true and correct only on

and as of such date; and (ii) each of the other representations and warranties of Purchaser contained in Article V shall be true and correct as of the Closing Date as if made on and as of the Closing Date; except, in the case of this clause (ii), (A) representations and warranties that are made as of a specific date shall be true and correct only on and as of such date and (B) where the failure of such representations and warranties to be true and correct (without giving effect to any qualifications as to "materiality," "Purchaser Material Adverse Effect" or other similar qualifications as to materiality) would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)    Covenants and Agreements. The covenants and agreements of Purchaser to be performed on or before the Closing Date in accordance with this Agreement shall have been performed in all material respects.

(c)    *Officer's Certificate*. Parent shall have received a certificate, dated as of the Closing Date and signed on behalf of Purchaser by an executive officer of Purchaser, stating that the conditions specified in Section 9.3(a) and Section 9.3(b) have been satisfied.

## ARTICLE X

## TERMINATION

Section 10.1    Termination. This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Parent and Purchaser;

(b)    by either Parent or by Purchaser, if the Closing shall not have been consummated on or before August 20, 2021, subject to Section 11.11 (the "Outside Date"); provided that, the right to terminate this Agreement under this clause shall not be available to any party to this Agreement whose breach or failure to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement has been the primary cause of, or has resulted in, the failure of the Closing to occur on or before such date;

(c)    by either Parent or Purchaser, if any Legal Restraint permanently preventing or prohibiting consummation of the Sale shall be in effect and shall have become final and non-appealable; provided that, the right to terminate this Agreement under this clause shall not be available to any party to this Agreement whose breach or failure to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement has been the primary cause of, or has resulted in, the failure of the Closing to occur on or before such date;

(d)    by Purchaser by notice to Parent, if Parent shall have breached or failed to perform in any respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, or any such representations or warranties have become inaccurate, and such breach, failure to perform or inaccuracy (i) would give rise to the failure of a condition set forth in Section 9.2(a), Section 9.2(b), and Section 9.2(d), and (ii) (A) is incapable of being cured prior to the Outside Date or (B) if capable of being cured prior to the Outside Date,

has not been cured prior to the date that is thirty (30) days from the date that Parent is notified in writing by Purchaser of such breach or failure to perform; or

(e)    by Parent by notice to Purchaser, if Purchaser shall have breached or failed to perform in any respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, or any such representations or warranties have become inaccurate, and such breach, failure to perform or inaccuracy (i) would give rise to the failure of a condition set forth in Section 9.3(a) or Section 9.3(b), and (ii) (A) is incapable of being cured prior to the Outside Date or (B) if capable of being cured prior to the Outside Date, has not been cured prior to the date that is thirty (30) days from the date that Purchaser is notified in writing by Parent of such breach or failure to perform.

Section 10.2    Notice of Termination.  In the event of termination of this Agreement by either or both of Parent and Purchaser pursuant to Section 10.1, written notice of such termination shall be given by the terminating party to the other.

Section 10.3    Effect of Termination.  In the event of termination of this Agreement by either or both of Parent and Purchaser pursuant to Section 10.1, this Agreement shall terminate and become void and have no effect, and there shall be no Liability on the part of any party to this Agreement; provided that termination of this Agreement shall not relieve any party hereto from Liability for damages for willful and intentional breach of this Agreement.  Notwithstanding anything to the contrary contained herein, the provisions of Section 6.2 (Confidentiality), Section 6.3(e) (Required Actions), Article XI (General Provisions) and this Section 10.3 shall survive any termination of this Agreement.

Section 10.4    Extension; Waiver.  At any time prior to the Closing, either Parent, on the one hand, or Purchaser, on the other hand, may (a) extend the time for performance of any of the obligations or other acts of the other, (b) waive any inaccuracies in the representations and warranties of the other contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any of the agreements or conditions of the other contained in this Agreement.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party granting such extension or waiver.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1    Interpretation; Absence of Presumption.

