**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL CONSUMER TRENDS and CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>PELOTON INTERACTIVE, INC., JOHN FOLEY, WILLIAM LYNCH, and JILL WOODWORTH,<br><br>*Defendants*. | 1:21-cv-09582 (ALC) (OTW)<br><br>The Honorable Andrew L. Carter<br><br>The Honorable Ona T. Wang<br><br><u>CLASS ACTION</u><br><br>**ORAL ARGUMENT REQUESTED** |

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS**</u>
<u>**THE SECOND AMENDED COMPLAINT**</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 2

      A.    FOLEY MISLED INVESTORS TO BELIEVE THAT THE BIKE'S 20% PRICE CUT WAS "ABSOLUTELY OFFENSIVE" ................................................ 2

      B.    FOLEY KNEW THE REAL REASON BEHIND THE 20% PRICE CUT TO THE BIKE ......... 3

      C.    DEFENDANTS ALSO MISLED INVESTORS INTO BELIEVING THAT PELOTON DID NOT HAVE EXCESS INVENTORY ........................................... 4

      D.    DEFENDANTS FOLEY, WOODWORTH, AND LYNCH KNEW OR, AT MINIMUM, WERE RECKLESS IN NOT KNOWING, THAT PELOTON HAD EXCESS INVENTORIES BY AUGUST 2021 ................................................... 6

      E.    THE TRUTH WAS REVEALED AFTER DEFENDANTS SECURED THEIR OWN FINANCIAL INTERESTS, AND INVESTORS SUFFERED THE LOSSES ............................. 7

III.  THE SECOND CIRCUIT'S REVIEW ................................................................ 8

IV.   ARGUMENT ...................................................................................................... 9

      A.    THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER ............................. 9

      B.    DEFENDANTS' SCIENTER ARGUMENTS FAIL ............................................. 14

      C.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ............................................ 21

      D.    POTENTIAL STANDING ISSUES DO NOT BEAR ON DISMISSAL ............................... 24

V.    CONCLUSION .................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)...................................................................................24

*In re Air Crash at Belle Harbor, NY, on Nov. 12, 2001*,
    2003 WL 21032034 (S.D.N.Y. May 5, 2003) .........................................................................9

*In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)....................................................................................10

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).........................................................................14

*In re Bear Stearns Cos., Sec., Derivative, and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)....................................................................................13

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)...............................................................................22, 23

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x 72 (2d Cir. 2013) .............................................................................................23

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
    322 F. Supp. 3d 676 (D. Md. 2018)..................................................................................18, 25

*City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*,
    153 F.4th 288 (2d Cir. 2025) ........................................................................................ *passim*

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .......................................................................11

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................................14

*Diabat v. Credit Suisse Grp. AG*,
    2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)........................................................................22

*In re Didi Glob. Inc. Sec. Litig.*,
    2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) .......................................................................15

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............................................................................12, 21

*Gabelli Asset Fund v. Garret Motion Inc.*,
    2024 WL 1653451 (2d Cir. Apr. 17, 2024) ...........................................................................17

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d. Cir. 2000).................................................................................................23

*Gimpel v. The Hain Celestial Grp., Inc.*,
    156 F.4th 121 (2d Cir. 2025) ...................................................................................17, 21, 22

*Gurary v. Winehouse*,
    235 F.3d 792 (2d Cir. 2000)...................................................................................................25

*In re Hardinge, Inc. Sec. Litig.*,
    696 F. Supp. 2d 309 (W.D.N.Y. 2010) ..................................................................................15

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004).....................................................................................................24

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................................................................11

*In re IPO Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005).....................................................................................22

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................................................................22

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012) ....................................................................................18

*In re Liberty Tax, Inc. Sec. Litig.*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020) ....................................................................................23

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014).......................................................................................24

*Lumen v. Anderson*,
    2011 WL 3794144 (W.D. Mo. Aug. 24, 2011)...................................................................24, 25

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth
    Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ........................................................................15

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ....................................................................10, 11, 12, 14

*Nguyen v. New Link Genetics Corp., vacated in part on other grounds sub nom.
    Abramson v. NewLink Genetics Corp*, 965 F.3d 165 (2d Cir. 2020),
    297 F. Supp. 3d 472 (S.D.N.Y. 2018).....................................................................................13

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000)............................................................................................9

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,*
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)..............................................................................21

*In re OSG Sec. Litig.,*
  12 F. Supp. 3d 622 (S.D.N.Y. 2014)...............................................................................13

*In re OSI Pharms., Inc. Sec. Litig.,*
  2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007).................................................................23

*In re Peabody Energy Corp. Sec. Litig.,*
  2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) .....................................................................10

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis,*
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..................................................................19

*In re Salix Pharms., Ltd.,*
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................................13

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.,*
  732 F. Supp. 3d 300 (S.D.N.Y. 2024).............................................................................10

*In re Scholastic Corp. Sec. Litig.,*
  252 F.3d 63 (2d Cir. 2001) ........................................................................................11, 12

*In re Signet Jewelers Ltd. Sec. Litig.,*
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)..................................................................21

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
  2023 WL 6314939 (S.D.N.Y. 2023).................................................................................19

*Skiadas v. Acer Therapeutics Inc.,*
  2020 WL 3268495 (S.D.N.Y. Jun. 16, 2020) ..................................................................14

*In re SolarEdge Techs., Inc. Sec. Litig.,*
  2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ...................................................................12

*In re STMicroelectronics N.V. Sec. Litig.,*
  2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025)..................................................................16

*Strougo v. Barclays PLC,*
  105 F. Supp. 3d 330 (S.D.N.Y. 2015)..............................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007)..........................................................................................9, 10, 20

iv

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   2022 WL 17884165 (S.D.N.Y. Dec. 23, 2022) ........................................................25

*U.S. v. Schiff*,
   602 F.3d 152 (3d Cir. 2010)....................................................................................15

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).....................................................................17

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).............................................................................21, 23

*Wallace v. IntraLinks*,
   2013 WL 1907685 (S.D.N.Y. May 8, 2013) ...........................................................22

*In re Waste Mgmt. Sec. Litig.*,
   775 F. Supp. 3d 742 (S.D.N.Y. 2025).....................................................................18

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)..........................................................17

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
   818 F. Supp. 2d 744 (S.D.N.Y. 2011)......................................................................21

*Wilson v. Dalene*,
   699 F. Supp. 2d 534 (E.D.N.Y. 2010) .....................................................................25

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
   379 F. Supp. 3d 164 (E.D.N.Y. 2019) .....................................................................23

*Zornberg v. NAPCO Sec. Techs., Inc.*,
   778 F. Supp. 3d 516 (E.D.N.Y. 2025) .....................................................................24