(a)    The parties acknowledge that the specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Parent Disclosure Schedule or the Purchaser Disclosure Schedule is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material or would reasonably be expected to have a Seller Material Adverse Effect, Business Material Adverse Effect or Purchaser Material Adverse Effect, and no party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Parent Disclosure Schedule or Purchaser Disclosure Schedule in any dispute or controversy between the parties as

to whether any obligation, item or matter not described in this Agreement or included in the Parent Disclosure Schedule or Purchaser Disclosure Schedule is or is not material or would reasonably be expected to have a Seller Material Adverse Effect, Business Material Adverse Effect or Purchaser Material Adverse Effect for purposes of this Agreement.

(b)    For the purposes of this Agreement:  (i) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (ii) references to the terms Article, Section, paragraph, Exhibit and Schedule are references to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto; (iv) references to "$" shall mean U.S. dollars, and any amounts that are denominated in a foreign currency shall be deemed to be converted into U.S. dollars at the applicable exchange rate in effect at 9:00 a.m., New York City time (as reported by Bloomberg L.P.) on the date for which such U.S. dollar amount is to be calculated; (v) the word "including" and words of similar import when used in this Agreement and the Ancillary Agreements shall mean "including without limitation," unless otherwise specified; (vi) the word "or" need not be exclusive; (vii) references to "written" or "in writing" include in electronic form; (viii) provisions shall apply, when appropriate, to successive events and transactions; (ix) Parent and Purchaser have each participated in the negotiation and drafting of this Agreement and the Ancillary Agreements and if an ambiguity or question of interpretation should arise, this Agreement and the Ancillary Agreements shall be construed as if drafted jointly by the parties thereto and no presumption or burden of proof shall arise favoring or burdening either party by virtue of the authorship of any of the provisions in this Agreement or the Ancillary Agreements; (x) references to any Law shall be deemed to refer to such Law as amended through the date hereof and to any rules or regulations promulgated thereunder as amended through the date hereof (provided that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date, references to any Law shall be deemed to refer to such Law and any rules or regulations promulgated thereunder as amended through such specific date); (xi) a reference to any Person includes such Person's successors and permitted assigns; (xii) any reference to "days" shall mean calendar days unless Business Days are expressly specified; (xiii) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (xiv) amounts used in any calculations for purposes of this Agreement may be either positive or negative, it being understood that the addition of a negative number shall mean the subtraction of the absolute value of such negative number and the subtraction of a negative number shall mean the addition of the absolute value of such negative number; (xv) any document or item will be deemed "delivered", "provided" or "made available" to Purchaser within the meaning of this Agreement if, prior to the execution of this Agreement, such document or item is (A) included in the electronic data room, (B) actually delivered or provided to Purchaser or any of Purchaser's Representatives (including by email) or (C) made available upon request, including at Parent or the Transferred Entities' offices/ and (xvi) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". If the Closing shall occur, notwithstanding anything in this Agreement to the contrary, any payment obligation of Purchaser hereunder shall be a joint and several obligation of Purchaser and the Transferred Entities.  Any reference in this Agreement to a specified date shall mean 9:00 a.m.

New York City time on such date (unless another time is specified). In the event of any conflict or inconsistency between the terms of this Agreement and any Ancillary Agreement, this Agreement will control.

Section 11.2    Headings; Definitions. The Section and Article headings contained in this Agreement and the Ancillary Agreements are inserted for convenience of reference only and will not affect the meaning or interpretation of this Agreement or the Ancillary Agreements.

Section 11.3    Governing Law; Jurisdiction and Forum; Waiver of Jury Trial.