**Statutes, Rules, and Regulations**

15 U.S.C. §78j ("Section 10(b)")................................................................................17

15 U.S.C. § 78t ("Section 20")  ..................................................................................24

15 U.S.C. §78u-4 (the "PSLRA")..................................................................... *passim*

17 C.F.R. § 240.10b-5 ("Rule 10b-5") ................................................................12, 13

Fed. R. Civ. P. 9(b) ..................................................................................................9, 12

Fed. R. Civ. P. 8.........................................................................................................21

Fed. R. Civ. P. 23.......................................................................................................25

v

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' renewed motion to dismiss the Second Amended Complaint (the "Complaint").[1]

## I.    INTRODUCTION

On August 27, 2025, the Second Circuit partially vacated the Court's motion-to-dismiss order. *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 302 (2d Cir. 2025). In its opinion, the Circuit found that the Complaint adequately alleges that Foley's August 2021 statement to investors describing the purpose of Peloton's 20% price cut to its Bike was false—the price cut was ***not*** "absolutely offensive," but rather a defensive move intended to unload excess inventory. *Id*. at 300-01. The Circuit further held that Defendants' warnings in Peloton's August 2021 Form 10-K of hypothetical, future "risks" were actionable as misleading—excess inventory was ***not*** a future risk, but rather a present reality that had already forced the Company to slash the Bike's price to unload product. *Id*. at 301. The Circuit concluded that these statements were actionable as false based on "numerous statements from [] confidential witnesses who reported details about the company's inventory build-up," which establish that, "by August 2021, Peloton had three months of excess inventory sitting at shipping ports." *Id*. at 300. As a result, "the specific financial consequences described in the ['risk warnings'] were ***not*** merely hypothetical 'but had already materialized and resulted in significant disruption to [Peloton's] business.'" *Id*. at 301. In rejecting Defendants' arguments, the Circuit emphasized that, even under the PSLRA's heightened pleading standard, the Court "must accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor" at this stage. *Id*. at 300.

---

[1] Emphases are added and internal citations and quotations are omitted unless noted. Citations to "¶_" refer to the Complaint (ECF 92). Citations to "Mot." refer to the Memorandum of Law In Support of Defendants' Renewed Motion to Dismiss (ECF 121).

Defendants, nevertheless, assert that the Complaint does not allege a strong scienter inference. But of course, Foley knew—or was, at minimum, reckless in not knowing—the true purpose for Peloton's 20% price cut. He was the Company's CEO during the Class Period, and the bikes together with the treads were responsible for nearly 80% of the Company's revenues. He received a steady stream of reports and had access to data showing that the Company was drowning in inventory by August 2021. Likewise, Defendants Woodworth and Lynch received and had ready access to reports and data reflecting that Peloton had months of excess inventory idling in shipping containers at ports, for which Peloton was incurring millions of dollars in demurrage fees.

The Complaint also adequately pleads loss causation. On November 5, 2021, Peloton's stock price plummeted 35%, immediately following the revelation that Peloton's inventory increased by nearly 35% in a single quarter. ¶223. Then, on January 20, 2022, Peloton's stock price fell an additional 24%, immediately following *CNBC*'s exposé based on leaked, internal Peloton documents that revealed the extent of the Company's excess inventories, which necessitated the pause of production of all of its products for months. Securities analysts covering the Company openly questioned Defendants' "credibility" upon the revelations, and the Individual Defendants were all terminated. These facts belie Defendants' assertion that their misstatements did not cause investors' losses.

## II.    STATEMENT OF FACTS

### A.    FOLEY MISLED INVESTORS TO BELIEVE THAT THE BIKE'S 20% PRICE CUT WAS "ABSOLUTELY OFFENSIVE"

On August 26, 2021, Peloton announced that it had reduced the price of its Bike by 20%. ¶187. Analysts and investors immediately asked what prompted this sudden and significant price reduction, questioning whether it was "offensive or defensive." *Id*. In response, Foley assured investors that "[t]he price drop with B1 was ***absolutely*** offensive" (*id.*), which—the Second Circuit

2

explained—would lead a "reasonable investor [to] understand" that Foley was "rejecting the suggestion that the [price] reduction was defensive." *Peloton*, 153 F.4th at 300 n.4.

The Second Circuit found that the Complaint sufficiently alleges that "Foley's characterization of the price reduction as 'absolutely offensive' was false or misleading." *Id.* at 300-01. In so holding, the Second Circuit highlighted how Peloton's "former senior director of operations and supply-chain management stated that 'the August 2021 price reduction on the original Bike was an attempt to increase sales because Peloton had so much excess inventory.'" *Id*. at 300 (quoting ¶31). The Second Circuit further credited the Complaint's "numerous statements from other confidential witnesses who reported details about the company's inventory build-up," including that, "by August 2021, Peloton had three months of excess inventory sitting at shipping ports." *Id.* (citing, *e.g.*, ¶189). Due to this excess inventory, Peloton was hemorrhaging cash to pay demurrage fees, with inventory sitting idle in shipping containers at ports for months. ¶¶54-55, 58. Additionally, "Peloton warehouses were running out of space," with the Company "trying to look for ways to create space," including by "securing additional storage." ¶108; *see also* ¶¶31, 38, 52-55, 57-58, 66-69, 70, 81, 139, 141. As the Second Circuit concluded, the Complaint's "allegations present inconsistencies with [Foley's] definitive statement[] that the price reduction was an offensive move to expand market share rather than a defensive attempt to mitigate the losses from the excess inventory." *Peloton*, 153 F.4th at 300.

### B.    FOLEY KNEW THE REAL REASON BEHIND THE 20% PRICE CUT TO THE BIKE

The facts alleged in the Complaint create a reasonable inference that Foley knew or was, at a minimum, reckless in not knowing the true reason why Peloton cut the price of the Bike by 20% when he answered analyst questions on the subject. He was the Company's CEO and a member of its Board during the Class Period. ¶16. Meanwhile, the Bike was Peloton's flagship product: 80% of its revenues were generated from sales of its bikes and treadmills. ¶109.

3

Additionally, by his own account, Foley was involved in the decision to reduce the price of the Bike by 20%, as he acknowledged when he said that "*we* had the opportunity to do [the price cut]," and that the price cut "was absolutely offensive as *we* think about the competitive landscape and *we* think about democratizing the access to great fitness." ¶187.

Moreover, it was widely known by Peloton's executives and employees that, "by August 2021, Peloton had three months of excess inventory sitting at shipping ports." *Peloton*, 153 F.4th at 300 (citing ¶189); *see also* ¶¶5, 52-55, 57-58, 66-68. Plus, Foley had direct access to inventory reports and data on Looker, NetSuite, Manhattan Scale ("Scale"), and Tableau, all of which showed Peloton's excess inventory.[2] Additionally, Foley personally "received sales updates from Tim Shannehan, Peloton's Chief Sales Officer, at least weekly." ¶134; *see also* ¶62. Further, Foley knew "through presentations at monthly supply chain meetings that by August 26, 2021 [] sales numbers had fallen significantly, and that the Bike price was lowered in the hopes of selling off excess inventory, *not* to democratize fitness." ¶199(iv); *see also* ¶¶42, 46, 133, 142, 170(ii).