(a)    This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Delaware, without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. In addition, each of the parties hereto irrevocably (i) submits to the personal jurisdiction of the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such dispute, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such dispute, any Delaware State court sitting in New Castle County, in the event any dispute (whether in contract, tort or otherwise) arises out of this Agreement or the Transactions, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) waives any objection to the laying of venue of any Action relating to this Agreement or the Transactions in such court, (iv) waives and agrees not to plead or claim in any such court that any Action relating to this Agreement or the Transactions brought in any such court has been brought in an inconvenient forum, and (v) agrees that it will not bring any Action relating to this Agreement or the Transactions in any court other than the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such Action, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such Action, any Delaware State court sitting in New Castle County. Each party agrees that service of process upon such party in any such Action shall be effective if notice is given in accordance with Section 11.7.

(b)    EACH PARTY TO THIS AGREEMENT WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE ANCILLARY AGREEMENTS, THE CONFIDENTIALITY AGREEMENT OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR THEREWITH OR THE ADMINISTRATION HEREOF OR THEREOF OR THE SALE OR ANY OF THE OTHER TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. NO PARTY TO THIS AGREEMENT SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON, OR ARISING OUT OF, THIS AGREEMENT OR ANY ANCILLARY AGREEMENTS, THE CONFIDENTIALITY AGREEMENT OR RELATED INSTRUMENTS. NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A

JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EACH PARTY TO THIS AGREEMENT CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 11.3. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION 11.3 WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

Section 11.4    Entire Agreement.    This Agreement, together with the Ancillary Agreements and the Exhibits and Schedules hereto and thereto, and the Confidentiality Agreement, constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede any prior discussion, correspondence, negotiation, proposed term sheet, letter of intent, agreement, understanding or arrangement, whether oral or in writing.

Section 11.5    No Third-Party Beneficiaries.  Except for Section 6.10 and Section 6.11(b) which are intended to benefit, and to be enforceable by, the Persons specified therein, this Agreement, together with the Ancillary Agreements and the Exhibits and Schedules hereto, are not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

Section 11.6    Expenses.    Except as otherwise expressly set forth in this Agreement, whether the Transactions are consummated or not, all legal and other costs and expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses unless expressly otherwise contemplated in this Agreement.

Section 11.7    Notices.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been given (i) when delivered personally by hand (with written confirmation of receipt and accompanied by email in accordance with clause (ii) of this Section 11.7), (ii) when sent by email (with email confirmation of receipt) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt and accompanied by email in accordance with clause (ii) of this Section 11.7), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this Section 11.7):

    (a)    If to Parent:

Amer Sports Corporation
Konepajankuja 6, P.O. Box 1000
00511 Helsinki Finland
Attention: Kaisa Rotkirch
E-mail: Kaisa.Rotkirch@amersports.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue

-80-

New York, New York 10022
Attention: Jonathan Davis, P.C. and Maggie Flores
E-mail: jonathan.davis@kirkland.com and maggie.flores@kirkland.com

(b)    If to Purchaser:

Peloton Interactive, Inc.
125 W. 25th Street, 11th Floor
New York, NY 10001
Attention:  Hisao Kushi, General Counsel
E-mail:  hisao@onepeloton.com

with a copy (which shall not constitute notice) to:

Fenwick & West LLP
902 Broadway, Suite 14
New York, New York 10010
Attention:  Ethan Skerry
E-mail:  eskerry@fenwick.com

Section 11.8    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns; provided that no party to this Agreement may directly or indirectly assign any or all of its rights or delegate any or all of its obligations under this Agreement without the express prior written consent of each other party to this Agreement, except that (a) Parent may transfer or assign, in whole or from time to time in part, its rights under this Agreement to any Affiliate of Parent, but any such transfer or assignment will not relieve Parent of any of its obligations hereunder and (b) Purchaser may transfer or assign, its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its direct or indirect wholly owned Subsidiaries, but any such transfer or assignment will not relieve Purchaser of any of its obligations hereunder.

Section 11.9    Amendments and Waivers.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the party against whom enforcement of any such modification or amendment is sought.  Any party to this Agreement may, only by an instrument in writing, waive compliance by the other party to this Agreement with any term or provision of this Agreement on the part of such other party to this Agreement to be performed or complied with.  The waiver by any party to this Agreement of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 11.10 Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the Transactions is not affected in any manner materially

adverse to any party hereto. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the fullest extent possible.