**C. DEFENDANTS ALSO MISLED INVESTORS INTO BELIEVING THAT PELOTON DID NOT HAVE EXCESS INVENTORY**

In addition to misrepresenting the true reason for the 20% price cut, Defendants concealed the inventory crisis at Peloton by characterizing excess inventory as a potential "risk," rather than a current reality, as of August 26, 2021. On that date, Peloton issued its annual report on Form 10-K. ¶¶213-18. In it, Defendants misleadingly presented the possibility of Peloton having "excess inventory" as a "merely hypothetical" risk. *See Peloton*, 153 F.4th at 301. Specifically, in a section of its Form 10-K concerning "business risks," Peloton stated that it "*may* experience excess

---

[2] ¶61 (Foley had "direct access to the Looker report[s] and reviewed the data it contained"); ¶62 (Foley was also on the daily "email distribution list for the Looker reports"); ¶199(iii) (Foley had access to monthly delivery summaries through NetSuite); ¶40 (CW4 stating that Tableau and Scale reports were widely disseminated); ¶68 (CW11 stating that the corporate office had access to NetSuite and Scale reports); ¶¶125-28 (NetSuite and Scale reports were widely available and Scale interfaced with Tableau, which provided access to inventory data on demand).

inventory levels" and that it "*may*" require the "sale of excess inventory at discounted prices" in the future when, in fact, it *presently* had excess inventory levels and *presently* was selling its Bike at a 20% discount to eliminate the excess. *Id*. at 301; ¶¶187, 213-18.

The Second Circuit found that the Complaint sufficiently alleges that Defendants' "risk disclosures" in Peloton's August 2021 Form 10-K and later Form 10-Q were misleading. *Peloton*, 153 F.4th at 301. "Excess inventory" and the "sale of excess inventory at discounted prices" were *not* future "risks" for Peloton, but rather, present realities by August 2021. *Id*. The Second Circuit concluded that the facts alleged in the Complaint reflected that these risks "had already materialized by the time" Peloton filed its 10-K with the SEC in August 2021. *Id*.

At the same time Defendants assured investors that there was merely a "risk" of excess inventory, Defendants cut the price of the Bike by 20% in "*direct response* to Peloton's excess inventory." *Id*. (citing ¶31).  In other words, at the same time that Peloton cautioned that it may accumulate excess inventory, excess inventory had *already* caused Peloton to experience "the specific financial consequences described in [its] disclosures." *Id*. This was no secret within Peloton. The Complaint includes the accounts of scores of former employees, who describe how Peloton warehouses were drowning in excess inventory of unsold bikes and that bikes were sitting at docks in shipping containers as a result no later than August 2021. ¶¶27, 30-31, 38, 48, 52-55, 57-58, 64, 66-70, 81, 108. These accounts are corroborated by leaked documents published by *CNBC*, documenting production halts to reset inventories, decreased demand, and an alarming number of bikes on hand, factors which forced Peloton to "reduce[] its earnings guidance by approximately $1 billion." *Peloton*, 153 F.4th at 301 (citing ¶¶7, 219-23). These accounts are also corroborated by the "post-Class Period admissions by Peloton's current CEO, Barry McCarthy, who acknowledged," looking back to the Class Period, "that Peloton's excessive 'inventory has

consumed an enormous amount of cash,'" with Peloton forced "to freeze production of the Bike+ for 5 months; the Bike for 2 months; the Tread for 6 weeks; and the Tread+ for all of FY 2022." ¶¶141, 144-45. As the Circuit concluded, the Complaint sufficiently alleges that the "risk" of excess inventory was "*not* merely hypothetical" by August 2021, "but had already materialized and resulted in significant disruption to [Peloton's] business." *Peloton*, 153 F.4th at 301.

D.    **DEFENDANTS FOLEY, WOODWORTH, AND LYNCH KNEW OR, AT MINIMUM, WERE RECKLESS IN NOT KNOWING, THAT PELOTON HAD EXCESS INVENTORIES BY AUGUST 2021**

Defendants Foley (CEO), Woodworth (CFO), and Lynch (President) each signed Peloton's August 2021 Form 10-K, and Foley and Woodworth both signed Peloton's November 2021 Form 10-Q. ¶214. As with Foley, Woodworth and Lynch both knew—or, at minimum, were reckless in not knowing—that the "risk" of excess inventory had materialized by, no later than, August 2021.

Throughout the Class Period, Woodworth and Lynch personally attended weekly and monthly meetings, during which the growing supply of inventory and declining sales were discussed and displayed on Google Slides, and they also received emails that contained action items following the monthly supply chain meetings. ¶¶27, 29, 133, 142, 189(iii), 195(iv), 197(v). During these meetings, Woodworth and Lynch were kept apprised of the fact that excess inventory had steadily accumulated. ¶¶27-30, 131, 133, 170(ii). Lynch had access to the Company's daily "Looker reports," which revealed, in real-time, that demand had declined. ¶¶45, 62, 120-21, 195(iii), 197(iii). Woodworth and Lynch also had access to the widely distributed NetSuite reports, which included monthly delivery summaries and reflected that—by August 2021—Peloton's most active distribution centers were doing only *half* the volume of deliveries that they had done in 2020. ¶¶37, 68, 124-26, 170(vii), 195(ii), 197(ii). Woodworth also had access to both the Scale and Tableau reports, which tracked and provided detailed, on-demand reporting on inventory and inventory movement. ¶¶40, 68, 127-28, 183(ii), 207(i).

6

These meetings and reports all reflected the reality about Peloton's excess inventory. By August 2021, Peloton's warehouses had "an alarming level of excess inventory," such that warehouse personnel "resorted to storing containers of inventory in warehouse yards." ¶189. And, as the Second Circuit noted, "by August 2021, Peloton had *three months* of excess inventory sitting at shipping ports," *Peloton*, 153 F.4th at 300 (citing ¶189), on which Peloton was paying substantial demurrage fees (¶¶54, 55, 58, 141, 189). As alleged, Defendants directed the reduction of the price of the Bike by 20% in "direct response to Peloton's 'excess inventory.'" *Id*. at 301. As two of the Company's three most senior officers, Woodworth and Lynch knew—or were severely reckless in not knowing—that, by August 2021, the "risk" of "excess inventory" was not a mere hypothetical; it was the reality.