Section 11.11 Specific Performance. The parties hereto agree that irreparable damage, for which monetary damages (even if available) would not be an adequate remedy, would occur in the event that the parties hereto do not perform any provision of this Agreement in accordance with its specified terms or otherwise breach such provisions. Accordingly, the parties hereto acknowledge and agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled in Law or in equity. Each of the parties hereto agrees that it will not oppose, and irrevocably waives its right to object to, the granting of an injunction, specific performance or other equitable relief on the basis that any other party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity. Any party hereto seeking an injunction or injunctions to prevent breaches or threatened breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such order or injunction. If, prior to the Outside Date, any party hereto brings any Action in accordance with Section 11.3 to enforce specifically the performance of the terms and provisions hereof by any other party, the Outside Date shall automatically be extended by (i) the amount of time during which such Action is pending, plus twenty (20) Business Days or (ii) such other time period established by the court presiding over such action.

Section 11.12 No Admission. Nothing herein shall be deemed an admission by Purchaser, Parent or any of their respective Affiliates, in any Action or Action by or on behalf of a third party, that Purchaser, Parent or any of their respective Affiliates, or that such third party or any of its Affiliates, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract.

Section 11.13 No Survival of Representations and Warranties.

(a)    The representations, warranties, covenants and agreements in this Agreement shall terminate at the Closing or upon the termination of this Agreement pursuant to Article X, except the covenants and agreements that explicitly contemplate performance after the Closing shall survive the Closing until fully performed in accordance with their respective terms. The Parties acknowledge and agree that, other than in connection with any Fraud, from and after the Closing they shall not be permitted to make, and no party shall have any liability or obligation with respect to, any claims for any breach of any representation or warranty set forth herein or any covenant or agreement herein that is to have been performed by another party on or prior to the Closing. In furtherance of the foregoing, other than in connection with any Fraud or claims under the terms of this Agreement or any Ancillary Agreement, from and after the Closing, each party hereby waives (on behalf of itself, each of its Affiliates and each of its Representatives), to the fullest extent permitted under Law, any and all rights, claims and causes of action (including any statutory rights to contribution or indemnification) for any breach of any representation or warranty or covenant or obligation to have been performed prior to the Closing set forth herein or the subject

-82-

matter of this Agreement that such party may have against the other Parties or any of their Affiliates or any of their respective Representatives arising under or based upon any theory whatsoever, under any Law, contract, tort or otherwise (including any claims arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any other Environmental, Health and Safety Laws).

(b)    The Purchaser hereby acknowledges and agrees that, except as expressly provided in Section 2.7, the foregoing Section 11.13(a), otherwise pursuant to this Agreement or any Ancillary Agreement or in connection with any Fraud, from and after Closing none of Parent, its Representatives or any of their respective Affiliates, officers, managers, employees or agents, shall have any liability, responsibility or obligation arising under this Agreement or any exhibit or Schedule hereto, or any certificate or other document entered into, made, delivered, or made available in connection herewith, or as a result of any of the Transactions, such provisions and other documents being the sole and exclusive remedy (as between the Purchaser and its Affiliates, on the one hand, and the Parent and its Affiliates, on the other hand) for all claims, disputes and losses arising hereunder or thereunder or in connection herewith or therewith, whether purporting to sound in contract or tort, or at Law or in equity, or otherwise (including any claims arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any other Environmental, Health and Safety Laws).