### E.    THE TRUTH WAS REVEALED AFTER DEFENDANTS SECURED THEIR OWN FINANCIAL INTERESTS, AND INVESTORS SUFFERED THE LOSSES

Despite their efforts, Defendants were unable to conceal forever that Peloton's excess inventory was ballooning out of control and was the true impetus for the 20% price cut of the Bike. On November 4, 2021, Peloton admitted that inventory increased by nearly 35% in a single quarter, necessitating a $1 billion reduction to its revenue guidance for 2022. ¶¶219-20, 223. This disclosure caused an immediate, single-day drop in Peloton's stock price of *35%*. ¶225.

Analysts and investors were stunned by the November disclosure—and justifiably so. Analysts at Jefferies put it bluntly: Peloton is "stuck with dying demand, bloated inventory, [and] bloated cost structure." ¶222. Credit Suisse's analysts similarly concluded that "demand has slowed and the focus has turned to cost leverage, efficiency initiatives, and right sizing." *Id*.

Investors learned the full truth on January 20, 2022, when *CNBC* published an exposé based on leaked, internal Peloton documents. ¶¶228-33. These documents showed how, contrary to Defendants' statements during the Class Period, Peloton's warehouses were so bloated with

7

inventory that the Company was forced to "*halt[] production* of its connected fitness products as consumer demand wanes and the company looks to control costs." ¶229. Peloton had "*thousands* of cycles and treadmills sitting in warehouses or on cargo ships, and it need[ed] to reset its inventory levels." *Id*. Additionally, Peloton was forced to "delay[] the opening of a $400 million US factory by a year because the company is *stuck with a glut of exercise machines and too little demand*." ¶231. Moreover, "the company had been scaling back production at factories … *for months,*" with Peloton having "*500 days'* worth of bike and treadmill inventory on hand." *Id*.

Following these revelations, Peloton's stock price fell another *24%* on January 20, 2022, as analysts now questioned the veracity of Peloton's Class Period statements to investors. ¶¶233, 235. In reporting on the *CNBC* report and the leaked documents cited therein, analysts at Needham raised concerns about "*Management credibility*," and cautioned about "*an array of questionable events [that] have taken place in a relatively short amount of time*." ¶233. The revelations were, as analysts at Roth Capital Partners concluded, "*absolutely concerning*." *Id*.

Within weeks, Foley and Lynch were each unceremoniously fired. ¶237. Woodworth was fired a few months later. ¶18. When Peloton's new CEO Barry McCarthy came onboard, he quickly discovered that, under his predecessors' watch, "*we were drowning in inventory*," which created "*an existential threat to the business*." ¶240. McCarthy further admitted that "[w]e have *too much* [inventory] for the current run rate of the business, and that inventory has consumed an enormous amount of cash," with the excess inventory costing $700 million—a "shockingly big number" that Peloton's prior management kept well hidden from investors. ¶¶241-42.

## III.    THE SECOND CIRCUIT'S REVIEW

On August 27, 2025, the Second Circuit vacated in part the Court's order granting Defendants' Motion to Dismiss. *Peloton*, 153 F.4th at 302. The Circuit ruled that the Complaint adequately alleges that both Foley's statement that the Bike's price cut was "absolutely offensive"

8

and Defendants' statements that excess inventory risks were merely hypothetical were false and misleading. *Id.* at 300-02. The Circuit rejected Defendants' challenge of the Complaint's confidential witnesses, crediting the "numerous statements from [] confidential witnesses who reported details about the company's inventory build-up," which establish that, "by August 2021, Peloton had three months of excess inventory sitting at shipping ports." *Id*. at 300. The Circuit also rejected Defendants' attempt to challenge scienter on appeal (*id.* at 301-02) and emphasized that, even in PSLRA cases, courts must accept "all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor" (*id.* at 300).

Rather than accept the Second Circuit's foregoing findings and analysis, Defendants again seek to discount the Complaint's witnesses' accounts and other well-pled scienter allegations by relying on a ***dissent*** from one of the judges, whose view the majority did not adopt. *See, e.g.*, Mot. at 2, 14, 18, 20. That dissent, of course, "carries no precedential value." *In re Air Crash at Belle Harbor, NY, on Nov. 12, 2001*, 2003 WL 21032034, at *5 (S.D.N.Y. May 5, 2003).

## IV.    ARGUMENT

### A.    THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER

A complaint pleads scienter by alleging facts that give rise to a strong inference of "conscious misbehavior ***or*** recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" and need only be "cogent and at least as compelling as any opposing inference." *Id*. at 324. As the Second Circuit "has reminded [], '[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter

in securities litigation.'" *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011). "While robust, this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is unaided by discovery at the motion to dismiss stage." *In re Peabody Energy Corp. Sec. Litig.*, 2022 WL 671222, at *20 (S.D.N.Y. Mar. 7, 2022).

In determining whether scienter is pled, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 309. And in cases such as this one, where "scienter is pled in part by alleging that the defendant knew facts or had access to information suggesting that their public statements were not accurate, the scienter analysis is closely aligned with the analysis as to misleading statements." *In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010). Here, the Second Circuit found that the very facts Defendants knew and had access to during the Class Period were what supported its finding that Defendants' statements were false and misleading. *See Peloton*, 153 F.4th at 300-01.

As summarized below, the Complaint contains ample allegations that, when considered holistically (as they must be), raise a strong inference of scienter.

***First***, Foley admitted to his personal role in the Bike's 20% price reduction when he proclaimed during the price reduction announcement that "***we*** had the opportunity to do" the price cut, which was "absolutely offensive." ¶187. Courts find an inference of scienter where, as Foley did here, an executive makes false or misleading statements about an initiative for which they were responsible or purport to know about. *See, e.g., San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024) (finding scienter where defendants stated "***we*** manage our inventory levels in a disciplined way" and "***we*** watch inventory very

10

closely"); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (finding scienter where defendant held himself out "to the public as intimately knowledgeable," as reflected by his statements that "'*we* really took a stance on [it]'" and "'*[w]e* always come back to transparency'").

***Second***, Foley's misrepresentation about the true purpose of Peloton's price cut was made in response to an analyst's direct question about whether the price cut was "offensive or defensive," which is further evidence of scienter. *See, e.g.*, *Celestica*, 455 F. App'x at 14 (scienter found where misrepresentations were made in response to analysts' inquiries about inventory issues key to the company's financial performance); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (scienter found where misrepresentations about inventory returns were made in response to analysts' inquiries); *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (finding scienter where defendant "explicitly denied" that the company was engaging in discounting "in response to repeated questions about pricing by analysts").