Section 11.14 Legal Representation.  Purchaser (on behalf of itself and on behalf of the Transferred Entities following the Closing) hereby agree, on their own behalf and on behalf of their directors, members, officers, employees and Affiliates, and each of their successors and assigns (all such parties, the "Waiving Parties"), that Kirkland & Ellis LLP ("K&E") (or any successor) may represent Parent or any Affiliate of the Parent Group, in each case, in connection with any Action arising out of or relating to this Agreement, the Ancillary Agreements or the Transactions notwithstanding its representation of Parent and/or any of its Subsidiaries, and Purchaser on behalf of itself and the Waiving Parties hereby consents thereto and irrevocably waives (and will not assert) any actual or potential conflict of interest or any objection arising from K&E's representation of Parent and/or any of its Subsidiaries on or before the Closing.  Purchaser acknowledges that the foregoing provision applies whether or not K&E provides legal services to the Transferred Entities after the Closing Date. Purchaser, for itself and the Waiving Parties, hereby irrevocably acknowledges and agrees that all communications between the Transferred Entities and their counsel, including K&E, made prior to the Closing to the extent related to the negotiation, preparation, execution, delivery and performance under, or any dispute or proceeding arising out of or relating to, this Agreement, any Ancillary Agreements or the consummation of the Transactions, or any matter relating to any of the foregoing, are privileged communications that are the property of the Transferred Entities (after the Closing) and are controlled by Purchaser.

Section 11.15 No Recourse Against Non-Parties. (a) All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or any Ancillary Agreement, or the negotiation, execution or performance of this Agreement or any Ancillary Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement or any Ancillary Agreement), may be made only against (and subject to the terms and conditions thereof) the entities that are expressly identified as parties hereto and thereto and (b) no Person who is not a named party to this Agreement or any Ancillary Agreement, including, without limitation, any past,

present or future director, officer, employee, incorporator, member, manager, partner, equityholder, Affiliate, agent, attorney or Representative of any named party to this Agreement or any Ancillary Agreement ("Non-Party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or any Ancillary Agreement or for any claim based on, in respect of, or by reason of this Agreement or any Ancillary Agreement or its negotiation or execution, and each party hereto waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.

Section 11.16 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the different parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic method shall be as effective as delivery of a manually executed counterpart of this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties as of the day first above written.

**AMER SPORTS CORPORATION**

By: /s/ Jussi Siitonen
Name: Jussi Siitonen
Title: Director

By: /s/ Huang Andrew Chih-Chun
Name: Huang Andrew Chih-Chun
Title: Director

By: /s/ Tao Tak Yan Dennis
Name: Tao Tak Yan Dennis
Title: Director

[*Signature Page to Stock and Asset Purchase Agreement*]

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties as of the day first above written.

**PELOTON INTERACTIVE, INC.**

By: /s/ William Lynch

Name: William Lynch

Title: President

*[Signature Page to Stock and Asset Purchase Agreement]*

**CERTIFICATION PURSUANT TO
RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, John Foley, certify that:

1.      I have reviewed this Annual Report on Form 10-Q of Peloton Interactive, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a.   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c.   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 4, 2021


/s/ John Foley

John Foley
Chief Executive Officer
*(Principal Executive Officer)*

Case 1:21-cv-09582-ALC    Document 122-5    Filed 10/15/25    Page 42 of 44

**CERTIFICATION PURSUANT TO**
**RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jill Woodworth, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of Peloton Interactive, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a.   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c.   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 4, 2021

/s/ Jill Woodworth

Jill Woodworth
Chief Financial Officer
*(Principal Financial Officer)*

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, John Foley, Chief Executive Officer of Peloton Interactive, Inc. (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

1.  the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended December 31, 2020 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  the information contained in the Report fairly presents, in all material respects, the financial condition, and results of operations of the Company.

Date: February 4, 2021

/s/ John Foley

John Foley
Chief Executive Officer
*(Principal Executive Officer)*

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Jill Woodworth, Chief Financial Officer of Peloton Interactive, Inc. (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

1. the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended December 31, 2020 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition, and results of operations of the Company.

Date: February 4, 2021

/s/ Jill Woodworth

Jill Woodworth
Chief Financial Officer
*(Principal Financial Officer)*