***Third***, Defendants directly received and had access to continuous reports and data during the Class Period showing that the "risk" of excess inventory had, in fact, materialized, and was not merely hypothetical. ¶¶61-63, 68, 124-29, 183(ii), 195(ii)-(iii), 197(ii)-(iii), 207(i). Woodworth and Lynch attended weekly and monthly meetings where the inventory glut and declining demand were discussed (¶¶27-29, 133, 189(iii), 195(iv)-(vi), 197(v)-(vi)), and Foley spoke at meetings where those same problems were also addressed (¶¶42, 46). They also regularly received Tableau, Looker, and Salesforce reports that showed that, by August 2021, Peloton had excess inventory. ¶¶124-29, 134, 195(iv)-(vi), 197, 199(iii)-(iv), 211(iii)-(iv), 267, 272.

"It is well settled that plaintiffs can plead conscious misbehavior or recklessness by alleging that defendants knew facts or had access to information suggesting that their public statements were not accurate." *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at

\*16 (S.D.N.Y. Mar. 25, 2013) (scienter found where defendants had access to internal reports that showed the company had excess inventory and attended meetings during which inventory was discussed); *see also In re Scholastic*, 252 F.3d at 76-77 (scienter found where executive defendant had "access to internal corporate documents and reports" showing rising returns, had conversations with other officers and employees, and attended meetings discussing returned inventory issues); *In re SolarEdge Techs., Inc. Sec. Litig.*, 2024 WL 4979296, at \*16 (S.D.N.Y. Dec. 4, 2024) (scienter found where defendants received company-generated "inventory data" and attended meetings during which the company's excess inventory was discussed).

Contrary to Defendants' assertions, the Complaint contains sufficient descriptions of the myriad reports that they received and the meetings they attended where they discussed those reports. *See* ¶¶29, 40, 61-63, 68, 124-29, 195(ii), 199(iii). In any event, "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act," the Second Circuit "do[es] ***not*** require the pleading of detailed evidentiary matter in securities litigation." *Celestica*, 455 F. App'x at 15. Indeed, "even if plaintiffs could have described the content of the [documents] in more detail, they provided sufficient facts" to satisfy the PSLRA's requirements. *Id*.

***Fourth***, while "pecuniary motive is not required to plead scienter," there is evidence of such motive here. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (citing *Tellabs*, 551 U.S. at 325). In this case, Foley, Woodworth, and Lynch each personally benefited by keeping Peloton's stock artificially inflated during the Class Period, buying themselves time to cancel their 10b5-1 trading plans just before they disclosed the truth to investors. Indeed, just four days after he falsely assured analysts and investors that his decision to cut the Bike's price was "absolutely offensive," Foley cancelled his trading plan. ¶¶285-86. Lynch and Woodworth similarly ceased trading under their plans in September 2021, shortly before the

12

truth was revealed to investors and before Peloton's stock price declined as a result. ¶¶164, 298. By prematurely canceling their trading plans, Defendants avoided the obligation to sell their shares at depressed prices once the truth became public. The suspicious timing of the terminations of Defendants' 10b5-1 plans further strengthens the scienter inference. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018) (termination of trading plan one month before disclosure of the truth to the market strengthens the scienter inference).

*Fifth*, Peloton's Board of Directors unceremoniously fired Foley as CEO, and Lynch as President, on the same day, February 8, 2022. ¶237. This was less than *three weeks* after Foley admitted Defendants had lost control of costs and that inventory had become so excessive that Peloton had to halt production of all of its Connected Fitness Products. ¶¶229-32. Woodworth was terminated only a few months later. Defendants' terminations "suggest[] a higher level of wrongdoing approaching recklessness or even conscious malfeasance." *See, e.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (suspiciously-timed resignations support the inference).

*Sixth*, it was neither difficult nor complex for Defendants to determine the true, undisclosed facts. Indeed, shortly upon joining the Company, Peloton's new CEO, Barry McCarthy, quickly uncovered that the Company had been "***drowning in inventory***," which "***posed an existential threat to the business***" (¶240), and that the excessive inventory had cost the Company $700 million in cash burn in 2021 to manage—a "shockingly big number" (¶242). These facts further bolster the scienter inference. *See Salix*, 2016 WL 1629341, at *14 ("ease with which potential acquirers discovered [the defendant's] true inventory levels" strengthened scienter inference); *In re Bear Stearns Cos., Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) ("[T]he fact that the new CEO ... discovered the accounting violations within months of

taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly.").

*Finally*, Defendants "had reason to focus on [Peloton's] inventory levels." *Celestica*, 455 F. App'x at 14. Peloton's Bike and treadmills accounted for 80% of the Company's revenue during fiscal year 2020 and 72% during fiscal year 2021. ¶109. Meanwhile, "by August 2021, Peloton had *three months* of excess inventory sitting at shipping ports," which had "resulted in *significant disruption* to [Peloton's] business.'" *Peloton*, 153 F.4th at 300 (citing ¶189). Where defendants' misstatements concern "significant disruption" to a key part of their business, as here, it is unlikely that they did not know the truth when their statements were made. *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. Jun. 16, 2020) (misstatements involving "the sine qua non" for a company's "success" and pertaining to topics "essential to [its] prospects . . . are probative evidence of a strong inference of scienter"); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (misstatements involving business responsible for 21% of company's revenues strengthened the scienter inference); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001) ("It thoroughly strains credulity to imagine that defendants" were not "aware of matters central to th[eir] business's operation.").

### B.    DEFENDANTS' SCIENTER ARGUMENTS FAIL

In their motion, Defendants urge the Court to ignore the Complaint's well-pled allegations of scienter and, in some cases, the Second Circuit's analysis. Defendants' arguments fail.

*First*, Defendants assert (Mot. at 19) that Foley lacked scienter because the subject of his misrepresentation—*i.e.*, Peloton's 20% price cut of its flagship product—was supposedly "immaterial." Defendants are wrong. Foley's misstatement was pivotal to investors' assessment of the Company at the time, leading investors to believe (incorrectly) that Peloton reduced the price of its Bike by 20% to "democratiz[e] the access" to its Bike. Analysts *raised* their share price

14

targets for Peloton to as high as $150 on the heels of Foley's misrepresentation, embracing and *repeating* Foley's misstatement that Peloton "announc[ed] a 20% price cut to its original Bike *to make it more accessible to consumers*." ¶204; *see also U.S. v. Schiff*, 602 F.3d 152, 171 n.26 (3d Cir. 2010) ("analyst and company reports discussing inventory levels are themselves probative" of the materiality of the inventory statements). Investors certainly would have deemed it important to their investment decision to know that—contrary to Foley's representation—Peloton cut the price of its Bike by 20% because "by August 2021, Peloton had *three months* of excess inventory sitting at shipping ports." *Peloton*, 153 F.4th at 300 (citing ¶189).

In any event, Defendants' argument ignores that "materiality 'is a mixed question of law and fact'" and thus "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *7 (S.D.N.Y. Mar. 14, 2024).[3]

***Second***, Defendants make the irrelevant observation (Mot. at 20) that "Risk Disclosures have 'only rarely been found to be actionable'" in other cases. But here the Second Circuit ***did*** find that Defendants' "Risk Disclosures" ***were*** actionable—precisely because, unlike in other cases, Defendants hid and misrepresented already materialized negative facts by characterizing them as hypothetical in their "risk disclosures." *Peloton*, 153 F.4th at 301. At the same time that Defendants assured investors that there was only a future "risk" of excess inventory, they knew—but failed to disclose to investors—that Peloton was ***already*** plagued with excess inventory, which had ***already*** "resulted in significant disruption to [Peloton's] business." *Id.* And the Second Circuit's decision

---

[3] *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309 (W.D.N.Y. 2010) and *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) (cited at Mot. at 19-20) are inapplicable because those courts did not find ***any*** of the defendants' statements to be false or misleading. Here, however, the Second Circuit specifically found there to be actionable misstatements.

15

did not break new ground: it is well established that "a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at \*4 (S.D.N.Y. Sept. 15, 2025).[4]

*Third*, Defendants assert (Mot. at 19) that they are not liable for the misstatements that the Second Circuit has already sustained because they purportedly made different, "accurate" statements elsewhere. This argument is baseless. Telling the truth on one investor conference call about one subject does not provide a company license to lie on the next investor call about another subject. Defendants *never* once told investors that they slashed the price of Peloton's Bike by 20% to combat the alarming excess in inventory by August 2021, and investors did not (nor could they) divine the truth through Defendants' other disclosures.

Nor did Defendants disclose the truth when they told investors that they were engaging in "corporate activities," such as "building inventory" for the "holiday season." *See* Mot. at 17-18. In fact, the Circuit has now held that Defendants' statements about having built up inventory ahead of the holiday season were *not* "representation[s] about the overall sustainability of Peloton's inventory levels beyond that season." *Peloton*, 153 F.4th at 299. None of the statements that Defendants claim revealed the truth remotely informed investors that "by August 2021, Peloton had *three months* of excess inventory sitting at shipping ports" and was "*already* engaging in 'the sale of excess inventory at discounted prices.'" *Id.* at 301 (citing ¶189).

Defendants' argument also fails because, at bottom, it is a thinly veiled "truth-on-the-market argument." The Second Circuit has long held that a "[t]he truth-on-the-market defense is

---

[4] Defendants did not, as they assert (Mot. at 20), make their false statements in the Risk Disclosures "by themselves." On the same day that Peloton issued one of its false and misleading "Risk Disclosures," Foley misled investors by representing that the Bike's price cut was offensive and not forced by the need to shed excess inventory. ¶187.

16

intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *See, e.g.*, *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 142 (2d Cir. 2025). To prevail on a truth-on-the-market defense, Defendants must show that the true facts were "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements" to investors. *Id*. Defendants' burden in establishing this defense is "extremely difficult, perhaps impossible, to meet," even "at the summary judgment stage." *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *21 (S.D.N.Y. Sept. 30, 2021).

Defendants cannot make such a showing here. To the contrary, the facts alleged show that investors did *not* know the true facts during the Class Period. Indeed, when the truth was ultimately revealed, Peloton's stock price crashed by more than *35%* in a single day and again by *24%* two months later upon further revelations. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("claim that the market knew or should have known . . . is [also] belied by the precipitous drop in . . . securities prices that followed immediately after" the corrective facts were disclosed). Additionally, analysts expressed outrage when the truth was disclosed, specifically questioning "Management credibility." ¶233. These facts cannot be squared with Defendants' "everyone knew the truth" argument—and certainly not at the pleading stage.

This case is nothing like those cited by Defendants. In Defendants' cited cases, the courts *never* found that *any* of the challenged misstatements were false or misleading. For example, in *Gabelli Asset Fund v. Garret Motion Inc.*, 2024 WL 1653451 (2d Cir. Apr. 17, 2024) (cited at Mot. at 17), the court found that the defendants warned investors of the risks *before* they had materialized—*not* after they had materialized, as is the case here. Likewise, in *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012) (cited at Mot. at 18, 20), the court

did not find *any* of the defendants' statements to be false or misleading; to the contrary, the court found that the defendants had disclosed the *exact* facts plaintiffs alleged were concealed throughout the class period. Here, in stark contrast, the Circuit specifically found that Defendants *did* make misstatements, even when measured under the rigorous PSLRA standards. And Defendants do not cite any law or case (nor is there any) that says, for an inference of scienter to exist, a court must find that *all* of Defendants' statements were false or misleading.

*Fourth*, Defendants wrongly contend (Mot. at 17, 20) that they could not have acted with scienter because they disclosed that the COVID pandemic made it difficult to forecast their inventory needs. But as the Second Circuit found, Defendants' false and misleading statements at issue did *not* concern forecasts—rather, they were statements of presently existing facts. *Peloton*, 153 F.4th at 300-01 ("Peloton was *already* engaging in the sale of excess inventory at discounted prices."). Moreover, the impact of COVID on Peloton's business did not permit Defendants to lie about the true purpose of their 20% price cut; nor did it allow them to tell investors that Peloton did not have excess inventories when, in fact, it did. *Id.* at 301.

*Fifth*, Defendants contend (Mot. at 19-20) that they could not have acted with scienter because the truth was revealed so soon after their misrepresentations. But Foley concealed the fact that Peloton's costly excess inventory was the true reason for the 20% price discount on August 26, 2021, which was nearly *five months* before the truth was revealed. Courts accept periods of much shorter length. *See In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 750 (S.D.N.Y. 2025) (sustaining an 18-week class period); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) (sustaining a shortened class period of 47 days). Additionally, Defendants did *not* voluntarily disclose the full truth; rather, the

18

full truth was disclosed at the end of the Class Period by a *CNBC* investigative journalist, who issued a report based on leaked, internal Peloton documents. ¶¶229-30.

It is of no moment that Defendants purportedly believed they could solve the belatedly disclosed inventory problem. Courts have repeatedly held that defendants act with scienter where, as here, they misrepresent and omit facts in the hopes that a problem (here, excess inventory) will resolve itself or that a remedy will present itself before the truth is disclosed. As courts have explained, "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is *not* inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *11 (S.D.N.Y. 2023); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *13 (S.D.N.Y. Apr. 14, 2020) (finding scienter where Defendants "hoped that PSG would uncover new sources of future revenue and thus that the risk of lower future sales . . . would not materialize") (citing *Tellabs*, 513 F.3d at 710). While Defendants may have hoped that a 20% price cut would successfully reduce the Company's inventory glut, this did not permit them to lie to investors about the purpose of the price cut or the fact that Peloton was drowning in inventory.

***Sixth***, Defendants mistakenly assert (Mot. at 20-21) that the Court should disregard the accounts of the confidential witnesses, arguing they supposedly "never 'communicated' with the Individual Defendants" and were not "'privy to' their knowledge." To the contrary, multiple witnesses communicated directly with the Individual Defendants, and the Complaint details the information conveyed to those Defendants and specifies the data they tracked. ¶¶30, 61. For example, CW1 participated in weekly meetings with Woodworth and Lynch on Wednesdays, during which the inventory issues were discussed regularly along with Google Slides that displayed the data. ¶27. CW1 also detailed how Woodworth and Lynch received follow-up reports

19

with action items via email after monthly supply chain meetings that they attended. ¶29. CW10 described how he sat next to Foley for years and knew from his time working with Foley that he checked the Looker reports regularly, which provided key data and analytics of the sale of the Company's inventory. ¶61. These accounts are further corroborated by reports from other witnesses who detailed monthly meetings where the Company's excess inventory issues were discussed with Woodworth, Foley, and Lynch. ¶¶42, 46. These witnesses detailed the information that Defendants had access to, which included Looker, NetSuite, Scale, and Tableau reports that specifically tracked inventory and sales. ¶¶40, 61-62, 68, 125-28, 183(ii), 195(ii), 199(iii), 207(i), 211(iii)-(iv). Defendants mistakenly ask the Court to discount "allegations from 'a cadre of confidential informants' contradict[ing] [their] statements.'" *Peloton*, 153 F.4th at 300.

*Finally*, Defendants' counterfactual narrative is not supported by the facts in the Complaint or the law. *See Tellabs*, 551 U.S. at 309 ("[C]ourts must, as with any motion to dismiss. . ., accept all factual allegations in the complaint as true."). Defendants argue (Mot. at 22) that the more compelling inference is that Peloton's forecasts proved to be wrong. But, as the Second Circuit has held, this case does ***not*** concern forecasts. *Peloton*, 153 F.4th at 300-01. Rather, this case concerns Defendants' misstatements of present fact: Peloton's inventory was ***already*** excessive by August 2021, and Defendants were ***already*** selling the Bike at a discount to shed that excess. *Id*. This, the Second Circuit held, rendered Defendants' statements false statements of ***then existing facts***. *Id*. Nor does Barry McCarthy's post-Class Period statement (Mot. at 23) attempting to find the silver lining in the "tailwind" that might result from Peloton's excess inventory show that Defendants lacked scienter when they made their misstatements covering up the problem. This isolated statement also does not negate McCarthy's other statements attesting to the alarming state of affairs at Peloton when he took over the helm from Foley. ¶¶240-42.

20

In sum, the Complaint is supported by over thirty witness accounts and states in detail the information and real-time reports that Defendants received contradicting their false statements. These facts create a strong inference that Defendants knew Peloton had amassed a glut of excess inventory, and that the true purpose of the 20% price cut was to reduce inventory levels. At minimum, these accounts establish that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor"—which is enough to establish scienter in this Circuit. *See Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 36 (S.D.N.Y. 2019).

## C.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

On a motion to dismiss, all that is needed to allege loss causation is "some indication of the loss and the causal connection that the plaintiff has in mind." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018). Loss causation is not subject to a "heightened pleading standard." *Gimpel*, 156 F.4th at 151. Rule 8's less stringent pleading requirements apply. *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011). "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016). Partial disclosures can satisfy loss causation. *Freudenberg*, 712 F. Supp. 2d at 202. And a corrective disclosure need not be "a 'mirror image' tantamount to a confession of fraud." *Id.*

The Complaint satisfies this standard, alleging that declines in Peloton's stock price followed the disclosure of negative news regarding demand and inventory. As alleged, the truth––that Peloton had amassed enormous quantities of excess inventory—was slowly revealed to investors through disclosures made between November 4, 2021 and January 20, 2022. *See* ¶¶219-

35. And Peloton's stock price dropped with each disclosure. ¶225 (drop from $86.06 to $55.64), ¶235 (drop from $31.84 to $24.22). At the motion to dismiss stage, this suffices to plead loss causation. *See Gimpel*, 156 F.4th at 151 (allegations that company's stock price dropped following negative company disclosures sufficient to plead loss causation).

Peloton's November 4, 2021 disclosure—that it had reduced its revenue guidance for fiscal year 2022 by approximately $1 billion because of excess inventory (¶¶219-20)—was the "tip of the iceberg" "in a series of revelations which would ultimately expose" the falsity of Peloton's statements. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008). In particular, the facts disclosed in Defendants' November disclosure contradicted their August statements that the price reduction of the Bike was "offensive" (¶187), and that any failure to accurately forecast excess inventory remained a hypothetical (¶214).[5] And analysts agreed that the November disclosure revealed the falsity of Defendants' prior statements regarding excess inventory. *See* ¶222 (Jefferies remarking that Peloton was "stuck with dying demand, bloated inventory, bloated cost structure"); *see also* ¶233.[6]

---

[5] Defendants claim that Plaintiffs allege that the November 2021 risk disclosure statement, "***If*** we fail to accurately forecast consumer demand, we ***may*** experience excess inventory levels . . .," ¶214, was corrected by the same-day disclosure of reduced revenue guidance. *See* Mot. at 23-24. Not so. Plaintiffs do not allege that the November 4 announcement of reduced revenue guidance was itself a misstatement, but rather that the January 20, 2022 news that Peloton planned to pause production of the Bike, had already halted production of the Bike+ months earlier, and faced a "significant reduction" in demand (¶¶229-30) corrected the November misstatement. Defendants' authority, *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024) (*see* Mot. at 24), is thus inapt because plaintiffs there erroneously alleged that a misrepresentation itself constituted a partial corrective disclosure.

[6] The cases Defendants cite for this point are distinguishable. *See* Mot. at 24. In *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 267 (S.D.N.Y. 2005), the plaintiffs did not allege ***any*** corrective disclosure as to the defendants' purported scheme. In *Wallace v. IntraLinks*, 2013 WL 1907685, at *9-10 (S.D.N.Y. May 8, 2013), the court held that the revised projection disclosure did not disclose accounting practices. In *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012), the alleged disclosures did not correct any misstatement. Unlike in those cases, here, Defendants' false statements were of presently existing facts, and Peloton's November 2021 announcement slashing guidance was attributed to ***excess inventory*** and thus linked to Defendants' earlier misstatements, *i.e.*, "price drop with B1 was absolutely offensive" (¶187), and "***we may experience excess inventory levels*** …, which may result in … the sale of excess inventory at discounted prices," (*Peloton*, 153 F.4th at 301; ¶¶220-21, 214).

Further, the November 5, 2021 news, that Peloton's inventory had increased to $1.27 billion, partially corrected Peloton's August statements that Peloton "*may* experience excess inventory levels" (¶214), and that the "price drop with B1 was absolutely offensive" (¶187). At the time the August 2021 statements were made, investors did not know that Peloton had *$1.27 billion* worth of unsold inventory, or that Peloton was burning $700 million in cash just to manage the excess inventory, nor did investors know that the purpose of the price reduction was to reduce excess inventory. ¶¶218, 223, 242. And, contrary to Defendants' arguments (Mot. at 24), statements that Peloton was "continuing to invest in inventory" did not rectify their August statements because the former were generic, did not disclose the truth about inventory levels, and were not "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d. Cir. 2000).[7] Additionally, that Peloton's stock price declined by 35% on November 5 alone demonstrates the dissemination of previously undisclosed information. *See Vivendi*, 838 F.3d at 261-62.[8]

Finally, the Complaint links the January 2022 news that Peloton was pausing production to Defendants' prior falsehoods. *See Bristol Myers*, 586 F. Supp. 2d at 164-65. The cases Defendants cite contain factual shortcomings not present here. Mot. at 25. In *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 463, 471 (E.D.N.Y. 2020), the company's stock price *increased* after the news alleged as corrective, so the plaintiff resorted to selecting several

---

[7] Both *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 77 (2d Cir. 2013) and *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019), are inapposite because the news plaintiffs alleged as corrective were mere negative opinions about the companies based on valuations that could be conducted using already publicly available information. *See* Mot. at 24.

[8] Defendants argue that allegations concerning the percentage of Peloton's unsold inventory contradict Peloton's SEC filings. *See* Mot. at 25. Not so. This figure was derived from Peloton's SEC filings. *See* ¶223. In any event, whether the proportion of finished products reveals unsold inventory is a factual dispute best reserved for the jury. *See In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, at *13-14 (E.D.N.Y. Mar. 31, 2007).

unrelated announcements of the company's financial performance that did result in stock drops in a futile attempt to salvage loss causation. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014) is similarly inapt because there, the purported revelatory news "related[d] to ***other*** negative information about the company" not the facts underpinning defendants' alleged misrepresentations.  Here, the January 2022 news regarding inventory glut, inventory-driven costs, a production halt, and the mismatch between inventory and demand line up with the facts underpinning the alleged misrepresentations. ¶¶228-35.[9]

### D.   POTENTIAL STANDING ISSUES DO NOT BEAR ON DISMISSAL

Defendants' standing arguments fail. To start, Defendants do not dispute (nor could they) that Plaintiff City of Hialeah purchased Peloton stock in December 2021 (ECF 92-1) and has standing under the current Class Period. *See Zornberg v. NAPCO Sec. Techs., Inc.*, 778 F. Supp. 3d 516, 530 (E.D.N.Y. 2025) (allowing case to proceed where additional plaintiff had standing to bring claims that lead plaintiff did not). And one of the benefits to the proposed class from the service of an additional plaintiff, like Plaintiff City of Hialeah here, is that it has standing to assert claims on behalf of the class where a lead plaintiff may not. *See Lumen v. Anderson*, 2011 WL 3794144, at *2 (W.D. Mo. Aug. 24, 2011) ("The timing for compliance with the PSLRA necessarily creates a substantial risk that a lead plaintiff will be appointed who does not have standing to assert all of the claims, so the lead plaintiff is permitted to designate additional plaintiffs to serve as class representatives."); *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) (declining to adopt a "per se" rule that a class cannot be certified where a lead plaintiff lacks standing for certain claims because an additional plaintiff can establish standing for those claims).

---

[9] Because the Complaint adequately alleges that the Management Defendants were "culpable participants" in the fraud, they are liable as control persons under §20(a). *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 149-50 (S.D.N.Y. 2021).

Indeed, class periods are often truncated as a result of motions to dismiss, class certification, and summary judgement, well after the lead plaintiff process is complete. There is no way at the lead plaintiff stage for movants or their counsel to anticipate the twists and turns of the litigation to come. In circumstances similar to those here, the weight of authority provides that Defendants' standing argument is premature.[10] Robeco and City of Hialeah have guided this case through an intensive investigation, the filing of several complaints, motions to dismiss thereon, and even an appeal. Changing course now "would significantly interfere with the timely and orderly processing of securities' law claims because the decision to appoint lead counsel is made before any claims are considered and before a full analysis of Rule 23 is conducted." *See Lumen*, 2011 WL 3794144, at *2 (rejecting defendants' argument that approval of a lead plaintiff is only valid to the extent the lead plaintiff has standing to assert the claims in question); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 17884165, at *9 (S.D.N.Y. Dec. 23, 2022) (deferring adequacy assessments to class certification stage). And, even if this Court were to certify a class based on a shortened class period, such "does not mean that the parties cannot at a later date move this Court to expand the Class Period," should additional statements "later be found to be actionable based on information obtained in discovery." *Emergent Biosolutions*, 322 F. Supp. 3d at 682.

## V.  CONCLUSION

For these reasons, Defendants' renewed motion to dismiss should be denied.[11]

Dated:  November 17, 2025                    Respectfully submitted,

                                                         */s/ Karin E. Fisch*
                                                         _____

---

[10] Defendants cite *Gurary v. Winehouse*, 235 F.3d 792, 799 (2d Cir. 2000) and *Wilson v. Dalene*, 699 F. Supp. 2d 534, 540 (E.D.N.Y. 2010) in support of their position that Robeco lacks standing. *See* Mot. at 25. But neither of those cases were class actions and are thus inapplicable here.

[11] The Court has not previously addressed the Complaint's scienter allegations or considered them in light of the Second Circuit's decision finding actionable misstatements. In the event that the Court grants Defendants' motion, Plaintiffs request leave to amend.

Karin E. Fisch
Cecilia E. Stein
Mica A. Cocco
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
kfisch@gelaw.com
cstein@gelaw.com
mcocco@gelaw.com

*Counsel for Lead Plaintiff Robeco Capital
Growth Funds SICAV – Robeco Global
Consumer Trends and Lead Counsel for the
Proposed Class*

Hannah Ross (HG5180)
Avi Josefson (AJ3532)
Kelly Hogan (6194526)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
kelly.hogan@blbglaw.com

Jonathan D. Uslaner (JU1942)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
2121 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 819-3481
jonathanu@blbglaw.com

*Counsel for Additional Plaintiff City of Hialeah
Employees' Retirement System*

26

**CERTIFICATE OF WORD COUNT**

I, Karin E. Fisch, hereby certify that Plaintiffs' Opposition to Defendants' Renewed Motion to Dismiss the Second Amended Complaint contains 8,633 words, exclusive of the caption, table of contents, table of authorities, signature blocks and the certificate.

Dated: November 17, 2025                                    /s/ Karin E. Fisch

27